**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
COLONIAL BANK,

        *Plaintiff*,

    v.

CHASE MORTGAGE FINANCE CORP.;
JPMORGAN CHASE & CO.; J.P. MORGAN
SECURITIES LLC; CITICORP MORTGAGE
SECURITIES, INC.; CITIMORTGAGE, INC.;
CITIGROUP GLOBAL MARKETS INC.; FIRST
HORIZON ASSET SECURITIES INC.; FIRST
HORIZON HOME LOAN CORPORATION;
ALLY SECURITIES LLC; CREDIT SUISSE
SECURITIES (USA) LLC; DEUTSCHE BANK
SECURITIES INC.; FTN FINANCIAL
SECURITIES CORP.; HSBC SECURITIES
(USA) INC.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.; RBS SECURITIES
INC.; UBS SECURITIES LLC; and WELLS
FARGO ASSET SECURITIES CORPORATION,

        *Defendants*.

No. 12 Civ. 6166 (LLS) (MHD)

**JOINT MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...........................................................................................i

TABLE OF AUTHORITIES ................................................................................... iii

GLOSSARY OF ABBREVIATIONS AND TERMS ..................................................x

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ......................................................................................................7

    A.    The RMBS Securitization and Offering Process. ....................................7

    B.    The Failure of Colonial Bank. ..............................................................9

    C.    The FDIC's Amended Complaint. .......................................................12

ARGUMENT .........................................................................................................14

I.    The FDIC's Claims are Time-Barred. .............................................................14

    A.    The FDIC's Claims Are Barred by the One-Year Statute of Limitations. ...........14

        1.    The FDIC has not pled compliance with Section 13. ................................15

        2.    Colonial had actual or constructive knowledge of all facts on which the FDIC premises its claims prior to August 14, 2008. ...............17

        3.    Other RMBS investors filed complaints making nearly identical allegations against Defendants prior to August 14, 2008. .......................27

        4.    Additional facts would have put a reasonably diligent investor on notice of the claims alleged here prior to August 14, 2008. ....................29

        5.    *American Pipe* tolling does not apply because the class claims relating to the Certificates were dismissed on standing grounds. ..............34

    B.    The FDIC's Claims Are Also Barred by the Three-Year Statute of Repose. ........36

    C.    The Extender Statute Does Not Save the FDIC's Claims. ....................................37

II.    The Section 11 Claims Fail on Numerous Additional Grounds. .......................40

    A.    The Allegations About Appraisals and LTV Ratios Fail. ....................................42

        1.    Appraisals and LTV ratios are non-actionable statements of opinion absent subjective falsity – which the FDIC does not allege. ........42

        2.    The AVM-based allegations do not state a plausible claim for many additional reasons. ..........................................................................44

B.      The Allegations About Additional Liens Fail. .......................................................49

C.      The Allegations About Owner-Occupancy Rates Fail. ...........................................51

D.      The Allegations About Departures From Underwriting Guidelines Fail. .............54

E.      The Allegations About Credit Ratings Fail. ..........................................................56

III.    The Section 15 Claims for Control Person Liability Fail. ...................................................57

IV.    The Claims Against Certain Underwriters Should be Dismissed for Lack of Standing. ............................................................................................................................58

CONCLUSION ....................................................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) .................................................................23, 24, 25, 26

*Am. Pipe & Construction Co. v. Utah*,
  414 U.S. 538 (1974).................................................................................................................34, 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................................................40

*Barrios v. Paco Pharms. Servs., Inc.*,
  816 F. Supp. 243 (S.D.N.Y. 1993).................................................................................................40

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................................40, 47, 49

*Belmont Holdings Corp. v. Sun Trust Banks, Inc.*,
  2010 WL 3545389 (N.D. Ga. Sept. 10, 2010) ......................................................................43, 57

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) ....................................................................................................20

*Boilermakers Nat'l Annuity Trust Fund v. WAMU Mortg. Pass-Through Certificates,
  Series AR1*, 748 F. Supp. 2d 1246 (W.D. Wash. 2010).........................................................35, 45

*Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*,
  419 F.3d 355 (5th Cir. 2005) ........................................................................................................39

*Cty. of Santa Clara v. Astra USA, Inc.*,
  2008 WL 5055395 (N.D. Cal. Nov. 25, 2008) ..............................................................................1

*Dodds v. Cigna Sec., Inc.*,
  12 F.3d 346 (2d Cir. 1993)......................................................................................................14, 57

*Dotson v. Griesa*,
  398 F.3d 156 (2d Cir. 2005)..........................................................................................................38

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)..........................................................................................................42

*Fasolino Foods Co. v. Banca Nazionale del Lavoro*,
  761 F. Supp. 1010 (S.D.N.Y. 1991)..............................................................................................26

*FDIC as receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)...................................................................passim

*FDIC v. Shrader & York*,
  991 F.2d 216 (5th Cir. 1993) ...........................................................................................14, 37

*FHFA v. Countrywide Fin. Corp.*,
  No. 12 Civ. 1059 (C.D. Cal. Oct. 18, 2012) ...........................................................................39

*FHFA v. UBS Americas, Inc.*, No. 12-3207 (2d Cir.)................................................................39

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994)......................................................................................................56

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)...................................................................41, 52

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)................................................................................................................59

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
  302 F.3d 552 (5th Cir. 2002) .............................................................................................43, 57

*Huddleston v. United States*,
  2012 WL 1816261 (6th Cir. May 21, 2012) ...........................................................................39

*Hutchinson v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)....................................................................................................57

*In re Barclays Bank PLC Sec. Litig.*,
  2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ..........................................................................17, 48

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012)................................................................................17, 55

*In re Colonial Ltd. P'ship Litig.*,
  854 F. Supp. 64 (D. Conn. 1994).............................................................................................35

*In re Countrywide Fin. Corp. Mortg.-Backed Sec.*,
  2012 WL 3578666 (C.D. Cal. Aug. 17, 2012)........................................................................52

*In re Craftmatic Sec. Litig.*,
  890 F.2d 628 (3d Cir. 1990).....................................................................................................38

*In re Crazy Eddie Sec. Litig.*,
  747 F. Supp. 850 (E.D.N.Y. 1990) ..........................................................................................35

*In re Deutsche Telekom AG Sec. Litig.*,
  2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)...........................................................................57

*In re Global Crossing, Ltd., Sec. Litig.,*
2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ...............................................................57

*In re IndyMac MBS Litig.,*
718 F. Supp. 2d 495 (S.D.N.Y. 2010) .............................................................passim

*In re IndyMac MBS Litig.,*
793 F. Supp. 2d 637 (S.D.N.Y. 2011) ...............................................................17, 35

*In re IndyMac MBS Litig.,*
No. 09-CV-4583 (LAK) (S.D.N.Y. Nov. 16, 2012) ...............................................36

*In re Lehman Bros. MBS Litig.,*
650 F.3d 167 (2d Cir. 2011) ...................................................................................58

*In re Lehman Bros. Sec. & ERISA Litig.,*
2011 WL 1453790 (S.D.N.Y. Apr. 13, 2011) ........................................................37

*In re Lehman Bros. Sec. & ERISA Litig.,*
684 F. Supp. 2d 485 (S.D.N.Y. 2010) .......................................................42, 45, 57

*In re Lehman Bros. Sec. & ERISA Litig.,*
No. 09-MD-2017 (LAK) (S.D.N.Y. Nov. 20, 2012) ..............................................36

*In re Merrill Lynch Auction Rate Sec. Litig.,*
704 F. Supp. 2d 378 (S.D.N.Y. 2010) ...................................................................20

*In re Morgan Stanley Info. Fund Sec. Litig.,*
592 F.3d 347 (2d Cir. 2010) ...................................................................................59

*In re Morgan Stanley Mortgage Pass-Through Certificates Litig.,*
810 F. Supp. 2d 650 (S.D.N.Y. 2011) .............................................................15, 35

*In re Morgan Stanley Pass-Through Certifiates Litig.,*
2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ..................................................22, 29

*In re Nomura Home Equity Loan v. Nat'l Credit Union Admin. Bd.,*
No. 12-606 (10th Cir. Nov. 6, 2012) ......................................................................39

*In re Salomon Analyst Level 3 Litig.,*
373 F. Supp. 2d 248 (S.D.N.Y. 2005) ..............................................................44, 45

*In re Smith Barney Transfer Agent Litig.,*
2012 WL 3339098 (S.D.N.Y. Aug. 15, 2012) ........................................................35

*In re Textainer P'ship Sec. Litig.,*
2006 WL 1328851 (N.D. Cal. May 15, 2006) ........................................................46

*In re Wash. Mut. Mortg.-Backed Sec. Litig.*,
276 F.R.D. 658 (W.D. Wash. 2011) .......................................................59

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
2010 U.S. Dist. LEXIS 106687 (N.D. Cal. Oct. 5, 2010)........................42

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
2010 WL 4117477 (N.D. Cal. Oct. 19, 2010).........................................35

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
712 F. Supp. 2d 958 (N.D. Cal. Apr. 22, 2010) ................................34, 35

*Jackson v. Broadcast Music, Inc.*,
2006 WL 250524 (S.D.N.Y. Feb. 1, 2006) ...............................................1

*Jodek Charitable Trust, R.A. v. Vertical Net Inc.*,
412 F. Supp. 2d 469 (E.D. Pa. 2006) ......................................................38

*Kruse v. Wells Fargo Home Mortg. Inc.*,
2006 WL 1212512 (E.D.N.Y. May 3, 2006) ...........................................35

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).....................................................................56

*Lighthouse Fin. Group v. RBS Group, PLC*,
2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012).............................15, 17, 35

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
594 F.3d 383 (5th Cir. 2010) ..................................................................41

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*,
792 F.2d 341 (3d Cir 1986).....................................................................38

*Martin v. EVP Second Corp.*,
1991 WL 131176 (S.D.N.Y. July 9, 1991) ..............................................58

*Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*,
2012 WL 3578666 (C.D. Cal. Aug. 17, 2012)........................................26

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
843 F. Supp. 2d 191 (D. Mass. 2012) ...............................................52, 55

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
2011 WL 4389689, at *5 (C.D. Cal. May 5, 2011) .................................59

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
722 F. Supp. 2d 1157 (C.D. Cal. 2010) ..................................................35

*Merck & Co. v. Reynolds,*
  130 S. Ct. 1784 (2010) ........................................................................................17

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,*
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ......................................................42

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.,*
  2010 WL 6508190 (S.D.N.Y. Dec. 15, 2010) ...............................................34, 35

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.,*
  2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) ......................................................55

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .........................................34, 35, 42

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC,*
  720 F. Supp. 2d 254 (S.D.N.Y. 2010).............................................................42, 56

*NCUA v. Goldman Sachs & Co.,*
  No. 11 Civ. 6521 (C.D. Cal.) ..............................................................................39

*NCUA v. RBS Sec., Inc.,*
  2012 WL 3028803 (D. Kan. July 25, 2012) ........................................................39

*NCUA v. RBS Sec., Inc.,*
  No. 11 Civ. 5887 (C.D. Cal.) ..............................................................................39

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
  693 F.3d 145 (2d Cir. 2012)............................................................................35, 60

*O'Melveny & Myers v. FDIC,*
  512 U.S. 79 (1994)...........................................................................................2, 14

*P. Stolz Family P'ship L.P. v. Daum,*
  355 F.3d 92 (2d Cir. 2004)..........................................................................3, 36, 37

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.,*
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)...........................................................17, 18, 29

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.,*
  681 F.3d 114 (2d Cir. 2012)...................................................................................59

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
  Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ..................................................45

*Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance
  Corp.*, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) .....................................6, 55, 59

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011) ................................................................35, 44, 56

*Price v. United States*,
   46 Fed. Cl. 640 (2000) .......................................................................................25

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010) .............................................................17

*Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.*
   2011 WL 1258504 (D. Colo. Mar. 29, 2011) ..................................................23

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010).............................................................................48

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
   547 F.3d 406 (2d Cir. 2008)..............................................................18, 21, 27

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) ..........................................................29

*Torkie-Tork v. Wyeth*,
   739 F. Supp. 2d 895 (E.D. Va. 2010) ..............................................................46

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y. 2010)...............................................4, 42, 44, 57

*Wilson v. Saintine Exploration & Drilling Corp.*,
   872 F.2d 1124 (2d Cir. 1989)...........................................................................38

*Wilson v. Venture Fin. Group, Inc.*,
   2010 WL 2028088 (W.D. Wash. May 18, 2010).............................................1

**Statutes**

12 U.S.C. § 1787(b)(14) ..................................................................................................39

12 U.S.C. § 1821(d)(14) ...................................................................................4, 36, 38

12 U.S.C. § 4617(b)(12) ..................................................................................................39

15 U.S.C. § 77k(a)(5) .......................................................................................................59

15 U.S.C. § 77m ...............................................................................................3, 14, 17, 36

15 U.S.C. § 78o-7 ...............................................................................................................7

28 U.S.C. § 2401 ...............................................................................................................39

**Rules**

17 C.F.R. § 229.1121(a) ...................................................................................................20

17 C.F.R. § 240.17g-1 .........................................................................................................7

**Other Authorities**

Black's Law Dictionary (9th ed. 2009) .............................................................................47

FDIC, Docket. No. 2010-0018, "Interagency Appraisal and Evaluation Guidelines," Final
    Guidance, 75 Fed. Reg. 77450, 77455, 77459, 77468-69S (Fed. Reg. Dec. 10, 2010)............45

USPAP Advisory Opinions, 2012-2013 Edition, Advisory Opinion 18 .......................................46

## GLOSSARY OF ABBREVIATIONS AND TERMS

| | |
|---|---|
| **AC:** | Amended Complaint |
| **AVM:** | Automated valuation model |
| **Certificate(s):** | One or more of the mortgage-backed pass-through certificates that Colonial allegedly purchased from some of the Defendants, and on which the FDIC bases its claim in this action |
| **CLTV:** | Combined loan-to-value ratio |
| **Distribution Reports:** | Monthly remittance reports published pursuant to SEC Regulation AB that that contain detailed information about the financial performance of the MBS Certificates and their underlying mortgage collateral |
| **EPD:** | Early payment default |
| **Extender Statute:** | 12 U.S.C. § 1821(d)(14): The statute of limitations for actions brought by the FDIC as conservator or receiver |
| **Loan Tape:** | A compilation of information from individual loans in the securitization's collateral pool providing various data points, such as property location, outstanding principal, original LTV, property type, and owner-occupancy status |
| **LTV:** | Loan-to-value |
| **MWL:** | Mortgage warehouse lending |
| **Offering(s):** | Any of the 11 RMBS offerings from which the FDIC alleges that Colonial purchased the Certificates (*see* Schedules 1-11 to the Amended Complaint) |
| **Offering Documents:** | Registration Statements, Prospectuses and Prospectus Supplements for the Offerings |
| **P.** | Prospectus |
| **P.S.** | Prospectus Supplement |
| **RMBS:** | Residential mortgage-backed securities |
| **USPAP:** | Uniform Standards of Professional Appraisal Practice |

x

**CMALT 2007-A3:**      CitiMortgage Alternative Loan Trust, REMIC Pass-Through
                        Certificates, Series 2007-A3

**CMALT 2007-A2:**      CitiMortgage Alternative Loan Trust, REMIC Pass-Through
                        Certificates, Series 2007-A2

**CMALT 2007-A5:**      CitiMortgage Alternative Loan Trust, REMIC Pass-Through
                        Certificates, Series 2007-A5

**CHASE 2007-S4:**      Chase Mortgage Finance Trust, Multi-Class Mortgage Pass-
                        Through Certificates, Series 2007-S4

**CMSI 2006-6:**        Citicorp Mortgage Securities Trust, REMIC Pass-Through
                        Certificates, Series 2006-6

**FHAMS 2007-FA1:**     Alternative Mortgage Securities Trust, Mortgage Pass-Through
                        Certificates, Series 2007-FA-1

**FHAMS 2007-FA2:**     Alternative Mortgage Securities Trust, Mortgage Pass-Through
                        Certificates, Series 2007-FA2

**RALI 2007-QS3:**      Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-
                        Through Certificates, 2007-QS3

**RFMSI 2007-SA4:**     Residential Funding Mortgage Securities I, Inc., Mortgage Pass-
                        Through Certificates, Series 2007-SA4

**WFMBS 2007-4:**       Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-
                        Through Certificates, Series 2007-4

**WFMBS 2007-7:**       Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-
                        Through Certificates, Series 2007-7

*"Aggressive underwriting during periods of hyper real estate market growth."*

*"Inadequate and/or insufficient financial analysis to properly assess the borrower's repayment capability."*

*"Weak appraisal reviews, including the failure to . . . adopt a more skeptical view when reviewing market-based appraisals and validating appraisal assumptions."*[1]

## PRELIMINARY STATEMENT

These are not just allegations that the Federal Deposit Insurance Corporation ("FDIC")

levels at Defendants in an attempt to recoup losses on residential mortgage-backed securities

("RMBS") purchased by Colonial Bank ("Colonial"). These are the findings that the FDIC made

about Colonial's own mortgage lending practices when the FDIC took over that failed institution

in August 2009. Before entering receivership, Colonial was an Alabama bank with $25 billion in

assets that actively originated and sold mortgage loans and invested in RMBS. After the FDIC

seized Colonial for engaging in "unsafe and unsound banking practices," it published a *post*

*mortem* report, entitled "Material Loss Review," that analyzed the causes of Colonial's failure.

(*See* Ex. 1). In its Material Loss Review, the FDIC summarized Colonial's history of extending

easy credit to mortgage borrowers "during periods of hyper real estate market growth" with

"insufficient financial analysis to properly assess the borrower's repayment capability." (Ex. 1 at

9). The FDIC also found that Colonial originated mortgages based on suspect property

appraisals and failed to adopt an appropriately "skeptical view" of the assumptions and data

---

[1] Ex. 1 at 9 (Material Loss Review of Colonial Bank, Montgomery, Alabama, Office of Inspector General, FDIC, Report No. MLR-10-031 (Apr. 2010)). All citations to exhibits are to the exhibits attached to the Declaration of Andrew T. Frankel.

The Material Loss Review is publicly available and judicially noticeable. *See Wilson v. Venture Fin. Group, Inc.*, 2010 WL 2028088, at *11 (W.D. Wash. May 18, 2010) (taking judicial notice of FDIC material loss review because "[t]he Loss Review is a public report of the FDIC's Office of Inspector General"); *see also Jackson v. Broadcast Music, Inc.*, 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006); *Cty. of Santa Clara v. Astra USA, Inc.*, 2008 WL 5055395, at *2 (N.D. Cal. Nov. 25, 2008).

incorporated therein.  (*Id.*)  Moreover, the FDIC found that, rather than reducing its RMBS holdings once the housing market began to deteriorate, Colonial actually *increased* its holdings, including by purchasing the 11 RMBS certificates (the "Certificates") at issue in this lawsuit.

Now, standing in Colonial's shoes, the FDIC brings this lawsuit under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") in an effort to recover Colonial's losses from its RMBS purchases – purchases Colonial made in the summer and fall of 2007, after home prices had already begun their precipitous and unprecedented decline.  In this action, the FDIC contends that the registration statements, prospectuses, and prospectus supplements (collectively, "Offering Documents") for these RMBS Certificates misrepresented the credit quality of the underlying mortgage loans by, among other things, failing to disclose that the mortgage lenders did not follow their own mortgage underwriting guidelines, extending mortgages to borrowers without adequately ensuring their ability to repay, and using inflated appraisals to calculate the mortgages' loan-to-value ("LTV") ratios.  In other words, the FDIC alleges that Defendants failed to disclose to Colonial the very lending practices the FDIC found Colonial itself engaged in prior to its failure.

Because the FDIC, acting as receiver, "steps into the shoes" of Colonial, "any defense good against the [bank] is good against the [FDIC]."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994).  Thus, the FDIC's lawsuit, if allowed to proceed, would be barred by a host of defenses arising from Colonial's own conduct, such as estoppel, unclean hands, and *in pari delicto*.  But because, according to the FDIC, Colonial itself engaged in the same mortgage origination and lending practices that are alleged here, the FDIC cannot show that Colonial was misled about the quality of the mortgage loans backing its Certificates.  The FDIC's claims are also doomed by the fact that Colonial purchased its Certificates in the middle of the worst

2

housing and financial crisis since the Great Depression, which forecloses the FDIC's argument that Colonial's losses were caused by alleged misrepresentations rather than the broad macroeconomic forces that affected virtually the entire RMBS market.  But the Court need not reach any of these issues: even after the FDIC amended its complaint in response to Defendants' initial Motion to Dismiss, its pleading continues to suffer from threshold deficiencies that compel dismissal as a matter of law.

**Untimeliness.**  The FDIC's claims are time-barred under both the 1933 Act's one-year statute of limitations and its three-year statute of repose.  15 U.S.C. § 77m.  It is undisputed that the statute of limitations bars all claims that expired before the FDIC's receivership began on August 14, 2009 – including 1933 Act claims accruing more than one year earlier.  Thus the FDIC's 1933 Act claims are untimely because, according to the FDIC's own allegations, a reasonably diligent investor – and certainly a sophisticated mortgage lender and RMBS investor like Colonial – should have discovered its claims before August 14, 2008.  (*See* Section I.A, *infra*).  Indeed, the FDIC contends that Colonial possessed "strong evidence" of the alleged misrepresentations within six months of the date of each Offering.  (AC ¶ 93, 96).  And while Colonial took no action, numerous other investors filed substantively similar RMBS complaints in 2007 and early 2008 against many of the same Defendants the FDIC belatedly names in this lawsuit, demonstrating that Colonial would have been equally able to do so.

Apart from the statute of limitations, the FDIC's claims are also independently barred by the "absolute" three-year statute of repose applicable to 1933 Act claims because the FDIC waited five to six years after the RMBS offerings to file this action.  (*See* Section I.B, *infra*); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 103 (2d Cir. 2004) ("The three-year period is an absolute limitation which applies whether or not the investor could have discovered the

violation."). The FDIC's untimely claims are not saved by the so-called FDIC "Extender Statute," 12 U.S.C. § 1821(d)(14), because (i) the statute of limitations had already expired by the time the FDIC became receiver, and there is no dispute that the Extender Statute does not revive stale federal claims; (ii) the Extender Statute does not apply to statutes of repose; and (iii) the Extender Statute does not apply to federal claims under the 1933 Act.  (*See* Section I.C, *infra*).[2]

**Failure to State a Claim.**  In addition to being untimely, the FDIC's Amended Complaint also fails to state a claim.  The FDIC does not plead any facts about the Defendants it has sued, the mortgage origination practices that Defendants employed, or the appraisal practices that Defendants utilized.  Instead, the FDIC rests its Amended Complaint almost entirely on the computerized and statistical analysis of a backwards-looking automated valuation model ("AVM").  According to the FDIC, this computerized retrospective analysis is sufficient to support its allegations that Defendants made materially false statements about appraisals, LTV ratios, credit ratings, and other matters.  The FDIC is wrong for a host of reasons:

*First*, the FDIC's allegations about appraisals and LTV ratios are legally insufficient. (*See* Section II.A, *infra*).  Appraisals and LTV ratios – like all estimates of value – are statements of *opinion* and are not actionable unless the opinion was not genuinely held and thus deliberately misrepresented.  *See*, *e.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).  Here, the FDIC does not even attempt to allege subjective falsity.  Rather, the Amended Complaint explicitly *disavows* any such allegation.

---

[2] As noted below, the Second Circuit is currently considering whether a similar extender statute extends the repose period for 1933 Act claims in an expedited appeal that was argued on November 26, 2012.

Based solely on its backwards-looking AVM, the FDIC contends that appraisals were overstated.  As the FDIC well knows, however, an AVM's output, just like the appraisals themselves, constitutes a non-actionable opinion.  The FDIC's AVM based allegations fail for the additional reason that an AVM is simply another method of valuing a property, and the FDIC has provided no reason – and certainly no "plausible" reason – to suppose that its hindsight AVM, which is preprogrammed to deem "false" every offering document ever issued in a declining real estate market, is more reliable than the actual appraisals performed at the time of origination or, in some cases, the actual sale prices of the mortgaged properties.  To be sure, the FDIC says *virtually* nothing about how its model works and therefore provides no "plausible" basis on which to infer that the AVM's output is inconsistent with the Offering Documents.  Moreover, the FDIC's inclusion of purchase money loans in its AVM analysis makes the analysis fundamentally flawed.  Thus the FDIC's reliance on its AVM in this case does not support its claims and is nothing more than impermissible pleading by hindsight.

*Second*, the FDIC's few allegations that are not based on its computer model likewise fail to state a claim.  (*See* Sections II.B-E, *infra*).  For example, the FDIC's allegation that there were undisclosed, additional liens on some of the properties fails because the FDIC admits that any such liens were put on the properties *after* the originations of the loans that back the Certificates.  Further, the allegations that the mortgage originators abandoned their underwriting guidelines are either unsupported or too conclusory to support its claims.  Rather than plead facts, the FDIC relies on the default rates of the underlying loans as evidence that originators abandoned their underwriting guidelines.  But such allegations are insufficient to state a "plausible" claim, because allegedly poor loan performance "could [have been] caused by any number of broad economic factors besides . . . deviations from descriptions in the offering documents," and does

not "establish that the[] offering documents contained material misstatements and omissions." *Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012).

Moreover, the Offering Documents made robust disclosures of the very risks that the FDIC now cites as the basis for its Section 11 claims.  They expressly disclosed, for example, that originators could, and did, depart from their underwriting guidelines (Ex. 2); that the underlying loans may not conform to the descriptions contained in the Offering Documents (Ex. 3); that the LTV figures referred only to the amount of the subject mortgage at the time of origination, and did not encompass other mortgages that might be placed on the property (Ex. 4); and that occupancy information was based on representations by the property owners at the time of origination, with no guarantees against borrower fraud (Ex. 5).  In addition, the majority of the Offering Documents disclosed that there could be "no assurance" of the accuracy of any appraisals.  (Ex. 6).  Such disclosures plainly undercut the FDIC's allegations that the Offering Documents were misleading, especially to an investor like Colonial that had first-hand knowledge of the alleged mortgage origination practices at issue here.

*Third*, the Amended Complaint fails to state a claim for control person liability under Section 15 of the 1933 Act, both because it fails to allege a primary violation of the Act, and because its allegations of control consist entirely of conclusory boilerplate, not facts.  (*See* Section III, *infra*).

*Finally*, claims against certain Defendants must be dismissed on statutory standing grounds because those Defendants did not act as underwriters for the Certificates purchased by Colonial.  (*See* Section IV, *infra*).

In short, the Amended Complaint suffers from numerous incurable legal defects, and should be dismissed in its entirety with prejudice.[3]

## BACKGROUND

### A.      The RMBS Securitization and Offering Process.

In the summer and fall of 2007, Colonial purchased the 11 RMBS Certificates at issue in this litigation, investing over $393 million in the residential housing market at a time when home prices already were falling dramatically.[4]  RMBS, also known as residential mortgage-backed pass-through certificates, are fixed-income investments tied to the residential real estate market.

In a typical mortgage securitization, a mortgage lender or aggregator sells hundreds or thousands of home loans it has originated or acquired to an entity that will act as the sponsor for the securitization.  (AC ¶¶ 25-27).  The sponsor may be an affiliate of the originator or a third-party financial institution.  The sponsor then "pools" the mortgage loans and transfers them to a "depositor," which deposits them into a trust.  The trust issues certificates, which are backed by the pool of mortgages held by the trust, and sells them to underwriters, which in turn sell them to sophisticated institutional investors such as Colonial.  The certificates entitle the investors to a portion of the income stream generated by the homeowners' monthly mortgage payments.  (*Id.*)

The incoming cash flows are usually divided into "tranches" corresponding to different certificate classes in an RMBS offering.  (AC ¶ 29).  Tranches differ based on the priority of payment, the degree of risk, the yield to investors, and the credit rating of an independent and nationally recognized rating agency.  *See* 15 U.S.C. § 78o-7; 17 C.F.R. § 240.17g-1.  Generally,

---

[3] To aid the Court's consideration of this Motion, attached as Appendix A is a chart ("Grounds for Dismissal of Claims"), which is organized by securitization, and sets forth the Defendant(s) associated with each Offering and the corresponding grounds for dismissal.

[4] Colonial appears to have purchased all of the Certificates in the secondary market, approximately one to six months after each was first offered for sale.

the certificates from the more senior tranches (*i.e.*, those with comparatively less risk) will pay lower yields, while certificates from subordinated tranches (*i.e.*, those with comparatively greater risk) will pay higher yields.  (AC ¶ 30).

The 11 Certificates at issue in this litigation all were registered for sale with the SEC. Issuers typically register RMBS offerings by first filing a shelf registration statement that contains general information about the issuer and allows the issuer to register securities for sale in the future, but does not contain detailed information about the securities that may be offered for sale because that information may not yet exist.  As part of the RMBS offering, the issuer subsequently files a prospectus and prospectus supplement to convey detailed information about the offering to potential investors, including information about the certificates, the pool of mortgages that backs them, and the risks associated with the offering.  The offering documents encourage investors to consider general and specific risk factors before purchasing the certificates.[5]

SEC Regulation AB requires that, after RMBS certificates are issued, specific loan information be disseminated to investors (via a website or other means) on a monthly basis.  This information takes the form of "Distribution Reports" that contain a wealth of current information about the RMBS certificates and the loan pools underlying them, including cashflows from the certificates, mortgage delinquency and default rates, and other data enabling existing and prospective investors to ascertain exactly how the certificates and the underlying mortgage collateral are performing.  (Ex. 8).  The Offering Documents directed investors to the websites where the monthly reports can be found, and this information thus was readily available to Colonial after, and in most cases before, it purchased the Certificates at issue here.  (Ex. 9; *see*

---

[5] *See* Ex. 7 (cover pages of Offering Documents warning investors to review relevant "risk factors" before purchasing certificates).

*also* Items 38(a) and (b) of Schedules to AC (generally alleging that Colonial purchased the Certificates after the initial offerings, and thus after Distribution Reports already were available)).[6]  (Ex. 9).

### B.    The Failure of Colonial Bank.

On August 14, 2009, the Alabama State Banking Department closed Colonial and the FDIC was appointed as receiver.  (AC ¶ 5).  After its appointment, the FDIC conducted a Material Loss Review to determine the causes of Colonial's failure and issued a report in April 2010. (*See* Ex. 1).

The FDIC concluded that Colonial failed because it suffered a liquidity crisis, brought on by three primary factors: "(1) bank management's failure to implement adequate risk management practices" in its investment and lending operations, including its investments in RMBS; "(2) deficiencies in loan underwriting, credit administration, and risk analysis and recognition" in the administration of its own loan portfolio; and "(3) an alleged fraud affecting its MWL [mortgage warehouse lending] operation."  (Ex. 1).  The FDIC noted that

---

[6] For two of the offerings, WFMBS 2007-4 and WFMBS 2007-7, loan level data was publicly filed pursuant to SEC Rule 433 prior to the alleged certificate purchases.  These filings provided information on the mortgages in the loan pool, such as the loan number, outstanding principal, original LTV ratio, property type, and owner-occupancy status.  Similar data was also filed for RALI 2007-QS3 and RFMSI 2007-SA4 as exhibits to SEC Form 8K.  Exhibit 10 provides excerpts of these filings for RALI 2007-QS3 and RFMSI 2007-SA4.  The documents are also available at http://www.sec.gov/edgar/ searchedgar/companysearch.html.  For other Offerings, for example FHAMS 2007-FA1 and FHAMS 2007-FA2, documents filed with the SEC indicated that the "Mortgage Loan Schedule" for each deal, which contains similar loan-by-loan data, was "available upon request from Trustee."  Ex. 11 (Excerpts of FHAMS 2007-FA1, 8-K filed 3/9/2007), at 18-19 (identifying loan-level information included in Mortgage Loan Schedule); *id*. at I-1 (Mortgage Loan Schedule was available upon request from the Trustee); Ex. 12 (Excerpts of FHAMS 2007-FA2, 8K filed 4/5/2007), at 22-23 (identifying loan-level information included in Mortgage Loan Schedule); *id*. at I-1 (Mortgage Loan Schedule was available upon request from the Trustee)).  In amending its complaint, the FDIC conceded that such information was available to Colonial by dropping its assertion that "Colonial did not have access to the loan tapes before it purchased the certificates."  (Orig. Compl., Dkt. No. 1, ¶ 35).

"[w]eaknesses in Colonial's risk management practices translated into a decline in the quality of the bank's . . . mortgage-backed securities[] and MWL operation, *as the bank's primary real estate lending markets began to deteriorate in 2007*."  (*Id.* (emphasis added)).

As illustrated in Figure 1, Colonial invested in the Certificates well after home values had begun their unprecedented decline:[7]

Figure 1



Monthly Composite Home Price Index
January 2000 – January 2012

Colonial's RMBS investments were "nearly all . . . collateralized by loans concentrated in high-growth real estate markets that eventually experienced significant market declines, such as California, Florida, Arizona, and Nevada."  (Ex. 1 at 7).  Many of the same states were heavily

---

[7] The S&P/Case-Shiller 20-City Composite Home Price Index is a publicly available index that measures the value of residential real estate in 20 metropolitan areas of the United States. *See* http://us.spindices.com/indices/real-estate/sp-case-shiller-20-city-composite-home-price-index.

represented in Colonial's own loan portfolio – a portfolio that the FDIC found was "negatively impacted when these real estate markets experienced a downturn in 2007." (*Id.* at 2). But despite "the collapse of the subprime and nontraditional mortgage markets in mid-2007," the FDIC found that "bank management was slow to recognize and react to the deteriorating market conditions." (*Id.*at 7). The FDIC added that, even though by December 2007 bank management had "noticed a 'tremendous' decline in trading volumes and liquidity for [its RMBS holdings] . . . management officials . . . did not intend to undertake any change in investment strategy." (*Id.*)

The FDIC's Material Loss Review also detailed numerous negative findings the FDIC had made (and called to Colonial's attention) in 2008 when examining Colonial as its principal regulator. By June 2008, the FDIC had identified a number of deficiencies in Colonial's underwriting of its own loan portfolio, including, *inter alia*, (i) "[a]ggressive underwriting during periods of hyper real estate market growth"; (ii) "failure to standardize underwriting and analysis practices/processes"; (iii) "[i]nadequate and/or insufficient financial analysis . . . to properly assess the borrower's repayment capability and guarantor support"; (iv) "[w]eak appraisal reviews, including the failure to ensure adjustments for rapidly changing market conditions"; and (v) "[f]ailure to obtain support or approval for loan policy exceptions." (Ex. 1 at 9).

In addition, Colonial suffered "substantial losses in its MWL [mortgage warehouse lending] operation," largely resulting from Colonial's association with Taylor, Bean & Whitaker Mortgage Corporation ("TBW"). (Ex. 1 at 10-11). TBW was Colonial's largest MWL client, and one of the largest non-depository mortgage lenders in 2008, originating more than $30 billion in mortgage loans.[8] According to the criminal indictment of TBW's chairman, beginning as early as 2002, the head of Colonial's MWL operation and others conspired to create and

---

[8] Ex. 13 ¶ 19 (*SEC v. Catherine L. Kissick*, No. 1:11-cv-215 (E.D. Va. Mar. 2, 2011) (alleging securities fraud against Colonial's former senior vice-president and head of its MWL operation)).

submit fictitious loans to Colonial, which were then held on Colonial's books as high quality assets.  (Ex. 14 ¶¶11-15).  These assets "include[d] . . . fake pools of loans purportedly being formed into mortgage-backed securities."[9]  At least six former Colonial and TBW employees have acknowledged their participation in the conspiracy.  (Ex. 15).  Colonial's participation in this fraud contributed to the liquidity crisis that precipitated its failure.  Indeed, the FDIC recently sued Colonial's outside auditors, alleging that Colonial's closure was triggered by this fraud and that its auditors are to blame for Colonial's failure.[10]  By the end of 2007, when Colonial purchased the RMBS at issue in this case, Colonial had purchased over half a billion dollars of mortgage loans that were either outright fakes or had been foreclosed, paid off, sold, or pledged to other parties.  (Ex. 16 ¶ 19).

> **C.**     **The FDIC's Amended Complaint.**

After waiting between five and six years since Colonial's purchase of the Certificates and nearly three years since its appointment as receiver, the FDIC seeks to recoup Colonial's losses by blaming them on Defendants.  Ignoring Colonial's extensive experience with and knowledge of mortgage lending practices and the risks associated with RMBS, the FDIC's own conclusions concerning the reasons for Colonial's losses, and the fact that any decline in RMBS value here coincided with an unprecedented collapse of the real estate market and the broader economy, the FDIC filed the original complaint in this action (and several others like it in courts across the

---

[9] Ex. 15 (Press Release, U.S. Dep't of Justice, *Former Chairman of Taylor, Bean & Whitaker Sentenced to 30 Years in Prison and Ordered to Forfeit $38.5 Million* (June 30, 2011)).

[10] Ex. 16 (*FDIC v. PricewaterhouseCoopers LLP. et al.*, No. 2:12-Cv-957 (M.D. Ala. Oct. 31 2012)).  Colonial's participation in the fraud also served as the basis for a shareholder class action that was filed against Colonial in February 2009.  *In re Colonial Bancgroup, Inc. Sec. Litig.*, 2:09-cv-00104-RDP-WC (M.D. Ala.).

country) against the underwriters and certain sponsors of Colonial's RMBS certificates.[11]   On

November 13, 2012, Defendants filed a Motion to Dismiss the original complaint.  The FDIC

responded by filing the Amended Complaint on December 4, 2012.  The FDIC's Amended

Complaint, however, has failed to cure any of the threshold pleading deficiencies that compel

dismissal as a matter of law.

   As in the FDIC's other pleadings, the Amended Complaint alleges that Defendants made

misrepresentations and omissions relating to the credit quality of the loans that backed the

Certificates.  Specifically, the FDIC alleges that the Offering Documents were false or

misleading because (i) the LTV ratios of the mortgages were allegedly understated due to

properties being appraised during the housing boom for more than they were "really" worth; (ii)

the LTV ratios were understated for the additional reason that there were undisclosed liens on

some of the properties; (iii) owner-occupancy rates allegedly were overstated because some

borrowers did not live in the properties that their loan applications said they would occupy; (iv)

the Offering Documents did not disclose that mortgage originators had allegedly abandoned their

mortgage underwriting guidelines; and (v) the credit ratings conferred on the Certificates by

Moody's, S&P and/or Fitch (nationally recognized credit rating agencies) were allegedly higher

than they should have been.

   Drawing virtually no distinctions among the various unrelated Defendants, the FDIC

bases these allegations not on any substantial pre-suit investigation, but rather on after-the-fact

analyses of publicly available information that, according to the FDIC's own allegations, was

---

[11] The FDIC has filed five complaints on behalf of Colonial seeking to recoup its losses on its
RMBS investments – this one, one in California federal court, and three in Alabama state court.
These are just a few of the RMBS complaints the FDIC has filed as receiver for various failed
banks.  Appendix B provides a list of nearly verbatim complaints filed by FDIC in other actions.
All of the complaints are nearly identical, with differences among defendants and certificates
relegated to lengthy schedules that are appended to the stock complaint.

available to Colonial more than a year before the FDIC was appointed receiver.  The FDIC's

allegations, however, are insufficient to state a claim.

## ARGUMENT

### I.    THE FDIC'S CLAIMS ARE TIME-BARRED.

Section 13 of the 1933 Act imposes a one-year statute of limitations and a three-year

statute of repose on claims brought under Sections 11 and 15.  15 U.S.C. § 77m (limitations and

repose periods for Section 11 claims); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir.

1993) ("Since Section 15 merely creates a derivative liability for violations of Sections 11 and

12, Section 13 applies to it as well.").  The statutes of limitations and repose operate

independently; either can bar a claim and mandate dismissal.  Here, they both do.

### A.    The FDIC's Claims Are Barred by the One-Year Statute of Limitations.

Section 13 precludes a Section 11 claim from being brought more than "one year after the

discovery of the untrue statement or omission, or after such discovery should have been made by

the exercise of reasonable diligence."  15 U.S.C. § 77m.  The claims the FDIC asserts could have

been brought by Colonial by August 14, 2008, and thus were barred by the one-year statute of

limitations prior to the FDIC's appointment as receiver on August 14, 2009.  Because Section 13

rendered the claims time-barred *before* the FDIC was appointed as receiver, they remain time-

barred today; when the FDIC is appointed as receiver for a bank, it "steps into the shoes" of the

bank, such that "any defense good against the [bank] is good against the" FDIC.  *O'Melveny &*

*Myers*, 512 U.S. at 86; *accord FDIC v. Shrader & York*, 991 F.2d 216, 220-27 (5th Cir. 1993)

(holding the FDIC's claims time-barred where the bank should have known of the claims before

the FDIC receivership began); *FDIC as receiver for Strategic Capital Bank v. Countrywide Fin.*

*Corp.*, 2012 WL 5900973, at *2 (C.D. Cal. Nov. 21, 2012) (dismissing FDIC RMBS complaint

as time-barred because the bank "discovered or should have discovered" the basis for its 1933

Act claims more than one year before the FDIC was appointed to be receiver, explaining "claims [that] were not live when the FDIC was appointed receiver . . . are untimely now").

1.    The FDIC has not pled compliance with Section 13.

As an initial matter, the FDIC has failed to meet its burden of pleading facts establishing that its claims were timely filed. *Lighthouse Fin. Group v. RBS Group, PLC*, 2012 WL 4616958, at *12 (S.D.N.Y. Sept. 28, 2012) (compliance with the statute of limitations is a "substantive element of the cause of action"). Instead, the FDIC makes only the conclusory allegation that "a reasonably diligent plaintiff would not have discovered [the relevant facts] until later than August 14, 2008" because the "specific loans" and "loan files" for the mortgage loans backing the Certificates were not available. (AC ¶ 107). But the FDIC *still* does not have access to the "specific loans" and "loan files" (which contain borrowers' personal information and are not publicly available), and yet nevertheless manages to file this lawsuit. Instead, the FDIC contends that it has stated a viable claim based on a forensic review of public information using analytical tools such as an AVM. (*See* AC ¶¶ 36, 51; Section I.A.2, *infra*). Thus, the FDIC's suggestion that it needed loan files to bring a lawsuit is belied by the very existence of this lawsuit.[12]

Such boilerplate allegations are implausible and must be disregarded. In *In re Morgan Stanley Mortgage Pass-Through Certificates Litigation*, for example, the court found similar allegations inadequate to avoid the limitations bar. 810 F. Supp. 2d 650, 663 (S.D.N.Y. 2011). Holding that the allegations "failed to allege with the requisite specificity the time and circumstances of [plaintiffs'] discovery of the conduct that forms the basis of [plaintiffs'] claims," the court dismissed similar claims as untimely. *Id.* For the same reason, the FDIC's

---

[12] To the extent that the FDIC argues that it states a viable claim, Defendants disagree. But, in any event, the FDIC cannot have it both ways: either this information is needed to state a proper claim, in which case the FDIC's claims fail, or it is not, in which case the FDIC's claims are untimely.

failure to plead why the public data serving as the basis for the Amended Complaint could not have been discovered earlier requires dismissal.

The FDIC's assertion that it could not have run an AVM analysis until after August 14, 2008 because "[t]o use an AVM, one must know the addresses of the properties," and it was not until "after August 14, 2008 [that] the same vendor that provided the AVM developed a method" for divining the addresses, is similarly unavailing.  (AC ¶ 51).  The FDIC never explains why running an AVM on a property-by-property basis was necessary to discover the alleged misstatements and omissions where the FDIC alleges that it had "strong evidence" of those purported misstatements much earlier, in the form of data on early payment defaults.  (AC ¶¶ 93, 96).  This failure is particularly stark given that other RMBS investors filed complaints in 2007 and 2008 alleging the same misstatements and omissions against many of the same Defendants here without the assistance of an AVM or access to loan files.  (*See* Part I.A.4 *infra*).

In similar circumstances, the court overseeing the *Countrywide* RMBS multi-district litigation recently dismissed one of the FDIC's identical RMBS complaints.  The court there rejected the same contentions made by the FDIC here, finding that FDIC's alleged inability to obtain more specific information about the loans backing the certificates at issue did not prevent the accrual of the claims.  According to the court, "[t]he statute of limitations begins to run when the plaintiff has or should have knowledge sufficient to draft a complaint," but "[t]he source of the knowledge is irrelevant."  *Strategic Capital Bank*, 2012 WL 5900973, at *7.  Thus, where, as the FDIC's allegations also show here, information providing the basis of a claim was available more than a year before the limitations period expired, "the complaint was time-barred before . . . the FDIC took receivership."  *Id.* at *8.  As in *Strategic Capital Bank*, the FDIC has not complied with the statute of limitations pleading requirements.

16

2.     Colonial had actual or constructive knowledge of all facts on which the
       FDIC premises its claims prior to August 14, 2008.

Rather than plead facts showing why the claims could not be brought earlier, the FDIC's

own allegations establish that this action is time-barred.  Under Section 13 of the 1933 Act, the

FDIC's claims under Section 11 must be filed no later than "one year after the discovery of the

untrue statement or the omission, or after such discovery should have been made by the exercise

of reasonable diligence."  15 U.S.C. § 77m; *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch &

Co.*, 714 F. Supp. 2d 475, 479 (S.D.N.Y. 2010).  Facts placing one on inquiry notice are

sufficient to trigger the statute of limitations if in the totality of the circumstances they would

establish a probability of the alleged claim.  *In re Barclays Bank PLC Sec. Litig.*, 2011 WL

31548, at * 6 (S.D.N.Y. Jan. 5, 2011).[13]  In addition, information contained in the financial press,

mainstream media, and publicly filed documents can trigger a duty to inquire for purposes of the

---

[13] *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), does not alter the long-settled rule in this
Circuit that Section 13's statute of limitations begins running upon inquiry notice.  *See*, *e.g.*, *In
re IndyMac MBS Litig.*, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011) (noting that *Merck*'s holding
was "based on the precise language of" 28 U.S.C. § 1658(b) and therefore "does not apply" to
Section 11 claims); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341,
364-65 (S.D.N.Y. 2012) (noting that the "majority of courts in this district declined to apply
*Merck* to Section 11 claims"); *Barclays*, 2011 WL 31548, at * 6 (declining to apply *Merck* to the
1933 Act because "the Second Circuit has not yet had occasion to determine whether *Merck*
requires a change in how the Circuit interprets . . . the 1933 Act") (quoting *Merrill Lynch*, 714 F.
Supp. 2d at 480); *Lighthouse*, 2012 WL 4616958, at *12 n.11 ("[T]his Court will continue to
apply the inquiry notice standard, consistent with other courts in this district, although for
purposes of this case, it does not matter as Plaintiffs have failed to plead compliance with the
statute of limitations under either test.").

Although a minority of courts have applied the *Merck* standard in the context of Section 11
claims, *see*, *e.g.*, *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d
746, 762 (S.D.N.Y. 2012), there is no material difference between the *Merck* standard and an
"inquiry notice" standard as applied to a Section 11 action given that a Section 11 plaintiff need
not allege scienter, reliance, or loss causation.  *See Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp.
2d at 364-65.  Thus, while there is no reason for this Court to apply a "*Merck* standard" to
actions covered by Section 13, application of *Merck* to this case would lead to the same result –
dismissal of the FDIC's claims as time-barred.

statute of limitations.  *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

A reasonable investor should have known all the facts that form the basis of the claims in the Amended Complaint before August 14, 2008 – more than one year before the FDIC was appointed receiver of Colonial.  Moreover, given what was publicly known about the mortgage market before August 14, 2008, a reasonable investor had actual or constructive knowledge of the claimed misrepresentations, including the alleged misrepresentations relating to underwriting standards, LTV ratios, and appraisal values, before August 14, 2008.[14]  Indeed, the question is not close here: the FDIC has publicly found that Colonial originated mortgages pursuant to the same practices the FDIC alleges the originators used in this case.  Colonial thus had first-hand knowledge of the matters that form the basis of the Amended Complaint.

The FDIC observed that Colonial was aware or should have been aware of the collapse in the mortgage markets well before August 2008 but that Colonial management nonetheless made an intentional decision not to alter its investment strategy in these markets:

> Despite the collapse of the subprime and nontraditional mortgage markets in mid-2007, bank management was slow to recognize and react to the deteriorating market conditions.  For example, in December 2007, bank management notified the [Office of the Comptroller of the Currency] that *the bank noticed a "tremendous" decline in trading volumes and liquidity for these securities; however, management officials advised the regulator that they did not intend to undertake any change in investment strategy.*

---

[14] Distribution Reports, press coverage, ratings events, prior lawsuits, and regulatory filings referenced throughout this brief are judicially noticeable for determining that Plaintiff was on notice of its claims before August 14, 2008.  *See Staehr*, 547 F.3d at 425 (in assessing whether a plaintiff was aware of certain information in a statute-of-limitations analysis, a court may "take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents"); *Pa. Pub. Sch. Emps.' Ret. Sys.*, 2012 WL 2847732, at *21-23 n.6 (dismissing plaintiff's Section 11 claims as time-barred where defendants "rel[ied] on news articles, SEC filings, and various lawsuits to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation prior to" the limitations date).

(Ex. 1 at 7) (emphasis added).[15]  And, in fact, the FDIC acknowledges in the Amended

Complaint that Colonial had "strong evidence" of the alleged misrepresentations prior to August

14, 2008.  (AC ¶¶ 93, 96).  Thus Colonial had reason to investigate and should be charged with

actual or constructive knowledge of the facts that the FDIC now pleads.  As such, the FDIC's

claims must be dismissed as time-barred because the statute of limitations would have expired

prior to the FDIC's appointment as receiver.

Similarly, in its recently filed complaint against Colonial's accountants, the FDIC noted

that there was ample evidence of poor RMBS performance during the period that Colonial

acquired the Certificates:

> Throughout 2007 home prices were falling in regions of the country that had
> recently witnessed major booms, mortgage loan originators were suffering from
> eroding markets, homeowners with subprime and other high-rate mortgages were
> defaulting in increasing numbers and, by the summer of 2007, many markets for
> mortgage-backed securities ("MBS"), particularly securities backed by residential
> mortgage loans, had all but frozen.

(Ex. 16 at ¶ 28).  Because Colonial unquestionably had knowledge of its the 1933 Act claims

more than a year before the FDIC was appointed receiver for Colonial in August 2008, dismissal

is required.

        a.      *A reasonably diligent investor could have made the same*
                  *allegations regarding underwriting standards as evidenced by*
                  *early payment defaults prior to August 14, 2008.*

The FDIC alleges that the rate at which the mortgages backing the Certificates suffered

early payment defaults ("EPDs") is "*strong evidence*" of the mortgage originators' abandonment

of their underwriting guidelines.  (AC ¶ 93 (emphasis added)).  In making this allegation, the

FDIC necessarily takes the position that more than one year before the FDIC was appointed

---

[15] All of the RMBS at issue here were purchased by Colonial between June and October 2007.
(*See* Items 38(a) and (b) of Schedules to AC).

receiver, Colonial had strong reasons to suspect that the originators had abandoned their guidelines when issuing the loans underlying the Certificates and, accordingly, that such knowledge should have caused a reasonable investor to investigate potential claims.  Colonial's failure to take action does not toll the statute of limitations.

EPDs, by definition, occur early in the life of a securitization.  Indeed, the FDIC categorizes any loan that "became 60 or more days delinquent within six months after [it was] made" as an EPD.  (AC ¶ 93).  Thus, to the extent that such default information allows the FDIC to state a claim, it also bars the claims in this belatedly-filed action because the existence and rate of EPDs would have been readily apparent for all of the Certificates before August 2008, given that the Certificates were issued between November 2006 and June 2007.

Colonial and other investors had access to EPD rates in the monthly Distribution Reports, which are required by Regulation AB to "[d]escribe . . . the performance of the asset pool during the . . . period," including "*[d]elinquency and loss information for the period.*"  17 C.F.R. § 229.1121(a) (emphasis added).  Distribution Reports for each Offering are available to the public on websites maintained by the securitization trustees, and Colonial is thus "chargeable with knowledge of [their] contents."  *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70 (S.D.N.Y. 2000); *accord In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010) (charging plaintiffs with knowledge, at dismissal stage, of SEC mandated disclosures on issuers' websites).

As illustrated in Figure 2, the Distribution Reports, which provided detailed information about the performance of the relevant loans, made plain that defaults were steadily and dramatically rising prior to August 14, 2008.[16]

<u>Figure 2</u>

## Number of Delinquencies, Defaults, Foreclosures, Bankruptcies, and Real-Estate-Owned Properties as Percentages of the Total Loans



The percentages were compiled using data from the distribution reports for each certificate. The distribution reports are released to investors on a monthly basis and remain publicly available on the trustees' websites.

By August 14, 2008, the rate of delinquencies, defaults, and foreclosures had risen to nearly 16% for RALI 2007-QS3 and was trending above 8% for the majority of the other

---

[16] Exhibit 17 contains the portions of the Distribution Reports used to create the delinquency graph.  Because Distribution Reports are publicly available on the trustees' websites pursuant to SEC Regulation AB, they are judicially noticeable.  *See Staehr*, 547 F.3d at 425 (in assessing whether a plaintiff was aware of certain information in a statute-of-limitations analysis, a court may "take judicial notice of the fact that . . . regulatory filings contained certain information, without regard to the truth of their contents").

Certificates.  Even for Certificates that did not experience the same rate of delinquencies as

RALI 2007-QS3, the Distribution Reports disclosed marked increases in delinquencies.  For

example, while the October 2007 Distribution Report for RFMSI 2007-SA4 initially reflected

delinquencies of 1.47%, the delinquencies in the loans underlying that securitization more than

doubled by January 2008 and had increased more than five-fold by July 2008.

If, as the FDIC contends, such defaults are "strong evidence" of abandonment of

underwriting guidelines and suffice to state a claim (they are not), then they also demonstrate

that Colonial had this evidence before August 14, 2008.  *See In re Morgan Stanley Pass-Through*

*Certificates Litig.*, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) (concluding that notice

arose "well before May 2008" in part because of Distribution Reports demonstrating

delinquencies more than doubling between October 2007 and March 2008).[17]  Accordingly, the

FDIC's claims are time-barred.

> b.  *A reasonably diligent investor could have made the same*
>     *allegations regarding LTV ratios prior to August 14, 2008.*

The FDIC contends that the appraisals used to determine the LTV ratios in the Offering

Documents materially overstated the value of the properties securing the loans.  (AC ¶ 49).  The

FDIC premises this assertion on a retrospective AVM that relies on "the actual sales prices of

comparable properties in the same locale *shortly before the . . . date" the property was sold*.

(*Id.* ¶ 50 (emphasis added)).  Again, the FDIC's allegations concede that the facts underlying its

analysis were available before August 14, 2008, because the properties necessarily were sold

before the securitizations closed in 2006 and 2007.  The FDIC nevertheless contends that the

---

[17] To the extent that the FDIC's allegations do not evidence high default rates, it simply
demonstrates that the FDIC – by its own logic – has failed to state a claim.  (*See* Section II.D,
*infra*).

claims did not accrue until it chose to run its AVM analysis.  (*See id.* ¶ 51.)  The FDIC's

contentions must be rejected.

Indeed, *Allstate Insurance Co. v. Countrywide Financial Corp.* rejected this precise

argument in dismissing claims as untimely.  824 F. Supp. 2d 1164 (C.D. Cal. 2011).  In *Allstate*,

the plaintiff alleged that it had used an "industry-standard automated valuation model" to "study

. . . 19,000 individual loans" and determine that property valuations in the securitizations were

overstated.  *Id.* at 1180, 1184 n.24.  The *Allstate* plaintiff argued that it could not have pleaded its

claims "until this 'loan-level' analysis was complete in 2010."  *Id.* at 1180 & nn.20-21.

Observing that "[t]he inputs to this model would have been widely available" prior to the

limitations date, the court dismissed the claims, noting that the plaintiffs were confusing "facts"

with "analysis":

> Most of the conclusions from [plaintiff's] analysis appear to be opinions in that
> they rely upon complex and unverifiable mathematical models. . . . To the extent
> that any of the loan-level analysis' results are factual, those facts must be
> considered summaries of other, previously disclosed facts. . . . [The plaintiff]
> could have analyzed that information whenever it wished; the fact that it declined
> to do so does not toll the statute of limitations. . . .

*Id.* at 1180-81.  The court further held that "a summary statistic is available (even if not

compiled) on the date that the *underlying facts* are available."  *Id.* at 1181 (emphasis added).  In

*Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.*, the court reached the same conclusion

and dismissed claims as untimely because "simple tests could have revealed the . . . errors," and

"had [plaintiff] promptly investigated . . . , it would have readily determined that the errors were

material."  2011 WL 1258504, at *10 (D. Colo. Mar. 29, 2011).

The same result applies here.  The facts underlying the FDIC's appraisal- and LTV ratio-

related allegations were publicly available before August 14, 2008, even if the FDIC did not

analyze them until sometime after early 2010.  The FDIC's assertion that it could not have run an

AVM analysis until after August 14, 2008 confuses "facts" with "analysis," and ignores that "a summary statistic is available (even if not compiled) on the date that the *underlying facts* are available." *Allstate*, 824 F. Supp. 2d at 1181 (emphasis added).

Moreover, the FDIC's assertion is not plausible in light of its concession in its *original* complaint that "AVMs have been in widespread use for *many years*." (Orig. Compl. ¶ 49 (emphasis added)). Although the FDIC has jettisoned that allegation from its Amended Complaint, the fact remains that AVM products were marketed to secondary market RMBS investors like Colonial as early as 2007 to help them examine property values and identify potential fraud in loan pools.[18] Indeed, the FDIC's own AVM vendor, CoreLogic, has publicly stated that it "updates property information with county-recorder offices" and "has provided the relevant loan-level data and many of the tools to analyze it *since before the housing bubble*." (Ex. 18 (emphasis added)).

When a complaint's own allegations reveal that a plaintiff had knowledge of its Section 11 claims, the alleged inability to run an AVM analysis should not delay the triggering of the statute of limitations. *See Strategic Capital Bank*, 2012 WL 5900973, at *6. The FDIC cannot rely on the timing of its decision to run the AVM analysis to prevent its claims from being time-barred. Because the facts on which the FDIC bases its appraisal and LTV allegations were accessible to Colonial well before August 14, 2008, those allegations are untimely.

---

[18] *See*, *e.g.*, Ex. 19 (Glen Fest, *Mortgage Securities: Slow MBS Market Hikes Fraud Risk*, Am. Banker, Mar. 1, 2007 ("Mortgage risk technology vendors . . . are prepping for this new need with tools that can help with a second look at loans in the secondary market. CoreLogic . . . extends an investor services module to secondary buyers that builds on its automated valuation specialty to lenders.")); *see also* Ex. 20 ("Finally Catching On," Mortgage Banking (Vol. 66, Issue 4) (Jan. 1, 2006)).

>    c.    *A reasonably diligent investor could have made the same*
>          *allegations regarding additional liens prior to August 14, 2008.*

The FDIC alleges that LTV ratios were also misstated because there supposedly were

additional liens on some of the properties at the time of the securitizations in 2006 and 2007.

(AC ¶ 60).  The FDIC bases these allegations exclusively on "land records," (*id.*), which

necessarily were publicly available when the securitizations closed in 2006 and 2007.  *See Price*

*v. United States*, 46 Fed. Cl. 640, 648 (2000) ("[T]he plaintiff should have sought, and could

have discovered, the true condition of the property . . . by exercising reasonable diligence. . . .

[He] easily could have gained this knowledge by examining the publicly available land

records.").

The FDIC does not deny that land records were publicly available, but rather claims that

it could not have analyzed the relevant land records until its AVM vendor came up with property

addresses sometime after August 14, 2008.  (AC ¶ 60 & n.4).  But again, the FDIC confuses the

availability of "facts" with the completion of an "analysis."  *Allstate*, 824 F. Supp. 2d at 1180.

Thus, the FDIC's delay in analyzing the land records underlying its Amended Complaint did not

prevent the running of the statute of limitations, and its allegations about additional liens are

time-barred.  *Strategic Capital Bank*, 2012 WL 5900973, at *6.

>    d.    *A reasonably diligent investor could have made the same*
>          *allegations regarding owner-occupancy rates prior to August 14,*
>          *2008.*

The FDIC alleges that "[a] significant number of the properties in the collateral pools of

the securitization that were stated to be primary residences actually were not."  (AC ¶ 81).  The

FDIC contends that this allegation is based upon an analysis of whether homeowners received

property tax bills and other bills at the mortgaged properties or at different addresses "*six months*

*after the closing of the mortgage*," and whether the homeowners designated the properties as

"homesteads" in *land records*.  (*Id.* ¶¶ 84-85 (emphasis added)).  Since all of the securitizations

closed in 2006 and 2007, and the land records were publicly available prior to August 14, 2008,

the FDIC again concedes that its allegations are based on facts that were available to Colonial

before that date.  The FDIC's contention that it did not perform this analysis until after August

14, 2008 (*id.* at  ¶ 82) again confuses facts with an *ex post* analysis of the facts.  *Allstate*, 824 F.

Supp. 2d at 1180.  The FDIC's own delay in analyzing the facts underlying its owner-occupancy

allegations cannot toll the statute of limitations.[19]

> e.     *A reasonably diligent investor could have made the same*
> *allegations regarding credit ratings prior to August 14, 2008.*

The FDIC's allegations that the Certificates' credit ratings were too high are wholly

derivative of its other allegations.  The FDIC merely alleges that because of the purported

misrepresentations and omissions concerning LTV ratios, additional liens, underwriting

guidelines, and owner-occupancy rates, the Certificates' credit ratings should have been lower

than they were.  (AC ¶ 102(a)-(d)).  For the same reasons that Colonial could have made these

predicate allegations prior to August 14, 2008, Colonial also could have made the credit ratings

allegations before that date.  Indeed, the majority of the Certificates were put on negative watch

or outlook by one or more of the major rating agencies before August 2008, and three

Certificates even lost their AAA rating.  (*See* Appendix C).[20]  These downgrades put Colonial on

---

[19] In addition, courts have held that a supposed inability to make owner-occupancy allegations cannot delay the running of the statute of limitations because an RMBS plaintiff can state a Section 11 claim without such allegations.  *FDIC as receiver for Strategic Capital Bank*, 2012 WL 5900973, at *5-6 & n.9 (dismissing claims as time-barred partly on this basis).  Indeed, courts have rejected owner-occupancy allegations as failing to state a Section 11 claim, as discussed in more detail below.  *See*, *e.g.*, *Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 WL 3578666, at *2 (C.D. Cal. Aug. 17, 2012).

[20] Appendix C provides a chart of the rating activity prior to August 14, 2008 for the classes of Certificates purchased by Colonial, as well as each Offering's two most subordinate classes.  Ratings actions are judicially noticeable.  *See Fasolino Foods Co. v. Banca Nazionale del*

notice of the claims on which FDIC now sues.  Accordingly, Colonial could have made its credit rating allegations prior to August 14, 2008.

> ### 3. Other RMBS investors filed complaints making nearly identical allegations against Defendants prior to August 14, 2008.

Contrary to the FDIC's assertion (AC ¶ 107), a reasonably diligent plaintiff could have brought a complaint prior to August 14, 2008.  In fact, multiple investors did bring RMBS claims prior to that date, unquestionably demonstrating that Colonial was equally able to do so. Indeed, no fewer than six complaints were filed in late 2007 and early 2008 against Defendants in this action.  These complaints made the same allegations that the FDIC makes here – namely, that underwriting guidelines were abandoned and that property values, LTV ratios, credit ratings, and owner-occupancy status were misrepresented.  (*See* Appendix D).[21]  For example:

(1) In *Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.*, No. 2:07-cv-05423 (E.D. Pa.) (filed Dec. 24, 2007), RMBS investors alleged that Merrill Lynch's "representations regarding the quality of the loans in the portfolio . . . were . . . false," including with respect to "the appraisal[s] of the collateral," "Loan-to-Value ratios," "the purpose of the real property serving as collateral (primary residence, second home, etc.)," and whether the "loans actually met the lenders' underwriting criteria."  (Ex. 22 at ¶¶ 71-72).

(2) In *City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc.*, No. 08-005187 (N.Y. Sup. Ct.) (filed March 19, 2008), the complaint alleged that the "appraisals of many properties were inflated," and that underwriting standards were abandoned because the originators were "granting exceptions as a matter of course." (Ex. 23 at ¶¶ 5, 26).

(3) In *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08 Civ. 10446 (RGS) (D. Mass.) (filed Jan. 31, 2008), the complaint named, *inter alia*, Greenwich Capital Markets, Inc. (RBS), UBS Securities Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc., as defendants and alleged false and misleading statements and/or omissions about "(i) the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios permitted on the loans."  (Ex. 24 at ¶ 4).

---

*Lavoro*, 761 F. Supp. 1010, 1019 (S.D.N.Y. 1991) (taking judicial notice of Dun & Bradstreet's financial ratings); *see also Staehr*, 547 F.3d at 425.

[21] Appendix D provides a table comparing the allegations made by the FDIC here to the allegations made by other RMBS investors in lawsuits filed prior to August 14, 2008, showing that Colonial could have brought these claims prior to the FDIC's appointment as receiver.

(4) In *Luther v. Countrywide Financial Corp.*, No. BC 380698 (Cal. Super. Ct.) (filed Nov. 14, 2007), which named, *inter alia*, UBS Securities LLC., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., Greenwich Capital Markets, Inc. (RBS), Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC), and J.P. Morgan Securities Inc. as defendants, RMBS investors alleged that offering documents failed to disclose underwriting deficiencies and appraisal manipulations.  (Ex. 25 at ¶¶ 7-9).

(5) In *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713 (E.D.N.Y.) (filed Mar. 26, 2008), RMBS investors alleged misstatements regarding underwriting standards and inflated appraisals of the underlying collateral in multiple J.P. Morgan RMBS trusts.  (Ex. 26 at ¶¶ 7-9).

(6) In *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653 (S.D.N.Y.) (filed June 3, 2008), RMBS investors brought suit against Credit Suisse entities, alleging that "a material portion of the underlying collateral . . . were not 'in accordance with its credit, appraisal and underwriting standards.'" (Ex. 27 at ¶ 39).

The ability of other RMBS investors to bring nearly identical claims, based on nearly identical allegations, belies any contention that Colonial could not have filed a complaint before running an AVM or performing other loan-level analyses.

Indeed, claims brought by the FDIC as receiver for another failed bank were recently dismissed as time-barred primarily due to the existence of previously filed complaints making similar allegations more than a year prior to the FDIC's receivership.  *Strategic Capital Bank*, 2012 WL 5900973, *6.  Finding that complaints filed more than year prior to the receivership made "[e]ach of the[] allegations [that] are found, at times verbatim, in the FDIC's complaint," the court concluded that "[b]y [May 22, 2008], [the bank] knew that misrepresentations were made in the Offering Documents."  *Id.* at *8.  Together, the "media sources, complaints and judgments" that were publicly available to the bank "created a roadmap for holders of [] MBS" to initiate litigation.  *Id.*  Accordingly, the court found that "the complaint was time-barred before May 22, 2009 when the FDIC took receivership."  *Id.*

The same result should apply here.  The lawsuits filed against Defendants before August 14, 2008 confirm that a reasonable investor was aware of the claims belatedly brought by the FDIC here.  As confirmed in other recent RMBS decisions, the ability of other RMBS investors

28

to bring nearly identical claims prior to August 14, 2008 establishes that Colonial could have done the same.  Accordingly, the FDIC's claims are untimely and must be dismissed with prejudice.  *See Strategic Capital Bank*, 2012 WL 5900973, at *5, 8; *Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365-366 (dismissing Section 11 claims as untimely based primarily on the filing of other lawsuits); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1136 (C.D. Cal. 2011) (dismissing claims in part because the filing of other complaints demonstrated that a reasonable investor would have been aware of its claims prior to the limitations date).

4.  <u>Additional facts would have put a reasonably diligent investor on notice of the claims alleged here prior to August 14, 2008.</u>

In addition to the facts described above that were known or available to Colonial, an overwhelming amount of publicly available information should have put Colonial on notice of its potential claims prior to August 14, 2008.  From negative rating events, to a slew of news reports, to Colonial's own experience in the residential mortgage market, all of this information was accessible to Colonial prior to August 14, 2008 and was enough to provide Colonial with sufficient knowledge to plead the claims asserted by the FDIC here.  Other courts have found the existence of such facts sufficient to require dismissal.  For example, in *In re Morgan Stanley Pass-Through Certificates Litigation*, the Court found plaintiff's claims to be untimely because: (i) Distribution Reports showed rising delinquencies on the mortgages backing the certificates months before the limitations date; (ii) there were rating downgrades of the certificates prior to the limitations date; (iii) a prior lawsuit involving "similar allegations regarding RMBS-related misconduct" was filed three months before the limitations date; and (iv) there was other relevant publicly available information, including "news reports of questions regarding the integrity of

29

ratings of subprime instruments."  2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010).  This case is no different.

        a.        *Rating agency reports revealed growing pessimism about the quality of the Certificates held by Colonial.*

Seven out of the 11 Certificates at issue in this action were put on negative outlook by one or more rating agencies prior to August 2008.  Three of the Certificates, CMALT 2007-A3, CMALT 2007-A2, and RALI 2007-QS3, were downgraded by one or more rating agencies in early August 2008.  Additionally, many of the certificates in the Offerings that were subordinated to the Certificates Colonial purchased were downgraded throughout 2008; indeed, prior to August 14, 2008, *every* Certificate at issue in this action included at least one subordinate class that had dropped below investment grade.  (*See* Appendix C).

These downgrades, and the accompanying reports published by the rating agencies, were sufficient to put investors such as Colonial on notice of the purported problems with the Certificates in advance of August 14, 2008.  Indeed, in March 2008, Fitch warned RMBS investors that the "substantial pressure on subordinate classes [resulting from rapidly increasing defaults] will also put pressure on senior classes, most notably for the later 2006 and 2007 transactions."  (Ex. 28).  As a sophisticated investor, Colonial understood the structure of the RMBS transactions and the consequential impact of a ratings downgrade.[22]

---

[22] The Amended Complaint implies that the statute of limitations did not run until after August 14, 2008 because the Certificates had not yet been downgraded below investment grade. (AC ¶ 111).  But "[n]othing in Section 13 or the securities laws suggest that the statute does not run until [a] ratings downgrade."  *FDIC as receiver for Strategic Capital*, 2012 WL 5900973, at *7.  Certainly there is no requirement that a security be downgraded below a certain level, as the FDIC implies.

        b.      *News articles and other publicly available information supplied additional negative views on the mortgage industry in general and the underwriters and issuers of Colonial's Certificates in particular.*

From the time that the Certificates were first issued through August 14, 2008, investors were subjected to a constant barrage of mainstream news articles criticizing RMBS products and putting Colonial on notice of the very deficiencies it alleges in the Amended Complaint.  As early as March 2007, Bloomberg reported that GMAC/Residential Capital bonds had been cut from "buy" to "neutral" because of, among other things, increasing "concerns about rising default rates on subprime mortgages."  (Ex. 29).  Residential Capital's affiliates sponsored, underwrote, and originated all of the loans for RALI 2007-QS3, and sponsored, and originated the majority of loans in RFMSI 2007-SA4.  By August 2007, American Home Mortgage Holdings, Inc., a significant originator in CMALT 2007-A5, filed for bankruptcy.  (Ex. 31).

By early 2008, major news outlets, including *The New York Times*, *Wall Street Journal*, and *Los Angeles Times*, reported on government investigations into firms, including Defendants, that provided loan analysis services to RMBS market participants.  (Exs. 34-39).  In March, the President's Working Group on Financial Markets issued a policy statement discussing the "causes of the recent turmoil, including lax underwriting standards for mortgages, particularly for subprime mortgages; an erosion of market discipline in the securitization process; [and] flaws in credit rating agencies' assessments of some complex structured credit products. . . ."  (Ex. 45). That same month, Fitch placed five of the Certificates on negative watch, explaining that the rapid increase of defaults in the collateral pools was partially "attributable to the use of high risk mortgage products such as 'piggy-back' second liens and stated-income documentation programs, which in many instances were poorly underwritten and susceptible to borrower/broker fraud" – and essentially reciting the FDIC's allegations. (Ex. 28).  By the end of May 2008, all

three rating agencies had placed Certificates held by Colonial on negative watch or negative

outlook.  (*See* Appendix C).

On June 6, 2008, *The New York Times* reported that "[d]elinquency and foreclosure

rates . . . have picked up speed in nearly every quarter since" late 2006 and that these defaults

were expanding beyond subprime loans.  (Ex. 46).  Specifically, *The New York Times* stated that

"California and Florida . . . accounted for nearly a third of all mortgages that were in foreclosure

or 90 days delinquent" and that "the problems in California and Florida are extraordinary."  (*Id.*)

According to the Offering Documents and the Distribution Reports, all of Colonial's Certificates

had substantial exposure to the California or Florida mortgage markets.[23]

On August 1, 2008, the *Wall Street Journal* reported that "investors should use caution

when it comes to First Horizon National" due to First Horizon's "heavy exposure to home-equity

loans written by outside mortgage brokers and other third parties that often employ lax

underwriting standards."  (Ex. 49).  First Horizon affiliates were the issuers of FHAMS 2007-

FA1 and FHAMS 2007-FA2.  In the days that followed, Fitch and Moody's downgraded three

Certificates.  (*See* Appendix C).  The *Wall Street Journal* then published another report on

August 7 highlighting the woes of the housing market.  The report specifically mentioned that

J.P. Morgan Chase & Co., whose subsidiaries originated the mortgage loans in the collateral pool

for CHASE 2007-S4, expected losses on unsecured mortgages to continue, and that as late as

---

[23] The Offering Documents disclosed that a plurality of mortgage loans in the collateral pools were originated in California and Florida.  *See* Ex. 47 (excerpts of Offering Documents disclosing the geographic concentrations of mortgage loans).  Additionally, many of the Offering Documents expressly warned investors that "[i]f the regional economy or housing market weakens in California, Florida, or any other region having a significant concentration of properties underlying the mortgage loans, the mortgage loans in that region may experience high rates of loss and delinquency, resulting in losses to certificate holders."  *See, e.g.*, RALI 2007-QS3, P.S. at S-18 in Ex. 48 (excerpts of Offering Documents warning that the high concentration of mortgage loans in certain states created additional risks to investors).

August 2007 the bank "was still making some loans that didn't require full documentation of borrowers' incomes and assets." (Ex. 50). The article also singled out Wells Fargo, which originated at least 90% of the mortgage loans for WFMBS 2007-4 and WFMBS 2007-7, noting that Wells Fargo did not reduce the maximum amount borrowers could finance until the fourth quarter of 2007. (*Id.*) Given the amount of negative publicity in connection with Colonial's Certificates, no reasonable investor could claim ignorance in August 2008 of the claims that the FDIC is belatedly attempting to assert here.[24]

c.  *Colonial's own experience in the residential mortgage markets and the FDIC's regulatory findings prior to August 14, 2008 confirm that Colonial was aware of potential claims.*

The FDIC's own review of Colonial confirms that Colonial knew of the alleged facts underlying its potential claims well before August 14, 2008. The FDIC found that, as early as 2007, Colonial management had "noticed a 'tremendous' decline in trading volumes and liquidity for" its RMBS. (Ex. 1 at 7). Further, the FDIC criticized a number of practices undertaken by Colonial *as a mortgage underwriter* that mirror the allegations of the Amended Complaint, including Colonial's "[a]ggressive underwriting," "[l]ack of consistency and discipline" in underwriting, "failure to standardize underwriting," "[w]eak appraisal reviews, including failure to ensure adjustments for rapidly changing market conditions," and "[f]ailure to obtain support or approval for loan policy exceptions." (*Id.* at 9). The FDIC found that Colonial experienced first-hand "asset quality problems" in its own loan portfolio in connection with deteriorating market conditions in 2007, (*id.* at 9) – and now the FDIC alleges that similar problems, such as rising defaults in *Defendants*' loan pools, establish that Defendants abandoned their underwriting guidelines. (AC ¶¶ 88-99).

---

[24] Appendix E provides a chronology of the publicly available news and other reports relevant to the Certificates, which are too numerous to mention individually in this memorandum.

The FDIC cannot plausibly claim, given Colonial's own participation and involvement in the mortgage industry, that Colonial was ignorant of the mortgage origination practices that the FDIC alleges in its Amended Complaint. The information available to Colonial was more than enough to put the bank, as a sophisticated and direct participant in the mortgage origination market, on notice of its claims prior to August 14, 2008.

      5.     *American Pipe* tolling does not apply because the class claims relating to the Certificates were dismissed on standing grounds.

Aware that its claims are untimely, the FDIC tries to rely on the tolling rule of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), with respect to three of the Certificates. The FDIC contends that the statute of limitations for its claims related to the RALI 2007-QS3, WFMBS 2007-4, and WFMBS 2007-7 Certificates has been tolled under *American Pipe* because those securitizations were "included" in putative class actions filed in May 2009 and March 2009 respectively. (AC ¶¶ 112-16). No such tolling occurred.

The claims relating to each of these securitizations were dismissed from their respective class actions because the named plaintiffs had not purchased RALI 2007-QS3, WFMBS 2007-4, and WFMBS 2007-7 certificates and therefore lacked standing to bring claims for alleged misrepresentations in the Offering Documents for those securitizations. *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) (dismissing class action claims relating to the RALI 2007-QS3 securitization because plaintiffs had not purchased any certificates from that securitization); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958 (N.D. Cal. Apr. 22, 2010) (dismissing claims relating to securities not purchased by the named plaintiffs, including WFMBS 2007-4 and WFMBS 2007-7).

There is no *American Pipe* tolling for claims relating to a securitization that was dismissed from a putative class action on standing grounds. *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 6508190, at *2 (S.D.N.Y. Dec. 15, 2010) (holding that "the American Pipe rule should not apply where the plaintiff that brought the dismissed claim was found by the court to lack standing").[25] When a named plaintiff in a class action is found to lack standing, there is no case, and "[when] there is no case, there can be no tolling." *Id.* Thus, because the named plaintiffs in *New Jersey Carpenters* and *In re Wells Fargo* did not purchase in the RALI 2007-QS3, WFMBS 2007-4, and WFMBS 2007-7 Offerings, there is no tolling.[26]

---

[25] *See also In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 82 (D. Conn. 1994) ("If the original plaintiffs lacked standing to bring their claims in the first place, the filing of a class action complaint does not toll the statute of limitations for other members of the purported class."); *Kruse v. Wells Fargo Home Mortg. Inc.*, 2006 WL 1212512, at *4-6 (E.D.N.Y. May 3, 2006) (denying intervention where original plaintiffs conceded they never had standing to sue); *In re Crazy Eddie Sec. Litig.*, 747 F. Supp. 850, 856 (E.D.N.Y. 1990) (warning that applying *American Pipe* when a plaintiff's claims were dismissed for lack of standing would "encourage bringing of a suit merely to extend the period in which to find a class representative"); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through Certifcates, Series AR1*, 748 F. Supp. 2d 1246 (W.D. Wash. 2010) ("[T]he statute of limitations does not toll for putative class actions whose named plaintiff lacks standing to advance claims in the first place."); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166-67 (C.D. Cal. 2010) (following "multiple other courts that have held in federal cases that the statute is tolled only as to claims where the named plaintiffs had standing"); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 2010 WL 4117477 (N.D. Cal. Oct. 19, 2010); *FDIC as receiver for Strategic Capital Bank*, 2012 WL 2900973, at *12 ("The [class action] plaintiffs did not purchase in any of the tranches [plaintiff] bought, so the [] class did not include [the plaintiff]. Therefore, [the] claim was not tolled by *American Pipe*."). *But see, e.g., In re Smith Barney Transfer Agent Litig.*, 2012 WL 3339098 (S.D.N.Y. Aug. 15, 2012); *In re IndyMac MBS Litig.*, 793 F. Supp. 2d 637, 646 (S.D.N.Y. 2011); *In re Morgan Stanley*, 810 F. Supp. 2d 650.

[26] The Second Circuit's decision in *NECA-IBEW Health and Welfare Fund v. Goldman Sachs & Co.*, 293 F.3d 145 (2d Cir. 2012) ("*NECA*") does not alter this analysis. Although *NECA* may call into question whether the *New Jersey Carpenters* and *In re Wells Fargo* courts properly held that lead plaintiffs lacked standing as to RALI 2007-QS3, WFMBS 2007-4, and WFMBS 2007-7, *NECA* does not abrogate the significant authority among district courts within the Second Circuit holding that there is no *American Pipe* tolling for claims relating to a securitization that were dismissed from a putative class action on standing grounds. *See Lighthouse*, 2012 WL 4616958, at *14, n.14 (S.D.N.Y. Sept. 28, 2012) (finding, after *NECA*, that "[t]here is no conclusive authority in this Circuit regarding whether *American Pipe* applies to claims that are

In any event, as shown above, (*see* Sections I.A.3-4, *supra*), the statute of limitations for any Section 11 claim on these securitizations expired prior to the time these putative class actions were filed.

**B.      The FDIC's Claims Are Also Barred by the Three-Year Statute of Repose.**

In addition to being untimely under the statute of limitations, the FDIC's claims are barred under Section 13's statute of repose.  Section 13 unambiguously provides that "[i]n no event shall any action be brought to enforce liability created under section [11] . . . more than three years after the security was bona fide offered to the public."  15 U.S.C. § 77m.  Here, there is no question that more than three years have elapsed since the Certificates were bona fide offered to the public.  The FDIC concedes that all of the Certificates were first offered for sale in 2006 and 2007, more than three years before it filed suit.[27]  Accordingly, the FDIC's claims are barred by the "absolute" statute of repose.  *P. Stolz Family P'ship L.P.*, 355 F.3d at 103 ("The three-year period is an absolute limitation which applies whether or not the investor could have discovered the violation.").

---

ultimately dismissed for lack of standing").  Additionally, because *NECA* creates a split with the First Circuit's decision in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011), and contradicts the findings of nearly every district court to have considered the question, there is a reasonable possibility that the Supreme Court will grant certiorari review (indeed, it already has asked the *NECA* plaintiffs to respond to the certiorari petition).  *See* http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles /12-528.htm (Supreme Court docket requesting response to the certiorari petition); *see also Strategic Capital Bank*, 2012 WL 5900973, at *12 (noting that *NECA* "has thrown the jurisprudence in this area into disarray").  Thus, should the Court be inclined to consider *NECA* in applying *American Pipe*, Defendants request that the Court dismiss the FDIC's claims relating to RALI 2007-QS3, WFMBS 2007-4, and WFMBS 2007-7 without prejudice to their renewal *after* the Supreme Court rules on the *NECA* certiorari petition, and, if granted, after the Supreme Court rules on the merits.  *Cf. In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-MD-2017 (LAK), Dkt. 1054 (S.D.N.Y. Nov. 20, 2012) (order denying motion for reconsideration based on NECA); *In re IndyMac MBS Litig.*, No. 09-CV-4583 (LAK), Dkt. 390 (S.D.N.Y. Nov. 16, 2012) (same).

[27] *See* Item 38(a) of Schedules to AC (setting forth month and year of each Offering).

## C.      The Extender Statute Does Not Save the FDIC's Claims.

The Extender Statute does not render timely the claims asserted by the FDIC here.  The FDIC asserts that "[u]nder 12 U.S.C. § 1821(d)(14) [(the "Extender Statute")], the statute of limitations on all of Colonial's claims asserted in this Amended Complaint *that had not expired as of August 14, 2009*, are [*sic*] extended to no less than three years from that date." (AC ¶ 106 (emphasis added)).  The Extender Statute does not help the FDIC for four reasons.

*First*, the Extender Statute cannot save the FDIC's claims because the statute of limitations expired prior to the FDIC's appointment as receiver for Colonial.  (*See* Section I.A, *supra*); *see also Shrader & York*, 991 F.2d at 220-27 (holding the FDIC's claims time-barred because the bank should have known of the claims before FDIC receivership began); *Strategic Capital Bank,* 2012 WL 5900973, at *2 ("[Because the FDIC's RMBS] claims . . . were not live when the FDIC was appointed receiver, [they] are untimely now").  As the FDIC has conceded, a claim must be viable on the date of appointment, (AC ¶ 106), but that was not the case here.[28]

*Second*, the Extender Statute does not extend the repose bar date.  The text of the Extender Statute only mentions statutes of limitations, and statutes of repose are fundamentally different from statutes of limitations.  Statutes of limitations are generally procedural rules whereas statutes of repose are substantive components of the underlying cause of action.  *In re Lehman Bros. Sec. & ERISA Litig.*, 2011 WL 1453790, at *3 (S.D.N.Y. Apr. 13, 2011) (explaining the difference between statues of limitations and statutes of repose).  Indeed, the Second Circuit has explained that "[u]nlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather [it] *defines the right involved* in terms of the time

---

[28] Because the FDIC's claims were barred by the statute of limitations prior to its appointment as receiver for Colonial on August 14, 2009, the Court does not need to address the issue of whether the Extender Statute would have applied to the FDIC's claims had they been timely.

allowed to bring suit."  *P. Stolz*, 355 F.3d at 102 (emphasis added).  Thus the Extender Statute is

of no consequence here because the 1933 Act's statute of repose barred all of the FDIC's claims

nearly two years before it filed this action.  (*See* Section I.B, *supra*).

*Third*, by its plain language, the Extender Statute only applies to state law claims and

thus cannot extend the viability of the FDIC's federal securities claims.  The text of the statute

discusses the limitations period for contract and tort claims, noting that it is "the longer of" (i) six

years from the beginning of the receivership for a "contract claim" or three years for a "tort

claim"; or (ii) the period applicable "under *State* law."  12 U.S.C. § 1821(d)(14)(A)(ii), (B).  By

pegging the limitations period solely to state law, on its face the Extender Statute can only apply

to state law claims.  *See Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005) (holding that "the

phrase 'under color of state law'" in a federal civil rights statute "appl[ies] only to state actors,

not federal officials").  Any suggestion that the Extender Statute also applies to federal claims is

untenable.

*Finally*, although the statute's language plainly limits its scope only to claims that sound

in contract or tort, the FDIC nonetheless has asserted statutory claims under the 1933 Act, which

sound neither in contract nor in tort, and as such can only be described as *sui generis*.  Indeed,

many statutory claims are *sui generis* – of their own kind, without a common law analogue.[29]

Claims under the 1933 Act clearly fall into this category and therefore cannot be saved by the

Extender Statute.  *See Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1127 (2d

Cir. 1989) (observing that § 12(a)(2) of the 1933 Act is "not derived from tort law principles");

---

[29] *See*, *e.g.*, *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 352-53 (3d Cir 1986) (because "RICO is a strictly statutory remedy . . . . it is truly *sui generis* and [] particular claims cannot be readily analogized to causes of action known at common law"); *Jodek Charitable Trust, R.A. v. Vertical Net Inc.*, 412 F. Supp. 2d 469, 483 (E.D. Pa. 2006) ("Section 8-401 is a *sui generis* statutory creation," which "creates neither a tort nor a contract cause of action.").

*see also In re Craftmatic Sec. Litig.*, 890 F.2d 628, 637 (3d Cir. 1990) (§ 12(a)(2) is "not analogous to . . . [a] tort").

While every relevant principle of statutory construction confirms that the Extender Statute does not apply to the federal statutory claims asserted by the FDIC in this action, courts have nonetheless reached conflicting conclusions as to whether the Extender Statute or similar extender provisions apply to statutes of repose such as Section 13.[30]  This issue is currently before the Second Circuit in connection with an expedited interlocutory appeal in *Federal Housing Finance Agency v. UBS Americas, Inc*., No. 12-3207 (2d Cir.) which was fully submitted on November 26, 2012.  On appeal, the Second Circuit is considering whether 12 U.S.C. § 4617(b)(12), a similar extender statute, applies to 1933 Act claims in an RMBS action brought by the Federal Housing Finance Agency.[31]  In view of the fact that the Second Circuit is expected to rule on this potentially dispositive issue in the near future, Defendants respectfully

---

[30] *See NCUA v. Goldman Sachs & Co.*, No. 11 Civ. 6521 (C.D. Cal.) (Mar. 15, 2012 Tentative Ruling) (finding that "the Extender Statute does not operate to extend any statute of repose"), *adopted by* Civil Minutes of Sept. 4, 2012; *NCUA v. RBS Sec., Inc.*, No. 11 Civ. 5887 (C.D. Cal.) (Dec. 19, 2011 Tentative Ruling) (refusing to construe 12 U.S.C. § 1787(b)(14), a similar extender statute, to displace Section 13 in RMBS action brought by the National Credit Union Administration Board); *see also Huddleston v. United States*, 2012 WL 1816261, at *2 (6th Cir. May 21, 2012) (federal statute of limitations applicable to claims under the Federal Tort Claims Act, 28 U.S.C. § 2401, did not preempt a statute of repose, since such a statute imposes "a substantive requirement, not just a procedural hurdle"); *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 362 (5th Cir. 2005) (a federal statute that expressly preempts only state statutes of limitations does not also preempt statutes of repose, because "the differences between statutes of limitations and statutes of repose are *substantive, not merely semantic*") (emphasis added).  *But see FHFA v. Countrywide Fin. Corp.*, No. 12 Civ. 1059 (C.D. Cal. Oct. 18, 2012) (applying 12 U.S.C. § 4617(b)(12) to 1933 Act claims); *NCUA v. RBS Sec., Inc.*, 2012 WL 3028803 (D. Kan. July 25, 2012) (applying § 1787(b)(14) to 1933 Act claims), *interlocutory appeal certified*, 2012 WL 4210500, at *3 (Sept. 19, 2012) (finding that "there are substantial grounds for a difference of opinion" on the issue, and that defendants' arguments are not "implausible or without force").

[31] The Tenth Circuit also recently agreed to hear an interlocutory appeal involving this issue.  *See In re Nomura Home Equity Loan Inc. v. Nat'l Credit Union Admin. Bd.*, No. 12-606 (10th Cir. Nov. 6, 2012).

submit that if the Court does not find that the FDIC's claims were barred by the 1933 Act's statute of limitations prior to its appointment as receiver for Colonial, then in the interest of judicial efficiency, the Court should defer ruling on the applicability of the Extender Statute pending the Second Circuit's ruling.[32]

## II.   THE SECTION 11 CLAIMS FAIL ON NUMEROUS ADDITIONAL GROUNDS.

The Amended Complaint also should be dismissed because it does not state a "plausible" claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Indeed, it does not plausibly allege that the Offering Documents contained a material misstatement on *any* topic.

The Offering Documents contained robust disclosures warning of the very risks the FDIC now cites, with the benefit of hindsight, as the basis for its Section 11 claims – risks that Colonial fully understood from its extensive experience in the mortgage origination and lending business. *See*, *e.g.*, *Barrios v. Paco Pharms. Servs., Inc.*, 816 F. Supp. 243, 252 (S.D.N.Y. 1993) (no actionable misstatement "[w]hen an offering document exactly states the cautionary 'fact' that the plaintiff claims has been covered up or misrepresented").  For example, the majority of the Offering Documents disclosed that there could be "no assurance" of the accuracy of any appraisal opinions incorporated into the Offering Documents.[33]  Additionally, the Offering

---

[32] Defendants proposed to the FDIC that the parties agree to defer briefing the applicability of the Extender Statute entirely in view of the fact that the Second Circuit has the issue under submission in *FHFA v. UBS*.  The FDIC refused this request.  Defendants are prepared to submit additional briefing on this issue in the event the Court determines it should decide this issue notwithstanding the pendency of the *FHFA v. UBS* appeal, and do not intend to waive any of their rights or defenses by not addressing these issues further.

[33] *See*, *e.g.*, WFMBS 2007-7, P.S. at S-47 ("There can be no assurance that such appraisal, which is based on the independent judgment of an appraiser and not an arms-length sales transaction, is an accurate representation of the market value of a Mortgaged Property") in Ex. 6 (excerpts of Offering Documents making substantially similar disclosures).

Documents informed potential investors that underlying loans may not conform to the descriptions contained in the Offering Documents and even contained provisions regarding how to address such discrepancies.[34]

The Offering Documents' disclosures thus refute the FDIC's theory that Defendants made representations that the mortgages invariably conformed to those descriptions.  Instead, the disclosures "change[d] the nature of [the sponsor's] representation[s]," such that the Offering Documents cannot be read to make representations that *all* the loans underlying the Certificates would necessarily conform to the stated credit quality criteria.  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 389-90 (5th Cir. 2010) (affirming dismissal of RMBS claims on the basis of disclosures that are substantively identical to those included in Ex. 3); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *16 (S.D.N.Y. Sept. 28, 2010) (dismissing RMBS claims on this basis).

The FDIC's Amended Complaint, which rests almost exclusively on computerized and statistical "models," also fails to state a plausible claim as to any category of misstatement it alleges, for several additional reasons.[35]

---

[34] *See*, *e.g.*, WFMBS 2007-7, P.S. at S-26 ("The Depositor will have limited obligations and rights under the Pooling and Servicing Agreement after the Closing Date, including, but not limited to, repurchasing or substituting Mortgage Loans due to breaches of representations and warranties or as a result of defective documentation . . . ") in Ex. 3 (excerpts of Offering Documents making substantially similar disclosures).

[35] The FDIC has argued to another Judge of this Court that allegations similar to those it has alleged here are conclusory and non-actionable.  *See*, *e.g.*, Ex. 51.  In *In re IndyMac MBS Litigation*, the FDIC "control[led]" and "administer[ed]" an IndyMac entity that was named as a defendant, and that  sought and obtained dismissal of allegations concerning appraisals, LTV ratios, and credit ratings.  718 F. Supp. 2d 495, 508-12 (S.D.N.Y. 2010).  The FDIC should not be permitted to deviate from the contrary positions it successfully advocated to another Judge of this Court.

A.      **The Allegations About Appraisals and LTV Ratios Fail.**

      1.      Appraisals and LTV ratios are non-actionable statements of opinion absent subjective falsity – which the FDIC does not allege.

As courts have held, appraisals and LTV ratios based thereon are merely subjective statements of opinion, not statements of fact.  *See*, *e.g.*, *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *7 (S.D.N.Y. Mar. 29, 2010); *Tsereteli*, 692 F. Supp. 2d at 393 ("[N]either an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses.").[36]  Accordingly, appraisals and LTV ratios cannot be false unless they are alleged to be subjectively false, *i.e.*, "knowingly fals[e] at the time of publication."  *N.J. Carpenters Health Fund*, 2010 WL 1473288, at *7-8 (dismissing appraisals, loan-to-value ratios, and ratings allegation because plaintiffs failed to allege that the statements were knowingly false); *see generally Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) ("[W]hen a plaintiff asserts a claim under section 11 or 12 based upon a belief or opinion alleged to have been communicated by a defendant, liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed.").

      The FDIC does not allege subjective falsity on the part of *anyone* – not the appraisers who provided the opinions, and certainly not Defendants.  To the contrary, the FDIC "expressly *excludes . . .* any allegation that could be construed as alleging fraud or intentional or reckless

---

[36] *Accord IndyMac*, 718 F. Supp. 2d at 511; *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 494-95 (S.D.N.Y. 2010); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 271 (S.D.N.Y. 2010); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 2010 U.S. Dist. LEXIS 106687, at *19 (N.D. Cal. Oct. 5, 2010).

conduct" so as to avoid triggering fraud-based pleading standards.  (AC ¶ 136).  That is

dispositive.  *See Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564 (5th Cir.

2002) ("[T]he district court's dismissal of the [plaintiffs' securities] claim was proper because

such a claim would require proof of fraudulent intent, and the [plaintiffs] expressly disavowed

this essential element in their complaint."); *Belmont Holdings Corp. v. Sun Trust Banks, Inc.*,

2010 WL 3545389, at *7 (N.D. Ga. Sept. 10, 2010) ("Plaintiff does not allege – and specifically

disavows – that [the speaker] did not believe the opinions and judgments it stated in the

[documents] . . . . Plaintiff's complaint, therefore, does not state a claim under Section[] 11

. . . .").  Without allegations of subjective falsity, the FDIC's repeated allegations to the effect

that appraisals were overstated and that LTV ratios were understated are not actionable and must

be dismissed.[37]

Similarly, the FDIC's related allegations that some of the Offering Documents

inaccurately stated that appraisals had been conducted in accordance with Uniform Standards of

Professional Appraisal Practice ("USPAP") also lack merit.  (AC ¶ 72; Item 72 of Schedules 6

and 7 of AC).  *First*, the FDIC fails even to make this allegation with respect to the vast majority

of the Offerings: the allegations as to USPAP compliance are found in Item 72 of the Schedules

to the Amended Complaint, but the FDIC omits Item 72 with respect to nine of the 11 Offerings.

(*See* AC Schedules 1-5, 8-9, 10-11 (all lacking "Item 72")).  The FDIC's USPAP allegations thus

add nothing with respect to its allegations against the majority of Defendants.[38]  *Second*, even

---

[37] This includes, without limitation, the allegations contained in Items 47, 57, 103(a), and 103(b) of the Schedules to the Amended Complaint.

[38] The Defendants against whom the FDIC makes no USPAP-related allegations are Citicorp Mortgage Securities, Inc.; Credit Suisse Securities (USA) LLC; RBS Securities Inc.; CitiMortgage, Inc.; HSBC Securities (USA) Inc.; Chase Mortgage Finance Corp.; JPMorgan Securities Inc.; JPMorgan Chase & Co.; Ally Securities Inc.; and Wells Fargo Asset Securities Corp.

with respect to the remaining two Offerings, all the FDIC provides is the "conclusory assertion" that appraisals were not made in accordance with USPAP, which is a "legal conclusion not entitled to the assumption of truth" – as numerous courts have held with respect to the precise issue of USPAP allegations.[39]

> 2. <u>The AVM-based allegations do not state a plausible claim for many additional reasons.</u>

The FDIC's AVM-based allegations also fail on numerous additional grounds. *First*, the FDIC cannot use the output of its AVM to challenge contemporaneous appraisals as a matter of law. This is because the AVM's output, like the appraisals themselves, constitutes an *opinion* – and a difference of opinion cannot give rise to a misrepresentation claim. Other courts have rejected allegations similar to the FDIC's on this basis. For example, in *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005), the plaintiffs relied on the defendant's own valuation models to allege as "fact" that a company was worth less than the defendant had stated. *Id.* at 251. The court "reject[ed] plaintiffs' characterization of valuation models as 'fact' rather than 'opinion,'" explaining:

> [F]inancial valuation models depend so heavily on the discretionary choices of the modeler . . . and choice of "comparables" that the resulting models and their

---

[39] *Tsereteli*, 692 F. Supp. 2d at 393 ("[T]he only fact alleged in support of the allegation that the appraisals were not made in accordance with USPAP is that [a Government] Report supposedly said that [the] appraisals 'were not in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP).' Were this statement made by the plaintiffs themselves in the amended complaint, as opposed to its having been attributed to [the Government], it would have been a *legal conclusion not entitled to the assumption of truth unless supported by appropriate factual allegations*. That the conclusory assertion comes not from plaintiffs but from the [Government] would make it no less conclusory.") (emphasis added); *accord Plumbers' Union Local No. 12 Pension Fund*, 632 F.3d at 774 (affirming dismissal of USPAP allegations because the complaint merely "allege[d] in a single general statement that the appraisals underlying the loans at issue . . . failed to comply with USPAP requirements"); *IndyMac*, 718 F. Supp. 2d at 510 (dismissing "allegation[s] [that] contain[ed] insufficient factual amplification to support a plausible inference that the appraisers . . . were subjected to pressure or that they succumbed to it in a way that violated USPAP").

predictions can only fairly be characterized as *subjective opinions*.  Like other opinions, some valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless *opinions and not objective facts*.

*Id.* at 251-52 (emphasis added).

As in *Salomon*, the FDIC's AVM-based allegations amount to nothing more than a difference of opinion, which cannot form the basis of a Section 11 claim.  *See also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (use of risk model that proved to be objectively erroneous and that had different prediction than other models did not sustain claim of falsity); *see also Lehman Bros.*, 684 F. Supp. 2d at 495 (allegations that rating agencies "used out-of-date models" and "did not implement updated models" were insufficient); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1256 (W.D. Wash. 2010) ("[The] fact that the [credit] ratings [for MBS] would have been different under a different methodology is insufficient to state a claim [under Section 11].").

*Second*, even if the output of an AVM were something beyond an opinion, the FDIC's AVM-based allegations still fail because an AVM is not an appraisal but rather an entirely different method of valuing a property years after the fact – such that there is no reason to expect the values to be the same.  The FDIC has pled no basis on which to infer that its AVM is more reliable than the appraisals it is second-guessing, especially when performed with the benefit of hindsight following a precipitous and unprecedented decline in home prices.

To the contrary, the FDIC publicly has taken the position that "the result of an [AVM], by itself or signed by an appraiser, is not an appraisal," and that "an AVM . . . is not, in and of itself, an alternative to an evaluation."  FDIC, Dkt. No. 2010-0018, "Interagency Appraisal and Evaluation Guidelines," Final Guidance, 75 Fed. Reg. 77450, 77455, 77459, 77468-69, *available*

*at* 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010).  And like the FDIC, the Appraisal Standards

Board – on which the FDIC relies in its Amended Complaint (AC ¶¶ 69-71) – has made clear

that "[t]he output of an AVM is not, by itself, an appraisal."[40]  But, other than the FDIC's

conclusory assurances that the AVM is objective and accurate (yet another opinion), the FDIC

has pled no basis on which to infer that its AVM is better at determining the value of a property

than a professional who inspected the property and formulated an appraisal in 2006 and 2007.

The FDIC's AVM-based allegations thus are deficient under *Twombly*'s "plausibility" standard.

     *Third*, and relatedly, the FDIC's AVM-based allegations do not give rise to a plausible

claim because the FDIC says virtually *nothing* about how its model works, and thus provides no

"plausible" basis on which to infer that the AVM's output is inconsistent with the Offering

Documents.  *See, e.g.*, *In re Textainer P'ship Sec. Litig.*, 2006 WL 1328851, at *5 (N.D. Cal.

May 15, 2006) (dismissing securities claim because the "conclusory allegations as to an

unspecified analysis performed by an unnamed or otherwise identified consultant and which fail

to include any information about the consultant's qualifications, how the analysis was performed,

or the data upon which the consultant relied, are inadequate").  Most critically, the FDIC has

failed to disclose the AVM's margin of error or confidence interval with respect to any property

on which it was run, making it impossible to determine whether any of the appraisal values it

second-guesses are consistent or inconsistent with the AVM's output.[41]  *See, e.g.*, *Torkie-Tork v.*

---

[40] USPAP Advisory Opinions, 2012-2013 Edition, Advisory Opinion 18, at A-42, *available at* http://www.uspap.org/#/166/ (visited Oct. 21, 2012).

[41] The Amended Complaint's only reference to any margin of error merely says that there is a 5% margin of error associated with the FDIC's conclusions about loan pools *as a whole*.  *See* AC at 3 n.1.  This says nothing about the AVM's margin of error when retroactively assessing the value of an *individual piece of property*.  The Amended Complaint's reference to the AVM's "mean error rate" is similarly uninformative.  (AC ¶ 50).  According to the FDIC's own AVM vendor, the "mean error rate" represents the "extent of overvaluation or undervaluation" of the entire loan pool, and is used to assess the AVM's *directional bias*.  There is no indication that it

*Wyeth*, 739 F. Supp. 2d 895, 903 n.11 (E.D. Va. 2010) (observing that "[a]rguments based on statistics" can constitute "misleading statements" if the margin of error is not taken into account). Any discrepancy between the AVM's output and an appraised value that is within the margin of error merely would be "consistent with" the appraisal being overstated; it would not "[]cross the line" into "plausibly" showing that it was overstated. *Twombly*, 550 U.S. at 570.

*Fourth*, the FDIC's inclusion of purchase money loans in its AVM analysis fundamentally skewed that analysis. The Amended Complaint recognizes that "the lower of the appraised value or the purchase price of the property" was used to calculate LTV ratios for purchase-money loans (as opposed to refinancings). (AC ¶ 52 & n.3). The FDIC therefore cannot allege that purportedly overstated appraisals rendered false the LTV ratios for purchase-money loans, because: (a) if the purchase price was lower than the appraised value, then the appraisal was ignored when calculating the LTV, which makes the appraisal irrelevant; and (b) if the purchase price was higher than the appraised value, then the appraisal could not have been inflated because it was actually lower than the fair market value of the property. *See* Black's Law Dictionary (9th ed. 2009) (defining "fair market value" as the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction"). The FDIC's erroneous inclusion of purchase-money loans in its analysis affected a significant percentage of that analysis; for example, in the WFMBS 2007-7 securitization, 56.83% of the loans collateralizing the Certificates purchased by Colonial were purchase money loans that

---

has anything to do with the margin of error associated with the AVM's analysis of any particular property. Ex. 52 (CoreLogic, Automated Valuation Testing) at 5.

should have been excluded, and other securitizations were collateralized by similarly high proportions of purchase money loans.[42]

*Fifth*, the FDIC's AVM improperly is based on hindsight, and indeed, is guranteed to deem "false" every offering document ever issued in a declining real estate market. *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010) ("[P]laintiff[] may not plead fraud by hindsight."). The FDIC's own AVM provider has explained why this is so:

> [A] retrospective AVM . . . is different than replicating the value that the model would have produced had it been run on the historical date. As a result, *users should expect retro values to differ from original values* produced in the past. . . . Depending on the time elapsed between the current and retrospective dates, any or all of [the data input into the AVM] may change. . . . [A] *retrospective AVM will most likely differ from what the same AVM . . . would have reported had it been run originally [on an earlier date].*

(Ex. 54 at 1) (emphasis added).

In other words, when the FDIC's AVM attempts to look back in time to estimate property values years earlier, it uses comparable sales data that was so recent at the time the property was appraised that it was *not available to the appraiser*.[43] Accordingly, pleading that appraisers got it wrong based on a retrospective AVM is improper pleading by hindsight, for "[t]he accuracy of offering documents must be assessed in light of information *available at the time*." *Barclays*,

---

[42] *See*, *e.g.*, FHAMS 2007-FA2 (collateralized by 48% purchase money loans); CHASE 2007-S4 (collateralized by 52.50% purchase money loans); WFMBS 2007-4 (collateralized by 52.70% purchase money loans) in Ex. 53.

[43] As the FDIC's AVM vendor notes, a retrospective AVM considers comparable sales taking place prior to the valuation date but not recorded until after that date. (*See* Ex. 54 at 1 ("Updated data . . . allows us to . . . consider comparable properties that sold prior to or on [a chosen date], but the sale was recorded after [that date].")). The FDIC's Amended Complaint confirms as much. (AC ¶ 50 (alleging that the FDIC's AVM uses "actual sale prices of comparable properties . . . *shortly* before the specified date") (emphasis added)). Although the FDIC asserts that its AVM "considered no transactions that occurred after" the date on which a mortgage loan closed, (AC ¶ 52), that is beside the point. The point is that the AVM considers sales data that was so contemporaneous that it was not available to the appraisers at the time, and thus is based on hindsight.

48

2011 WL 31548, at *5 (emphasis added).  Indeed, a backwards-looking AVM is guaranteed to

deem disclosures inaccurate given that an AVM is able to consider more recent comparable sales

than the appraiser was able to consider.  In a falling market, the more recent sales will tend to be

at lower prices than earlier sales.  Necessarily then, the AVM will yield lower values than the

appraiser did contemporaneously with the origination.  That is the very definition of pleading by

hindsight.

Because the output of a computer model that is guaranteed to indict every offering

document ever issued during a declining market is, at most, merely "consistent with" an offering

document being false, it does not "cross the line" into "plausibly" showing falsity, and thus does

not state a claim.  *Twombly*, 550 U.S. at 557 & n.5.

*     *     *

Because the FDIC's allegations about appraisals and LTV ratios are deficient in these

many respects, the Amended Complaint should be dismissed with prejudice.

### B.        The Allegations About Additional Liens Fail.

The FDIC's allegations about undisclosed additional liens on some of the properties are

pure makeweight.  (*See* AC ¶ 60).  The FDIC admits that "the additional liens referred to in this

Amended Complaint and the Schedules do not include liens that were originated on or before the

date on which each mortgage loan in the pools was closed."  (AC ¶ 60 n.5).  Thus, although the

FDIC alleges that "[m]any of these liens were originated concurrently with the first lien," (AC ¶

60), the additional liens tallied in the Schedules to the Amended Complaint only consist of liens

put on the properties *after* the originations of the loans that back the Certificates that Colonial

purchased.  (*Id.* ¶¶ 60 n.5, 63, Item 63 to Schedules to AC).  The FDIC's "analysis" thus merely

purports to show that the total amount of money borrowed on the properties changed *after* the

mortgages were originated, and before the securitizations closed, because some of the borrowers

49

went out and obtained additional mortgages. (*See id.* ¶ 60 (alleging that "many of the properties that secured mortgage loans . . . were subject to liens in addition to the lien of the mortgage . . . at the time of the closing of these *securitizations*," not at the time of origination) (emphasis added)). The FDIC nevertheless inexplicably asserts that LTV ratios were misstated as result. (*Id.* ¶¶ 60, 64).

The Offering Documents foreclose any such claim. *First*, the Offering Documents make explicit that the "LTV" or "loan-to-value ratio" numbers they provide consist of the ratio only of the *subject mortgage* to the value of the property. (*See* Ex. 5). Nothing in any of the Offering Documents suggests that the reported "LTV" numbers are combined LTV ("CLTV") ratios reflecting both subject mortgages and additional liens. Therefore, the Offering Documents did not misrepresent anything by failing to disclose additional liens. The Offering Documents, furthermore, made clear that the LTV figures referred only to the value of the subject mortgage on the property at the time of *origination*, *i.e.*, not at some later date, such as the date of securitization. (*See* Ex. 4). Thus, the Offering Documents were not, and could not have been, "misleading" about the presentation of LTV ratios.

*Second*, as to those Offering Documents that did provide CLTV data (*i.e.*, provided LTV metrics that expressly took into account additional liens) – WFMBS 2007-4, WFMBS 2007-7, and CHASE 2007-S4 – the FDIC does not make *any* allegations that information pertaining to "additional liens" was misstated.[44] This is no surprise, because the disclosures for these Offerings demonstrate that the CLTV ratios were calculated based on loans existing *at the time*

---

[44] *See* AC ¶ 63 (alleging that additional lien allegations are set forth in Item 63 to Amended Complaint); Schedules 4, 10, and 11 to AC (containing no "Item 63").

*of origination*, not at securitization.[45]  Thus, the additional lien allegations made in paragraphs 56

to 62 of the Amended Complaint must be dismissed with respect to Defendants alleged to have

issued or underwritten these three Offerings.[46]

In any event, because the Offering Documents plainly stated that both LTV and CLTV

calculations were as of origination – not some post-origination date such as the securitization

date – the FDIC cannot identify a misstatement.  Its allegations about additional liens must be

dismissed with prejudice.

### C.    The Allegations About Owner-Occupancy Rates Fail.

The FDIC's allegations that the Offering Documents overstated owner-occupancy rates

fail because the Amended Complaint does not provide a plausible basis from which to infer that

owner-occupancy rates were misrepresented.  (*See* AC ¶ 79).

*First*, the Offering Documents expressly warned that owner-occupancy rates were based

on borrower representations and that there were no guarantees of the truth of those

representations or guarantees against borrower fraud.  The Offering Documents generally

contained language that is substantially identical to the following: occupancy information was

"[b]ased on representations by the obligors on the Mortgage Notes . . . at the time of origination

of the related Mortgage Loans."[47]  The Offering Documents also disclosed that there was a

---

[45] *See* Ex. 56 (excerpts of Offering Documents explaining that CLTV ratios were calculated based on loans existing at the time of origination, not at securitization).

[46] The Defendants as to whom the FDIC makes no "additional lien" allegations in the Schedules to the Amended Complaint are Wells Fargo Asset Securities Corporation, J.P. Morgan Securities LLC, J.P. Morgan Securities Inc., and JPMorgan Chase & Co.

[47] *See* Ex. 5 (excerpts of Offering Documents explaining that occupancy data was based on representations made by the borrowers).

possibility of misrepresentation by the borrowers.[48]  Because the FDIC does not and cannot

allege that Defendants misreported the extent to which borrowers *said* they would live in the

properties, such disclosures are dispositive, as numerous courts have held.  *See, e.g., Mass. Mut.*

*Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 205 (D. Mass. 2012) ("The

disclosures specifically stated that all owner-occupancy rates were based *only* on borrowers'

representations," and "thus put investors on notice that none of the owner occupancy information

had been verified by Defendants and that the rates represented only the self-reported data

provided by borrowers, which might be inaccurate."); *Footbridge*, 2010 WL 3790810, at *9

(rejecting allegations that "statements regarding owner-occupancy levels were false because the

number of owner-occupied properties was lower than defendants represented," because "[t]he

[complaint] does not allege that the percentages reported . . . are inaccurate representations of the

data received from borrowers"); *see also In re Countrywide Fin. Corp. Mortg.-Backed Sec.*, 2012

WL 3578666, at * 2 (C.D. Cal. Aug. 17, 2012) ("The mere fact that the Offering Documents

included 'data charts' does not undermine the repeated warnings about the possibility of

misrepresentations, or transform the accurate repetition of occupancy rates into misstatements.").

*Second*, the inferences the FDIC asks the Court to draw from its owner-occupancy

allegations cannot plausibly be drawn.  The FDIC's Amended Complaint conclusively presumes

that a borrower did not live in the subject property if (i) the borrower had tax bills sent to another

address (such as an office address or a post office box); or (ii) the borrower had other bills sent to

another address; or (iii) the borrower did not want to pay the money necessary to designate the

property a "homestead."  (AC ¶¶ 81, 83-86; Item 86(a)-(c) of Schedules to AC).  Of course, such

---

[48] *See, e.g.*, RALI 2007-QS3, P. at 45 (noting that defaults could "aris[e] from, among other things, *fraud or negligence* in the origination or servicing of a mortgage loan, including *misrepresentation by the mortgagor* . . . .") (emphases added) in Ex. 57 (excerpts of Offering Documents making substantially similar disclosures).

facts are as consistent with borrowers living in the properties as with not living in them, and thus fail to meet the *Twombly* standard.

*Third*, the FDIC's owner-occupancy allegations refute themselves.  The FDIC theorizes that if a borrower satisfies *any one* of its criteria for assessing occupancy, the borrower must have been lying on the loan application when stating an intent to live in the property.  (*See id.* ¶¶ 81, 83-86).  Thus, for example, the FDIC necessarily postulates that if a borrower had tax bills sent to another address (such as an office address or a post office box), the borrower must not live in the premises – even if the borrower had *all other bills* sent to the subject property and even if the borrower *did* designate the property as a "homestead."  This makes no sense: when a borrower mainly acts in ways that allegedly are consistent with living in the premises, then the only plausible inference is that the borrower lives in the premises.

Notably, the FDIC's Amended Complaint demonstrates that the vast majority of borrowers it postulates did not live in the premises acted consistently with living in the premises in two of the three ways the FDIC says are relevant to assessing occupancy (*e.g.*, they had non-tax bills sent to the property and declared it a homestead).  Specifically, the FDIC alleges that between 15% and 30% of the borrowers on the mortgages did not live in the premises as they said they would, but the vast majority of those borrowers acted consistently with living in the premises in two of the three ways.  (*See* Appendix F).  Indeed, for the majority of the Offerings, fewer than 5% of the properties – an amount that falls within the margin of error identified by the FDIC for its analysis – had borrowers who allegedly acted inconsistently with living in the properties in two or more of the three ways.  (*See* Appendix F; *see also* AC ¶ 3 n.1 (noting 5%

margin of error for conclusions about loan pools as a whole)).[49]  For such offerings, the only

inference to be drawn is that the actual owner-occupancy rates are consistent with what the

Offering Documents reported borrowers said.

### D.   The Allegations About Departures From Underwriting Guidelines Fail.

The FDIC's allegations about departures from underwriting standards also must be

dismissed.  The FDIC cannot proceed on a theory that the originators *sometimes* departed from

their underwriting guidelines, because the Offering Documents were explicit that the originators

did so.[50]  In fact, the FDIC freely concedes that the Offering Documents disclosed that the

originators "made exceptions to [their] standards."  (AC ¶ 89).  Accordingly, the FDIC's theory

necessarily is that "the originators [made] wholesale, rather than case-by-case, exceptions" and

"disregard[ed] those underwriting standards" – in effect, that the originators abandoned their

underwriting guidelines.  (*Id.* ¶ 90).  But Colonial was itself an originator of mortgage loans and

thus had first-hand knowledge of industry underwriting practices.  As such, the FDIC's

contention that Colonial was somehow misled by the Offering Documents is not plausible.

---

[49] The FDIC's own allegations reveal the small number of homeowners who allegedly acted inconsistently with occupancy in two or more of the three ways that the FDIC says are relevant to assessing occupancy.  For each Offering, the FDIC alleges that a certain number of borrowers acted in *one or more* of the three ways, and it counts the same borrower multiple times if the borrower acted in multiple such ways.  (*See* Item 86(a)-(c) of Schedules to the AC).  For example, the FDIC would count the same borrower twice if the borrower had tax bills sent to another address, and also had other bills sent to another address.  (*Id.*)  The FDIC then "eliminat[es] duplicates" within this group of borrowers to come up with a total number of borrowers who acted in *at least one* of the three ways.  (*See* Item 86(d) to Schedules to AC).  Necessarily, the number of "duplicates" the FDIC eliminated represents the maximum number of borrowers who allegedly acted inconsistently with occupancy in *more than* one of the three ways.  (*See* Appendix F).

[50] *See*, *e.g.*, WFMBS 2007-4, P.S. at S-47 ("exceptions to the Underwriting Standards may have been granted by [the originator]") in Ex. 2 (excerpts of other Offering Documents making substantially similar disclosures).

Further, the FDIC provides no facts whatsoever about what any originator did or did not do, much less facts suggesting the originators made "wholesale" exceptions to or "disregard[ed]" their guidelines.  *See*, *e.g.*, *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767-68 (S.D.N.Y. 2012); *IndyMac*, 718 F. Supp. 2d at 509-10; *see also N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, 2011 WL 1338195, at *10-11 (S.D.N.Y. Mar. 31, 2011) (rejecting allegations that the defendants misrepresented their commitment to underwriting guidelines where the facts alleged did not provide "*factual* allegations to support [the plaintiff's] statements") (emphasis added).  Instead, the FDIC relies solely on summary statistics – but those statistics do not support the notion that mortgage underwriting guidelines were "disregarded."

Courts have recognized that allegedly poor loan performance "could [have been] caused by any number of broad economic factors besides . . . deviation[s] from descriptions in the Offering Documents," and would not itself "establish that the[] offering documents contained material misstatements and omissions."  *Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *11; *accord Mass. Mut. Life Ins. Co*, 843 F. Supp. 2d at 208 (information concerning delinquencies and defaults merely "indicated that the loans were performing poorly," not that underwriting standards were abandoned).[51]  This is particularly obvious with respect to the FDIC's allegations about the rate at which loans "were *ever* 90 or more days delinquent" and the number of loans in each pool "that were 30 or more days delinquent *as of 2012*."  (AC ¶¶ 97-98 (emphasis added)).  Default rates in the worst housing market since the Great Depression are not a reliable indicator of  whether any mortgage originator adhered to its underwriting guidelines

---

[51] The FDIC cannot have it both ways.  Either the EPD rates were high, putting Colonial on notice of its claims and thus barring the claims under the statute of limitations (*see* Section I.A.3, *supra*), or they fail to provide evidence that originators abandoned their underwriting guidelines, and thus fail to state a claim.

*years earlier.  See*, *e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)

(affirming dismissal of securities claims at the pleading stage; "[w]hen the plaintiff's loss

coincides with a marketwide phenomenon . . . the prospect that the plaintiff's loss was caused by

the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if

proven, would show that its loss was caused by the alleged misstatements as opposed to

intervening events"); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir.

1994) ("[T]he substantial period between the alleged fraud and [the plaintiff's] loss, coupled with

the concurrence of that loss with the real estate market crash, is additional support for the

conclusion that the fraud was not a substantial cause of [the] injury.").  Accordingly, The FDIC's

allegations about underwriting guidelines must be dismissed.

> ### E.   The Allegations About Credit Ratings Fail.

The FDIC's allegations that the Certificates' credit ratings were too high also fail, for at

least three reasons.  *First*, these allegations are entirely derivative of the other allegations

discussed above, and thus fail along with them.  (*See* AC ¶ 102(a)-(d) (incorporating other

allegations of Amended Complaint as basis for credit ratings allegations)).

*Second*, the FDIC does not and cannot allege that the Offering Documents

misrepresented the credit ratings that third-party rating agencies actually bestowed on the

Certificates.  The FDIC does not, for example, allege that the Offering Documents stated that

Fitch rated the securities AAA when it actually rated them AA.  The FDIC's precise allegations

have been dismissed from numerous other RMBS cases on this basis.  As one court explained,

"[t]he . . . [certificates] actually received the ratings listed in the prospectus supplements, and

Plaintiff[] do[es] not allege to the contrary, so there is no misstatement on the face of the

documents."  *N.J. Carpenters Vacation Fund*, 720 F. Supp. 2d at 271; *accord Plumbers' Union*,

632 F.3d at 775 (because ratings "were accurately reported by defendants . . . nothing more is required").

*Third*, credit ratings cannot form the basis of a Section 11 claim without allegations of subjective falsity, which the FDIC does not make. Like appraisals, credit ratings reflect "a statement of *opinion* by each agency that it believed . . . that the credit quality of the mortgage pool underlying each Certificate was sufficient to support the assigned rating" and, accordingly, a plaintiff must "allege that the ratings agencies did not truly hold those opinions at the time they were made public." *Tsereteli*, 692 F. Supp. 2d at 394-95; *accord Lehman Bros.*, 684 F. Supp. 2d at 494-95; *IndyMac*, 718 F. Supp. 2d at 512 ("Ratings are opinions and therefore actionable under the Securities Act only if not truly held by the ratings agencies when issued. The [Complaint] is completely devoid of any such allegations."). The FDIC, however, does not allege subjective falsity. To the contrary, as noted, the FDIC *disavows* any such allegations, (AC ¶ 136), and that is dispositive. *Herrmann*, 302 F.3d at 564; *Belmont*, 2010 WL 3545389, at *7.

## III.   THE SECTION 15 CLAIMS FOR CONTROL PERSON LIABILITY FAIL.

The FDIC's Section 15 claims for secondary control person liability are subject to the same limitations and repose periods as its Section 11 claims, and the Section 15 claims thus are time-barred for the reasons stated above. *See Dodds*, 12 F.3d at 349 n.1.

Additionally, the FDIC's Section 15 claims "necessarily fail[]" because the FDIC has not adequately alleged an underlying violation of Section 11. *Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011). Furthermore, the FDIC does not adequately allege control; all it offers is the boilerplate allegation that some Defendants "controlled" others "by or through stock ownership, agency, or otherwise." (AC ¶¶ 4, 7, 10, 13, 141-150). Such "[c]onclusory allegations of control are insufficient as a matter of law." *In re Global Crossing, Ltd., Sec. Litig.*, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005); *accord In re Deutsche*

*Telekom AG Sec. Litig.*, 2002 WL 244597, at *5-7 (S.D.N.Y. Feb. 20, 2002) (cursory allegation that one defendant "had the power to influence and control and did influence and control the decision-making of" another was insufficient to state a claim for controlling person liability); *Martin v. EVP Second Corp.*, 1991 WL 131176, at *3 (S.D.N.Y. July 9, 1991) (Stanton, J.) (rejecting conclusory allegation that "EVP was at all times material hereto a controlling person of the Partnership within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act").[52]  Accordingly, the Section 15 claims must be dismissed.

**IV.   THE CLAIMS AGAINST CERTAIN UNDERWRITERS SHOULD BE DISMISSED FOR LACK OF STANDING.**

The FDIC asserts Section 11 claims against certain Defendants that did not underwrite the securities purchased by Colonial.  As the Offering Documents show, Citigroup Global Markets Inc. did not underwrite the class of WFMBS 2007-4 Certificates purchased by Colonial; RBS did not underwrite the classes of CMALT 2007-A3 and CMALT 2007-A5 Certificates purchased by Colonial; UBS did not underwrite the class of FHAMS 2007-FA1 Certificates purchased by Colonial; Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") as successor by merger to Banc of America Securities LLC ("BAS") did not underwrite the class of FHAMS 2007-FA2 Certificates purchased by Colonial; and FTN Financial Securities Corp. did not underwrite any certificates in either FHAMS 2007-FA1 or FHAMS 2007-FA2 (collectively, the "Split Underwriter Deals").  Because these Defendants did not underwrite the securities purchased by Colonial, the FDIC lacks statutory standing to assert Section 11 claims against these Defendants on these offerings.  Accordingly, these Section 11 claims must be dismissed, and Merrill Lynch and UBS dismissed entirely from this action.

---

[52] The standards for "control" are the same under Section 15 as they are under Section 20(a) of the Securities Exchange Act of 1934, and case law under the latter is therefore applicable. *See In re Lehman Bros. MBS Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011).

Section 11 claims are "notable . . . for the limitations on their scope." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). One such limitation is standing: Section 11 only authorizes investors to sue "certain enumerated parties." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("[T]he reach of section 11 is expressly limited to specific offering participants."). As to underwriters, Section 11 provides that an investor in a security may only sue "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(5). This limitation prevents an investor from bringing claims against an underwriter of securities it did not purchase. That, however, is what the FDIC is attempting to do here with respect to the above-named Defendants in the Split Underwriter Deals.

These Defendants did not underwrite the securities that Colonial purchased. While an RMBS offering can involve multiple interrelated classes, or tranches, of certificates, "there is also no question that each tranche is a discrete security." *Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *7 n.8; *see also Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *5 (C.D. Cal. May 5, 2011) (noting that each certificate in an RMBS offering "is traded separately" and possesses "a unique CUSIP number, an individual credit rating, a different interest rate, different rights to distribution of principal and interest payments, [and] distinct credit enhancement rights" and therefore "is indisputably a separate security"); *In re Wash. Mut. Mortg.-Backed Sec. Litig.*, 276 F.R.D. 658, 663 (W.D. Wash. 2011) ("Each tranche of MBS is an individual security."). Here, the Amended Complaint alleges that Colonial purchased only one Certificate from each of the Split Underwriter Deals. For example, in the FHAMS 2007-FA2 Offering Colonial purchased "a senior certificate . . . in class 1-A-4." (Item 38(b) of Schedule 7 to AC). The Offering Documents for FHAMS 2007-FA2 make clear,

however, that BAS did not underwrite that Certificate.  Instead, BAS underwrote only the "subordinated certificates" in the offering from "Class B-1, Class B-2, and Class B-3."[53]  The Offering Documents further state that BAS acted as an underwriter solely "with respect to the Class B-1, Class B-2 and Class B-3 Certificates," and not the class 1-A-4 Certificate purchased by Colonial.[54]

In sum, the FDIC's Section 11 claims against the above-named Defendants in the Split Underwriter Deals must be dismissed because those Defendants were not underwriters "with respect to such securit[ies]."  *Cf. NECA*, 693 F.3d at 158 (stating that a plaintiff "clearly lacks [statutory] standing to assert . . . claims on its behalf" involving "Certificates from other Offerings, or from different tranches in the same Offering . . . because it did not purchase those Certificates").  Accordingly, those claims must be dismissed, and Merrill Lynch and UBS must be dismissed entirely from this action.

## CONCLUSION

For the reasons set forth above, the Amended Complaint should be dismissed with prejudice.

---

[53] FHAMS 2007-FA2, P.S. at cover page & S-83 in Ex. 58.

[54] *Id.* at S-95.  Likewise, the Offering Documents demonstrate that (1) Citigroup Global Markets Inc. only underwrote subordinated certificates from the WFMBS 2007-4 Offering; (2) RBS (then Greenwich Capital Markets, Inc.) only underwrote subordinated certificates from the CMALT 2007-A3 and CMALT 2007-A5 Offerings; and (3) UBS only underwrote subordinated certificates from the FHAMS 2007-FA1 Offering.  (Ex. 58 (excerpts of Offering Documents naming separate underwriters for subordinated and senior securities in the Split Underwriter Deals)). The Amended Complaint alleges that Colonial only purchased "senior certificate[s]" in these securitizations.  (*See* Item 38(b) of Schedules 1, 3, 6, and 10 to AC).

Similarly, the FDIC's claims against FTN Financial Securities Corp. must be dismissed for lack of standing because "Underwriters" is a defined term in the prospectus supplements for the FHAMS 2007-FA1 and FHAMS 2007-FA2 Offerings, and in both Offerings, that term is defined *only* to include entities other than FTN Financial Securities Corp.  Ex. 59 (excerpts of defined terms for FHAMS 2007-FA1 and FHAMS 2007-FA2).

Dated: January 17, 2013                    Respectfully submitted,
      New York, New York


SIMPSON THACHER & BARTLETT LLP      MUNGER, TOLLES & OLSON LLP

By: ___/s/ Andrew T. Frankel_____      By: ___/s/ James C. Rutten_____
Thomas C. Rice (trice@stblaw.com)      Marc T.G. Dworsky
Andrew T. Frankel (afrankel@stblaw.com)      (marc.dworsky@mto.com)
Alexandra C. Pitney (lpitney@stblaw.com)      James C. Rutten (james.rutten@mto.com)

425 Lexington Avenue                    355 South Grand Avenue, 35th Floor
New York, New York 10017                Los Angeles, California 90071
Phone: (212) 455-2000                   Phone: (213) 683-9100
Fax: (212) 455-2502                     Fax: (213) 687-3702

*Attorneys for Defendant Deutsche Bank      Achyut J. Phadke (achyut.phadke@mto.com)*
*Securities Inc., RBS Securities Inc., and UBS      560 Mission Street, 27th Floor*
*Securities LLC*                        San Francisco, California 94105
                                                        Phone: (415) 512-4000
                                                        Fax: (415) 512-4077

                                                        *Attorneys for Defendant Wells Fargo Asset*
                                                         *Securities Corporation*


MAYER BROWN LLP                         CLEARY GOTTLIEB STEEN &
                                                  HAMILTON LLP

By: ___/s/ Michael O. Ware_____      By: ___/s/ Roger A. Cooper_____
Mark G. Hanchet                        Roger A. Cooper (racooper@cgsh.com)
(mhanchet@mayerbrown.com)              Jared Gerber (jgerber@cgsh.com)
Michael O. Ware (mware@mayerbrown.com)
Charles Korschun
(ckorschun@mayerbrown.com)

1675 Broadway                          1 Liberty Plaza
New York, New York 10019               New York, New York 10006
Phone: (212) 506-2500                  Phone: (212) 225-2000
Fax: (212) 262-1910                    Fax: (212) 225-3999

*Attorneys for Defendants HSBC Securities      Attorneys for Defendant Merrill Lynch, Pierce,*
*(USA) Inc. and Ally Securities, LLC*          *Fenner & Smith Inc.*

SULLIVAN & CROMWELL LLP

By:    /s/ Bruce E. Clark
Bruce E. Clark (clarkb@sullcrom.com)

125 Broad Street
New York, New York 10004-2498
United States
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Kathleen S. McArthur
(mcarthurk@sullcrom.com)

1701 Pennsylvania Avenue, NW
Washington, D.C. 20006-5805
Phone: (202) 956-7500
Fax: (202) 956-6993

*Attorneys for Defendants First Tennessee
Bank National Association (successor by
merger to First Horizon Home Loan
Corporation), FTN Financial Securities
Corp., and First Horizon Asset
Securities, Inc.*

SULLIVAN & CROMWELL LLP

By:    /s/ Sharon L. Nelles
Sharon L. Nelles (nelless@sullcrom.com)
Darrell S. Cafasso (cafassod@sullcrom.com)

125 Broad Street
New York, New York 10004-2498
United States
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Defendants Chase Mortgage
Finance Corp., JP Morgan Chase & Co., and
J.P. Morgan Securities LLC*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:    /s/ Bruce Birenboim
Brad S. Karp
(bkarp@paulweiss.com)
Bruce Birenboim
(bbirenboim@paulweiss.com)
Susanna M. Buergel
(sbuergel@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants Citicorp Mortgage
Securities Inc., CitiMortgage Inc., and
Citigroup Global Markets Inc.*

CRAVATH, SWAINE & MOORE LLP

By:    /s/ Richard W. Clary
Richard W. Clary
(rclary@cravath.com)
Julie North
(jnorth@cravath.com)
Richard J. Stark
(rstark@cravath.com)
Michael T. Reynolds
(mreynolds@cravath.com)
Lauren A. Moskowitz
(lmoskowitz@cravath.com)

Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Defendant Credit Suisse
Securities (USA) LLC*

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

## Appendix A – Grounds for Dismissal of Claims

| Deal No. | Certificate | Defendant(s) | Defendant's Alleged Role | Certificate Issue Date | Colonial's Alleged Purchase Date | Untimely – 1933 Act 1 yr Statute of Limitations[1] | Untimely – 1933 Act 3 yr Statute of Repose (bar date)[2] | No Actionable Misstatements or Omissions | No Control Person Liability (Defendant) | Lack of Standing (Defendant) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CMALT 2007-A3 Class 1-A-4 | CMSI Credit Suisse RBS CitiMortgage | Issuer Underwriter Underwriter Control Person | 3/28/2007 | 8/21/2007 | X | X (3/28/2010) | X | X (CitiMortgage) | X (RBS) |
| 2 | CMALT 2007-A2 Class 1-A-15 | CMSI Credit Suisse CitiMortgage | Issuer Underwriter Control Person | 2/27/2007 | 6/5/2007 | X | X (2/27/2010) | X | X (CitiMortgage) | |
| 3 | CMALT 2007-A5 Class 1-A-6 | CMSI HSBC RBS CitiMortgage | Issuer Underwriter Underwriter Control Person | 5/30/2007 | 8/31/2007 | X | X (5/30/2010) | X | X (CitiMortgage) | X (RBS) |
| 4 | CHASE 2007-S4 Class A-12 | Chase Mortgage JP Morgan JP Morgan  Chase | Issuer Underwriter Control Person | 5/30/2007 | 10/19/2007 | X | X (5/30/2010) | X | X (JP Morgan Chase) | |
| 5 | CMSI 2006-6 Class A-4 | CMSI Citigroup CitiMortgage | Issuer Underwriter Control Person | 11/28/2006 | 10/23/2007 | X | X (11/28/2009) | X | X (CitiMortgage) | |
| 6 | FHAMS 2007-FA1 Class A-4 | FHASI DBS UBS FTN FHHLC | Issuer Underwriter Underwriter Underwriter Control Person | 2/28/2007 | 6/15/2007 | X | X (2/28/2010) | X | X (FHHLC) | X (UBS/FTN) |
| 7 | FHAMS 2007-FA2 Class 1-A-4 | FHASI Citigroup BAS FTN FHHLC | Issuer Underwriter Underwriter Underwriter Control Person | 3/30/2007 | 9/24/2007 | X | X (3/30/2010) | X | X (FHHLC) | X (BAS/FTN) |
| 8 | RALI 2007-QS3 Class A-5 | RBS | Underwriter | 2/27/2007 | 6/15/2007 | X | X (2/27/2010) | X | N/A | |
| 9 | RFMSI 2007-SA4 Class 4-A-1 | GMAC | Underwriter | 8/30/2007 | 9/21/2007 | X | X (8/30/2010) | X | N/A | |
| 10 | WFMBS 2007-4 Class A-15 | WFASC RBS Citigroup | Issuer Underwriter Underwriter | 3/28/2007 | 9/4/2007 | X | X (3/28/2010) | X | N/A | X (Citigroup) |
| 11 | WFMBS 2007-7 Class A-36 | WFASC Bear Stearns | Issuer Underwriter | 5/30/2007 | 6/26/2007 | X | X (5/30/2010) | X | N/A | |

[1] All claims were barred as of August 14, 2009 (the date of the FDIC's appointment as receiver) because Colonial was on notice of the alleged claims no later than August 14, 2008.
[2] Bar dates calculated from the date each of the Certificates was offered for sale.

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

### Appendix B – Substantially Identical Complaints Filed by the FDIC as Receiver for Various Failed Banks

| Date of Initial Filing | Complaints Filed by the FDIC |
|---|---|
| Nov. 4, 2011 | FDIC as receiver for Franklin Bank, S.S.B. v. Countrywide Secs. Corp., No. 12-cv-03279 (C.D. Cal.) |
| Nov. 4, 2011 | FDIC as receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Co., No. 12-cv-01777 (S.D. Tex.) |
| Feb, 24, 2012 | FDIC as receiver for Security Savings Bank v. Banc of Am. Secs. LLC, No. 12-cv-6690 (C.D. Cal.) |
| Feb, 24, 2012 | FDIC as receiver for Security Savings Bank v. Countrywide Fin. Corp.. LLC, No. 12-cv-6692 (C.D. Cal.) |
| May 18, 2012 | FDIC as receiver for Strategic Capital Bank v. Countrywide Fin. Corp., No. 12-04354 (C.D. Cal.) |
| May 18, 2012 | FDIC as receiver for Citizens National Bank and Strategic Capital Bank v. Bear Stearns Asset Backed Secs. I LLC, et al., No. 12-cv-4000 (S.D.N.Y.) |
| May 18, 2012 | FDIC as receiver for Strategic Capital Bank v. J.P. Morgan Secs. LLC, et al., No. 12-cv-8415-MRP (MANx) (C.D. Cal.) |
| Aug. 10, 2012 | FDIC. as receiver for Colonial Bank v. Countrywide Fin. Corp., No. 12-cv-6911-MRP (MANx) (C.D. Cal) |
| Aug. 10, 2012 | FDIC as receiver for Colonial Bank v. Countrywide Secs. Corp., No. 12-cv-8317-MRP (MANx) (C.D. Cal.) |
| Aug. 10, 2012 | FDIC as receiver for Colonial Bank v. Banc of America Funding Corp., et al., No. 12-cv-00791 (M.D. Ala.) |
| Aug. 10, 2012 | FDIC as receiver for Colonial Bank v. Citigroup Mortg. Loan Trust, Inc., et al., No. 12-cv-00790 (M.D. Ala) |
| Aug. 17, 2012 | FDIC as receiver for Guaranty Bank v. Ally Secs. LLC, et al., No. 12-cv-00872 (W.D. Tex.) |
| Aug. 17, 2012 | FDIC as receiver for Guaranty Bank v. J.P. Morgan Secs. LLC, et al., 1:12-cv-00878-SS (W.D. Tex.) |
| Sept. 14, 2012 | FDIC as receiver for Irwin Union Bank & Trust Co. v. J.P. Morgan Acceptance Corp. I, No. 03C01-1209-PL-004729 (Ind.) |
| Sept. 14, 2012 | FDIC as receiver for Irwin Union Bank & Trust Co. v. J.P. Morgan Acceptance Corp.I., No. 03C01-1209-PL-004731 (Ind.) |

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166 (S.D.N.Y.)

## Appendix C – Downgrades of Certificates and Subordinate Classes Before August 14, 2008

| | Offering | Class | Original Rating Fitch/Moody's/S&P | Oct. 2007 | Jan. 2008 | Mar. 2008 | Apr. 2008 | May 2008 | July 2008 | Aug. 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CMALT 2007-A3 | 1-A-4 B2 B3 | AAA/Aaa/AAA A/-/- BBB/-/- | | Fitch: A- Fitch: BB | Fitch: AAA*- Fitch: A-*- Fitch: BB*- | | Fitch: CCC Fitch: CC | | Mdy's: Aa1 |
| 2 | CMALT 2007-A2 | 1-A-15 B2 B3 | AAA/Aaa/AAA A/-/- BBB/-/- | | Fitch: A- Fitch: BB | Fitch: AAA*- Fitch: A-*- Fitch: BB*- | Mdy's: Aaa*- | Fitch: CCC Fitch: CC | | F: AA*-/Mdy's: Aa1 |
| 3 | CMALT 2007-A5 | 1-A-6 B2 B3 | AAA/Aaa/AAA A/-/- BBB/-/- | | Fitch: A- Fitch: BB | Fitch: AAA*- Fitch: A-*- Fitch: BB*- | | Fitch: B*- Fitch: CC | | |
| 4 | CHASE 2007-S4 | A-12 B2 B3 | AAA/Aaa/AAA BBB/-/- BB/-/- | | | | | S&P: AAA*- | | Fitch: C Fitch: C |
| 5 | CMSI 2006-6 | A-4 B2 B3 | AAA/Aaa/AAA A/-/- BBB/-/- | | | | | | | Fitch: BBB Fitch: BB |
| 6 | FHAMS 2007-FA1 | A-4 B2 B3 | AAA/-/AAA A/-/- BBB/-/- | | Fitch: A- Fitch: BB | Fitch: AAA*- Fitch: A-*- Fitch: BB*- | | Fitch: CCC Fitch: CC | | |
| 7 | FHAMS 2007-FA2 | 1-A-4 B3 B5 | AAA/Aaa/AAA BBB/-/- B/-/B | S&P: B- | | Fitch: BBB*- Fitch: B*- | | Mdy's: Aaa*- Fitch: C Fitch: C/S&P: CC | Fitch: AAA*- | |
| 8 | RALI 2007-QS3 | A-5 B2 M3 | AAA/Aaa/AAA B/-/- BBB/-/- | | Fitch: C Fitch: C | Fitch: AAA*- | Mdy's: Aaa*- | S&P: AAA*- | | Fitch: AA*- |
| 9 | RFMSI 2007-SA4 | 4-A-1 B1 M3 | AAA/-/AAA BB/-/BB BBB/-/BBB | | | | | | | Fitch: C Fitch: CC |
| 10 | WFMBS 2007-4 | A-15 B2 B3 | AAA/Aaa/AAA A/-/- BBB/-/- | | | | | | | Fitch: BBB*- Fitch: B*- |
| 11 | WFMBS 2007-7 | A-36 B2 B3 | AAA/Aaa/- A/-/- BBB/-/- | | | | | | | Fitch: BBB*- Fitch: BB*- |

Note 1: table was compiled using publicly available ratings information available on Bloomberg and the rating agencies' websites.  *See* Ex. 21.
Note 2: *- indicates that the rating agency has placed the Certificate on negative watch or negative outlook.

*FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.*
12-cv-6166 (S.D.N.Y.)

**Appendix D  – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008**

| Allegations regarding Inflated or Inaccurate Appraisals and Understated Loan-to-Value Ratios | |
|---|---|
| Amended Complaint | "In connection with these securitizations, there was an undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans." ¶ 66 |
| | "[T]he appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties." ¶ 67 |
| | "[A] material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations." ¶ 68 |
| Complaints filed before August 14, 2008 make similar allegations | |
| Luther[1] | "The appraisals of many properties were inflated as appraisers were pressured to provide the desired appraisal value regardless of the actual value of the underlying property so the loan could close." ¶ 17 |
| | "Inflated and unreliable [appraisals]  render[ed] the loan-to-value ratio guidelines essentially meaningless." ¶ 53 |
| City of Ann Arbor[2] | "The appraisals of many properties were inflated, as appraisers . . . were rewarded for their willingness to support preconceived or predetermined property values violating USPAP regulations." ¶ 5 |
| Plumbers' & Pipefitters' Local #562[3] | "[A]ppraisals were unreliable due to lack of controls on the part of [Defendants] . . . . Moreover, the originators had exerted pressure on appraisers to produce pre-determined appraisal values that were not based on the actual values of the properties." ¶ 34 |
| | Chase Home Finance "and its brokers either tacitly or explicitly pressured appraisers to appraise certain values, since appraisers knew they would not be hired again if they failed to report the value desired.  This led to inflated appraisals." ¶ 44 |

---

[1] Luther v. Countrywide Home Loans Servicing LP, No. BC 380698 (Cal. Super. Ct.), complaint filed Nov. 14, 2007 (Ex. 25).
[2] City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.,  No. 08-cv-1418 (E.D.N.Y.), complaint filed Mar. 19, 2008 (Ex. 23).
[3] Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp., I., No. 08-cv-1713 (E.D.N.Y.), complaint filed Mar. 26, 2008 (Ex. 26).

*FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.*
12-cv-6166 (S.D.N.Y.)

### Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008

| | |
|---|---|
| Plumbers Union Local No. 12[4] | "[A]ppraisals of many properties were inflated." ¶ 5 |
| | "The property appraisals for the mortgage loans were not objective, meticulous or compliant with [USPAP]." ¶ 44 |
| | "Wells Fargo Bank's correspondent [lenders, from which Wells Fargo purchased loans] were originating loans with questionable loan-to-value ratios due to defective appraisals . . . . Because of Wells Fargo Bank's failure to control the originators' aggressiveness with respect to appraisers and appraisals, these loans were extremely risky notwithstanding the FICO score or payment history of the borrower." ¶ 47 |
| NJ Carpenters Health Fund[5] | "[A] material portion of the underlying collateral . . . were not 'in accordance with [applicable] credit, appraisal and underwriting standards.'" ¶ 39. |
| **Allegations regarding Conformity with USPAP** | |
| Amended Complaint | "[A] material number of mortgage loans in the collateral pools had appraisals conducted [sic] that deviated from USPAP." ¶73 |
| **Complaints filed before August 14, 2008 make similar allegations** | |
| Luther | "[T]he appraisals were not in conformity with Fannie Mae or Freddie Mac standards as they were not a reasonable estimate of the actual value of the homes in question." ¶ 53 |
| City of Ann Arbor | "[P]rior to 2007, [American Home Mortgage's] appraisal process had been substantially eroded such that many of the real estate properties underlying the Alt-A loans were not the subject of legitimate appraisals done in compliance with USPAP standards . . . ." ¶ 36 |
| Plumbers Union Local No. 12 | "[A]ppraisers were rewarded for their willingness to . . . violat[e] USPAP regulations." ¶ 5 |
| | "The property appraisals for the mortgage loans were not objective, meticulous or compliant with [USPAP]." ¶ 44 |

---

[4] Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08-cv-10446 (D. Mass.), complaint filed Jan. 31, 2008 (Ex. 24).
[5] N.J. Carpenters Health Fund v. DLJ Mort. Capital Inc., No. 08 Civ. 5653 (S.D.N.Y.), complaint filed June 3, 2008 (Ex. 27).

*FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.*
12-cv-6166 (S.D.N.Y.)

**Appendix D  – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008**

| Allegations regarding Abandonment of Underwriting Standards | |
|---|---|
| Amended Complaint | "[The Offering Documents] omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale . . . exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.  ¶ 90 |
| Complaints filed before August 14, 2008 make similar allegations | |
| City of Ann Arbor | "The underwriting, quality control, and due diligence practices and policies utilized were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application."  ¶ 5

American Home Mortgage "regularly granted exceptions [to its underwriting standards] even where 'compensating factors' were not present. "  ¶ 36

American Home Mortgage "grant[ed] mortgages to customers with little or no money down.  Exceptions were not made for 'quality' loans, but rather were granted as a matter of course."  ¶ 36

"Wells Fargo did not attempt to confirm the standards actually used by mortgage brokers, correspondents and other third parties from which Wells Fargo acquired mortgages."  ¶ 47 |
| Luther | "Countrywide Home Loans was granting exceptions to 'standard underwriting practices,' regardless of whether 'compensating factors' existed."  ¶ 53

"Stated Income loans were not adequately reviewed . . . This permitted many loans to be closed where there was no reasonable basis to conclude that the borrower would ever be able to keep up with monthly mortgage payments."  ¶ 53 |

*FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.*
12-cv-6166 (S.D.N.Y.)

**Appendix D  – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008**

| | |
|---|---|
| Plumbers' & Pipefitters' Local #562 | "The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application." ¶ 7 |
| | "[T]he originators and other lenders that sold mortgage loans to [the issuer] had become so aggressive in approving and funding loans that many of the mortgage loans were made to borrowers who had either falsified the required documentation or had not submitted it to the lender." ¶ 32 |
| | "Wells Fargo did not sufficiently confirm the standards of mortgage brokers, correspondents and other third parties from which Wells Fargo acquired Mortgages . . . On December 10, 2007, Moody's downgraded the ratings of certain investments backed by subprime loans issued by Wells Fargo & Co. because borrowers were having problems keeping up with payments, such that Wells Fargo's underwriting practices were suspect." ¶¶ 50, 52 |
| | Chase Home Finance "and its brokers were much more generous in granting exceptions than represented and the emphasis was on getting loans approved more so than on making 'careful considerations' of the borrower's ability to pay." ¶ 44 |
| Plumbers Union Local No. 12 | "The underwriting, quality control and due diligence practices utilized in connection with the approval and funding of the mortgage loans were so weak that some borrowers were given mortgage loans based on stated income in the loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application." ¶ 5 |
| | "[N]o-documentation loans were not limited to situations where assets could be verified, which meant that mortgage loans were approved and funded for borrowers with both insufficient assets and insufficient income." ¶ 42 |
| Luminent Mortgage Capital Inc.[6] | "Plaintiff . . . relied on Merrill's due diligence on the Mortgage Loans to ensure that those loans actually met the lenders' underwriting criteria (i.e., that the borrower's financial profile actually met the lender's purported minimum standards for extending a mortgage loan) and otherwise satisfied the standard criteria for 'Alt-A' quality loans regarding, inter alia, the appraisal of the collateral; the amount of assets held by the borrower; the borrower's employment history, income, and debt ratio; and the location of the real property . . . .  Of course, if the information on the deal tape and other information provided by Defendants was materially inaccurate, Plaintiff's entire calculus regarding the desirability of the Junior Certificates would be rendered inaccurate and useless." ¶¶ 72, 74 |

---

[6] Luminent Mort. Capital, Inc. v. Merrill Lynch & Co., No. 2:07-cv-05423 (E.D. Pa.), complaint filed Dec. 24, 2007 (Ex. 22).

FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.
12-cv-6166 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008**

| | |
|---|---|
| NJ Carpenters Health Fund | "Following the issuance of the Certificates, disclosures began to emerge revealing that [originators] routinely disregarded the underwriting guidelines in originating mortgage collateral." ¶ 3 |
| | "[T]he 'guidelines' for determining exceptions were materially disregarded in favor of generating sufficient loan volume . . . ." ¶ 43 |
| **Allegations regarding Rate of Loan Delinquencies** | |
| Amended Complaint | "A high rate of delinquency at any time in a group of mortgage loans is [] evidence that originators of those loans may have disregarded their underwriting standards in making the loans." ¶ 97 |
| **Complaints filed before August 14, 2008 make similar allegations** | |
| Luminent Mortgage Capital Inc. | "Here, a review of the performance of the loan portfolio over time demonstrates an unusually high rate of early payment defaults, as well as unusually high rates of delinquencies." ¶ 75 |
| | "[E]arly payment default and delinquency rates . . . prove that the material information referenced [in the complaint was] materially false." ¶ 79 |
| Plumbers' & Pipefitters' Local #562 | "The delinquency and foreclosure rates of the mortgage loans securing the Certificates has grown faster and in greater quantity than what would be expected for mortgage loans of the types described in the Prospectus Supplements." ¶ 10 |
| | "Wells Fargo lenders were becoming increasingly aggressive in mortgage lending practices in 2006, leading to higher defaults, well beyond Wells Fargo's experience." ¶ 50 |
| Plumbers Union Local No. 12 | "The delinquency rates on the underlying mortgage loans have skyrocketed." ¶ 53 |
| NJ Carpenters Health Fund | The fact that originators "routinely disregarded the underwriting guidelines in originating mortgage collateral . . . [was] confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly-rated debt issues." ¶ 3 |
| | Credit Suisse, "beginning in 2006, began to experience an exceptional increase in their mortgage default rate." ¶ 66 |

*FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.*
12-cv-6166 (S.D.N.Y.)

**Appendix D – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008**

| | |
|---|---|
| **Allegations regarding Ratings of the Certificates** | |
| Amended Complaint | "The[] statements by the defendants about the ratings of the certificates they issued and underwrote were misleading because the defendants omitted to state that the ratings were affected by all the material untrue or misleading statements about specific mortgage loans in the collateral pools." ¶ 102 |
| **Complaints filed before August 14, 2008 make similar allegations** | |
| City of Ann Arbor | "As a result [of false statements regarding underwriting, appraisals and LTVs] defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings." ¶ 6 |
| Luther | "Defendants were able to get AAA ratings on many of the tranches of certificates, however due to the undisclosed underwriting defects and appraisal manipulations, these tranches were in fact not equivalent to AAA-rated corporate bonds." ¶ 8 |
| Plumbers' & Pipefitters' Local #562 | Ratings agencies "offered superior credit ratings on the Certificates as a result of defendants' failure to disclose the underwriting defects and appraisal manipulations." ¶ 8 |
| Plumbers Union Local No. 12 | "As a result [of false statements regarding underwriting, appraisals and LTVs] defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other bonds with the same credit ratings." ¶ 6 |
| NJ Carpenters Health Fund | "[T]he initial ratings . . . [were] material misstatements of fact . . . because the Rating Agencies presumed that the loans were of high credit quality issued in compliance with the stated underwriting guidelines . . . ." ¶ 45 |
| **Allegations regarding Second Liens on Properties** | |
| Amended Complaint | "[M]any of the properties that secured mortgage loans in the collateral pool of each securitization were subject to [undisclosed] liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations." ¶ 60 |
| **Complaints filed before August 14, 2008 make similar allegations** | |

*FDIC (Colonial Bank) v. Chase Mort. Fin. Corp., et al.*
12-cv-6166 (S.D.N.Y.)

**Appendix D  – Similar Allegations Against Defendants and Originators Made in Complaints Filed Prior to August 14, 2008**

| | |
|---|---|
| Luther | "Countrywide Home Loans did not verify that borrowers had sufficient cash to meet down payments and closing costs, which led to many 'silent second' liens [on the properties]."  ¶ 55 |
| Plumbers Union Local No. 12 | "[T]he loan-to-value ratio limits represented in the Registration Statements were misleading . . . as a result of . . . second liens on properties whereby borrowers secretly borrowed their down payments."  ¶ 44 |
| **Allegations regarding Owner-Occupancy Status** | |
| Amended Complaint | "[M]ortgage loans on primary residences usually have more favorable terms . . . than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.  Plaintiff is informed and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans did so."  ¶ 80 |
| Complaints filed before August 14, 2008 make similar allegations | |
| City of Ann Arbor | "[American Home Mortgage] was, as a matter of course, awarding loans to speculators who were not occupying the homes without properly verifying income.  AHM knew the high proportion of non-owner occupied loans would decrease the borrowers' 'willingness' to continue to pay loan payments if home prices stagnated or dropped."  ¶ 35 |
| Luminent Mortgage Capital Inc. | "Specifically, in evaluating whether to invest in the Junior Certificates, Plaintiff considered and relied upon standard metrics concerning the underlying loans, such as . . . the purpose of the real property serving as collateral (primary residence, second home, etc.)"  ¶ 72<br><br>Merrill provided "false and misleading information regarding various other material characteristics of the Mortgage Loans that Plaintiff relied upon, including . . . the purpose of the Mortgage Loans."  ¶ 70<br><br>"[Merrill] recklessly misrepresented the composition of the pool of Mortgage Loans . . . by providing false and misleading information regarding various other material characteristics of the individual Mortgage Loans as aforesaid, including but not limited to . . . the purpose of the Mortgage Loans."  ¶ 88 |

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

### Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|---|---|
| March 26, 2007 | Bloomberg reports that GMAC/ResCap bonds were cut from "buy" to "neutral" by Banc of America Securities due to the departure of top executives and because of increasing "yield premiums on ResCap bonds . . . on concerns about rising default rates on subprime mortgages." **Residential Capital's affiliates sponsored, issued, underwrote, and originated all of the loans for RALI 2007-QS3, and sponsored, issued, and originated the majority of loans in RFMSI 2007-SA4.** (Ex. 29) |
| April 19, 2007 | AFX International Focus and Associated Press reports that "shares of First Horizon National Corp. sank Thursday after the bank said it lost money on mortgage lending because of more payment defaults and weaker demand for home loans from investors . . . The culprit was bad credit, which led to losses in the bank's mortgage business. The bank is writing off more loans as borrowers miss payments." **First Horizon affiliates were the issuers of FHAMS 2007-FA1 and FHAMS 2007-FA2 and originated or purchased the mortgage loans in the collateral pool.** (Ex. 30) |
| August 6, 2007 | American Home Mortgage files for bankruptcy. **American Home Mortgage was a significant originator in CMALT 2007-A5.** (Ex. 31) |
| August 7, 2007 | First Horizon National Corp.'s 10Q acknowledges "significant current uncertainties in the mortgage and credit markets" and the various adverse effects it may have on the company. (Ex. 32) |
| August 27, 2007 | The Associated Press reports that First Horizon was "among companies with too much exposure to riskier debt" from the mortgage industry. (Ex. 33) |

Black: News Articles and Press Releases          Green: SEC Filings and Related Documents
Red: Ratings Events                              Blue: Complaints Filed by RMBS Investors

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

**Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008**

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|---|---|
| November 14, 2007 | RMBS investors file class action complaint in Luther v. Countrywide Fin. Corp., No. BC 380698 (Cal. Super. Ct.) against, inter alia, UBS Securities LLC., Deutsche Bank Securities, Inc., Citigroup Global Markets, Inc., Greenwich Capital Markets, Inc. (RBS), and J.P. Morgan Securities Inc., alleging that registration statements for RMBS issued or underwritten by defendants failed to disclose underwriting deficiencies and inflated appraisals in connection with the underlying mortgages. The Complaint acknowledges that "[b]y the summer of 2007, the amount of uncollectable mortgage loans underlying the certificates began to be revealed to the public." (Ex. 25 ¶¶ at 7-9) |
| December 24, 2007 | RMBS investors file complaint in Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co., No. 2:07-cv-05423 (E.D. Pa.) alleging that "Merrill's representations regarding the quality of the loans in the portfolio . . . were . . . false," including with respect to "the appraisal[s] of the collateral," "Loan-to-Value ratios," "the purpose of the real property serving as collateral (primary residence, second home, etc.)," and whether the "loans actually met the lenders' underwriting criteria." (Ex. 22 at ¶¶ 71-72) |
| Early 2008 | Major news outlets, including the New York Times, Wall Street Journal, and Los Angeles Times, report on government investigations into firms that provided loan analysis services to MBS market participants, including Defendants. Reports state that vendors had seen material increases in the number of defective loans, and that many of these defective loans nevertheless had been securitized. (Exs. 34-39) |
| January 30, 2008 | The Wall Street Journal reports that the FBI was "investigat[ing] mortgage fraud in several states where they have noted high fraud activity, including California, Texas, Florida and Arizona . . . [as well as] possible fraud in the secondary market for mortgages, which could implicate well-known financial firms." The report noted that "[t]he faltering U.S. housing market and a rise in defaults and foreclosures, particularly among low-end borrowers, has whipsawed global stock and bond markets, led to the dismissal of Wall Street chiefs and resulted in losses by banks, hedge funds and securities firms." (Ex. 38) |

FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.
12-cv-6166-LLS (S.D.N.Y.)

**Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008**

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|---|---|
| January 31, 2008 | RMBS investors file complaint in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., No. 08 Civ. 10446 (D. Mass.) against, inter alia, Greenwich Capital Markets, Inc. (RBS), UBS Securities Inc., and Merrill Lynch, Pierce, Fenner & Smith, Inc, alleging that RMBS "Registration Statements [filed by defendants with the SEC] were materially false and misleading in that they included false statements and/or omissions about: (i) the underwriting standards purportedly used in connection with the underwriting of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios permitted on the loans." (Ex. 24 at ¶ 4) |
| February 8, 2008 | The Los Angeles Times reveals that "Standard & Poor's . . . overhaul[ed] its grading process in response to criticism that its ratings on mortgage bonds helped precipitate the sub-prime meltdown" saying that it would now begin to "[f]lag ratings on securities such as mortgage-backed bonds, to help distinguish them from corporate and government ratings." (Ex. 40) |
| February 12, 2008 | Moody's issues a press release stating that it had "downgraded the servicer quality (SQ) rating of First Horizon Home Loans . . . citing the above average collection abilities, average loss mitigation results, above average foreclosure and REO timeline management and above average stability assessment." (Ex. 41) |
| February 27, 2008 | Residential Capital's 2007 Annual Report on SEC Form 10-K discloses that it suffered a $4.3 billion loss in 2007, compared to net income of $705.1 million in 2006.  The 10-K explains that its 2007 results were "adversely affected by domestic economic conditions, including increases in delinquencies on our mortgage loans held for investment portfolio and a significant deterioration in the securitization and residential housing markets." A May 5, 2008 8-K further reports that "[t]here is a significant risk that we will not be able to meet our debt service obligations, be unable to meet certain financial covenants in our credit facilities, and be in a negative liquidity position in June 2008." **Residential Capital's affiliates sponsored, issued, underwrote, and originated all of the loans for RALI 2007-QS3, and  sponsored, issued, and originated the majority of loans in RFMSI 2007-SA4.**  (Exs. 42-43) |

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

**Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008**

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|---|---|
| March 6, 2008 | Fitch places CMALT 2007-A3, CMALT 2007-A2, CMALT 2007-A5, FHAMS 2007-FA1 and RALI 2007-QS3 on negative watch.  In a corresponding press release, Fitch states that a detailed review of its RMBS ratings is necessary due to rapidly rising delinquency levels in the collateral partially "attributable to the use of high risk mortgage products such as 'piggy-back' second liens and stated-income documentation programs, which in many instances were poorly underwritten and susceptible to borrower/broker fraud." (Ex. 28) |
| March 11, 2008 | The Wall Street Journal reports that Kourash Partow, an American Home sales executive convicted of mortgage fraud, had sought a lighter sentence on the grounds that his employers encouraged the intentional misrepresentation of loan performance data and the adequacy of loan underwriting. **American Home Mortgage was a significant originator in CMALT 2007-A5.** (Ex. 44) |
| March 13, 2008 | The President's Working Group on Financial Markets issues a policy statement offering the group's "insight on causes of recent market issues." The Working Group described these causes as "lax underwriting standards for mortgages, particularly for subprime mortgages; an erosion of market discipline in the securitization process; flaws in credit rating agencies' assessments of some complex structured credit products; risk management weaknesses at global financial institutions; and regulatory policies that failed to mitigate risk management weaknesses." (Ex. 45) |
| March 19 2008 | Investors in Citigroup RMBS file complaint in *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, No. 08-005187 (N.Y. Sup. Ct.) against Citigroup Global Markets and other Citigroup entities alleging, inter alia, that "appraisals of many properties were inflated," that "appraisals were not done . . . in compliance with USPAP," that "[e]xceptions" to underwriting standards were abandoned because the originators were "granting exceptions as a matter of course," and that defendants made false statements regarding "the maximum loan-to-value ratios used to qualify borrowers." (Ex. 23 at ¶¶ 4-5, 36) |
| March 26, 2008 | Investors in J.P. Morgan RMBS file complaint in *Plumbers' & Pipefitters' Local #562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713 (E.D.N.Y.) alleging misstatements regarding underwriting standards and inflated appraisals of the underlying collateral in multiple J.P. Morgan RMBS trusts. (Ex. 26) |

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

**Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008**

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|---|---|
| April 4, 2008 | Moody's places CMALT 2007-A2 on negative watch. |
| April 11, 2008 | Moody's places RALI 2007-QS3 on negative watch |
| May 7, 2008 | Moody's places FHAMS 2007-FA2 on negative watch. |
| May 22, 2008 | S&P places CHASE 2007-S4 on negative watch. |
| May 28, 2008 | S&P places RALI 2007-QS3 on negative watch. |
| June 3, 2008 | RMBS investors file complaint in N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653 (S.D.N.Y.) alleging that mortgage originators "routinely disregarded the underwriting guidelines in originating mortgage collateral" which was "confirmed by substantially higher rates of delinquencies and foreclosures on collateral for such highly-rated debt issues." (Ex. 27 at ¶ 3) |

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

**Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008**

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|------|--------------------------------------------------------------|
| June 6, 2008 | The New York Times reports that "[d]elinquency and foreclosure rates . . . have picked up speed in nearly every quarter since" late 2006 and indicates that these defaults were expanding beyond subprime loans. Significantly, the article reports that "California and Florida . . . accounted for nearly a third of all mortgages that were in foreclosure or 90 days delinquent" and that "[t]he problems in California and Florida are extraordinary." **RFMSI 2007-SA4, WFMBS 2007-4, WFMBS 2007-7, CMALT 2007-A3, CMALT 2007-A2, CMALT 2007-A5, CHASE 2007-S4, CMSI 2006-6, FHAMS 2007-FA1, and FHAMS 2007-FA2 all had substantial exposure to loans originated in California.  RALI 2007-QS3 had substantial exposure to loans originated in California and Florida.**[1] (Ex. 46) |
| July 31, 2008 | Fitch places FHAMS 2007-FA2 on negative watch. |
| August 1, 2008 | The Wall Street Journal, discussing risk exposure to home equity loans, reports that "investors should use caution when it comes to First Horizon National" due to First Horizon's "heavy exposure to home-equity loans written by outside mortgage brokers and other third parties that often employ lax underwriting standards." **First Horizon affiliates were the issuers of FHAMS 2007-FA1 and FHAMS 2007-FA2 and originated or purchased the mortgage loans in the collateral pool.** (Ex. 49) |
| August 4, 2008 | Fitch **downgrades CMALT 2007-A2** to AA with a negative watch. |

---

[1] The Offering Documents disclosed that a plurality of mortgage loans in the collateral pools were originated in California and Florida.  *See* Ex. 47. (excerpts of Offering Documents disclosing the geographic concentrations of mortgage loans).  Additionally, many of the Offering Documents expressly warned investors that "[i]f the regional economy or housing market weakens in California, Florida, or any other region having a significant concentration of properties underlying the mortgage loans, the mortgage loans in that region may experience high rates of loss and delinquency, resulting in losses to certificate holders."  *See, e.g.*, RALI 2007-QS3, P.S. at S-18 in Ex. 48 (excerpts of Offering Documents warning that the high concentration of mortgage loans in certain states created additional risks to investors).

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

**Appendix E – Chronology of Information Publicly Available to RMBS Investors Prior to August 14, 2008**

| Date | Event Contributing to Colonial's Knowledge of Alleged Claims |
|---|---|
| August 5, 2008 | Fitch **downgrades RALI 2007-QS3** to AA with a negative watch. |
| August 7, 2008 | Moody's **downgrades CMALT 2007-A2 and CMALT 2007-A3** to Aa1. |
| August 7, 2008 | August 7, 2008: The Wall Street Journal reports on the woes of the housing market, noting that "evidence that lax lending standards were leading to higher mortgage delinquencies first emerged in late 2006" and that "data from the FDIC suggested that lenders still did not substantially tighten standards until at least July or August 2007. . . ." (Ex. 50)<br><br>The article also reports that J.P. Morgan Chase & Co. expected its losses on unsecured mortgages to continue, and that as late as August 2007 the bank "was still making some loans that didn't require full documentation of borrowers' incomes and assets." **JP Morgan Chase originated the mortgage loans in the collateral pool of CHASE 2007-S4**.<br><br>The article further reports that Wells Fargo did not take the corrective measure of reducing the maximum amount borrowers could finance until the fourth quarter of 2007, only after there was a reduced demand for MBS.  **Wells Fargo originated at least 90% of the mortgage loans for WFMBS 2007-4 and WFMBS 2007-7.** |

*FDIC (Colonial Bank) v. Chase Mortgage Finance Corp., et al.*
12-cv-6166-LLS (S.D.N.Y.)

### Appendix F – Owner Occupancy Information

| Deal No. | Offering | Loans in Loan Pool | Number of Properties with Alleged Misstated Owner Occupancy (based on presence of one factor allegedly suggesting non-occupancy) | Number of Properties that Possess Two Alleged Characteristics of Non-Occupancy | Percentage of Properties with One Alleged Characteristic of Non-Occupancy | Percentage of Properties with Two Alleged Characteristics of Non-Occupancy* |
|---|---|---|---|---|---|---|
| 1 | CMALT 2007-A3 | 1638 | 287 | 69 | 17.52% | **4.21%** |
| 2 | CMALT 2007-A2 | 2164 | 530 | 136 | 24.49% | 6.28% |
| 3 | CMALT 2007-A5 | 2961 | 681 | 134 | 23.00% | **4.53%** |
| 4 | CHASE 2007-S4 | 1354 | 406 | 115 | 29.99% | 8.49% |
| 5 | CMSI 2006-6 | 687 | 143 | 20 | 20.82% | **2.91%** |
| 6 | FHAMS 2007-FA1 | 1124 | 177 | 33 | 15.75% | **2.94%** |
| 7 | FHAMS 2007-FA2 | 1209 | 206 | 45 | 17.04% | **3.72%** |
| 8 | RALI 2007-QS3 | 3594 | 773 | 225 | 21.51% | 6.26% |
| 9 | RFMSI 2007-SA4 | 159 | 30 | 7 | 18.87% | **4.40%** |
| 10 | WFMBS 2007-4 | 3278 | 779 | 155 | 23.76% | **4.73%** |
| 11 | WFMBS 2007-7 | 8620 | 2069 | 517 | 24.00% | 6.00% |

* Bolded numbers indicate percentages less than the alleged margin of error in the Amended Complaint.