**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>             Plaintiff,<br><br>    v.<br><br>CHASE MORTGAGE FINANCE CORP.; JPMORGAN CHASE & CO.; J.P. MORGAN SECURITIES LLC; CITICORP MORTGAGE SECURITIES, INC.; CITIMORTGAGE, INC.; CITIGROUP GLOBAL MARKETS INC.; FIRST HORIZON ASSET SECURITIES INC.; FIRST HORIZON HOME LOAN CORPORATION; ALLY SECURITIES LLC; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK SECURITIES INC.; FTN FINANCIAL SECURITIES CORP.; HSBC SECURITIES (USA) INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; RBS SECURITIES INC.; UBS SECURITIES LLC; and WELLS FARGO ASSET SECURITIES CORPORATION;<br><br>             Defendants. | No. 12 Civ. 6166 (LLS) (MHD) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 4

ARGUMENT ................................................................................................................ 5

I.  ALL OF THE FDIC'S CLAIMS ARE TIMELY ........................................................ 5

   A.   The Timeliness of the FDIC's Claims is Governed by 12 U.S.C.
       §1821(d)(14) ........................................................................................ 6

      1.   The Extender Provision Applies to Statutes of Repose .................................... 6

      2.   The Extender Provision Applies to Federal Securities Claims ...................... 10

   B.   None of the FDIC's Claims Is Barred by the Three-Year Statute of Repose ........ 11

   C.   The FDIC Has Adequately Pled Compliance with
       Section 13 of the 1933 Act ...................................................................... 11

   D.   Defendants Have Not Shown That a Reasonable Investor in These Certificates
       Would Have Had Enough Facts Before August 14, 2008, to File a Well-Pled
       Complaint Against These Defendants That Would Have Withstood a Motion
       to Dismiss Under Rule 12(b)(6) .............................................................. 15

      1.   Because the Certificates Remained Investment Grade After August 14,
         2008, Defendants Cannot Show as a Matter of Law That the Limitations
         Period Began to Run Before That Date. ............................................ 17

      2.   The Facts on Which the Amended Complaint Is Based Were Not
         Available to a Reasonable Investor Before August 14, 2008 ...................... 18

      3.   Other Information Available Before August 14, 2008 Was Not Sufficient
         to Trigger the Statute of Limitations. ............................................. 22

         a.   Complaints by Other RMBS Investors. ..................................... 24

         b.  "Negative Rating Events". ..................................................... 26

         c.  News Reports. ...................................................................... 27

         d.  Colonial's Role as a Mortgage Lender. ..................................... 31

   E.   Even If Defendants Could Show That the Statute of Limitations Began to Run
       Before August 14, 2008, It Was Tolled With Respect to Three Certificates By
       the Filing of Two Class Actions .............................................................. 32

i

II.  THE SECTION 11 CLAIMS ARE NOT SUBJECT TO DISMISSAL ON ANY
     OTHER GROUND ................................................................................................34

     A.  Defendants May Not, and Did Not, Disclaim Their Statutory Duty .....................36

     B.  The Allegations About LTVs and Property Appraisals Are Sufficient ................37

         1.  Even If LTVs and Appraisals Are Properly Deemed Opinions, the
             Amended Complaint Adequately Pleads That the Statements in the
             Prospectus Supplements About Appraisals and LTVs Were Untrue or
             Misleading ..................................................................................................38

         2.  The FDIC's AVM-Based Allegations Are More Than Sufficient to Meet
             *Twombly*'s "Plausibility" Standard ..............................................................41

         3.  The AVM-Based Allegations Do Not Plead "Fraud by Hindsight"................43

         4.  The AVM-Based Allegations Do Not Fail Because Some of the
             Certificates Were Backed in Part by Purchase-Money Loans.........................44

     C.  The Allegations About Undisclosed Additional Liens Are Sufficient .................45

     D.  The Allegations About Owner-Occupancy Rates Are Sufficient .........................47

     E.  The Allegations About Departures from Underwriting Standards
         Are Sufficient .......................................................................................................50

     F.  The Allegations About Credit Ratings Are Sufficient ..........................................54

III. DEFENDANTS THAT DID NOT UNDERWRITE THE PARTICULAR CLASS
     OF SECURITIES THAT COLONIAL PURCHASED MAY STILL BE LIABLE
     AS "UNDERWRITERS" UNDER SECTION 11 ..................................................55

IV.  THE AMENDED COMPLAINT PLEADS A CLAIM FOR CONTROL PERSON
     LIABILITY UNDER SECTION 15 OF THE 1933 ACT.........................................59

CONCLUSION....................................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Activision Sec. Litig.*,
No. C-83-4639(A) MHP, 1986 WL 15339 (N.D. Cal. Oct. 20, 1986) ................. 58-59

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
824 F. Supp. 2d 1164 (C.D. Cal. 2011) ................................................................. 20

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) ........................................................................................... 32, 33

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) ...................................................................... 28

*Barneby v. E.F. Hutton & Co.*,
715 F. Supp. 1512 (M.D. Fla. 1989) ........................................................................ 48

*Bates v. Long Island R.R. Co.*,
997 F.2d 1028 (2d Cir. 1993) ................................................................................... 35

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ............................................................. *passim*

*Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through
Certificates Series AR-1*,
748 F. Supp. 2d 1246 (W.D. Wash. 2010) ............................................................... 42

*Borden, Inc. v. Spoors Behrins Campbell & Young, Inc.*,
735 F. Supp. 587 (S.D.N.Y. 1990) .......................................................................... 60

*Brecher v. Citigroup Inc.*,
No. 09 Civ. 7359 (SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 4, 2011) ..................... 15

*Briarwood Invs., Inc. v. Care Inv. Trust Inc.*,
No. 07 Civ. 8159 (LLS), 2010 WL 5422549 (S.D.N.Y. Dec. 29, 2010) ................... 39

*Burlington Northern & Santa Fe Ry. Co. v. Poole Chem. Co.*,
419 F.3d 355 (5th Cir. 2005) ..................................................................................... 9

*Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*,
No. 12-10085-RWZ, 2013 WL 535320 (D. Mass. Feb. 13, 2013) ...................... 39-40

*Capital Ventures Int'l v. UBS Sec. LLC*,
No. 11-11937-DJC, 2012 WL 4469101 (D. Mass. Sept. 28, 2012) .................... *passim*

iii

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*,
    703 F. Supp. 2d 253 (E.D.N.Y. 2010) ............................................................... *passim*

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)........................................................................5, 15

*In re Deutsche Bank AG Sec. Litig.*,
    No. 09 Civ. 1714 (DAB), 2011 WL 3664407 (S.D.N.Y. Aug. 19, 2011) ..................33

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*,
    No. 12 Civ. 4761 (JSR), 2013 WL 856499 (S.D.N.Y. Feb. 27, 2013) ......................51

*Dijulio v. Digicon, Inc.*,
    325 F. Supp. 963 (D. Md. 1971) ...................................................................58

*FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*,
    No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973
    (C.D. Cal. Nov. 21, 2012) .........................................................................14

*FDIC as Receiver for the Bank of New England v. Zibolis*,
    856 F. Supp. 57 (D.N.H. 1994)....................................................................11

*FDIC as Receiver for United W. Bank, F.S.B. v. Countrywide Fin. Corp.*,
    No. 11-CV-10400-MRP (MANx), 2013 WL 49727
    (C.D. Cal. Jan. 3, 2013) ......................................................................... *passim*

*FDIC v. Barton*,
    96 F.3d 128 (5th Cir. 1996) .........................................................................6

*FDIC v. Former Officers and Directors of Metro. Bank*,
    884 F.2d 1304 (9th Cir. 1989) ......................................................................8

*Fed. Home Loan Bank of Chi. v. Banc of Am. Funding Corp.*,
    No. 10 CH 45033, slip op. (Ill. Cir. Ct. Sept. 19, 2012) ............................................13

*Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*,
    No. 49D05 1010 PL 45071, slip op. (Ind. Super. Ct. July 3, 2012)............................17

*Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Sec. Inc.*,
    No. GD-09-016893, slip op. (Ct. Pa. Ct. Comm. Pleas Mar. 6, 2013) ......................30

*Fed. Hous. Fin. Agency v. Countrywide Fin. Corp.*,
    No. 2:12-CV-1059-MRP (MANx), 2012 WL 5275327
    (C.D. Cal. Oct. 18, 2012) ........................................................................ *passim*

*Fed. Hous. Fin. Agency v. Morgan Stanley*,
   No. 11 Civ. 6739 (DLC), 2012 WL 5868300 (S.D.N.Y. Nov. 19, 2012)...................45

*Fed. Hous. Fin. Agency v. J.P. Morgan Chase & Co.*,
   No. 11 Civ. 6188 (DLC), 2012 WL 5395646 (S.D.N.Y. Nov. 5, 2012)...............27, 53

*Fed. Hous. Fin. Agency v. UBS Am. Inc.*,
   858 F. Supp. 2d 306 (S.D.N.Y. 2012)................................................................. *passim*

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994).......................................................................................53

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009).......................................................................37

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
   862 F. Supp. 2d 322 (S.D.N.Y. 2012).......................................................................57

*In re Global Crossing, Ltd. Sec. Litig.*,
   No. 02 Civ. 910 (GEL), 2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005)........................59

*Griffin v. Singletary*,
   17 F.3d 356 (11th Cir. 1994) ...................................................................................33

*Haas v. Pittsburgh Nat'l Bank*,
   526 F.2d 1083 (3d Cir. 1975)....................................................................................33

*Harden v. Raffensperger, Hughes & Co., Inc.*,
   65 F.3d 1392 (7th Cir. 1995) ...................................................................................58

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..................................................................................................56

*Huddleston v. United States*,
   485 Fed. Appx. 744 (6th Cir. 2012)............................................................................9

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir.1998).......................................................................................37

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010)..................................................................1, 51

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   793 F. Supp. 2d 637 (S.D.N.Y. 2011).......................................................................33

*Inv. Co. of the Sw. v. Reese*,
   875 P.2d 1086 (N.M. 1994) ........................................................................ 8-9

*Iowa Pub. Emps.' Ret. Sys. v. M.F. Global Ltd.*,
   620 F.3d 137 (2d Cir. 2010) .................................................................... 36-37

*Kowal v. Int'l Bus. Machs. Corp. (In re Int'l Bus. Machs. Corp. Sec. Litig.)*,
   163 F.3d 102 (2d Cir. 1998) ........................................................................ 39

*Lau v. Mezei*,
   No. 10 CV 4838 (KMW), 2012 WL 3553092 (S.D.N.Y. Aug. 16, 2012) ................ 15

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011) ........................................................ 55, 56, 58

*In re Lehman Bros. Sec. and ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) .................................................... 51, 52

*In re Lehman Bros. Sec. and ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011) ...................................................... 33

*In re Lehman Bros. Sec. and ERISA Litig.*,
   No. 09 MD 2017 (LAK), 2013 WL 440622 (S.D.N.Y. Jan. 23, 2013) .............. 34

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ........................................................................ 53

*Luminent Mortg. Capital v. Merrill Lynch & Co.*,
   652 F. Supp. 2d 576 (E.D. Pa. 2009) .................................................... 24, 25

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
   No. 2:10-CV-0302-MRP (MANx), 2011 WL 4389689
   (C.D. Cal. May 5, 2011) .............................................................................. 37

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
   843 F. Supp. 2d 191 (D. Mass. 2012) .............................................. *passim*

*McDonald v. Sun Oil Co.*,
   548 F.3d 774 (9th Cir. 2008) ............................................................ 7, 8, 9

*McKenna v. SMART Techs. Inc.*,
   No. 11 Civ. 7673 (KBF), 2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) .............. 60

*Merck & Co. v. Reynolds*,
   130 S. Ct. 1784 (2010) .......................................................................... 15, 16

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*
No. 09 Civ. 2137 (LTS), 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) ..................23

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
810 F. Supp. 2d 650 (S.D.N.Y. 2011).................................................................. *passim*

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
No. 09 Civ. 2137 (LTS) (MHD), 2012 WL 2899356
(S.D.N.Y. July 16, 2012) ................................................................................. *passim*

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
No. 09 Civ. 2137 (LTS), 2013 WL 139556 (S.D.N.Y. Jan. 11, 2013) ......................34

*In re Mun. Mortg. & Equity, LLC Sec. & Deriv. Litig.*,
No. MJG-08-1961-MDL, 2012 WL 2450161 (D. Md. June 26, 2012) ................ 15-16

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
No. 08 Civ. 5653 (PAC), 2013 WL 357615 (S.D.N.Y. Jan. 23, 2013) ......................34

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781 (HB), 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ......................52

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
No. 08 CV 8781 (HB), 2011 WL 2020260 (S.D.N.Y. May 19, 2011)........1, 15, 22, 23

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
No. 12-17070-cv, 2013 WL 765178 (2d Cir. Mar. 1, 2013)..............................1, 51, 52

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
720 F. Supp. 2d 254 (S.D.N.Y. 2010).........................................................................51

*Nat'l Credit Union Admin Bd. v. RBS Sec. Inc.*,
No. 11-2340-RDR, 2012 WL 3028803 (D. Kan. July 25, 2012)........................ *passim*

*NECA-IBEW Health and Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012), *cert. denied*, 2013 WL 1091772
(U.S. Mar. 18, 2013) ................................................................................1, 34, 56

*Newman v. Warnaco Grp., Inc.*,
335 F.3d 187 (2d Cir. 2003)........................................................................................16

*P. Stolz Family P'ship v. Daum*,
355 F.3d 92 (2d Cir. 2004)..........................................................................................37

*Pearson v. United States*,
831 F. Supp. 2d 514 (D. Mass. 2011) .........................................................................35

*In re Phar-Mor, Inc. Litig.*,
    848 F. Supp. 46 (W.D. Pa. 1993) ................................................................48

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan
    Acceptance Corp.*,
    No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448
    (E.D.N.Y. Feb. 23, 2012) .................................................................15, 26, 30, 39

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan
    Acceptance Corp. I*,
    No. 08 CV 1713 (ERK) (WDW), 2012 WL 4053716
    (E.D.N.Y. Sept. 14, 2012) ................................................................................34

*Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ...........................................................42

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    658 F. Supp. 2d 299 (D. Mass. 2009) ............................................................25

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ......................................................................25, 51

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    No. 08-10446-RGS, 2012 WL 4480735 (D. Mass. Oct. 1, 2012) ................33

*Police and Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*,
    No. 10 Civ. 4429 (MGC), 2012 WL 2026556 (S.D.N.Y. May 31, 2012) ..................14

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
    No. 09 CV 1110 (HB), 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011) ...........1, 26, 27, 52

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010) ...................................................1, 14, 17

*Rafton v. Rydex Series Funds*,
    No. 10-CV-01171-LHK, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) ..........................16

*Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.*,
    No. 10-cv-00338-MSK, 2011 WL 1258504 (D. Colo. Mar. 29, 2011) ......................21

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005) ...........................................................42

*SEC v. Spectrum, Ltd.*,
    489 F.2d 535 (2d Cir. 1973) ...........................................................................55

*In re Smith Barney Transfer Agent Litig.*,
    No. 05 Civ. 7583 (WHP), 2012 WL 3339098 (S.D.N.Y. Aug. 15, 2012)..................33

*SMS Fin., LLC v. ABCO Homes, Inc.*,
    167 F.3d 235 (5th Cir. 1999) ......................................................................9

*Special Situations Fund III, L.P. v. Cocchiola*,
    No. 01-3099 (WHW), 2007 WL 2261557 (D.N.J. Aug. 3, 2007) ..............................58

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)......................................................................28

*Stonehedge/FASA-Texas JDC v. Miller*,
    110 F.3d 793, 1997 WL 119899 (5th Cir. 1997) ...........................................6

*Textrainer P'ship Secs. Litig.*,
    No. C-05-0969 MMC, 2006 WL 1328851 (N.D. Cal. May 15, 2006) ......................41

*Torkie-Tork v. Wyeth*,
    739 F. Supp. 2d 895 (E.D. Va. 2010) ........................................................41

*Tregenza v. Great Am. Commc'ns Co.*,
    12 F.3d 717 (7th Cir. 1993) ....................................................................12

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010).......................................................51

*UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*,
    168 F.3d 1173 (10th Cir. 1999) ................................................................9

*Universal Church v. Geltzer*,
    463 F.3d 218 (2d Cir. 2006).....................................................................7

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)..................................................15, 33

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000).......................................................................35

*In re WorldSpace Sec. Litig.*,
    No. 07 Civ. 2252 (RMB), 2008 WL 2856519 (S.D.N.Y. July 21, 2008)..................59

*WRH Mortgage Inc. v. Butler*,
    684 So.2d 325 (Fla. App. 1996).................................................................7

## STATUTES

12 U.S.C. § 1821 ................................................................................................6, 8, 10

15 U.S.C. § 77b ............................................................................................................55

15 U.S.C. § 77k ............................................................................................................48

15 U.S.C. § 77m .............................................................................................................5

15 U.S.C. § 77o ............................................................................................................59

28 U.S.C. § 1658 ..........................................................................................................16

Pub. L. No. 101-73, 103 Stat. 183 (1989) .....................................................................8

## OTHER AUTHORITIES

135 Cong. Rec. S10182-01 (1989) .................................................................................9

135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989) ..........................................................9

Federal Deposit Insurance Corporation, *Interagency Appraisal and Evaluation Guidelines*, 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010) ...................................43

Rajdeep Sengupta, *Alt-A: The Forgotten Segment of the Mortgage Market*, FED. RESERVE BANK OF ST. LOUIS REVIEW, Jan./Feb. 2010, 92(1) ...................................28

The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice (*available at* htttp://www.uspap.org/#/166/) ............................................................43

## INTRODUCTION

This motion depends on arguments that the Second Circuit and numerous judges of this Court have rejected.[1] Those arguments are no more persuasive now than when they were rejected so many times before.

The Federal Deposit Insurance Corporation as Receiver for Colonial Bank (FDIC) brought this action to recover damages arising from the defendants' violation of sections 11 and 15 of the Securities Act of 1933 (1933 Act).

Defendants are the issuers and underwriters of 11 residential mortgage-backed securities (RMBS) that Colonial Bank purchased for approximately $388 million between June and October 2007. (Am. Compl. ¶¶ 1, 38 & Item 38 of Schedules 1-11.) Defendants bundled mortgage loans into "collateral pools" and sold "certificates" that entitle their holders to a stated part of the cash flow from payments that the borrowers would make on their loans. Those mortgage loans are the sole source of payment to owners of the certificates. The safety and value of the certificates depends on the credit quality of the mortgage loans that back them. (*Id.* ¶ 35.)  The certificates all were rated triple-A when Colonial purchased them. (*Id.* ¶¶ 100, 110 & Item 38 of Schedules 1-11.) Colonial's

---

[1] *See, e.g.*, *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, No. 12-1707-cv, 2013 WL 765178, at *10, *12 (2d Cir. Mar. 6, 2013);  *NECA-IBEW Health  and Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 (2d Cir. 2012); *Fed. Hous. Fin. Agency v. UBS Am. Inc.*, 858 F. Supp. 2d 306, 313-333 (S.D.N.Y. 2012) (Cote, J.); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763-69 (S.D.N.Y. 2012) (Swain, J.); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS) (MHD), 2012 WL 2899356, at *2-3 (S.D.N.Y. July 16, 2012); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2011 WL 2020260, at *4-5 (S.D.N.Y. May 19, 2011); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09 CV 1110 (HB), 2011 WL 135821, at *8-9 (S.D.N.Y. Jan. 12, 2011); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80, 483 (S.D.N.Y. 2010) (Rakoff, J.); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 505, 509-10 (S.D.N.Y. 2010) (Kaplan, J.).

investment policy required that it purchase only certificates that were rated at least double-A. (*Id.* ¶ 101.)

In the offering documents for each securitization, defendants made many detailed statements about the specific mortgage loans in that securitization. For example, defendants made statements about how much equity the borrowers had in their homes (the more equity, the less likely borrowers are to default); the procedures followed to appraise the value of the borrowers' homes; how many of the homes were the primary residences of the borrowers (borrowers are much less likely to default on a mortgage loan on the home in which they actually live than on a second home or investment property); and the underwriting standards of the lenders that made the loans. Colonial had no access to information about those individual loans when deciding whether (and at what price) to purchase a particular certificate other than what the defendants disclosed in the offering documents that they filed with the Securities and Exchange Commission.

According to the detailed allegations in the amended complaint, many of the material statements that the defendants made about the mortgage loans that backed each of Colonial's certificates were untrue or misleading when the defendants made them. Many borrowers actually had much less equity in their homes than defendants stated; many appraisals did not follow the required procedures; many fewer homes were primary residences than defendants stated; and many lenders disregarded their underwriting standards. Faced with these allegations and with a statute that makes them strictly liable without proof of anything else, defendants nevertheless try to persuade the Court that, as a matter of law, they are not responsible for a single one of these statements. Defendants also try to divert the Court's attention from the issues relevant to their motion by making

misleading and irrelevant assertions about Colonial's own lending practices. (Defs. Br. at 1-2, 9-12.) But whatever Colonial's lending practices were, they say nothing about what it knew or should have known about the truth of the statements defendants made in the offering documents for these securities, which were backed by mortgage loans originated by other lenders.

Defendants first argue that all of the claims in the amended complaint are time-barred as a matter of law because any reasonable investor not only would have suspected by August 14, 2008 (one year before Colonial failed and the Federal Deposit Insurance Corporation was appointed as its receiver) that defendants had made untrue or misleading statements in the offering materials, but also could have filed by that date a well-pled complaint with sufficient facts to withstand a motion to dismiss under Rule 12(b)(6). But because many of the facts that are alleged in the amended complaint and are necessary to alert a plaintiff that it has, and then to state a claim, were not discoverable until after August 14, 2008, and because the certificates kept their triple-A rating well beyond that date, the Court should not hold that the statute of limitations was triggered before that date. Moreover, the information defendants point to does not begin to establish that Colonial had actual or constructive knowledge that the offering documents contained statements that were untrue or misleading. None of that information relates to the certificates Colonial purchased, but rather concerns only general market practices or conditions. Courts consistently have held that such information is insufficient to trigger the statute of limitations.

Defendants next argue that the amended complaint does not plead a plausible claim for relief. They contend that Colonial should have paid no attention to the many

statements they made about the credit quality of the loans backing these certificates, either because the statements were opinions, the defendants were not the source of that information, or the offering documents contained boilerplate statements that purported to disclose or disclaim the risk of each of these misstatements. But courts in other RMBS cases have rejected these arguments repeatedly, and they do not shield defendants from liability here for the same reasons that have persuaded those many other courts. Defendants also challenge the "statistical" analyses of the securitizations underlying the amended complaint, but those methods have been upheld repeatedly by other courts on motions to dismiss. In sum, defendants ask the Court to decide – as a matter of law before any discovery – that they are not responsible for a single one of the untrue or misleading statements that they made about the mortgage loans that backed each of the certificates that Colonial purchased. Many judges of this Court have rejected similar arguments in other RMBS cases, and the FDIC respectfully urges the Court to do the same here.

## FACTUAL BACKGROUND

On August 14, 2009, Colonial was closed and the Federal Deposit Insurance Corporation was appointed as its receiver. The FDIC then investigated possible claims that it is authorized to bring as receiver. That investigation included a detailed analysis of a random sample of the relevant loans in each of the 11 securitizations using a comprehensive, industry-standard automated valuation model (AVM), among other tools, to test the truth of the statements defendants made in the offering documents. (*See, e.g.*, Am. Compl. ¶¶ 2-3, 50-57, 60-63, 82-86.) As a result, the FDIC discovered in 2012 that many of those statements were untrue or misleading. (*Id.* ¶ 138.)

The FDIC filed a complaint in this Court on August 10, 2012, asserting claims under sections 11 and 15 of the 1933 Act. The defendants moved to dismiss that complaint as time-barred and for failure to state a claim. Pursuant to Rule 15(a)(1)(B), the FDIC filed an amended complaint as of right on December 4, 2012. Defendants now move to dismiss the amended complaint on the same grounds. As discussed below, defendants fail to meet their burden of demonstrating that the amended complaint either is time-barred or fails to state a claim as a matter of law.

## ARGUMENT

## I.   ALL OF THE FDIC'S CLAIMS ARE TIMELY.

All of the FDIC's claims are timely under section 13 of the 1933 Act, which requires a section 11 claim to be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" but "[i]n no event . . . more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. To establish that the FDIC's claims are barred under the three-year statute of repose, defendants would have to show that the certificates were offered to the public before August 14, 2006. To establish as a matter of law that the FDIC's claims are barred under the one-year statute of limitations, defendants would have to show that, on or before August 14, 2008, Colonial discovered or should have discovered sufficient facts to plead a viable claim that defendants made material untrue or misleading statements in the offering documents for these securities. *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012). Because defendants cannot meet that burden, their motion should be denied.

### A.  The Timeliness of the FDIC's Claims Is Governed by 12 U.S.C. § 1821(d)(14).

The timeliness of the FDIC's claims must be determined by applying 12 U.S.C. § 1821(d)(14), the so-called "extender provision" of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). That provision gives the Federal Deposit Insurance Corporation as receiver for a failed bank at least three years after it is appointed as receiver to file claims held by the failed bank that had not expired at the time of the failure. *See* 12 U.S.C. § 1821(d)(14)(A)(ii) – (B). Therefore, as long as the claims asserted in the amended complaint were not already time-barred when the FDIC was appointed as receiver for Colonial – and they were not, for the reasons explained below – then under FIRREA, the FDIC had at least three years from the date of its appointment in which to file those claims. *FDIC v. Barton*, 96 F.3d 128, 132-33 (5th Cir. 1996). The FDIC was appointed receiver on August 14, 2009, and it filed its original complaint less than three years later on August 10, 2012. Its claims therefore are timely.

### 1.  The Extender Provision Applies to Statutes of Repose.

Defendants argue, incorrectly, that section 1821(d)(14) does not apply because it refers only to "statutes of limitations," and thus cannot alter a "statute of repose." (Defs. Br. at 37.) As several courts have held, reliance on this distinction is misplaced. *See, e.g., Stonehedge/FASA-Texas JDC v. Miller,* 110 F.3d 793, 1997 WL 119899, at *2 (5th Cir. 1997) (rejecting argument that section 1821(d)(14) did not apply because relevant limitations period was a "'substantive statute of repose' rather than a 'procedural statute of limitations'"); *Fed. Hous. Fin. Agency v. Countrywide Fin. Corp.,* No. 2:12-CV-1059-MRP (MANx), 2012 WL 5275327, at *8 (C.D. Cal. Oct. 18, 2012) (*FHFA/Countrywide*) (holding that comparable provision in Housing and Economic Recovery Act of 2008

(HERA) applied to statute of repose, rejecting argument defendants make here); *Fed. Hous. Fin. Agency v. UBS Am. Inc.*, 858 F. Supp. 2d 306, 316-17 (S.D.N.Y. 2012) (*FHFA/UBS*) (same); *Nat'l Credit Union Admin Bd. v. RBS Sec. Inc.*, No. 11-2340-RDR, 2012 WL 3028803, at *16-17 (D. Kan. July 25, 2012) (*NCUA/RBS*) (holding that comparable extender provision in Federal Credit Union Act (FCUA) applied to statute of repose under 1933 Act); *WRH Mortgage Inc. v. Butler*, 684 So.2d 325, 327 (Fla. App. 1996) (regardless of whether limitations period was properly characterized as statute of limitations or statute of repose, it was preempted by section 1821(d)(14)).

Statutory construction must begin with a determination whether the relevant language has a plain meaning. *Universal Church v. Geltzer*, 463 F.3d 218, 223 (2d Cir. 2006). Where the statutory language is ambiguous, the court may look to the statute's legislative history. *Id.* When FIRREA was enacted in 1989, the term "statute of limitations" was ambiguous about whether it also included statutes of repose. *See McDonald v. Sun Oil Co.*, 548 F.3d 774, 781 (9th Cir. 2008) (concluding that in 1986, "[t]he term 'statute of limitations' was ambiguous regarding whether it included statutes of repose"); *FHFA/Countrywide*, 2012 WL 5275327, at *6 ("[T]he term 'statute of limitations' was ambiguous in 1986. In the intervening 22 years, Congress routinely set both periods using the caption 'limitation.'").[2] Even today, the two terms "are often conflated." *NCUA/RBS*, 2012 WL 3028803, at *16 (citing numerous examples). As one court recently noted in rejecting the same argument defendants make here, "[t]he United

---

[2] Defendants cite several cases to support the proposition that statutes of limitation and repose are "distinct" concepts. (Defs. Br. at 37-38.) Although they may be conceptually distinct, it is nevertheless beyond dispute that "Congress, the courts and learned commentators regularly use the term 'limitations' to encompass both types of timeliness provision." *FHFA/UBS*, 858 F. Supp. 2d at 315.

States Code is littered with statutory provisions entitled 'statute of limitations,' 'time limits,' 'time limitations' and 'limitations of actions,' that regulate both when plaintiffs can bring a claim after discovery of their rights and when plaintiffs are absolutely barred from bringing a claim." *FHFA/Countrywide*, 2012 WL 5275327, at *5. Indeed, Section 13 of the 1933 Act itself is entitled "Limitation of Actions," despite providing both a statute of limitations and a statute of repose. In contrast, an electronic search of the entire U.S. Code reveals *not a single instance* of Congress using the term "statute of repose."

Because of this ambiguity in the statutory language, the Court must "examine [FIRREA's] legislative history in order to determine Congress's intent at the time of its adoption." *McDonald*, 548 F.3d at 781. Furthermore, because this action is brought by an agency of the federal government, the Court should construe this ambiguity in favor of the FDIC. *See NCUA/RBS*, 2012 WL 3028803, at *17 ("In cases involving ambiguous limitations provisions impacting actions brought by the government, courts generally construe those provisions in favor of the government.") (citing *FDIC v. Former Officers and Directors of Metro. Bank*, 884 F.2d 1304, 1309 (9th Cir. 1989)); *FHFA/Countrywide*, 2012 WL 5275327, at *8 (construing ambiguity in favor of FHFA).

Construing section 1821(d)(14) to apply to statutes of repose comports with the express purpose of FIRREA, while defendants' argument to the contrary undermines that purpose. Congress enacted FIRREA in response to the savings-and-loan crisis "[t]o strengthen the enforcement powers of Federal regulators of depository institutions." Pub. L. No. 101-73, 103 Stat. 183, 187 (1989). Section 1821(d)(14) "was expressly constructed to give the FDIC the power to maximize potential recoveries by offering the agency a longer period in which to act." *Inv. Co. of the Sw. v. Reese*, 875 P.2d 1086, 1093

8

(N.M. 1994) (*citing* 135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989) (statement of

Senator Riegle)). Courts have explained the importance of the extended limitation

periods:

> Extending these limitations periods will significantly increase the amount of money that can be recovered by the Federal Government through litigation, and help ensure the accountability of the persons responsible for the massive losses the Government has suffered through the failures of insured institutions. The provisions should be construed to maximize potential recoveries by the Federal Government by preserving to the greatest extent permissible by law claims that would otherwise have been lost due to the expiration of hitherto applicable limitations periods.

*SMS Fin., LLC v. ABCO Homes, Inc.*, 167 F.3d 235, 242 n.21 (5th Cir. 1999) (*quoting*

135 Cong. Rec. S10182-01 (1989)); *see also UMLIC-Nine Corp. v. Lipan Springs Dev.

Corp.*, 168 F.3d 1173, 1178 (10th Cir. 1999) (similarly describing purpose of provision).[3]

---

[3] The rulings defendants cite in other cases brought by the NCUA are not persuasive. (Defs. Br. at 39 n.30.) The court that issued those decisions did not undertake any meaningful analysis of legislative history or context as the other courts cited herein have done. *See, e.g., FHFA/UBS*, 858 F. Supp. 2d at 340 (finding *NCUA* court's analysis "untenable in light of the commonly understood meaning of 'statute of limitations' and the frequent practice by Congress, federal courts and commentators of using the term to encompass all forms of time limitation").

The other cases defendants cite also do not support their argument. (*See* Defs. Br. at 39 n.30.) *Huddleston v. United States*, 485 Fed. Appx. 744 (6th Cir. 2012), addressed a provision in the Federal Tort Claims Act, which waives sovereign immunity only to the extent state law would impose liability on a private person. Thus, plaintiff had to meet the requirement of Tennessee's statute of repose to have a claim for medical malpractice under Tennessee law for which the United States could be liable under the FTCA. *Burlington Northern & Santa Fe Railway Co. v. Poole Chemical Co*., 419 F.3d 355 (5th Cir. 2005), construed a provision in the Comprehensive Environmental Response, Compensation, and Liability Act. The court did not hold that the term "statute of limitations" must be construed in all contexts not to include statutes of repose. It concluded that, without express Congressional intent to the contrary, it would apply the purported "plain meaning" of the statute. Because it found none in CERCLA's legislative history, the court interpreted section 9658 as not applying to the relevant Texas statute of repose. The legislative history of FIRREA, by contrast, shows that Congress intended to "maximize potential recoveries by the Federal Government by preserving to the greatest extent permissible by law claims that would otherwise have been lost due to the expiration of hitherto applicable limitations periods." *SMS Fin.*, 167 F.3d at 242 n.21. Moreover, other courts that have interpreted the same statute have rejected *Burlington. See, e.g., McDonald*, 548 F.3d at 781-82 (finding reliance on *Burlington* misplaced and noting that Fifth Circuit "failed to analyze the meaning of 'statute of limitations' at the time [the relevant provision] was adopted").

Furthermore, other courts have reached the same conclusion after considering congressional intent. *See FHFA/Countrywide*, 2012 WL 5275327, at *8 (in enacting HERA Congress "simply created a new set of rules for FHFA alone"); *FHFA/UBS*, 858 F. Supp. 2d at 317 (holding that "Congress intended to prescribe *comprehensive* time limitations for '*any action*' that the Agency might bring as conservator, including claims to which a statute of repose generally attaches"); *NCUA/RBS*, 2012 WL 3028803, at *16-17 (applying similar reasoning in holding that extender provision in FCUA applies to statute of repose). Defendants offer no compelling reason to depart from these rulings.

### 2. The Extender Provision Applies to Federal Securities Claims.

Defendants' argument that the extender provision applies only to state law contract and tort claims, not to "*sui generis*" statutory claims under federal law, also is without merit. (Defs. Br. at 38-39.) FIRREA states unambiguously that the extender provision applies to "*any action* brought by the Corporation as conservator or receiver." 12 U.S.C. § 1821(d)(14)(A) (emphasis added).

In the opinions discussed above, the courts rejected the argument that the extender provisions in HERA and FCUA are limited to state, not federal, claims. *See FHFA/Countrywide*, 2012 WL 5275327, at *9; *FHFA/UBS*, 858 F. Supp. 2d at 317; *NCUA/RBS*, 2012 WL 3028803, at *13-15. The courts held that these extender provisions apply to "*any action*" brought by the relevant agency, and that this language should be given its plain meaning. *FHFA/Countrywide*, 2012 WL 5275327, at *9 (emphasis added); *see also FHFA/UBS*, 858 F. Supp. 2d at 317; *NCUA/RBS*, 2012 WL 3028803, at *15.

For the same reasons, these courts also rejected the argument that the extender provisions in HERA and FCUA do not apply to statutory claims, only to tort and contract claims. *FHFA/Countrywide*, 2012 WL 5275327, at *9 (noting that defendants "once

again ignore[] the broad language that Congress used" and that "[c]ourts often apply statutes of limitation to claims not easily characterized as 'tort' or 'contract'"); *NCUA/RBS*, 2012 WL 3028803, at *13 ("The term 'any action' should be read to include statutory claims, not just the tort and contract claims mentioned later."). *See also FDIC as Receiver for the Bank of New England v. Zibolis*, 856 F. Supp. 57, 60-61 (D.N.H. 1994) (holding that extender provision in FIRREA applied to claim under state fraudulent transfer statute even though not a "tort" or "contract" action). Because this reasoning applies equally to the extender provision in FIRREA, the Court should conclude that section 1821(d)(14) applies to the FDIC's claims under the 1933 Act.

### B. None of the FDIC's Claims Is Barred by the Three-Year Statute of Repose.

Defendants' argument that the FDIC's claims are barred by the three-year statute of repose in the 1933 Act is premised on their incorrect assumption that the extender provision in FIRREA does not apply. Defendants do not argue that the three-year period of repose had expired with respect to any certificate by August 14, 2009, when the FDIC was appointed as receiver for Colonial. Nor could they, because all of the certificates were offered to the public after August 14, 2006. (*See* Am. Compl. at Item 38(a) of Scheds. 1-11.) Thus, the FIDC's claims are not barred by the statute of repose.

### C. The FDIC Has Adequately Pled Compliance with Section 13 of the 1933 Act.

Assuming the FDIC was required to affirmatively plead compliance with the limitations period in section 13 of the 1933 Act,[4] it has more than adequately done so. To withstand a motion to dismiss on this basis, the plaintiff

---

[4] Defendants cite no Second Circuit authority – and the FDIC is aware of none – imposing this pleading burden on a plaintiff asserting a claim for violation of section 11 of the 1933 Act.

need only plead facts sufficient to allege plausibly that a reasonable
investor could not have brought a complaint, prior to [the relevant trigger
date], that could have withstood a Rule 12(b)(6) motion. Thereafter, the
burden shifts to Defendants to show that "'uncontroverted evidence
irrefutably demonstrates [that the] plaintiff discovered or should have
discovered' facts sufficient to adequately plead a claim'" prior to that date.

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS)

(MHD), 2012 WL 2899356, at *2 (S.D.N.Y. July 16, 2012) (*Morgan Stanley III*)

(quoting *In re Bear Stearns*, 851 F. Supp. 2d at 763).

The allegations in the amended complaint are more than sufficient to meet this

standard. The FDIC has alleged that:

- A reasonably diligent plaintiff could not have filed a well-pled complaint, based
  in fact (not mere speculation), before August 14, 2008 that would have withstood
  a motion to dismiss because it did not have access to facts about the specific loans
  underlying its certificates that would have alerted investors that the statements
  defendants made about those loans were untrue or misleading. (Am. Compl.
  ¶ 107.) Such facts could have been found in loan files or records maintained by
  the servicers of the loans, but reasonable investors like Colonial did not have
  access to those sources of information. (*Id.*) The necessary facts did not become
  available until early 2010. (*Id.*)

- To perform the retrospective AVM, additional liens, and owner-occupancy
  analyses that are the bases for the complaint, it was necessary to have property
  addresses for the specific loans backing the certificates. Those addresses were
  first available in early 2010, when the same vendor that provided the AVM
  invented an algorithm to compare the information the defendants disclosed about
  the loans that backed a mortgage-backed security with information in its other
  proprietary databases of land and tax records and thereby to discover the
  addresses of the properties that backed the security. (Am. Compl. ¶¶ 51, 60 n.4,
  82.)

---

Other courts have criticized this implied rule. *See, e.g., NCUA/RBS*, 2012 WL 3028823, at *19-
20. As these courts have explained, the statute of limitations is an affirmative defense and there is
no basis to require a plaintiff to affirmatively plead it, particularly because the statute of
limitations "isn't even found in the statute that creates the substantive right." *Tregenza v. Great
Am. Commc'ns Co.*, 12 F.3d 717, 718-19 (7th Cir. 1993) (concluding that rule requiring plaintiff
to allege compliance with section 13 of 1933 Act "makes no sense" because statute of limitations
is an affirmative defense and a plaintiff is not required to negate an affirmative defense in his
complaint).

- All of the certificates involved in this action were not downgraded below investment grade until well after August 14, 2008. (*Id.* ¶¶ 108-111 and Item 38(e) of Scheds. 1-11.) If the rating agencies, which were monitoring these certificates and are much more sophisticated than a reasonable investor, did not discover such facts and downgrade the certificates below investment grade before August 14, 2008, then there is no reason to conclude that a reasonable investor would have discovered those facts. (*Id.*)

- The FDIC discovered the untrue or misleading statements by defendants in 2012 in the course of its investigation of possible claims that it is authorized to bring as receiver for Colonial. (*Id.* ¶ 138.)

Contrary to defendants' assertion, these allegations are neither "conclusory" nor "boilerplate." (Defs. Br. at 15.) They specifically allege when the FDIC discovered that the defendants' statements were untrue or misleading, the information that led it to make that discovery, and why a reasonable investor would not have discovered it earlier. Courts in this Circuit have found similar allegations sufficient to meet the plaintiff's pleading burden under section 13. *See, e.g., Morgan Stanley III*, 2012 WL 2899356, at *3 (allegation that reasonable investor could not have discovered claim before certificates were downgraded below investment grade was sufficient).[5] *Cf. Fed. Home Loan Bank of Chi. v. Banc of Am. Funding Corp.*, No. 10 CH 45033, slip op. at 13 (Ill. Cir. Ct. Sept. 19, 2012) (Declaration of Kathryn E. Matthews, dated Mar. 18, 2013, Ex. A) (plaintiff adequately pled that claims under Illinois Securities Act were brought within statute of limitations by alleging that it did not have access to loan files for loans that secured its

---

[5] Defendants cite instead to an earlier decision from the same court in the same case. Defs. Br. at 15 (citing *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 663 (S.D.N.Y. 2011) (*Morgan Stanley II*). But in *Morgan Stanley II*, the plaintiffs had focused for the first time in their briefs and at oral argument "on ratings downgrades to below-investment-grade as the key triggers for discovery." *Id.* The court permitted the plaintiffs to replead to make this allegation, and then upheld the amended complaint on that basis as adequately pleading compliance with the statute of limitations. *Morgan Stanley III*, 2012 WL 2899356, at *3. Because the FDIC has included such specific allegations in its amended complaint, *Morgan Stanley III* supports the denial of defendants' motion.

RMBS and had no independent way to verify defendants' representations about the credit quality of the underlying loans).

Defendants instead urge this Court to follow a recent decision (now on appeal) from Judge Pfaelzer in the Central District of California, which dismissed a complaint that the Federal Deposit Insurance Corporation brought as receiver for Strategic Capital Bank arising out of that bank's purchase of Countrywide RMBS. Defs. Br. at 16 (citing *FDIC as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 2:12-CV-4354 MRP (MANx), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)). There are several reasons why the Court should not do so.

First, Judge Pfaelzer concluded that when a certificate was downgraded below investment grade is irrelevant for purposes of the statute of limitations analysis. *Id.* at *7. That conclusion is contrary to the weight of authority on this issue, particularly from judges in this Court.[6] Second, she concluded that a reasonable investor could have stated a claim that would have withstood a Rule 12(b)(6) motion based entirely on allegations in other complaints about Countrywide's underwriting and appraisal practices generally, without any specific information tied to the particular certificates that the bank actually purchased. *Id.* at *4-6. That ruling also conflicts with recent decisions in other RMBS cases.[7] Third, the allegations in that case related exclusively to RMBS issued by

---

[6] *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764-67 (holding that statute of limitations did not begin before certificates were downgraded below investment grade); *Morgan Stanley III*, 2012 WL 2899356, at *3 (same); *FHFA/UBS*, 858 F. Supp. 2d at 321-22 (same); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010) (finding it inappropriate to resolve statute of limitations question on motion to dismiss where certificates were not downgraded below investment grade until after limitations date).

[7] *See, e.g.*, *Police and Fire Ret. Sys. of Detroit v. Goldman, Sachs & Co.*, No. 10 Civ. 4429 (MGC), 2012 WL 2026556, at *1 (S.D.N.Y. May 31, 2012) (dismissing complaint where plaintiff failed to allege that misrepresentations specified in the complaint applied to the particular mortgages underlying the certificates it purchased); *City of Ann Arbor Emps.' Ret. Sys. v.*

14

Countrywide, and the information upon which Judge Pfaelzer relied in finding the claims time-barred related exclusively to the practices of Countrywide, not any of the defendants here. There was more information publicly available at an earlier date about Countrywide and its alleged origination practices than there was about the underwriting practices of any of the defendants here. Thus, while the FDIC believes that *Strategic Capital* was wrongly decided, it is in any event unpersuasive and not controlling here.

> **D. Defendants Have Not Shown That a Reasonable Investor in These Certificates Would Have Had Enough Facts Before August 14, 2008, to File a Well-Pled Complaint Against These Defendants That Would Have Withstood a Motion to Dismiss Under Rule 12(b)(6).**

The Supreme Court's decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), together with the Second Circuit's application of *Merck*, make clear that until a reasonably diligent plaintiff would have discovered the facts supporting its claims and could plead those facts "with sufficient detail and particularity to survive a motion to dismiss," the one-year statute of limitations does not begin to run. *See City of Pontiac*, 637 F.3d at 175; *In re Bear Stearns*, 851 F. Supp. 2d at 763.[8] Furthermore, whether

---

*Citigroup Mortg. Loan Trust, Inc.,* 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (requiring plaintiffs to plead how alleged misstatements "are tied to the loans in which they invested").

[8] Defendants incorrectly assert that only a "minority of courts" have applied *Merck* to claims under the 1933 Act. (Defs. Br. at 17 n.13.) To the contrary, the weight of authority holds that the *Merck* standard applies to such claims. *See In re Bear Stearns,* 851 F. Supp. 2d at 762 (concluding, "*in accord with the majority of judges in this district*," that "the Supreme Court's invalidation of the inquiry notice standard for '34 Act claims extends to claims brought under Sections 11 and 12(a)(2) of the '33 Act") (emphasis added); *FHFA/UBS,* 858 F. Supp. 2d at 319 (noting that the "*majority of district courts* that have considered the matter" have concluded that *Merck* applies to claims under the 1933 Act) (emphasis added); *see also Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp.,* No. 08 CV 1713 (ERK) (WDW), 2012 WL 601448, at *10 & n.11 (E.D.N.Y. Feb. 23, 2012); *In re Wachovia Equity Sec. Litig.,* 753 F. Supp. 2d 326, 370-71 & n.39 (S.D.N.Y. 2011); *N.J. Carpenters Health Fund v. Residential Capital, LLC,* No. 08 CV 8781 (HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011); *Brecher v. Citigroup Inc.,* No. 09 Civ. 7359 (SHS), 2011 WL 5525353, at *3 n.1 (S.D.N.Y. Nov. 4, 2011); *Lau v. Mezei,* No. 10 CV 4838 (KMW), 2012 WL 3553092, at *9 (S.D.N.Y. Aug. 16, 2012); *NCUA/RBS,* 2012 WL 3028803, at *21; *In re Mun. Mortg. & Equity, LLC Sec. & Deriv. Litig.,* No. MJG-08-1961-MDL, 2012 WL 2450161, at *28 n.47 (D. Md. June

sufficient facts could have been discovered more than a year before a plaintiff filed its

complaint "is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for

resolution at the motion to dismiss stage." *In re Bear Stearns*, 851 F. Supp. 2d at 763.

Thus, the Court should grant a motion to dismiss only where "'uncontroverted evidence

irrefutably demonstrates [that the] plaintiff discovered or should have discovered' facts

sufficient to adequately plead a claim" before that date. *Id.* (quoting *Newman v. Warnaco*

*Grp., Inc.*, 335 F.3d 187, 195 (2d Cir. 2003)).

As explained in more detail below, defendants have not irrefutably demonstrated

by uncontroverted evidence that Colonial should have discovered such facts before

August 14, 2008.[9] Many of defendants' arguments rely on the fallacy that any given fact

alleged in the amended complaint is either (a) sufficient alone to state a claim, and

therefore triggered the statute of limitations as soon as it became publicly available, or (b)

entirely irrelevant. (*See, e.g.*, Defs. Br. at 21-22.) But as explained in further detail below,

---

26, 2012); *Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *9 & n.1
(N.D. Cal. Jan. 5, 2011). There is no reason for this Court to hold otherwise. Extending *Merck* to
claims under the 1933 Act makes perfect sense because, under the limitations provisions in both
the 1934 Act and the 1933 Act, it is plaintiff's "discovery" of the factual predicate of the claim
that triggers the statute of limitations. Although the language in the two statutes differs slightly,
because the Supreme Court held in *Merck* that "'discovery' as used in §1658(b)(1) under the
Exchange Act encompasses not only those facts the plaintiff actually knew, but also those facts a
reasonably diligent plaintiff would have known," *Merck*, 130 S. Ct. at 1796, accrual of a claim
occurs in precisely the same way under both statutes.

[9] Defendants are incorrect that, when a claim does not require scienter, there is no difference
between the inquiry notice standard and the *Merck* standard. (Defs. Br. at 17 n.13.) There is a
significant difference between the type and quantity of information sufficient to require a
reasonable investor to investigate the possibility that the offering documents contained an untrue
or misleading statement and the type and quantity of information sufficient to enable an investor
to plead facts in a complaint that will withstand a Rule 12(b)(6) motion. For example, newspaper
articles or other reports about practices prevalent in the industry generally might be sufficient to
prompt a reasonable investor to investigate whether those practices affected the specific securities
it purchased. They would not, however, provide a reasonable investor with the facts necessary to
state a viable claim, because courts have required plaintiffs to plead facts tying claims of loosened
underwriting guidelines or inflated appraisals to *the specific loans that secured the certificates
they bought*. *See, e.g.*, *City of Ann Arbor,* 703 F. Supp. 2d at 263.

many of the facts alleged by the FDIC, while perhaps not alone sufficient to state a claim, are sufficient to plead a plausible claim for relief when combined with other facts that became available at a later date. As a result, the Court should not find that the statute of limitations began to run before that later date.

> **1. Because the Certificates Remained Investment Grade After August 14, 2008, Defendants Cannot Show as a Matter of Law That the Limitations Period Began to Run Before That Date.**

Most courts have found that when the limitations period began to run is a question of fact at least until the certificates are downgraded below investment grade. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764-67; *Morgan Stanley III*, 2012 WL 2899356, at *3; *NCUA/RBS*, 2012 WL 3028803, at *23-24; *FHFA/UBS,* 858 F. Supp. 2d at 321-22; *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D05 1010 PL 45071, slip op. at 2 (Ind. Super. Ct. July 3, 2012) (Matthews Decl. Ex. B). Even courts applying a more lenient inquiry notice standard have declined to resolve this question on a motion to dismiss when the "certificates at issue were not downgraded below investment grade until . . . after the . . . limitation date." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010). As courts have explained, "absent a decline in the Certificates' ratings (or some other indicator of a steep decline in the Certificates' value), it is difficult to see how a plaintiff could have plausibly pled that the epidemic of indiscretions in the MBS industry had infected his or her Certificates." *In re Bear Stearns*, 851 F. Supp. 2d at 764-65; *see also FHFA/UBS*, 858 F. Supp. 2d at 321-22 ("Whatever questions the [investors] might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have 'discovered' that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this

possibility by the ratings agencies" when they downgraded the securities below investment grade).

Because none of the certificates involved in this action was downgraded below investment grade before August 14, 2008,[10] defendants have not shown as a matter of law that the statute of limitations expired before the FDIC was appointed as receiver.

### 2. The Facts on Which the Amended Complaint Is Based Were Not Available to a Reasonable Investor Before August 14, 2008.

Defendants erroneously contend that, because the allegations in the amended complaint are based in large part on a forensic analysis of the underlying loans, and some of the information used in that analysis was available before August 14, 2008, the FDIC's claims are time-barred as a matter of law. (Defs. Br. at 22-26.)

First, no investor could have obtained the data necessary to perform the forensic analysis described in the amended complaint until long after August 14, 2008. To develop information about a particular loan, an investor must know the address of the property that secures the loan. To take obvious examples, an investor could not run an AVM on a property or learn whether there were undisclosed additional liens on the property without knowing the address of the property. But it was not possible for investors like Colonial to know the addresses of the properties that secured the loans that back its certificates because the loan files and servicing records that contain this information were not available to them.[11] (Am. Compl. ¶¶ 51, 107.)

---

[10] The certificates were downgraded below investment grade between October 27, 2008 and June 4, 2010. (Am. Compl. ¶¶ 108-110 & Item 38(e) of Scheds. 1-11.)

[11] Defendants fundamentally misconstrue the FDIC's allegations when they argue that access to loan files and servicing records was unnecessary because "the FDIC still does not have access to the 'specific loans' and 'loan files' . . . and yet nevertheless manage[d] to file this lawsuit." (Defs. Br. at 15.) The FDIC does not assert that access to the loan files or servicing records is required to state a claim and, thus, to trigger the statute of limitations. Rather, it asserts that the

That essential prerequisite became available to the FDIC for the first time in early 2010, when the leading vendor of real estate data first developed an algorithm enabling the information disclosed about securitized loans to be compared with other proprietary databases of land records to discover the address of the property that secured a loan.[12] (*Id.*) Only with that information could the FDIC, through the vendor, use the AVM and do the additional-liens and occupancy analyses on a random sample of the loans that backed Colonial's certificates to test the truth of defendants' statements.[13]

Second, other courts have refused to dismiss as time-barred complaints that were based on AVMs or other similar loan-level analyses, despite the fact that some of the data inputs into those analyses may have been publicly available more than a year before the complaint was filed. *See, e.g.*, *FDIC as Receiver for United W. Bank, F.S.B. v. Countrywide Fin. Corp.*, No. 11-CV-10400-MRP (MANx), 2013 WL 49727, at *1 (C.D. Cal. Jan. 3, 2013) (*FDIC/UWB*) ("While the amended complaint relies heavily on an . . . ('AVM,') which uses data that could theoretically have been available as early as April

---

limitations period could not begin until a reasonably diligent plaintiff could obtain information demonstrating that there were misrepresentations regarding the credit quality of the specific loans in the loan pools, such as by obtaining the addresses of the properties that secured the loans that back its certificates and using those addresses to perform the type of loan-level analysis performed here. Because investors do not have access to loan files or servicing records, both of which contain that information, the FDIC could not analyze or make allegations about individual loans until well after August 14, 2008, when the property addresses became available.

[12] The Court should disregard the two unsubstantiated articles that defendants cite as evidence of what analytical tools purportedly were available to investors before August 2008. (Frankel Decl. Exs. 18, 19.) Even if the Court properly could take judicial notice of the truth of the matters asserted in these articles – which it cannot (*see* note 18, *infra*) – defendants have no basis to link these articles to the specific type of retrospective analysis described in the amended complaint. Ultimately, whether a particular AVM technology existed as of a certain date remains a question of fact.

[13] Defendants note that the FDIC no longer asserts that Colonial did not have access to the loan tapes before it purchased the certificates. (Defs. Br. at 9 n.6.) That is irrelevant. As asserted in the amended complaint, loan tapes do not include the addresses of the properties in the collateral pool of the securitization. (Am. Compl. ¶ 51.)

19

2007, the Court cannot hold as a matter of law . . . that such data would have led a reasonable investor both to recognize the misstatements and to link those to the possibility that the securities purchased by United Western Bank would suffer losses."); *FHFA/UBS*, 858 F. Supp. 2d at 320-22, 324 (finding that complaint, which relied principally on forensic analysis of loan-level data, including AVM, was not time-barred by September 2008); *accord Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937-DJC, 2012 WL 4469101, at *8-9, *13 (D. Mass. Sept. 28, 2012) (*Capital Ventures/UBS*); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 202-03, 208-09 (D. Mass. 2012) (*MassMutual/RFC*).

Third, the case on which defendants principally rely – *Allstate Insurance Co. v. Countrywide Financial Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011) – does not help them. In *Allstate*, the court criticized the loan-level analysis that the plaintiff conducted as nothing more than "summaries of other, previously disclosed facts" that were "available in the Prospectus Supplements that Allstate claims to have relied upon." *Id.* at 1181. As a result, the court determined that "a reasonable investor could and should have engaged someone to copy and paste the Prospectus Summaries into a spreadsheet and analyze the numbers well before 2008." *Id.* This critique does not apply to the FDIC's analysis, as the same court implicitly recognized in *FDIC/UWB*, 2013 WL 49727, at *1. The FDIC did much more than copy and paste information from the prospectus supplements into a spreadsheet. Rather, it used newly available information (the property addresses) to test the accuracy of the assertions made in the offering documents. None of the FDIC's analyses, which relate to representations about specific properties, could have been done

before it had that information. Thus, the statute of limitations could not have begun before the information became available in early 2010.[14]

The same is true with respect to defendants' argument that the FDIC could have made the same allegations about owner-occupancy rates and second liens before August 14, 2008. (Defs. Br. at 25-26.) The amended complaint specifically alleges why access to land records, tax records, or other publicly available information did not enable a reasonable investor to perform the type of loan-level analysis that the FDIC conducted, because that information is useless unless it can be connected to the specific loans in the collateral pools backing the investor's certificates. (Am. Compl. ¶¶ 60 n.4, 82.) Defendants do not address these allegations, other than by invoking *Allstate*, which does not apply here for the reasons previously explained.

Finally, defendants' contention that the FDIC could have made the same allegations about the abandonment of underwriting guidelines before August 14, 2008, is similarly misplaced and has been rejected repeatedly by other courts. Defendants argue that the amended complaint's reliance on the existence of early payment defaults (EPDs) as evidence of the abandonment of underwriting guidelines shows that the FDIC could have brought its claims as soon as those EPDs occurred, *i.e.*, shortly after the loans were originated. But even if defendants could establish on a motion to dismiss precisely what EPD data was available to reasonable investors by August 14, 2008, taken in isolation, that information still would not have been sufficient for a reasonable investor to state a

---

[14] *Roaring Fork Capital SBIC, L.P. v. ATC Healthcare, Inc.*, No. 10-cv-00338-MSK, 2011 WL 1258504 (D. Colo. Mar. 29, 2011), also has no bearing here. In that case, the court found that the statute of limitations began to run because the plaintiff easily could have requested and obtained access to the defendant's books "within roughly 60 days," and based on plaintiff's own allegations, the relevant accounting misstatements "should have been immediately obvious" from a review of that information. *Id.* at *10.

plausible claim that the defendants had made untrue or misleading statements in the offering documents for these certificates.[15] *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2011 WL 2020260, at *5 (S.D.N.Y. May 19, 2011) (*NJ Carpenters/ResCap*) (fact that plaintiff alleged high delinquency rates in support of claim that originators abandoned underwriting guidelines did not mean that availability of information about delinquency rates triggered statute of limitations); *MassMutual/RFC*, 843 F. Supp. 2d at 208 (access to monthly reports of defaults and delinquencies insufficient even to put plaintiff on *inquiry notice* of misrepresentations about underwriting and appraisal practices); *NCUA/RBS*, 2012 WL 3028803, at *24 (early spike in default and delinquency rates was insufficient to show that "a reasonably diligent investor would have sufficient notice to file a plausible claim by March 2008").

### 3. Other Information Available Before August 14, 2008 Was Not Sufficient to Trigger the Statute of Limitations.

Although defendants acknowledge that the statute of limitations does not begin to run until a plaintiff "should have known all the facts that form the basis of the claims" alleged in its complaint (Defs. Br. at 17-18), they urge the Court to find that publicly available information that said nothing about whether *these defendants* made untrue or

---

[15] Indeed, defendants make that precise point in arguing that the FDIC's allegations about EPDs fail to state a claim. Defendants argue, on the one hand, that EPD data should have triggered the statute of limitations because it would have put a reasonable investor on notice of wholesale departures from the underwriting guidelines, and on the other hand, that this same data does not support a claim. (*See* Defs. Br. at 55.) Thus, it is defendants – not the FDIC – that seek to "have it both ways." (*Id.* at n.51.) Indeed, Judge Cote recently addressed and rejected the same argument that defendants make here (*i.e.*, that information in the complaint either is insufficient to plead a claim or plaintiff had enough information to plead its claims whenever that information became available). *See FHFA/UBS*, 858 F. Supp. 2d at 320-21. Judge Cote explained that this argument "pose[s] a false dichotomy" because, between the date on which the relevant information became available and the filing of the complaint, "an important event occurred that caused the [investors] to discover that the loans included in the securitizations they bought from defendants were not as advertised: the securities were downgraded from investment grade to near-junk status." *Id.* The same reasoning applies here.

misleading statements in *these offering documents* was sufficient to trigger the limitations period before August 2008. But courts repeatedly have held that the availability of precisely the same types of information upon which defendants rely here would not have enabled a reasonable investor to plead a plausible claim for material untrue statements or omissions in the offering materials, because it did not provide the necessary link to the particular certificates that the plaintiff purchased. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 764 (complaint assembled from this sort of information would not have survived Rule 12(b)(6) motion because it discussed "general, industry-wide practices" "untethered to the transactions that are the subject of the" complaint); *NCUA/RBS*, 2012 WL 3028803, at *22-26 (press and regulatory reports, lawsuits, and data about early payment defaults and delinquencies was insufficient to trigger statute of limitations where certificates had not been downgraded below investment grade); *MassMutual/RFC*, 843 F. Supp. 2d at 208 (articles, industry publications, government reports, and monthly reports disclosing deficiencies and defaults in underlying loans were not sufficient to put investor on inquiry notice that specific underwriting and appraisal practices represented in offering materials were false); *NJ Carpenters/ResCap*, 2011 WL 2020260, at *5 (combination of elevated delinquency rates, collapse of Bear Stearns, and fact that rating agency had put certificates on watch for possible downgrades was insufficient to show that reasonable investor would have discovered facts constituting violation by May 18, 2008).[16] As one court recently explained:

---

[16] Defendants cite *In re Morgan Stanley Mortgage Pass-Through Certificates Litigation,* No. 09 Civ. 2137 (LTS), 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) (*Morgan Stanley I*), for the proposition that "other courts have found the existence of such facts sufficient to require dismissal." (Defs. Br. at 29-30.) That decision has no bearing here. First, it applied an inquiry notice standard, not *Merck*. Second, much of the information on which the court relied in finding that inquiry notice arose before May 2008 – including a lawsuit filed by the lead plaintiffs' own

> The 2007 reports, lawsuits, and investigations regarding loan origination practices cited by defendants may have signaled a potential for problems in the RMBS market generally – and may, as plaintiff suggests, have triggered a duty on the part of *defendants* to scrutinize the loans included in their securitizations more closely – but such reports were insufficient to trigger the Securities Act's statute of limitations. . . .

*FHFA/UBS*, 858 F. Supp. 2d at 321-22.

As demonstrated below, the same reasoning applies here with respect to each source of information to which the defendants point and thus precludes the dismissal of the FDIC's claims.

### a.  Complaints by Other RMBS Investors

Defendants argue that the fact that other RMBS investors had brought complaints before August 14, 2008 shows that Colonial could have done so as well. (Defs. Br. at 27.) None of the complaints that they cite, however, involved any of the trusts from which Colonial bought certificates. Moreover, all of those complaints either were dismissed for failure to state a claim or have never been tested by a Rule 12(b)(6) motion. As a result, and for the additional reasons discussed below, these complaints do not establish that a reasonable investor could have discovered facts sufficient to state a viable claim for misrepresentations in the offering documents *for these certificates* by August 2008.

- The complaint filed in *Luminent Mortgage Capital v. Merrill Lynch & Co.*, No. 2:07-cv-05423 (E.D. Pa.) on December 24, 2007, was dismissed for failure to state a claim. *Luminent*, 652 F. Supp. 2d 576 (E.D. Pa. 2009). It did not involve any of the trusts involved here, and it alleged facts that have no bearing here. For example, the alleged misrepresentations primarily involved

---

counsel against the key originator of the mortgages in one of the two trusts at issue – is irrelevant here. Third, the court permitted the plaintiffs in that case to amend their complaint twice, and ultimately refused to find that the third amended complaint was time barred when assessed under the *Merck* standard, because none of the information to which defendants pointed referred by name to any of the entities involved in the origination, packaging, and sale of the particular certificates at issue, and because plaintiffs alleged that the certificates were not downgraded below investment grade until less than a year before the plaintiffs filed suit. *Morgan Stanley III*, 2012 WL 2899356, at *3.

whether the loans had "soft" or "hard" prepayment penalty terms. (*Id.* at 9-10.) Moreover, the plaintiff in that case was able to discover the alleged untrue or misleading statements about the underlying loans because it *received a sample of actual loan files from the defendants* and was able to compare the information in those files to the representations made about the loans. (*See* Frankel Decl. Ex. 22 at ¶¶ 61-63.) Colonial did not, and reasonable investors do not, have access to such information. (Am. Compl. ¶ 107.)

- *City of Ann Arbor Employees Retirement System v. Citigroup Mortgage Loan Trust Inc.*, No. 08-005187 (N.Y. Sup. Ct. filed Jan. 31, 2008), also did not involve any of the same trusts, or even the same issuers, that are involved in this action. In addition, the January 2008 complaint that defendants cite was found insufficient by the court; plaintiffs were ordered to replead and allege specifically the false statements and omissions on which they relied and "*how those statements and/or omissions are tied to the loans in which they invested.*" *City of Ann Arbor*, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010) (emphasis added).

- *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08 Civ. 10446 (RGS), which was originally filed in Massachusetts state court, also was dismissed for failure to state a claim because it did not tie allegations about general practices to the specific trusts involved in the suit. *See Plumbers' Union Local No. 12*, 658 F. Supp. 2d 299, 307 (D. Mass. 2009) ("That questionable appraisal practices were a common problem in the industry as a whole, without more, tells nothing about the Trusts' underlying loans.")[17] It also asserted claims only as to Nomura trusts, none of which are involved in this action.

- *Luther v. Countrywide Home Loans Servicing LP*, No. BC 380698 (Cal. Super. Ct. filed Nov. 14, 2007), involved only Countrywide-issued RMBS. This case does not involve any Countrywide RMBS or even any loans originated by Countrywide. Although *Luther* named as defendants certain of the underwriters that are defendants here, that is not a basis to find that the statute of limitations was triggered on claims arising from the sale of RMBS with no connection to Countrywide. The *Luther* complaint also has never been tested by a Rule 12(b)(6) motion.

---

[17] Although the First Circuit reversed the district court's dismissal of plaintiffs' allegations about departures from underwriting standards, it still required some link to the particular certificates involved in the suit. *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773-74 (1st Cir. 2011) (finding that "the sharp drop in the credit ratings after the sales and the *specific* allegations as to FNBN [the originator of the loans] offer enough basis to warrant some initial discovery aimed at these precise allegations"). Moreover, it affirmed the dismissal of plaintiffs' allegations about appraisal practices for lack of any facts specific to the trusts involved in the suit. *Id.* at 774.

- *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 Civ. 1713, which was filed in Nassau County Supreme Court on March 26, 2008, related only to J.P. Morgan trusts, none of which are involved in this suit. Moreover, that complaint was never tested by a Rule 12(b)(6) motion. After the action was removed to federal court, a consolidated class action complaint was filed and then amended, and that amended complaint ultimately was dismissed in part in early 2012. The court found its allegations about underwriting practices insufficient except to the extent that they inferred a "nexus" to the specific certificates involved. *See Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *13-18.

- *N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,* No. 08 Civ. 5653 (S.D.N.Y.), filed on June 3, 2008, was a class action brought by investors in RMBS backed by subprime, second-lien loans originated by New Century Mortgage Corporation and DLJ Mortgage Capital. (Defs. Ex. 27 at ¶¶ 1-2.) Colonial's certificates, in contrast, were not backed by subprime or second lien loans, or indeed by any loans originated by New Century or DLJ Mortgage. Moreover, the trusts involved in that case all were issued by Home Equity Mortgage Trust (HEMT); this case does not involve any HEMT trusts. The mere fact that Credit Suisse, as underwriter, is a defendant here and was a defendant there does not establish that the statute of limitations on Colonial's claims was triggered before August 2008.

### b.   "Negative Rating Events"

Defendants argue that various rating agency reports and actions show that Colonial had actual or constructive knowledge of its claims before August 14, 2008. *See* Defs. Br. at 30 (noting that, in or before August 2008, seven certificates were put on "negative outlook"; three certificates experienced a downgrade that did not bring them below investment grade; and at least one class subordinate to each of the tranches Colonial bought were downgraded below investment grade.) For the following reasons, defendants' argument should be rejected.

First, "negative watches" are not downgrades and do not trigger the statute of limitations. *In re Bear Stearns*, 851 F. Supp. 2d at 766-67; *see also Morgan Stanley II*, 810 F. Supp. 2d at 663-65; *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, No. 09 CV 1110 (HB), 2011 WL 135821, at *8 (S.D.N.Y. Jan. 12, 2011) (*Miss.

26

*PERS/Goldman*). That is particularly true where, as here, the investor has risk-related investment criteria that allow it to purchase only certificates of a particular grade. *See Morgan Stanley II*, 810 F. Supp. 2d at 664-65. Moreover, a negative watch may be imposed for reasons other than concerns about the quality of the underlying collateral. Second, downgrades of the ratings for subordinate tranches likewise do not give rise to actual or constructive knowledge because it is the purpose of such subordinated tranches to absorb losses to the underlying collateral and protect the cash flow of higher-rated certificates like those purchased by Colonial. *See Fed. Hous. Fin. Agency v. J.P. Morgan Chase & Co.*, No. 11 Civ. 6188 (DLC), 2012 WL 5395646, at *19 (S.D.N.Y. Nov. 5, 2012) (*FHFA/JPM*) (given purpose of subordinate tranches, finding "little, if any reason to believe that the downgrade of those tranches should have led the [investors] to discover that the underlying mortgages were not simply risky, but so poorly underwritten as to put at risk even the most senior certificates"); *In re Bear Stearns*, 851 F. Supp. 2d at 766 (disregarding downgrades to subordinate tranches in performing statute of limitations analysis). The same is true for downgrades that did not bring the plaintiff's certificates below investment grade. *See Miss. PERS/Goldman,* 2011 WL 135821, at *8 (downgrades in 2007 did not trigger statute of limitations, particularly where it was not until February 2008 that any rating agency downgraded the certificate below investment grade).

### c.  News Reports

Defendants' argument that the statute of limitations was triggered by various news reports also is misplaced. (Defs. Br. at 31-33 & Appx. E; Frankel Decl. Exs. 28-46, 49-50).[18] The articles that defendants highlight in their brief illustrate the weakness of

---

[18] Defendants ask the Court to take judicial notice of these articles. However, judicial notice may be taken of newspaper articles at the motion to dismiss stage only to indicate what was in the

their argument. For example, defendants cite an article reporting that a securities firm cut

its recommendation on GMAC/Residential Capital debt from "buy" to "neutral" after the

departure of some key executives, and noting that the "yield premiums" on ResCap bonds

had increased "on concerns about rising default rates on subprime mortgages." (Defs. Br.

at 31; Frankel Decl. Ex. 29.) At most, this article would have alerted a reasonable

investor that default rates on subprime mortgages were rising; it says nothing about the

reason for the defaults, and it certainly would not have led Colonial even to suspect that

the issuers and underwriters of these Alt-A[19] securities had made untrue or misleading

statements in the offering documents about the credit quality of the underlying loans.

Similarly, a report that American Home had filed for bankruptcy (Defs. Br. at 31 &

Frankel Ex. 31) does not suggest that the company's failure resulted from its poor

---

public realm at the time, not whether the contents of those articles were in fact true. *See In re Bank of Am. Corp. Sec., Derivative & ERISA Litig*., 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) ("On a motion to dismiss, a court may take judicial notice of the publication of a newspaper article . . . provided that consideration is limited to the fact of publication and not the truth of the article's content."); *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008) ("[I]it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, *without regard to the truth of their contents*.") (emphasis added). But *Merck* makes the mere fact that these articles were published irrelevant to the Court's analysis. The Court is no longer to determine when a reasonable plaintiff would have been alerted to investigate (to which the mere publication of these articles may be relevant), but when a plaintiff could have filed a valid complaint, to which only the *substance* of these articles could be relevant.

[19] The FDIC is suing solely on securities that were backed by "Alt-A" mortgage loans. Private label mortgage-backed securities (that is, those not issued by government-sponsored enterprises like Fannie Mae and Freddie Mac) were divided into three categories: jumbo prime (loans made to prime, or "A", borrowers but that were too large to be purchased by Fannie Mae or Freddie Mac); Alt-A (also referred to as "Alternative A"); and subprime ("B" and "C" borrowers). Alt-A mortgage loans generally were made to creditworthy borrowers with high incomes and good credit scores. *See* Rajdeep Sengupta, *Alt-A: The Forgotten Segment of the Mortgage Market*, FED. RESERVE BANK OF ST. LOUIS REVIEW, Jan./Feb. 2010, 92(1), p. 56 (explaining that Alt-A mortgages generally were underwritten to borrowers who would otherwise qualify for a prime loan in terms of their credit history, unlike subprime loans, which were "primarily to borrowers with incomplete or impaired credit histories," and noting that "the credit quality for Alt-A pools is characteristically better than that for subprime pools").

origination practices, much less provide any reason for Colonial to suspect that the securities it purchased were affected by such practices. *See In re Bear Stearns*, 851 F. Supp. 2d at 765 (collapse of Bear Stearns and bankruptcy of American Home did not suggest that plaintiffs should have known "by May or July of 2008 that *their securities* were tainted by the irresponsible practices that drove" these entities into bankruptcy).

The majority of the articles do not mention the defendants at all, and a few specifically note that no investment banks have been accused of any wrongdoing. (*See, e.g.,* Frankel Decl. Exs. 36, 37). Others, although referring to one of the defendants in this suit, do not involve its activities as an underwriter of any of these securitizations. *See, e.g.*, *id.* Ex. 35 (noting that two underwriters had been added to suit involving sale of Countrywide RMBS); Ex. 41 (discussing downgrade of servicer quality rating of First Horizon Home Loans); Ex. 50 (noting that J.P. Morgan expected losses on prime loans *that were not securitized* to increase). Other articles discuss initiatives by the rating agencies to reevaluate their ratings of certain RMBS. (*See, e.g.*, Exs. 28, 40.) But because the ratings agencies, even after revamping their analyses, did not downgrade Colonial's certificates below investment grade until after August 2008, these articles do not support defendants' argument. In addition, many of the other articles defendants cite specifically address issues in the *subprime* mortgage market and investigations into those practices. (*See, e.g.*, Exs. 34, 36, 37, 38, 39). The certificates in this case, in contrast, all are backed by Alt-A mortgages. Finally, to the extent that some of these articles mention an originator of loans underlying the certificates (*see, e.g.*, Ex. 44), they do not show that a reasonable investor would have discovered facts enabling it to plead a viable claim against these defendants as underwriters. *See, e.g.*, *FHFA/UBS*, 858 F. Supp. 2d at 321

(when investors learned of loan originators' "dubious underwriting practices says little about when they discovered the facts that form the basis of this complaint"; plaintiff's claim "is not that the *originators* failed to scrutinize loan applicants adequately *in general*; it is that *defendants* failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the *particular* securitizations sold to the [investors]"); *Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Sec. Inc.*, No. GD-09-016893, slip op. at 3-5 (Ct. Pa. Ct. Comm. Pleas Mar. 6, 2013) (Matthews Decl. Ex. C) (refusing to find that statute of limitations on section 11 claim against underwriter began to run upon publication of report criticizing practices of originator of loans in the trust).[20]

In sum, it is not possible from these reports to conclude that a reasonable investor would have discovered facts sufficient to state a claim against *these defendants* as to misstatements in the offering documents for *these certificates* by August 14, 2008.[21]

---

[20] Defendants also point to one article noting that California and Florida accounted for a large percentage of the mortgages that were in foreclosure or 90-days delinquent, noting that Colonial's certificates "had substantial exposure" to mortgages on properties in these states. (Defs. Br. at 32.) But the article does not attribute those defaults and delinquencies to the wholesale abandonment of underwriting guidelines or to any of the other conduct alleged in the amended complaint. To the contrary, it attributes this trend to the weakening economy, specifically noting that falling home prices were "contributing greatly to foreclosures." *Id.*

[21] *See, e.g., Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *11 (holding that 70 articles, 39 of which mentioned originators of loans in the relevant offerings, did not trigger statute of limitations because they did not "refer to the offerings, the Certificates, or tie the originators to securities offered by the defendants," and most simply "describe[d] the high rate of default experienced by subprime mortgages and the worsening business situation of the originators," which "would not establish that their offering documents contained material misstatements and omissions"); *Morgan Stanley II*, 810 F. Supp. 2d at 665 (news articles and SEC report were too general even to provide *inquiry notice* where they did not specifically mention the defendant and did not address specific misrepresentations alleged in complaint).

### d. Colonial's Role as a Mortgage Lender

Finally, defendants cannot use Colonial's "participation and involvement in the mortgage industry" generally to show that it should have discovered the defendants' untrue or misleading statements about these RMBS before August 2008. (Defs. Br. at 33-34.) Even if Colonial's role as a mortgage lender gave it reason to question residential loan origination practices generally – and defendants have not shown that it did[22] – it would not establish that Colonial knew or should have known that defendants made untrue or misleading statements in the offering documents for these securities, which were not backed by loans Colonial originated. Moreover, as an investor, Colonial was entitled to rely upon the issuers and underwriters of these RMBS to ensure that loans tainted by such practices did not make their way into these securitizations.[23] *See FHFA/UBS*, 858 F. Supp. 2d at 321.

Defendants' reliance on statements by the FDIC to show what Colonial knew or reasonably should have known in 2008 also is entirely misplaced. (Defs. Br. at 18-19.) For example, the excerpt defendants cite from the complaint that the FDIC filed against Colonial's accountants speaks only to general market conditions in mid-2007; it says

---

[22] As the Material Loss Review prepared by the Federal Deposit Insurance Corporation Office of Inspector General explains, Colonial was primarily a commercial real estate lender, "with an emphasis on acquisition, development, and construction (ADC) loans." (Frankel Decl. Ex. 1, Exec. Summary at 1.) The statements about Colonial's "aggressive underwriting" and other purported deficiencies that defendants pull from that report refer expressly to "areas within the bank's ADC loan portfolio," not its residential mortgage loan portfolio. (*Id.* at 9.)

[23] Defendants imply elsewhere in their brief that the fraud perpetrated against Colonial by its customer, Taylor, Bean & Whitaker Mortgage Corporation (TBW), and two rogue Colonial employees (both of whom have been convicted of crimes) somehow undermines the FDIC's claims against the defendants. (*See* Defs. Br. at 11-12.) But as the materials that defendants submit to the Court make clear (Frankel Decl. Exs. 13-16), Colonial was a *victim* of that fraud, by which TBW and these individuals effectively stole many hundreds of millions of dollars from Colonial. Defendants fail to explain how those events are in any way relevant to the claims asserted in the amended complaint.

31

nothing about what Colonial knew or a reasonable investor should have known about the truth of statements in the offering documents for RMBS. Likewise, that Colonial management purportedly noticed in December 2007 a decline in trading volumes and liquidity for certain securities but "advised the regulator that they did not intend to undertake any change in investment strategy," is irrelevant. At that point, Colonial had already made all of the RMBS purchases involved in this action, and in any event, knowledge that trading volume and liquidity had decreased does not amount to knowledge that the quality of the underlying collateral was misrepresented.

Thus, for all of these reasons, defendants have failed to show that the FDIC's claims are time-barred under the one-year statute of limitations in the 1933 Act.

### E. Even If Defendants Could Show That the Statute of Limitations Began to Run Before August 14, 2008, It Was Tolled With Respect to Three Certificates By the Filing of Two Class Actions.

The FDIC's claims on three certificates – purchased in Securitizations 8, 10, and 11 – are timely for another reason. Each of those securitizations was included in a class action filed before August 14, 2009, and Colonial, as a purchaser of certificates in those securitizations, was a member of the proposed class in each action. (Am. Compl. ¶¶ 112-114.) As a result, under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), the limitations period on these claims was tolled as of the date each class action was filed.

Defendants mistakenly argue that "there is no *American Pipe* tolling for claims relating to a securitization that was dismissed from a putative class action on standing grounds."[24] (Defs. Br. at 35.) The few district court decisions that have reached that

---

[24] As alleged in the amended complaint, one securitization was dismissed from *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (S.D.N.Y.) on March 31, 2010, and the other two were dismissed from *In re Wells Fargo Mortg.-Backed Certificates Litig.*, No. 09-cv-01376 (N.D. Cal.) on April 22, 2010. (Am. Compl. ¶¶ 113-114.)

conclusion represent the minority view, which conflicts with the policies underlying *American Pipe*.

The vast majority of courts – including the two federal Courts of Appeals that have addressed the issue – have held that *American Pipe* tolling applies even when the named plaintiff lacked standing to bring the claim. *See, e.g.*, *Griffin v. Singletary*, 17 F.3d 356, 360-61 (11th Cir. 1994) (holding that filing of class action in which class representatives lacked standing tolled statute of limitations with respect to later-filed individual claims); *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097-98 (3d Cir. 1975) (filing of class action complaint by named plaintiffs who later were determined to lack standing tolled statute of limitations so that claims of later-added plaintiffs were timely).[25] As these courts have recognized, the two policies of *American Pipe* plainly apply to claims that were part of a class action when it was filed, even if another court later determines that the plaintiff lacked standing to bring them. *See, e.g.*, *Morgan Stanley II*, 810 F. Supp. 2d at 669. First, even under those circumstances, it is still more efficient to encourage class members to remain in the class until such a decision is made than to

---

[25] *See also Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-10446-RGS, 2012 WL 4480735, at *7-8 (D. Mass. Oct. 1, 2012) (holding that *American Pipe* tolling applied to all members of putative class as originally filed, even after First Circuit affirmed ruling that named plaintiffs lacked standing as to trust they did not purchase); *In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP), 2012 WL 3339098, at *6 (S.D.N.Y. Aug. 15, 2012) (holding that "*American Pipe* tolling applies despite the original plaintiffs' lack of standing"); *Morgan Stanley II*, 810 F. Supp. 2d at 669 (same); *In re Wachovia*, 753 F. Supp. 2d at 372 (applying tolling where class action claims were dismissed for lack of standing); *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 309 (S.D.N.Y. 2011) (holding that "the filing of a class action suspends the running of applicable statutes of limitation even where the putative class plaintiff did not have standing to assert the claims at issue"); *In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714 (DAB), 2011 WL 3664407, at *6 (S.D.N.Y. Aug. 19, 2011), *reconsideration granted on other grounds*, 2012 WL 3297730 (S.D.N.Y. Aug. 10, 2012) (rejecting argument that tolling did not apply even where defendants asserted that it was clear from face of certification that named plaintiff lacked standing); *In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 645-47 (S.D.N.Y. 2011) (applying *American Pipe* to toll claims where putative class plaintiff lacked standing to assert them).

force them to file single-plaintiff actions. Second, no matter whether the named plaintiffs have standing, still their complaint gives the defendants notice of their potential liability to all members of the class as originally defined. *Id.*

Moreover, defendants' argument is particularly specious in light of recent authority from the Second Circuit. In *NECA-IBEW Health and Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 (2d Cir. 2012), *cert. denied*, 2013 WL 1091772 (U.S. Mar. 18, 2013), the court held that a class plaintiff does have standing to represent investors who purchased certificates from RMBS trusts other than those the named plaintiff purchased, as long as the securities were issued pursuant to the same registration statement and are backed by loans made by common originators.[26] That test is indisputably met here. (*See* Am. Compl. ¶¶ 115-16). *NECA* establishes that the court's dismissal of Securitization No. 8 from *N.J. Carpenters* was inappropriate, and it calls into question the California court's dismissal of Securitizations Nos. 10 and 11 from *In re Wells Fargo.*[27]

## II.     THE SECTION 11 CLAIMS ARE NOT SUBJECT TO DISMISSAL ON ANY OTHER GROUND.

Defendants made material untrue or misleading statements about four aspects of the loans in the securitizations: (1) the appraisals and loan-to-value ratios (LTVs) of the

---

[26] On March 18, 2013, the Supreme Court denied certiorari in *NECA. See Goldman, Sachs & Co. v. NECA-IBEW Health and Welfare Fund*, No. 12-528, 2013 WL 1091772 (U.S. Mar. 18, 2013). As a result, there is no basis for the Court to follow the course suggested by defendants. (*See* Defs. Br. at 36 n. 26.) *NECA* is binding law in this Circuit.

[27] Indeed, since *NECA*, several district courts in this Circuit have reconsidered their prior rulings denying class action standing. *See, e.g., N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, No. 08 Civ. 5653 (PAC), 2013 WL 357615, at *8-9 (S.D.N.Y. Jan. 23, 2013); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 Civ. 2137 (LTS), 2013 WL 139556, at *2-3 (S.D.N.Y. Jan. 11, 2013); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713 (ERK), 2012 WL 4053716, at *1 (E.D.N.Y. Sept. 14, 2012).

loans, including that the appraisals of the properties that secured the loans complied with

the Uniform Standards of Professional Appraisal Practice (USPAP); (2) the number of

properties that were primary residences; (3) whether the loans were originated in

compliance with the applicable underwriting standards; and (4) the credit ratings of the

certificates. The schedules to the amended complaint describe every one of the untrue or

misleading statements that the defendants made about each of the 11 securitizations. To

establish that those statements were untrue or misleading, the amended complaint

includes detailed allegations about the true characteristics of the loans. Because it does

not have access to the loan files, the FDIC used sophisticated computer models and

analyzed public records to test the truth of those statements. None of the defendants'

arguments even suggests, let alone demonstrates as a matter of law, that these allegations

are insufficient to establish at least one material untrue or misleading statement in the

offering documents for each securitization.[28]

---

[28] The defendants' argument that the FDIC should not be allowed to "deviate" from a position allegedly taken in an earlier, unrelated litigation – *In re IndyMac MBS Litig.*, No. 09-CIV-4583 (S.D.N.Y. filed Nov. 23, 2009) – is severely flawed. (Defs. Br. at 41 n.35.) The Federal Deposit Insurance Corporation is *not* a party to that litigation in any of its capacities. First, IndyMac MBS, Inc., a first tier subsidiary of the failed IndyMac Bank, F.S.B., which is a defendant in that litigation, is a separate legal entity from the IndyMac Bank Receivership. Second, even if the Federal Deposit Insurance Corporation as Receiver for IndyMac Bank were a party to the litigation – which it is not – each Federal Deposit Insurance Corporation receivership is a "separate legal entity." *Pearson v. United States*, 831 F. Supp. 2d 514, 516 (D. Mass. 2011). Thus, a position taken by the Federal Deposit Insurance Corporation as receiver for one bank does not bind it in a case where it acts as receiver for a different bank. *See id.* at 518-19 (holding that a plaintiff's notice of claim did not alert Federal Deposit Insurance Corporation to claims relating to receiverships other than the one receivership specifically named in that notice). Moreover, to the extent that the defendants are attempting to invoke the doctrine of judicial estoppel, the Second Circuit applies that doctrine only to inconsistent *factual* assertions in prior proceedings, not to conclusions of law or legal arguments. *Wight v. BankAmerica Corp.,* 219 F.3d 79, 90 (2d Cir. 2000) (noting that a party seeking to invoke judicial estoppel must show that its adversary "advanced an inconsistent factual position in a prior proceeding") (internal quotation marks omitted); *Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1037-38 (2d Cir. 1993) (finding judicial estoppel prohibits the assertion of an inconsistent "factual position" in an effort to "preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn

Defendants nevertheless argue that the amended complaint should be dismissed because it does not state a plausible claim for relief. For the reasons discussed below, none of defendants' arguments shields them from liability for any of these statements.

### A.  Defendants May Not, and Did Not, Disclaim Their Statutory Duty.

Defendants' argument that the disclaimers in the offering documents shield them from liability fails because disclaimers, especially general and imprecise disclaimers, cannot shield defendants from liability for untrue or misleading statements of present or past fact. (Defs. Br. at 40-41.) Defendants argue, for example, that because the offering documents in many instances disclosed "that loans might not conform to the descriptions contained" therein and "contained provisions regarding how to address such discrepancies," they are not liable for the alleged misstatements. (*Id.*) But courts uniformly have rejected this argument. *See, e.g.*, *In re Bear Stearns*, 851 F. Supp. 2d at 775 (although such provisions "could be read as an acknowledgment of occasional underwriting violations, [they] cannot be read as an acknowledgment of the pandemic of violations that Plaintiffs allege" here); *Capital Ventures/UBS*, 2012 WL 4469101, at *6 (rejecting same argument, noting that courts "have refused to allow such clauses to defeat claims of the type of widespread misrepresentation alleged here").

First, disclaimers or cautionary language cannot cure untrue or misleading statements of present or past fact. Although the "bespeaks caution" doctrine may permit an issuer or underwriter to disclaim liability for statements about the future, the duty not to make untrue or misleading statements of existing fact cannot be disclaimed. *See Iowa Pub. Emps.' Ret. Sys. v. M.F. Global Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010) ("bespeaks

positions" and "prevent[ ] the perpetuation of untruths"). The doctrine therefore does not apply here.

caution does not apply" to statements in prospectus about defendant's risk-management

system, because they "communicate present or historical fact"); *P. Stolz Family P'ship v.*

*Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("bespeaks caution" doctrine applies only to

forward-looking statements and not to statements of historical fact because "[i]t would be

perverse indeed if an offeror could knowingly misrepresent historical facts but at the

same time disclaim those misrepresented facts with cautionary language").

Second, even if issuers and underwriters ever could validly disclaim liability for

their untrue or misleading statements of present fact, to be effective, disclaimers and

"cautionary language . . . must relate directly to that by which the plaintiffs claim to have

been misled." *In re Bear Stearns*, 851 F. Supp. 2d at 768-69 (quoting *Hunt v. Alliance N.*

*Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 729 (2d Cir. 1998)); *see also In re Flag*

*Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009) ("The

requirement that the cautionary language match the specific risk is particularly important,

considering that most, if not all security offerings contain cautionary language.").

Disclosures of general risks are ineffective.

Third, whether cautionary language or particular disclaimers are sufficient to

shield a defendant from liability almost always is a question of fact not suitable for

resolution on a motion to dismiss. *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*,

No. 2:10-CV-0302-MRP (MANx), 2011 WL 4389689, at *18 (C.D. Cal. May 5, 2011).

As a result, no language in the prospectus supplements shields defendants from liability

for the widespread untrue and misleading statements alleged here.

### B.  The Allegations About LTVs and Property Appraisals Are Sufficient.

The amended complaint alleges that the LTVs stated in the prospectus

supplements were significantly lower than the actual LTVs for many of the mortgage loans because the values of the properties were overstated to a material extent. (Am. Compl. ¶ 49.) The FDIC sampled loans in each of the securitizations using a "comprehensive, industry-standard automated valuation model [AVM]" to calculate the value of the underlying property at the time the mortgage loan was originated. (*Id.* ¶ 50.) The AVM results show that the appraised values given to such properties were significantly higher than the actual values of the properties at the time the loans were originated, resulting in a material understatement of the LTVs in the prospectus supplements. (*Id.* ¶¶ 51-57.)

Defendants make several arguments as to why these allegations fail. (Defs. Br. at 42-49.) But whether the results of the AVM may be impeached for the reasons defendants offer is a question of fact that may not be resolved on this motion to dismiss. It is beyond dispute that retrospective AVM-based allegations provide ample support for a plausible section 11 claim. *See, e.g., FDIC/UWB*, 2012 WL 49727, at *2; *Capital Ventures/UBS*, 2012 WL 4469101, at *9; *MassMutual/RFC*, 843 F. Supp. 2d at 204.

1. **Even If LTVs and Appraisals Are Properly Deemed Opinions, the Amended Complaint Adequately Pleads That the Statements in the Prospectus Supplements About Appraisals and LTVs Were Untrue or Misleading.**

Defendants argue incorrectly that the FDIC's allegations about appraisals and LTVs fail because appraisals and LTVs are opinions, which are not actionable unless they are alleged to be subjectively false. (Defs. Br. at 42.)

First, the amended complaint does not merely allege that the appraised values were incorrect. It also alleges that the offering documents for some of the securitizations falsely stated that appraisals were conducted in accordance with USPAP. These

38

statements are actionable as "statement[s] of verifiable fact." *In re Bear Stearns*, 851 F. Supp. 2d at 769; *see also Plumbers' & Pipefitters' Local #562*, 2012 WL 601448, at *13 (statement that appraisals conformed to USPAP was a "factual one: the originators failed to perform a task as the Offering Documents said it would be performed"). Moreover, far from making "conclusory assertion[s]" (Defs. Br. at 44), the amended complaint provides detailed allegations in support of this claim. *See* Am. Compl. ¶¶ 68-73 (listing USPAP provisions that were not followed, as shown by use of inaccurate property descriptions, disregard of recent sales data, and use of properties that were not comparable).

Second, to the extent that the FDIC's claims are based on the inaccuracy of the appraisals, those claims are actionable. As this Court has held, in the securities context, "an opinion may be treated as false or misleading 'if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact.'" *Briarwood Invs., Inc. v. Care Inv. Trust Inc.*, No. 07 Civ. 8159 (LLS), 2010 WL 5422549, at *4 (S.D.N.Y. Dec. 29, 2010) (quoting *Kowal v. Int'l Bus. Machs. Corp. (In re Int'l Bus. Machs. Corp. Sec. Litig.)*, 163 F.3d 102, 109 (2d Cir. 1998)). The amended complaint pleads that these "opinions"[29] were not honestly believed when made, *i.e.*, that they were subjectively false. *See FHFA/UBS*, 858 F. Supp. 2d at 327-28 (explaining that opinions may give rise to liability under section 11 where plaintiff alleges that they were both objectively false and not believed by the speaker); *In re Bear Stearns*, 851 F. Supp. 2d at 769-70 (same); *Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, No. 12-10085-RWZ, 2013 WL 535320, at *4 (D. Mass. Feb. 13, 2013) (*Capital Ventures/JPM*) (plaintiff "alleges that

---

[29] Some district courts in the Second Circuit have held that appraisals are opinions. Not every subjective statement is a non-actionable opinion, however. Although appraisals involve an element of professional judgment, they nevertheless must be based on verifiable facts, such as recent sales of the subject and comparable properties.

the appraisal values were actively manipulated to justify issuance of the loan, meaning that the values did not represent the appraisers' actual subjective belief and had no real basis in fact. If those allegations are true, the appraisals are actionable opinions"). It also alleges that the "opinions" were without a basis in fact. *See* Am. Compl. ¶ 67 (alleging that appraisals used "inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties").

Defendants argue that the FDIC has failed to plead subjective falsity because the amended complaint expressly disclaims any allegation of fraud by the defendants. (*See* Defs. Br. at 42.) But that is irrelevant because to state a claim, the plaintiff need allege only that the *appraisers*, not the defendants, did not honestly believe their statements of value when made. *FHFA/UBS*, 858 F. Supp. 2d at 325-27 (explaining why allegations of subjective falsity of appraisers' statements of value does not amount to alleging scienter on the part of defendants, and that only the former is required to state a claim). To avoid liability, the defendant underwriters bear the burden of showing that they could not have discovered the untruth of the appraisals and LTVs through reasonable care. *Id.* at 327. The amended complaint sufficiently alleges that the appraisals were not subjectively believed when made. *See* Am. Compl. ¶ 67 ("a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations"). Moreover, the fact that the AVM results show such a widespread deviation from the LTVs reported in the prospectus supplements supports the plausible inference that the values were knowingly inflated. *See FHFA/UBS*, 858 F. Supp. 2d at 328 ("that the LTV data reported in the offering materials deviates so

significantly from the results of plaintiff's loan-loan level analysis . . . raise a plausible inference that the appraisers knowingly inflated their valuations"); *MassMutual/RFC*, 843 F. Supp. 2d at 204 (allegations based on AVM results "provide further support that the appraisals had no basis in fact . . . [and] create a reasonable inference that the LTV ratios were knowingly understated and the appraisals knowingly inflated").

> ### 2. The FDIC's AVM-Based Allegations Are More Than Sufficient to Meet *Twombly*'s "Plausibility" Standard.

Defendants contend that the AVM-based allegations fail because "the FDIC has pled no basis on which to infer that its AVM is any more reliable than the appraisals it is second-guessing." (Defs. Br. at 45.) Specifically, they argue that the amended complaint does not plead facts about "how its model works," in particular its margin of error, and thus provides "no 'plausible' basis on which to infer that the AVM's output is inconsistent with the Offering Documents." (*Id.* at 46.)

But the FDIC's description of the methodology behind the AVM far exceeds its pleading burden under Rule 8. The amended complaint includes allegations about the model's objectivity, inputs, scope, reliability, and mean error rate (Am. Compl. ¶ 50), which are more than sufficient to allow the court to assess the reliability of the AVM and, thus, the plausibility of the FDIC's claims. Defendants insist – without citing any authority[30] – that the FDIC's allegation about the model's mean error rate is insufficient,

---

[30] Defendants' reliance on *Textrainer Partnership Securities Litigation*, No. C-05-0969 MMC, 2006 WL 1328851, at *5 (N.D. Cal. May 15, 2006) and *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 903 n.11 (E.D. Va. 2010), to challenge the AVM allegations is misplaced. (Defs. Br. at 46.) The plaintiff in *Textrainer*, unlike the FDIC here, made allegations about certain price estimates solely "based on a review of industry data [by] an experienced industry consultant," without providing any additional detail about the data, the industry, or the consultant. *Textrainer*, 2006 WL 1328851, at *5. The dicta in *Torkie-Tork* to which defendants point noted only that statements about statistical results can be misleading if they do not disclose the error rate. The

and that the FDIC must allege the margin of error with respect to *each individual piece of property* in order to state a claim. (Defs. Br. at 46 n.41.) But courts consistently have held that allegations supported by substantially similar retrospective AVM data are sufficient to allege actionable misrepresentations, without regard to whether the complaint pleaded the AVM's margin of error at all, not to mention with the specificity defendants urge. *See, e.g., FDIC/UWB,* 2013 WL 49727, at *2 ("The amended complaint plausibly states that [LTVs] were inflated. *The AVM used by the Plaintiff is not simply an opinion*, the appraisals made in the 'Offering Documents' were actionable statements and *Countrywide's mathematical arguments regarding margins of error are seriously flawed*.") (emphasis added).[31]

Furthermore, the interagency guidelines and advisory opinion that defendants cite are irrelevant (Defs. Br. at 45-46), because they neither reject the use of AVMs to test

---

FDIC has alleged the AVM's error rate. That is more than enough to state a plausible claim for relief.

[31] *See also FHFA/UBS*, 858 F. Supp. 2d at 328 (finding AVM results showing that LTVs in offering materials were understated, together with allegations based on news reports, other complaints, and investigations detailing instances in which appraisers overstated property values, sufficient to state a claim); *Capital Ventures/UBS*, 2012 WL 4469101, at *9 (plaintiff plausibly alleged actionable misrepresentations about appraisals and LTVs by presenting AVM results and other allegations about appraisal practices); *MassMutual/RFC*, 843 F. Supp. 2d at 204 (same). Defendants give no reason for the Court to depart from these rulings, and the cases they cite on this issue are inapposite. (Defs. Br. at 44-45.) *Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010), addressed claims that required a showing of scienter. The court concluded that plaintiffs had not alleged a subjective intent to defraud merely by pointing to an "erroneous quantitative prediction." *Id.* That holding has no bearing here. *In re Salomon Analyst Level 3 Litigation*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005), also addressed whether the plaintiff had alleged falsity and scienter with the particularity required of a fraud claim – a standard that does not apply here. Finally, defendants cite *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortgage Pass-Through Certificates Series AR-1*, 748 F. Supp. 2d 1246, 1256 (W.D. Wash. 2010), for the proposition that the "fact that the [credit] ratings [for MBS] would have been different under a different methodology is insufficient to state a claim." (Defs. Br. at 45.) But the FDIC has not alleged, as the plaintiff did in *Boilermakers*, that the offering documents were misleading "because the ratings were based on outdated models." *Id.* at 1256.

appraisal values nor establish pleading standards. The interagency guidelines state only that, for the limited purpose of appraising properties for federally-related transactions, a full appraisal – rather than an AVM – must be conducted by a licensed appraiser. *See* Federal Deposit Insurance Corporation, *Interagency Appraisal and Evaluation Guidelines*, 2010 WL 5015725 (Fed. Reg. Dec. 10, 2010). Likewise, the advisory opinion of the Appraisal Standards Board merely states that, although the "output of an AVM is not, by itself an appraisal . . . [the] output may become a basis for appraisal, appraisal review, or appraisal consulting opinions and conclusions if the appraiser believes the output to be credible." The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, at A-42 (*available at* htttup://www.uspap.org/#/166/).

Finally, defendants' attack on the reliability of the AVM also is premature. *See MassMutual/RFC*, 843 F. Supp. 2d at 204 ("[A]rguments regarding the methodological flaws of the AVM . . . are premature at the motion to dismiss stage, especially considering the significant allegations Plaintiff has made concerning the methodology of the AVM model."); *accord Capital Ventures/UBS*, 2012 WL 4469101, at *9. At this stage, the AVM results need only raise a plausible inference that the LTVs in the offering documents were materially understated.

### 3. The AVM-Based Allegations Do Not Plead "Fraud by Hindsight."

Defendants rely on a document published in 2010 by CoreLogic – the vendor of the AVM that the FDIC used for its amended complaint – in an effort to show that "the FDIC's AVM plainly is based on hindsight." (Defs. Br. at 48.) Based on a single quote from this document, defendants infer that the FDIC's AVM must have "use[d] comparable sales data that was so recent at the time the property was appraised that it was *not available to the appraiser.*" (*Id.*) Defendants are mistaken.

43

The AVM was run as of the date on which each mortgage loan closed, that is, the model used sales of comparable properties that *took place only before, not after*, the sale of the property that the model was valuing. (Am. Compl. ¶ 50.) The fact that there may be some lag between a sale of a comparable property and the loading of that sale into the database does not mean that the output of the model is *post hoc*. In each case, the sale of the comparable property took place before the closing of the loan as to which the disclosed LTV is alleged to have been inaccurate. It does not matter how long it then took to load that sale into the database, and any lag does not make these allegations "misrepresentation by hindsight."

Moreover, even if the Court were to consider defendants' attack on the AVM's methodology, the two-page marketing piece by CoreLogic (Frankel Decl. Ex. 54) does not support their argument. The main purpose of that paper is to describe a single experiment that CoreLogic conducted in 2010 that compares the results of AVMs with actual sales prices. The paper concludes that retrospective AVMs run in 2010 were more accurate than AVMs run at the time the properties were sold in 2007, 2008, and 2009. As CoreLogic notes, "models are continuously adjusted to produce the most accurate values possible, given the data we have available. Over time, our models have become significantly more accurate – even during times of market volatility." (*Id.*) That says nothing about whether retrospective AVMs consider data that was not available to the appraiser at the time of the original appraisal.

### 4. The AVM-Based Allegations Do Not Fail Because Some of the Certificates Were Backed in Part by Purchase-Money Loans.

Defendants argue that the FDIC's AVM-based allegations fail because the prospectus supplements disclosed that, for purchase-money loans, LTVs were not always

44

calculated using the appraised value; the sale price was used if it was lower than the appraised value. (Defs. Br. at 47.) The Court should reject this argument as well.

First, this argument "addresses the merits of the claim and is better suited to trial." *Fed. Hous. Fin. Agency v. Morgan Stanley*, No. 11 Civ. 6739 (DLC), 2012 WL 5868300, at *3 (S.D.N.Y. Nov. 19, 2012) (*FHFA/Morgan Stanley*). Second, as defendants acknowledge, this argument has no bearing on mortgages taken out to refinance an earlier mortgage (Am. Compl. ¶ 52 n.3), which represented a significant portion of the loans underlying these certificates. (Defs. Br. at 47-48.) Moreover, even in those instances in which the purchase price was used to calculate LTV, it was only because the purchase price was *lower* than the appraised value. (Am. Compl. ¶ 42.) Had the appraisal been accurate (that is, not inflated), then it would have been lower than the purchase price, and thus would have been used instead of the purchase price to calculate LTV. Thus, in all cases, the AVM supports the FDIC's allegations that the values that were actually used to calculate LTVs (however those values were determined) were too high, and thus that the LTVs that defendants disclosed were untrue or misleading. *See FHFA/Morgan Stanley*, 2012 WL 5868300, at *3 (rejecting argument that "automated appraisal data does not bear on the falsity of LTV statistics for purchase-money mortgages," holding that plaintiff "plausibly asserted the falsity of the representations regarding LTV ratio[s], even in . . . securitizations [backed by purchase-money loans].").

### C.  The Allegations About Undisclosed Additional Liens are Sufficient.

The amended complaint alleges that defendants did not disclose in the prospectus supplements that many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to additional liens, making defendants' statements about the LTVs of the mortgage loans misleading. (Am. Compl. ¶¶ 58-64.) To ensure that

its calculations did not include liens that had been paid off but not promptly removed from land records, the amended complaint does not include in its statistics liens that were originated on or before the date on which each mortgage loan in the pool was closed. (*Id.* at ¶ 5 n.5.) On this basis, defendants argue that the FDIC's analysis shows only "that the total amount of money borrowed on the properties changed *after* the mortgages were originated." (Defs. Br. at 49.) The amended complaint expressly alleges, however, that many of the undisclosed liens were originated "*concurrently with the first lien and by the same originator.*" (Am. Compl. ¶ 60 (emphasis added).)

Defendants nevertheless argue that these allegations fail because the offering documents disclosed that the LTVs purported to include only the subject mortgage, and only referred to the value of the subject mortgage at the time of origination. (Defs. Br. at 50.) These disclosures, however, are not sufficient to shield defendants from liability for *omissions*. Defendants' statements about LTVs in the prospectus supplements were materially misleading because they omitted information about the additional liens already in existence on the properties backing the mortgage loans. The FDIC does not allege that defendants failed to disclose that there *might* be additional liens, but rather that there actually *were* such liens already in existence before the prospectus supplements were disseminated. (Am. Compl. ¶¶ 59-63.) Nowhere did defendants tell investors of the actual, not merely possible, existence of additional liens or of the magnitude of the risk they posed. The existence of those additional liens made defendants' statements about LTVs materially misleading, and the general disclosures to which defendants point are not specific or precise enough to have cautioned Colonial about the particular risk of the existing additional liens.

46

### D.  The Allegations About Owner-Occupancy Rates Are Sufficient.

"Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky." (Am. Compl. ¶ 76.) In each prospectus supplement, the defendants made statements about the number of loans in the pool that were secured by primary residences. The FDIC alleges those numbers were overstated because a review of the loan files will show that many of the properties that secured loans in the pool were not actually primary residences at the time the loans were underwritten. (*See, e.g.*, *id.* ¶¶ 78-79, 81.)

The FDIC used loan-level data to demonstrate that many of the properties that defendants stated to be the primary residences of their owners most likely were not. First, the data showed that certain borrowers instructed local tax authorities to send the bill for the real-estate taxes on the property to an address other than the property itself. Second, certain borrowers failed to designate the property as their "homestead," which grants special benefits for a primary residence, even though they had the legal right to do so if the property actually was their primary residence. Third, many borrowers did not receive any bills at the address of the mortgaged property even six months after the loan closed, but did receive their bills at a different address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property. (*Id.* ¶¶ 82-85.)

Defendants argue that they are not liable for any misstatements about the number of owner-occupied properties in each securitization because the prospectus supplements generally disclosed that the occupancy status of the properties was "[b]ased on representations by the obligors on the Mortgage Notes . . . at the time of origination of the related Mortgage Loans." (Defs. Br. at 51.) Defendants are mistaken for several reasons.

First, defendants are not mere passive conduits of information obtained from

47

others. Absent an affirmative showing that they did not know, and in the exercise of reasonable care could not have known, that the statement was untrue or misleading, the underwriter defendants are strictly liable for untrue or misleading statements in the offering documents. (The issuers have no such defense). *See* 15 U.S.C. §§ 77k(b)(1),(b)(3). That is true even if defendants were only repeating information obtained from third parties. Indeed, it is "plain from the statutory structure itself that a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials." *FHFA/UBS*, 858 F. Supp. 2d at 330.[32] Thus, courts have refused to absolve defendants of liability for untrue or misleading statements about owner occupancy rates even where those statements were based solely on representations by the borrowers at the time of origination. *See, e.g.*, *id.* at 330 ("[T]he Securities Act does not condition liability on a showing that defendants themselves inaccurately represented the data that they received from the borrowers.").

Second, none of the prospectus supplements includes the type of disclosure that some courts have found sufficient to protect an underwriter from liability for misrepresentations about owner occupancy rates. In *MassMutual/RFC*, for example, Judge Ponsor noted that the offering materials did not merely disclose that statements about owner occupancy were based on representations of the borrowers at the time of origination. Rather, they went further and "*explicitly disclosed the possibility of borrower*

---

[32] *See also In re Phar-Mor, Inc. Litig.*, 848 F. Supp. 46, 49 (W.D. Pa. 1993) (statement in offering document that defendant did not independently verify information or make any warranties as to its accuracy or completeness did not absolve defendant of liability under section 12); *Barneby v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1523-24 (M.D. Fla. 1989) (defendant could not avoid liability under section 12 by asserting that all statements in offering document were those of a third party and not warranted by it).

*misrepresentations or fraud.*" 843 F. Supp. 2d at 205 (emphasis added). Unlike the prospectus supplements disseminated by the defendants here, the offering documents addressed in *MassMutual/RFC* highlighted the particular risks associated with borrower misrepresentations:

> Fraud committed in the origination process may increase delinquencies and defaults on the mortgage loans. For example, a borrower may present fraudulent documentation to a lender during the mortgage loan underwriting process, which may enable the borrower to qualify for a higher balance or lower interest rate mortgage loan than the borrower would otherwise qualify for.

*Capital Ventures/UBS*, 2012 WL 4469101, at *8 (quoting statement from prospectus supplement in *MassMutual/RFC*). Other courts have concluded that, without such an explicit warning of borrower misrepresentation or fraud, the same general disclaimer invoked here was insufficient to shield defendants from liability for their untrue or misleading statements about owner occupancy. *Id.*[33]

Defendants also contend that the "inferences the FDIC asks the Court to draw from its owner-occupancy allegations cannot plausibly be drawn." (Defs. Br. at 52.) The question on a motion to dismiss is not whether the fact that a borrower had tax bills sent elsewhere or failed to designate a property as his "homestead" is sufficient proof that the borrower did not live in the property; it is whether those facts make an allegation that the borrower did not live in the property plausible. Indeed, similar allegations have been

---

[33] Defendants assert that the "Offering Documents also disclosed that there was a possibility of misrepresentation by the borrowers." Defs. Br. at 51-52 (citing Frankel Decl. Ex. 57). But the statements to which the defendants point have nothing to do with the probability that borrowers actually misrepresented their occupancy status or committed fraud. Instead, the passages highlighted by defendants simply (1) note the types of losses that are not subject to subordination, including "fraud losses resulting from fraud committed by the borrower in obtaining the mortgage loan," or (2) disclose the terms of the loan pool or primary mortgage insurance policies, which include broad exclusions for fraud at origination. *See* Frankel Decl. Ex. 57 (providing examples). These "disclaimers" in no way resemble the disclosure that Judge Ponsor found sufficient to defeat liability as a matter of law in *MassMutual/RFC*.

upheld despite defendants' argument that "where borrowers' property tax bills were being mailed six-months after the loan closed" was insufficient to allege a misrepresentation in the offering materials. *FHFA/UBS*, 858 F. Supp. 2d at 330. The court reasoned:

> Whether or not defendants are correct with regard to the proof that would be required at trial, at the very least, the [allegations] render plausible [plaintiff's] claim that the owner-occupancy rates reported in the offering materials were materially false. That is all that is required at this stage of the litigation.

*Id.* The FDIC's owner-occupancy allegations should be upheld for the same reason.

## E.  The Allegations About Departures from Underwriting Standards Are Sufficient.

The amended complaint alleges that statements in the prospectus supplements that the originators made mortgage loans in compliance with their underwriting standards, and made exceptions to those standards only when compensating factors were present, were untrue or misleading because defendants omitted to state that (i) the originators were disregarding those underwriting standards; (ii) the originators were making extensive exceptions to those standards when no compensating factors were present; (iii) the originators were making wholesale, rather than case-by-case exceptions to those standards; (iv) the originators were making mortgage loans that the borrowers could not repay; and (v) the originators were frequently failing to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards. (Am. Compl. ¶¶ 89-90.) The FDIC supports these allegations with detailed information about (i) the deterioration in undisclosed credit characteristics of the loans made by these particular originators; and (ii) the high rates of delinquency and default that the loans in these pools have experienced. (*Id.* ¶¶ 91-99 & Items 96-98 of Scheds. 1-

11.) Courts have held that allegations similar to those made here are sufficient to plead that statements about adherence to underwriting standards were untrue or misleading.[34] Defendants do not offer any compelling reason to treat the FDIC's allegations differently than those addressed in these rulings.[35]

Defendants argue that the FDIC "cannot proceed on a theory that originators *sometimes* departed from their underwriting guidelines, because the Offering Documents were explicit that the originators did so." (Defs. Br. at 54.) But that is not what the amended complaint alleges. It alleges a wholesale abandonment of the originators' underwriting standards. None of the disclaimers to which defendants point disclosed that the originators *systematically* disregarded their underwriting standards and borrowers' ability to repay the loans. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, No. 12-17070-cv, 2013 WL 765178, at *12 (2d Cir. Mar. 1, 2013) (*NJ Carpenters/RBS*) (holding that similar disclaimer did not shield defendants from liability); *Dexia SA/NV v. Bear, Stearns & Co., Inc.,* No. 12 Civ. 4761 (JSR), 2013 WL 856499, at *5 (S.D.N.Y. Feb. 27, 2013) (similar disclaimer did not shield defendants from liability for the "systematic deviation from established underwriting standards alleged by plaintiffs"); *In re Bear Stearns*, 851 F. Supp. 2d at 768-69 (disclaimer that

---

[34] *See, e.g., FDIC/UWB*, 2013 WL 49727, at *2 (finding nearly identical allegations about disregard of underwriting standards "plausible" and denying motion to dismiss complaint); *see also N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, No. 12-1707-cv, 2013 WL 765178, at *9-10 (2d Cir. Mar. 1, 2013); *Nomura*, 632 F.3d at 773-74; *In re IndyMac*, 718 F. Supp. 2d at 509-10; *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2010); *In re Lehman Bros. Sec. and ERISA Litig.,* 684 F. Supp. 2d 485, 493-94 (S.D.N.Y. 2010); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 270 (S.D.N.Y. 2010).

[35] For the reasons previously explained, the fact that Colonial was an originator of mortgage loans does not somehow make it implausible that Colonial was misled by the statements in the prospectus supplements. (*See* part I.D.3(d), *supra*.) To defeat the FDIC's claim, defendants would have to show that Colonial had actual knowledge that the defendants were making untrue or misleading statements in the offering documents for these securities. They have not done so.

originators would grant exceptions from guidelines did not preclude liability because "[n]o language in the Offering Documents disclosed, for example, that the originators had systematically violated their own stated underwriting standards, [or] that exceptions were *improperly* granted"); *accord Miss. PERS/Goldman*, 2011 WL 135821, at *10.

Defendants' challenge to the amended complaint's "statistics" is similarly misplaced. (Defs. Br. at 55.) As have plaintiffs in other cases, the FDIC alleges that mortgage loans included in these securitizations have experienced high rates of delinquency and default over time (Am. Compl. ¶¶ 93-98 & Items 96-98 of Scheds. 1-11), and that the initial triple-A ratings of the certificates are now significantly below investment grade or worse. (*Id.*, Item 38 of Scheds. 1-11.) Courts have found similar allegations sufficient to support a reasonable inference that the originators disregarded their underwriting guidelines. *See NJ Carpenters/RBS*, 2013 WL 765178, at *9-10 (allegations that trust experienced unusually high default rates and that certificates were downgraded below investment grade, along with statements of former employees of originator, supported reasonable inference that underwriting guidelines were disregarded); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781 (HB), 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) (allegations of credit rating downgrades and increase in delinquencies and defaults supported inference that underwriting guidelines were "totally disregarded"); *In re Lehman Bros.*, 684 F. Supp. 2d at 493 (allegations that delinquency and foreclosure rates on loans in pool increased supported claim that originators departed from underwriting guidelines).

In response, defendants contend that "allegedly poor loan performance" could have been caused by broad economic factors and indicates only that the loans were not

performing well, not that the offering documents contained material misstatements and

omissions. (Defs. Br. at 55-56.)[36] But defendants cannot counter the FDIC's pleading by

offering their own factual explanations for the high default or delinquency rates:

> Defendants . . . argue that an unforeseen event—namely, the housing
> collapse—and not the abandonment of underwriting standards caused the
> Certificates to decline in value. However, "any decline in value is
> presumed to be caused by the misrepresentation in the registration
> statement." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d
> 1044, 1048 (2d Cir. 1995). If Defendants wish to challenge that
> presumption they may present evidence at a later stage establishing an
> alternative cause of loss.

*In re Bear Stearns*, 851 F. Supp. 2d at 769 n.25; *see also Maine State*, 2011 WL

4389689, at *17; *MassMutual/RFC*, 843 F. Supp. 2d at 202. The FDIC's allegations

concerning the "very high" 90- and 30- day delinquency rates on the particular loans

underlying the certificates in this case (Am. Compl. ¶¶ 97-98 & Items 97-98 of Scheds.

1-11) provide further support for the allegation that the certificates that Colonial

purchased "were not as advertised." *FHFA/JPM*, 2012 WL 5395646, at *9; *see also*

*MassMutual/RFC*, 843 F. Supp. 2d at 202 ("Defendants[] contend that the poor

performance of the loans is due solely to the economic downturn, but this is a question of

fact that cannot be resolved on a motion to dismiss.") Defendants' argument, at most,

raises a disputed question of fact.

---

[36] The cases that defendants cite in support of this argument are inapposite. (Defs. Br. at 56.)
*Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 174 (2d Cir. 2005), addressed claims under section
10(b) and Rule 10b-5, on which the plaintiff bears the burden of pleading and proving loss
causation. The court's dismissal in that case was based on the plaintiff's failure to meet its
pleading burden on this element. *Id.* at 175. The FDIC has no such burden here because loss
causation is not an element of a section 11 claim. *First Nationwide Bank v. Gelt Funding Corp*.,
27 F.3d 763, 772 (2d Cir. 1994), likewise involved a fraud claim (under RICO) that required the
plaintiff to prove causation and is inapposite for the same reason.

### F.  The Allegations About Credit Ratings Are Sufficient.

Each of the certificates that Colonial purchased was rated triple-A, and these ratings were disclosed in the prospectus supplements. (Am. Compl. ¶ 100 & Items 38(c) & 100 of Scheds. 1-11.) "The ratings were important to the decision of any reasonable investor whether to purchase the certificates." (*Id.* ¶ 101.) But the statement of these ratings was misleading because the rating agencies were provided inaccurate information about the loans in the collateral pool of each securitization, and the defendants never disclosed that. As described in the amended complaint, "[i]f the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect." (*Id.* ¶ 44.) Similarly, if the rating agencies had known that the number of loans actually secured by primary residences was overstated, or that the originators did not follow their underwriting standards, then the ratings of the certificates that Colonial purchased would have been lower. Defendants' statement of each rating of the certificates was misleading because the defendants did not disclose that rating agencies did not and could not take into account the true facts about the mortgage loans in rating the certificates.

Defendants argue that the FDIC's allegations about credit ratings are "entirely derivative of the other allegations" and, thus, "fail along with them." (Defs. Br. at 56.) Because the FDIC's other allegations are sufficient to state a claim for all of the reasons discussed above, defendants are wrong on this point as well.

In addition, defendants assert that allegations about credit ratings are not actionable without assertions that either the ratings agencies or the defendants believed

that the ratings were inaccurate when made. (*Id.* at 57.) But defendants miss the point.[37] The amended complaint alleges that defendants omitted to state that the ratings were inaccurate because they were based on the same untrue or misleading statements that the defendants made in the prospectus supplements (Am. Compl. ¶ 102), and therefore materially understated the risk of the certificates. (*Id.* ¶ 130.)

## III. DEFENDANTS THAT DID NOT UNDERWRITE THE PARTICULAR CLASS OF SECURITIES THAT COLONIAL PURCHASED MAY STILL BE LIABLE AS "UNDERWRITERS" UNDER SECTION 11.

Each of the defendants against which the FDIC has asserted a claim for liability as an underwriter under section 11 (Underwriter Defendants) is potentially liable to the FDIC, even if it did not underwrite the particular class of securities that Colonial bought. "The term 'underwriter' has been broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer'. . . to the public."[38] *SEC v. Spectrum, Ltd.*, 489 F.2d 535, 541 n.11 (2d Cir. 1973). *See also In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 177 (2d Cir. 2011) (explaining actions necessary to qualify as an "underwriter" under the "participation prongs" of the statutory definition in the 1933 Act).

Each of the Underwriter Defendants is named as an underwriter in the relevant prospectus supplements that the FDIC alleges contained untrue or misleading

---

[37] The FDIC does not need to plead that the defendants were aware that the rating agencies believed the ratings to be false or misleading, as liability may attach for accurately conveying false or misleading ratings. *See In re Bear Stearns*, 851 F. Supp. 2d at 771.

[38] Under section 11, an underwriter is defined as:

> Any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11).

statements.[39] Moreover, it is undisputed that each of the Underwriter Defendants in fact participated directly in the distribution of securities from the relevant RMBS trust to the public by means of those prospectus supplements. That is sufficient for liability to attach under section 11. *In re Lehman Bros.*, 650 F.3d at 176-180.

Defendants incorrectly assert, however, that because some of the Underwriter Defendants did not underwrite the *specific class* or "tranche" of certificates that Colonial purchased, Colonial lacks standing to assert section 11 claims against them. (Defs. Br. at 58-59.)[40] In other words, defendants argue – without citing any relevant authority – that the liability of an underwriter must be determined at the tranche level.[41] But the underlying purpose of section 11 is to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct

[39] *See* Matthews Decl. Ex. E (WFMBS 2007-4 Pro Sup at S-1, S-61) (stating that "Each of Greenwich Capital and Citigroup is referred to herein as an '**Underwriter**' and, together, as the '**Underwriters**' . . ."); Ex. F (CMALT 2007-A3 Pro Sup at 1, 5) (defining RBS and Credit Suisse as "Underwriters" and stating that "[t]he Underwriters have committed to purchase all of the certificates (other than the ratio-stripped IO class certificates) from the Depositor"); Ex. G (CMALT 2007-A5 Pro Sup at 1, 5) (listing RBS and HSBC as "Underwriters" and stating that "the Underwriters have committed to purchase all of the certificates (other than the ratio-stripped IO class certificates) from the Depositor"); Ex. H (FHAMS 2007-FA1 Pro Sup at S-1) (stating that "each of Deutsche Bank Securities Inc. and  UBS Securities LLC, together with FTN Financial Securities Corp., will sell the offered certificates to investors at varying prices to be determined at the time of sale" and listing all three at bottom of prospectus supplement); Ex. I (FHAMS 2007-FA2 Pro Sup at S-1) (stating that "Citigroup Global Markets, Inc. and Banc of America Securities LLC, together with FTN Financial Securities Corp., will sell the offered certificates to investors at varying prices to be determined at the time of sale" and listing all three at bottom of prospectus supplement).

[40] Defendants make this argument with respect to five securitizations: WFMBS 2007-4, CMALT 2007-A3, CMALT 2007-A5, FHAMS 2007-FA1, and FHAMS 2007-FA2. (Defs. Br. at 58-60.) They assert that with respect to these securitizations, the FDIC has sued an entity that underwrote only subordinate classes of certificates, whereas Colonial purchased only from the senior classes. (*Id.*)

[41] Several of the cases that defendants cite address whether a named plaintiff in a class action has standing to assert claims on behalf of purchasers of certificates from tranches that it did not purchase. (Defs. Br. at 59.) Although that is not the relevant question here, the Second Circuit has held that it can. *See NECA-IBEW*, 693 F.3d at 164-65.

56

role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). As noted, each of the Underwriter Defendants is listed in the prospectus supplements as an underwriter of securities issued thereunder. Most of the alleged untrue or misleading statements contained in those documents are not specific to any particular tranche of security; rather, they relate to the underlying loans generally or to loans in a particular pool, which back more than one tranche.[42] *See, e.g.*, Am. Compl. ¶¶ 47, 72, 78, 89. *See also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 336-37 (S.D.N.Y. 2012) (noting, in addressing standing under section 11, that alleged misstatements about underwriting standards, appraisal standards, and LTVs were not tranche-specific). As a result, there is no reason to condition liability on whether the defendant underwrote the particular tranche that the plaintiff purchased.

Defendants purport to rely on the language in section 11 stating that an investor may sue "every underwriter with respect to *such security*," which they argue refers to the *specific tranche* purchased by the investor. Defs. Br. at 59 (citing 15 U.S.C. § 77k(a)(5) (emphasis added)). Several courts have rejected the meaning that defendants attribute to this language. *See, e.g., In re Bear Stearns*, 851 F. Supp. 2d at 779 ("While the phrase 'such security' has no grammatical referent in Section 11(a), the text makes clear that the only prerequisite to filing suit is the presence of a misrepresentation or omission in its registration statement"; finding nothing that would "warrant treating tranches – which were issued pursuant to the same, allegedly defective Offering Documents – as 'different' securities for the purpose of Sections 11 and 12(a)(2)"); *Fort Worth*, 862 F. Supp. 2d at

---

[42] For two of the five securitizations, there was only one mortgage loan pool, so all of the tranches were backed by the same mortgage loans. (Am. Compl. at Item 38(a) and (b) of Scheds. 6 and 10.)  For the other three, Colonial's certificates were backed by loans from Pool I (*id.* at Scheds. 1, 2 and 7), and the subordinate certificates were backed by loans from Pool I and Pool II.

339-40 (noting that statute does not explain what "such security" refers to, and rejecting notion that it refers to particular tranches of RMBS).

But even assuming, as defendants urge, that each tranche issued pursuant to the same prospectus supplement is considered to be a separate security, that does not shield defendants from liability here. A person may be liable as an underwriter of securities that it did not actually sell if it directly or indirectly "participated" in the distribution of the security. "Participation" in a distribution of securities is interpreted broadly and does not require that the defendant actually sell the securities. *See In re Lehman Bros.,* 650 F.3d at 181 n.10 ("Persons may be liable for participation even though they did not themselves directly sell or offer securities or purchase securities for resale."); *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1400-01 (7th Cir. 1995) (holding that defendant was subject to liability under section 11 as an "underwriter" even though it "neither purchased [the issuer's] notes with a view to distribute them, nor offered or sold notes in connection with their distribution," because its role was "necessary to the distribution" of the securities).[43] Participation may include, for example, contributing information about the securities to the documents that were used to sell the securities. *See, e.g., Special Situations Fund III, L.P. v. Cocchiola*, No. 01-3099 (WHW), 2007 WL 2261557, at *6 (D.N.J. Aug. 3, 2007) (describing actions that can constitute "participation" under the 1933 Act, including taking part in the preparation of the registration statement or prospectus); *In re Activision Sec. Litig.*, No. C-83-4639(A)

---

[43] *See also Special Situations Fund III, L.P. v. Cocchiola*, No. 01-3099 (WHW), 2007 WL 2261557, at *5 (D.N.J. Aug. 3, 2007) ("Nor must a party actually sell shares to the public to be an underwriter under the Securities Act, mere participation in an offering is enough."); *Dijulio v. Digicon, Inc*., 325 F. Supp. 963, 965 (D. Md. 1971) (noting, in addressing whether venue existed over claim under section 11, that all members of underwriting group for the use and benefit of which the registration statement and prospectus were prepared and filed were subject to liability under the 1933 Act "regardless of which underwriter actually made the sale").

MHP, 1986 WL 15339, at *6-7 (N.D. Cal. Oct. 20, 1986) (concluding, in assessing

whether venue was proper, that defendants "participated" in sale of stock in district by

virtue of their status as members of the underwriting syndicate).[44]

      The FDIC has not had the opportunity to take discovery concerning the role that

each of the Underwriter Defendants played in these offerings, such as whether they

participated in the preparation of the prospectus supplements. As a result, dismissal of its

claims against any defendant on this basis would be premature.

## IV.      THE AMENDED COMPLAINT PLEADS A CLAIM FOR CONTROL PERSON LIABILITY UNDER SECTION 15 OF THE 1933 ACT.

      Section 15 extends liability to "[e]very person who, by or through stock

ownership, agency, or otherwise . . . controls any person liable under [section 11 or 12]."

15 U.S.C. § 77o(a). "In order to state a claim for control person liability under Section

15, a plaintiff must allege (a) a primary violation by a controlled person, and (b) control

by the defendant of the primary violator." *In re WorldSpace Sec. Litig.,* No. 07 Civ. 2252

(RMB), 2008 WL 2856519, at *7 (S.D.N.Y. July 21, 2008) (internal quotations omitted).

Section 15 claims must satisfy the minimal notice pleading standard of Rule 8, not the

heightened pleading requirements of Rule 9(b) or the PSLRA. *In re Global Crossing, Ltd.

Sec. Litig*., No. 02 Civ. 910 (GEL), 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005).

      As set forth fully above, the amended complaint adequately alleges primary

violations of section 11. Moreover, the control person liability of the defendants is

---

[44] Defendants' argument that the FDIC's claims against FTN Financial Securities Corp. must be dismissed because the relevant prospectus supplements define "Underwriters" to include only entities other than FTN Financial is baseless. (Defs. Br. at 60 n.54.) Defendants cannot use definitional terms in the offering documents to alter the scope of statutory liability under the federal securities laws. The prospectus supplements unambiguously state that FTN Financial, together with the other entities listed as underwriters, "will sell the offered certificates to investors at varying prices determined at the time of sale." Matthews Decl. Exs. H, I at S-1.

alleged by their ownership and control of the primary violators. (Am. Compl. ¶¶ 141-150.) Each of the section 15 defendants was, at the relevant time, the parent of a wholly-owned subsidiary that has violated section 11. Matthews Decl. Ex. D (excerpts of relevant prospectus supplements describing parent/subsidiary relationship); *see McKenna v. SMART Technologies Inc.*, No. 11 Civ. 7673 (KBF), 2012 WL 1131935, at *20 (S.D.N.Y. Apr. 3, 2012) (finding sufficient on motion to dismiss information included in prospectus regarding ownership and control); *Borden, Inc. v. Spoors Behrins Campbell & Young, Inc.,* 735 F. Supp. 587, 591 (S.D.N.Y. 1990) (allegation that defendants were sole shareholders of primary violator met standard for control person liability because "[d]efendants' positions strongly suggest that they had the potential power to influence and direct the activities of [the primary violator]"). Under the liberal notice pleading rules, the allegations in the amended complaint state a claim of control person liability.

## CONCLUSION

For all of the foregoing reasons, the Court should deny defendants' motion to dismiss the amended complaint in its entirety.

Dated: March 18, 2013

Respectfully submitted,

**GRAIS & ELLSWORTH LLP**

By: /s/ Mark B. Holton

David J. Grais (DG 7118)
Mark B. Holton (MH 4939)
Kathryn E. Matthews (KN 0932)
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 755-0100

*Attorneys for Federal Deposit Insurance
Corporation as Receiver for Colonial Bank*