# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
COLONIAL BANK,

<em>Plaintiff</em>,

v.

CHASE MORTGAGE FINANCE CORP.;
JPMORGAN CHASE & CO.; J.P. MORGAN
SECURITIES LLC; CITICORP MORTGAGE
SECURITIES, INC.; CITIMORTGAGE, INC.;
CITIGROUP GLOBAL MARKETS INC.; FIRST
HORIZON ASSET SECURITIES INC.; FIRST
HORIZON HOME LOAN CORPORATION;
ALLY SECURITIES LLC; CREDIT SUISSE
SECURITIES (USA) LLC; DEUTSCHE BANK
SECURITIES INC.; FTN FINANCIAL
SECURITIES CORP.; HSBC SECURITIES
(USA) INC.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INC.; RBS SECURITIES
INC.; UBS SECURITIES LLC; and WELLS
FARGO ASSET SECURITIES CORPORATION,

<em>Defendants</em>.

No. 12 Civ. 6166 (LLS) (MHD)

## JOINT MEMORANDUM OF LAW IN FURTHER SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ........................................................................................................4

I.   The FDIC's Claims are Untimely.................................................................4

    A.   The "Inquiry Notice" Standard Governs the Timeliness of the FDIC's Claims. ...............................................................................................5

    B.   The FDIC Pleads No Facts to Show That Its Claims Are Timely..........................6

    C.   The Accrual of a § 11 Claim is Not Contingent on a Ratings Downgrade. ...........7

    D.   The FDIC's Decision to Perform a Particular Type of Retrospective Analysis Does Not Toll the Statute of Limitations. ................................................9

    E.   The FDIC's Own Allegations, Combined with Information in the Public Domain, Show that the Facts on which It Bases Its Claims Were Available to Colonial before August 14, 2008. ....................................................10

    F.   The Ability of Other MBS Investors to File Complaints Prior to August 14, 2008 Confirms that Colonial Could Have Done so As Well..........................13

    G.   None of the FDIC's Claims are Tolled by *American Pipe*..................................15

    H.   The Extender Statute Does Not Save the FDIC's Claims from Being Time Barred. .........................................................................................16

II.   The FDIC Has Failed to State a Claim for Relief Under § 11. ........................................17

    A.   The Allegations About Appraisals and LTV Ratios Fail. ....................................17

        1.   Appraisals and LTV ratios are statements of opinion that are not actionable absent subjective falsity—which the FDIC does not allege..................................................................................17

        2.   The FDIC provides no basis on which to infer that its AVM's output is more reliable than an appraisal. ...................................................20

        3.   The retrospective AVM cannot give rise to a "plausible" claim because it rests on hindsight and is predestined to deem "false" every prospectus supplement ever issued in a declining real estate market. .................................................................................22

4.      The AVM-based allegations fail to state a claim because they challenge statements that were not even in the Offering Documents. ............................................................................................24

B.      The Allegations About Additional Liens Fail. ....................................................25

C.      The Allegations About Owner-Occupancy Fail. .................................................26

D.      The Allegations About Underwriting Guidelines Fail. ........................................28

E.      The Allegations About Credit Ratings Fail. ........................................................31

III.     The FDIC Has Failed to State a Claim for Relief Under § 15. .........................................32

IV.     The FDIC Lacks Statutory Standing to Assert § 11 Claims Against Certain Defendants. .......................................................................................................................32

CONCLUSION ...........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164 (C.D. Cal. 2011).................................................................................................9, 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..............................................................19, 34

*Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512 (M.D. Fla. 1989) .......................................................................................................................28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).........................................................3

*Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65 (S.D.N.Y. 2000) .............................11

*Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, 2013 WL 535320 (D. Mass Feb. 13, 2013) ...............................................18

*Capital Ventures Int'l v. UBS Sec. LLC*, 2012 WL 4469101 (D. Mass. Sept. 28, 2012)............................................................................10, 21, 27

*City of Pontiac General Employees Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011) ..........................................................5

*Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141 (S.D.N.Y. 2011)..........................................20, 32

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) .....................................2, 17, 18

*FDIC as receiver for Colonial Bank v. Countrywide Sec. Corp.*, 2013 WL 1598680 (C.D. Cal. April 9, 2013) .........................................1, 13, 14, 15

*FDIC as receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ......................................passim

*FDIC as receiver for United W. Bank v. Countrywide Fin. Corp.*, 2013 WL 49727 (C.D. Cal. Jan. 3, 2013) ...............................................10, 21, 26

*FDIC v. Shrader & York*, 991 F.2d 216 (5th Cir. 1993) ..........................................17

*Fed. Home Loan Bank of Chi. v. Banc of Am. Funding Corp.*, No. 10 CH 45033 (Ill. Cir. Ct. Sept. 19, 2012).................................................10, 12

*Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D05 1010 PL 45071 (Ind. Super. Ct. July 3, 2012) ................................10

*Fed. Hous. Fin. Agency v. Morgan Stanley*, 2012 WL 5868300
(S.D.N.Y. Nov. 19, 2012) ................................................................ 25

*Fed. Hous. Fin. Agency v. UBS Am. Inc.*, -- F. Supp. 2d -- , 2013
WL 1352457 (2d Cir. Apr. 5, 2013) ........................................... 4, 16

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306
(S.D.N.Y. 2012) ..................................................................... passim

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL
3790810 (S.D.N.Y. Sept. 28, 2010) ................................................ 27

*Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816 (S.D.N.Y. 2010) ................. 7

*Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir.
1995) ................................................................................. 34

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) .................................... 19

*Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479 (2d Cir.
2011) ................................................................................. 32

*In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548 (S.D.N.Y.
Jan. 5, 2011) ........................................................................ 23

*In re Bear Stearns Mortg. Pass-Through Certif. Litig.*, 851 F.
Supp. 2d 746 (S.D.N.Y. 2012) ................................................. passim

*In re IndyMac MBS Litig.*, 793 F. Supp. 2d 637 (S.D.N.Y. 2011) ................... 6

*In re Lehman Bros. MBS Litig.*, 650 F.3d 167 (2d Cir. 2011) ................. 33, 34

*In re Morgan Stanley Mortg. Pass-Through Certif. Litig.*, 2010
WL 3239430 (S.D.N.Y. Aug. 17, 2010) .............................................. 7

*In re Morgan Stanley Mortg. Pass-Through Certif. Litig.*, 2012
WL 2899356 (S.D.N.Y. July 16, 2012) ................................... 6, 7, 10, 12

*In re Morgan Stanley Mortg. Pass-Through Certif. Litig.*, 810 F.
Supp. 2d 650 (S.D.N.Y. 2011) ............................................... 10, 12

*In re Phar-Mor Litig.*, 848 F. Supp. 46 (W.D. Pa. 1993) ......................... 27

*In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248
(S.D.N.Y. 2005) ..................................................................... 20

*Koch v. Christie's Int'l PLC*, 699 F.3d 141 (2d Cir. 2012) ................... 5, 6

iv

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young LLP*, 622 F.3d 471 (6th
Cir. 2010) ............................................................................................................18

*Lighthouse Fin. Grp. v. RBS Grp.*, *PLC*, -- F. Supp. 2d --, 2012
WL 4616958 (S.D.N.Y. Sept. 28, 2012*)*..................................................................7

*Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp. (In re
Countrywide Fin. Corp. MBS Litig.)*, 2012 WL 3578666 (C.D.
Cal. Aug. 17, 2012)............................................................................................27

*Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 843 F. Supp.
2d 191 (D. Mass. 2012)...............................................................................passim

*Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734 (N.D.
Cal. June 8, 1994) .............................................................................................20

*Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) ...................................................5, 6

*Mitchell v. Home*, 377 F. Supp. 2d 361 (S.D.N.Y. 2005).............................................2

*N.J. Carpenters Health Fund v. RBS Grp. PLC*, 709 F.3d 109 (2d
Cir. 2013) ................................................................................................3, 29, 30

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, -- F. Supp. 2d --,
2012 WL 3028803 (D. Kan. July 25, 2012) ......................................................11, 30

*NECA-IBEW Pension Trust Fund v. Bank of America Corp.*, 2013
WL 620257 (S.D.N.Y. Feb. 15, 2013)..........................................................5, 6, 7, 9

*O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222
(S.D.N.Y. 1989) ........................................................................................19, 31, 32

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp.
2d 341 (S.D.N.Y. 2012)......................................................................................6, 9

*Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P.
Morgan Acceptance Corp. I*, 2012 WL 601448 (E.D.N.Y. Feb.
23, 2012) ...........................................................................................11, 12, 28

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011
WL 135821 (S.D.N.Y. Jan. 12, 2011) ..................................................................10

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F.
Supp. 2d 475 (S.D.N.Y. 2010)............................................................................12

*Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002) ....................................................25, 26

*Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010).......................................22, 23

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) ................................................................34

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F.
    Supp. 2d 387 (S.D.N.Y. 2010).........................................................................................2, 17, 31

*Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 2013
    WL 1342529 (S.D.N.Y. Mar. 29, 2013) .............................................................................26, 31

## Statutes

15 U.S.C. § 77k(a).......................................................................................................................26, 33

17 C.F.R. § 229.1121(a) ....................................................................................................................11

## Other Authorities

1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 3:15
    (9th ed. 2012) ...............................................................................................................................16

Black's L. Dictionary (9th ed. 2009).................................................................................................25

**PRELIMINARY STATEMENT**

The FDIC's opposition brief does nothing to demonstrate that its claims are timely or have been sufficiently pleaded. With respect to timeliness, the FDIC relies on two false premises. First, it argues that ratings downgrades below investment grade are necessary to trigger the limitations period. But no court has so held, and the FDIC's assertion runs counter to settled law. Second, the FDIC focuses on when it undertook the particular automated valuation model ("AVM") analysis and other analyses underlying its Amended Complaint ("AC"). But the correct test turns on when reasonable investors were on notice or could have pleaded claims with sufficient particularity to survive Rule 12(b)(6) motions. The FDIC's own allegations reveal that, as early as 2006 and 2007, Colonial Bank ("Colonial") possessed what the FDIC calls "strong evidence" of systemic wrongdoing with respect to the *particular* mortgage-backed certificates (the "Certificates") at issue in this lawsuit. (AC ¶¶ 93, 102(d)). The FDIC does not dispute that, while Colonial chose to do nothing with that information, other investors filed numerous mortgage-backed securities ("MBS") suits against many of the same Defendants the FDIC sues here, based on the same core allegations the FDIC makes here. (*See* Mem. of L. in Supp. of Mot. to Dismiss ("Mot.") at 27-29). The FDIC cannot possibly demonstrate that its claims are timely in these circumstances.

Indeed, just last week, the court in the companion case brought by the FDIC on behalf of the same bank—Colonial—dismissed the FDIC's nearly identical action because "a reasonably diligent investor in Countrywide RMBS, like Colonial Bank, could have prepared a well-pled complaint for misstatements in the Offering Documents by August 14, 2008"—the same trigger date that applies here. *FDIC as receiver for Colonial Bank v. Countrywide Sec. Corp.*, 2013 WL 1598680, at *1 (C.D. Cal. April 8, 2013) ("*Colonial Bank*"). The court's dismissal followed its dismissal of another case brought by the FDIC on behalf of yet another bank—a case filed even earlier than the instant case. *See FDIC as receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012) ("*Strategic Capital Bank*").

The FDIC now asks the Court for a different result, but its arguments are no more persuasive than they were when they were rejected in its other cases. As the court in those cases recognized, other MBS investors were able to file complaints under § 11 of the Securities Act of 1933 (the "1933 Act") without performing the AVM analysis that the FDIC contends was the basis for its delay in filing suit. *See id.* at *6 n.14. The result here should be no different. Because the claims were time-barred before the FDIC became receiver on August 14, 2009. they must be dismissed with prejudice. (*See* Section I.F., *infra*).

In addition to being untimely, the FDIC's Amended Complaint fails to state a claim. Its allegations relating to appraisals and loan-to-value ("LTV") ratios do not set forth any facts suggesting that the appraisers (or Defendants) *subjectively disbelieved* their own appraisal opinions. Yet, as numerous courts in this District have held, appraisals and LTV ratios based thereon are "subjective opinions" that are not actionable absent "subjective falsity." *E.g.*, *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010). The FDIC conflates objective and subjective falsity by suggesting that the Court should assume from its AVM analysis (itself meaningless, as shown below) that hundreds or thousands of appraisers were not just wrong in their assessments of fair market value during the housing boom, but dishonest. No such implication is permitted. *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011) (affirming dismissal of § 11 complaint alleging objective falsity, because it did not also allege subjective falsity—a separate and distinct element).

Further, Defendants recently uncovered a sworn affidavit submitted by the FDIC's own AVM vendor, CoreLogic, Inc. ("CoreLogic"),[1] to the New York Supreme Court—which is judicially noticeable here.[2] That affidavit confirms what Defendants said in their motion: merely

---

[1] *See* Pl.'s Mem. of L. in Opp'n to Mot. to Dismiss Am. Compl. ("Opp'n") at 43 (acknowledging that CoreLogic is the FDIC's AVM vendor).

[2] *See Mitchell v. Home*, 377 F. Supp. 2d 361, 368 (S.D.N.Y. 2005) ("[T]he court may consider public records, including [state court proceedings], in deciding a motion to dismiss, even if that document was not incorporated in the complaint by reference.").

using a retrospective AVM to second-guess a professional appraisal does not state a plausible claim.  (Mot. at 44-49).  In that affidavit, the FDIC's AVM vendor states under oath that "[p]rofessionals in the real estate field should not . . . rely solely on CoreLogic (or other) AVMs to make reliable determinations of the reasonableness of value opinions offered by licensed or certified appraisers," because "there is no way to discern from AVMs the cause of any difference between an AVM's point estimate and the opinion of value contained in an appraisal," and "AVMs frequently produce entirely *inaccurate* values in rapidly fluctuating markets."  (Ex. 60 at ¶¶ 3,8 (CoreLogic Aff.) (emphasis in original)).[3]  As this affidavit makes clear, an AVM analysis, which is all the FDIC offers, does not plausibly suggest objective falsity, much less subjective falsity.  Accordingly, the FDIC's appraisal and LTV-related allegations must be dismissed.  (*See* Section II.A.2, *infra*).

The FDIC's attempts to defend its allegations of "wholesale abandonment of the originators' underwriting standards" (Opp'n at 51), likewise fail in light of the Second Circuit's recent decision in *New Jersey Carpenters Health Fund v. RBS Group PLC*, 709 F.3d 109 (2d Cir. 2013) ("*RBS*"), which illustrates the contrast between MBS-related allegations that have been upheld in this Circuit, and the threadbare allegations the FDIC makes here.  (*See* Section II.E, *infra*).

The FDIC's remaining allegations and claims also must be dismissed.  Its allegations about additional liens, owner-occupancy rates, and credit ratings all fail—both as a matter of law, and because, to the extent the FDIC pleads any facts at all, those facts are merely "consistent with" liability and do "not nudge[] the[] claims across the line from conceivable to plausible."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  (*See* Sections II.C, D, F, *infra*).  In addition, the FDIC offers no meaningful defense of its claim for control person liability under § 15 of the 1933 Act, which rests entirely on conclusory boilerplate.  Although the

---

[3] Unless otherwise indicated, exhibits 1-59 cited herein are attached to the Declaration of Andrew T. Frankel filed on January 17, 2013 (Dkt. #77), and exhibits 60-66 cited herein are attached to the Reply Declaration of Andrew T. Frankel filed herewith on April 17, 2013.

FDIC appeals to "liberal notice pleading rules" (Opp'n at 60), those rules require well-pleaded *facts* plausibly suggesting control—which are nowhere found in the Amended Complaint.  (*See* Section III, *infra*).  Finally, the FDIC's claims against certain of the underwriter defendants should be dismissed for lack of standing: the FDIC has no conceivable claims against underwriters that did not underwrite the Certificates purchased by Colonial.  (*See* Section IV, *infra*).

## ARGUMENT

**I.  THE FDIC'S CLAIMS ARE UNTIMELY.**

The FDIC's timeliness arguments boil down to two assertions, neither of which has merit: (i) that a downgrade below investment grade is necessary to trigger the statute of limitations; and (ii) that the facts on which the Amended Complaint rests were not available until the FDIC was able to run its chosen retrospective AVM analysis sometime after early 2010.  (*See* Opp'n at 17-22).  However, even the cases on which the FDIC relies do not make the running of the statute of limitations contingent on a certificate's rating being downgraded below investment grade; rather, the running of the statute is determined based on the totality of the circumstances. Further, the FDIC's decision to perform a particular type of retrospective computer analysis after Colonial failed has no bearing on when Colonial's claims accrued.  Finally, as the FDIC concedes, the Extender Statute cannot save its claims if the statute of limitations began running before August 14, 2008.[4]

The Amended Complaint thus contains no facts plausibly establishing that the FDIC's claims are timely.  To the contrary, the combination here of the FDIC's own allegations (particularly its allegations that early payment defaults ("EPDs") from 2006 and 2007 are "strong evidence" of systemic "disregard[]" of underwriting standards (AC ¶¶ 93, 96)), the downgrades

---

[4] In view of the Second Circuit's recent decision in *Federal Housing Finance Agency v. UBS Americas, Inc.*, -- F. Supp. 2d --, 2013 WL 1352457 (2d Cir. Apr. 5, 2013), Defendants no longer argue that the claims here are barred by the statute of repose but reserve the right to reassert this argument at a later juncture.  The claims continue to be barred by the statute of *limitations*, however, for the reason stated herein.

of the Certificates and other certificates from the same offerings, and the abundance of public information specifically concerning the entities connected to the Certificates, establishes that Colonial was on notice of its claims well before August 14, 2008 (one year before the FDIC was appointed receiver).

### A.   The "Inquiry Notice" Standard Governs the Timeliness of the FDIC's Claims.

Attempting to salvage its timeliness allegations, the FDIC asks this Court to extend *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), to actions under the 1933 Act, in contravention of Second Circuit authority limiting *Merck* to claims under the Securities Exchange Act of 1934 (the "1934 Act").  Contrary to the FDIC's assertion that the Second Circuit's application of *Merck* "make[s] clear" that *Merck* applies to § 11 claims (Opp'n at 15), the Second Circuit recently *declined* to extend *Merck* beyond 28 U.S.C. § 1658(b) (the statute of limitations for fraud claims under the 1934 Act) and expressly held that "*Merck*'s scienter discovery requirement does not apply outside the realm of the statute that it interpreted."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150 (2d Cir. 2012).[5]

In *Koch*, the Second Circuit refused to extend *Merck* to RICO actions, noting that "[f]ederal courts generally apply a discovery accrual rule," under which "discovery of the injury, not discovery of the other elements of the claim, is what starts the clock."  *Id.* at 148 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000) (internal quotation marks omitted)).  Parsing the language of both *Merck* and § 1658(b), the Second Circuit recognized that the "issue in *Merck* was the meaning of the statutory terms 'the facts constituting the violation,'" and also "that facts showing scienter are among those that constitute the violation."  *Id.* at 149.  But since "[n]othing in *Merck*'s discussion of § 1658(b) purports to alter [the] well-established [discovery accrual

---

[5] The FDIC's reliance on *City of Pontiac General Employees Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011), a case under § 10(b) of the 1934 Act, is misplaced.  In *NECA-IBEW Pension Trust Fund v. Bank of America Corp.*, the most recent case from this District to consider the application of *Merck* to 1933 Act claims, the court observed that *City of Pontiac* did not resolve which discovery standard applies to § 11 claims.  2013 WL 620257, at *6-7 (S.D.N.Y. Feb. 15, 2013).

rule] or even to apply it outside the context of th[at] statute," the Second Circuit refused to extend *Merck* beyond "the realm of the statute that it interpreted."  *Id.* at 149-50.[6]

Koch makes clear that *Merck* does not apply to the FDIC's 1933 Act claims, which are governed by the limitation provisions set forth in § 13 of the 1933 Act, not the limitations provisions of § 1658(b), and does not require discovery of the facts constituting the violation.  As such, the "inquiry notice" standard applies here.[7]  Notably, *the FDIC concedes* that "newspaper articles or other reports about practices prevalent in the industry generally might be sufficient to *prompt a reasonable investor to investigate* whether those practices affected the specific securities it purchased," thereby starting the one-year clock. (Opp'n at 16 n.9 (emphasis added)).  But, "even if the more permissive *Merck* standard [were] applied, the claims alleged . . . are time-barred" because the FDIC's own allegations reveal that dismissal is warranted under either standard.  *NECA-IBEW Pension Trust Fund*, 2013 WL 620257, at *7; *accord Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365.

### B.   The FDIC Pleads No Facts to Show That Its Claims Are Timely.

Despite the FDIC's suggestion to the contrary (*see* Opp'n at 11 n.4), a "plaintiff bringing a § 11 . . . claim must affirmatively plead facts demonstrating that [its § 11 claims] are within the statute of limitations."  *In re Morgan Stanley Mortg. Pass-Through Certif. Litig.*, 2012 WL 2899356, *1 (S.D.N.Y. July 16, 2012) ("*Morgan Stanley III*").  The FDIC, however, pleads only in conclusory fashion that "a reasonably diligent plaintiff would not have discovered [the

---

[6] *See also Merck*, 130 S. Ct. at 1800 (Scalia, J., concurring) (noting that it is "contrary to common sense" to equate § 13 with § 1658(b), because § 13 "explicitly established a constructive-discovery rule"); *NECA-IBEW Pension Trust Fund*, 2013 WL 620257, at *7 ("Given the difference in the language of the two statutes of limitations, the . . . conclu[sion] that *Merck* does not extend to actions brought under the Securities Act is compelling."); *In re IndyMac MBS Litig.*, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011) (noting that *Merck* was "based on the precise language of" § 1658(b) and therefore "does not apply" to § 11 claims); *Pa. Pub. Sch. Emps.' Ret. Sy*s. *v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 364-65 (S.D.N.Y. 2012) (same).

[7] The cases upon which the FDIC relies to the contrary were decided before *Koch*.  (*See* Opp'n at 15-16).

relevant facts] until later than August 14, 2008" because the "specific loans" and "loan files" for the mortgages backing the Certificates were not available.  (AC ¶ 107).  Such unsupported conclusory allegations are insufficient to carry a plaintiff's burden, because even under the *Merck* standard, a plaintiff must "plead *facts* sufficient to allege plausibly that a reasonable investor could not have brought a complaint, prior to [the relevant trigger date], that could have withstood a Rule 12(b)(6) motion."  *Morgan Stanley III*, 2012 WL 2899356 at *2 (emphasis added).  Nor is there any relevance to the FDIC's contention that "loan files" were not available until later than August 14, 2008—the FDIC's Amended Complaint is not based on a review of "loan files," but rather on the purported results of its AVM analysis.  And, as shown below, MBS plaintiffs have been pleading § 11 claims for years, and surviving motions to dismiss, without using AVMs.  Because the FDIC has not pleaded facts affirmatively showing that its claims are timely, the Amended Complaint must be dismissed.

### C.   The Accrual of a § 11 Claim is Not Contingent on a Ratings Downgrade.

Where, as here, "the facts needed for [the statute of limitations] determination can be gleaned from the complaint and related documents," it is appropriate to resolve the issue at the motion to dismiss stage.  *Lighthouse Fin. Grp. v. RBS Grp., PLC*, -- F. Supp. 2d --, 2012 WL 4616958, at *12 (S.D.N.Y. Sept. 28, 2012); *accord NECA-IBEW Pension Trust Fund*, 2013 WL 620257, at *7.  Moreover, and contrary to the FDIC's arguments, a statute of limitations analysis does not look at each piece of information available to a potential plaintiff "in isolation" (Opp'n at 21), but requires the court to determine whether in "the totality of the circumstances" a plaintiff was on notice of the claim more than a year before the filing date.  *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 829 (S.D.N.Y. 2010); *see also In re Morgan Stanley Mortg. Pass-Through Certif. Litig.*, 2010 WL 3239430, at *7 (S.D.N.Y. Aug. 17, 2010) ("*Morgan Stanley I*") (noting that courts "evaluat[e] the totality of the circumstances" in a limitations analysis).

The FDIC's primary argument nevertheless focuses on just one issue. The FDIC contends that the statute of limitations does not begin to run until a security is downgraded below investment grade. (*See* Opp'n at 17-18, 26-27). No authority supports such an artificial rule. Indeed, when the FDIC made this same argument in *Strategic Capital Bank*, the court flatly rejected it, holding that "[n]othing in Section 13 or the securities laws suggest[s] that the statute does not run until ratings downgrade" and that such blind reliance on credit ratings is "misplaced for reasonable sophisticated investors" like banks. *Strategic Capital Bank*, 2012 WL 5900973, at *7 ("[T]he rule offered by the FDIC absolves investors from monitoring the performance and truthfulness of the representations in their investments, and delegates all responsibility for assessing representations to the rating agencies. . . . [S]uch a rule would transform this suit from a claim about misrepresentations in the Offering Documents into a suit over the downgrade itself."). There is no reason why this Court should reach an inconsistent result in this case.

The FDIC responds by mischaracterizing the caselaw. (*See* Opp'n at 17-18). While some cases have held that a ratings downgrade may be *sufficient* to trigger the running of the statute, none has held that a downgrade below investment grade is *necessary*. To the contrary, the plaintiff must only have had some indication that its certificates had declined in value sufficient to allege some conceivable statutory damages. *See In re Bear Stearns Mortg. Pass-Through Certif. Litig.*, 851 F. Supp. 2d 746, 764-65 (S.D.N.Y. 2012). Here, the EPD rates— accepting for purposes of this motion the FDIC's allegation that they are "strong evidence" of systemic wrongdoing (AC ¶¶ 93, 96)—combined with negative rating actions and Colonial's December 2007 observation of "a 'tremendous' decline in trading volumes and liquidity" for the Certificates (Ex. 1 at 7 (FDIC's Material Loss Review)), sufficiently linked the problems in the MBS industry to Colonial's Certificates. *See Bear Stearns*, 851 F. Supp. 2d at 764-65. Colonial thus had more than enough information prior to August 14, 2008 to trigger the running of the statute of limitations with respect to all the Certificates at issue in this action.

**D.      The FDIC's Decision to Perform a Particular Type of Retrospective Analysis Does Not Toll the Statute of Limitations.**

The FDIC next contends that its claims are timely because "no investor could have obtained the data necessary to perform the forensic analysis described in the amended complaint" prior to 2010.  (Opp'n at 18).  But this is another argument that the FDIC has already lost in *Strategic Capital Bank*.  There, the court held that the FDIC's alleged inability to obtain more specific information about the loans backing the certificates, including through an AVM analysis, did not prevent the accrual of the claims.  As the court explained, even under *Merck*, "[t]he source of the knowledge is irrelevant" if a reasonable investor "has or should have knowledge sufficient to draft a complaint." *Strategic Capital Bank*, 2012 WL 5900973, at *7. Where, as here, information providing the basis of a claim was available more than a year before the FDIC receivership began, "the complaint [is] time-barred."  *Id.* at *8.

In dismissing 1933 Act claims as untimely, courts have relied on a combination of factors apart from when an AVM analysis could have been performed to determine that the statute of limitations had expired prior to the filing of a complaint.  These factors include the plaintiff's own allegations, monthly distribution reports showing increased delinquencies, ratings actions, media and other industry reports, and the existence of lawsuits filed prior to the limitations date. *See, e.g.*, *Colonial Bank*, 2013 WL 1598680, at *1; *Strategic Capital Bank*, 2012 WL 5900973, at *8 ( "[p]ublic media sources, complaints and judicial decisions" available to Strategic Capital Bank prior to May 22, 2008 rendered the FDIC's complaint time-barred before May 22, 2009, when the FDIC took receivership); *Pa. Pub. Sch. Emps.' Ret. Sys.*, 874 F. Supp. 2d at 365-66 (plaintiff's § 11 claim time-barred based on pre-complaint availability of SEC filings, lawsuits, and news articles); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1179-80 (C.D. Cal. 2011) (dismissing claims as time-barred in light of pre-complaint access to "public press reports and prior complaints"); *NECA-IBEW Pension Trust Fund*, 2013 WL 620257, at *11 ("[B]y mid to late 2008, there was an abundance of publically available information, including [ ] financial disclosures, well-publicized litigation involving substantially similar claims, and

9

general market data, all of which plaintiffs could have employed to state a claim . . . under the Securities Act.").  Here, all of these factors "irrefutably demonstrate[] that [Colonial] should have discovered facts sufficient to adequately plead a claim prior to [August 14, 2008]."  *Morgan Stanley III*, 2012 WL 2899356, at *2 (internal quotation marks omitted).[8]

### E.     The FDIC's Own Allegations, Combined with Information in the Public Domain, Show that the Facts on which It Bases Its Claims Were Available to Colonial before August 14, 2008.

As discussed in Defendants' opening brief (*see* Mot. at 17-34), the FDIC's own allegations, the information in the public domain about the entities connected to the Certificates, and the rating downgrades and negative watches reveal that Colonial could have made the same allegations and asserted the same claims the FDIC now asserts more than one year before the FDIC's appointment as receiver.[9]

---

[8] Not only did Colonial admittedly have access to detailed loan level data ("loan tapes") before purchasing the Certificates (*see* Opp'n at 19 n.13), but for certain offerings Colonial had access to the precise information the FDIC now pleads was unavailable until 2010: the street addresses and names of the mortgagors.  (*Compare* Opp'n at 12 ("To perform the retrospective AVM . . . it was necessary to have property addresses for the specific loans backing the certificates. . . . first available in early 2010") *with* Exs. 11-12 (2007 SEC filings informing investors that mortgage schedules, which include "the Mortgagor's name and the street address of the Mortgaged Property" were "Available Upon Request from [the] Trustee")).

[9] Because the volume of publicly available information significantly increased from early 2008 through August 13, 2008 (*see, e.g.*, Mot. at App. E), no weight should be given to cases relied on by the FDIC where the accrual date proposed by defendants was earlier (often more than a year earlier) than August 14, 2008.  *See, e.g.*, *Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 320-21 (S.D.N.Y. 2012) ("*FHFA*") (proposed accrual date of September 2007); *Bear Stearns*, 851 F. Supp. 2d at 763 (August 2007); *In re Morgan Stanley Mortg. Pass-Through Certif. Litig.*, 810 F. Supp. 2d 650, 668 (S.D.N.Y. 2011) ("Morgan Stanley II"); *Morgan Stanley III*, 2012 WL 2899356, at *2 (December 2007); *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D05 1010 PL 45071, slip op. at 2 (Ind. Super. Ct. July 3, 2012) (October 2007); *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) ("*MassMutual*") ("early 2007"); *Fed. Home Loan Bank of Chi. v. Banc of Am. Funding Corp.*, No. 10 CH 45033, slip op. at 11 (Ill. Cir. Ct. Sept. 19, 2012) (October 2007); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011 WL 135821, at *8 (S.D.N.Y. Jan. 12, 2011) (February 2008); *Capital Ventures Int'l v. UBS Sec. LLC*, 2012 WL 4469101, at *12 (D. Mass. Sept. 28, 2012) (November 2007); *FDIC as receiver for United W. Bank v. Countrywide Fin. Corp.*, 2013 WL 49727, at *1 (C.D. Cal. Jan. 3, 2013) (April 2007); *Plumbers' & Pipefitters' Local No. 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I*, 2012 WL

For example, the availability of monthly Distribution Reports for each of the Certificates clearly shows that Colonial could have made the same allegations regarding the purported disregard of underwriting guidelines.  The FDIC alleges that "[a]n EPD is *strong evidence* that the originator did not follow its underwriting standards," but instead "disregarded [its] underwriting standards."  (AC ¶¶ 93, 96 (emphasis added)).  The FDIC does not dispute that Distribution Reports provided investors with, among other things, a detailed description of the performance of the mortgage pool, including EPD and other delinquency and loss information. *See* 17 C.F.R. § 229.1121(a); (*see also* Ex. 9 (excerpts of Offering Documents disclosing that Distribution Reports would be released monthly and made available on trustees' websites)). Investors such as Colonial are "chargeable with knowledge of [their] contents."  *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70 (S.D.N.Y. 2000).  Accordingly, and by the FDIC's own logic, Colonial knew or should have known of the rising delinquency and default rates for each of the Certificates (*see* Mot. at 21 Fig. 2) and, prior to August 14, 2008, could have drawn the same conclusions with respect to underwriting guidelines that the FDIC belatedly draws.  (*See* Mot. at 19-27).  Indeed, complaints filed against Defendants before August 14, 2008 relied on EPD data in making similar allegations about underwriting standards.  (*See* Mot. App. D at 5).

Defendants' opening brief also sets forth in detail why Colonial could have asserted, prior to August 14, 2008, the same allegations with respect to LTV ratios, additional liens, owner-occupancy rates, and credit ratings, all of which are based on information in the public record. (*See* Mot. at 19-27).  Other than relying on its alleged inability to perform an AVM and other statistical analyses, the FDIC fails to offer any meaningful rebuttal to Defendants' arguments that its claims are untimely.  But § 11 claims do not specifically require AVM-based allegations.  *See Strategic Capital Bank*, 2012 WL 5900973, at *6.

---

601448, at *10 (E.D.N.Y. Feb. 23, 2012) (March 2007); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, -- F. Supp. 2d --, 2012 WL 3028803, at *23-24 (D. Kan. July 25, 2012) (March 2008).

Additionally, the ratings downgrades and negative watches (*see* Mot. at App. B), along with the news articles, press releases, and public filings identified by Defendants (*see* Mot. at App. E), all contributed to the total mix of information that provided Colonial with knowledge of its alleged § 11 claims prior to August 14, 2008.  Unlike in the cases identified by the FDIC, *see*, *e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010); *Morgan Stanley II*, 810 F. Supp. 2d at 664-65, the news articles submitted by Defendants are not simply about the mortgage market in general.[10]  Rather, as shown in Appendix E to Defendants' motion, they reveal a large quantity of information in the public domain specifically relating to "the entities that were involved in the origination, packaging, and sale of the Certificates." *Morgan Stanley III*, 2012 WL 2899356, at *3. Such information plainly enabled a reasonable investor to conclude that Colonial's Certificates had been impacted.  (*See* Mot. at App. E).

The FDIC's attempt to distinguish as irrelevant several (but not all) of the articles identified by Defendants on the ground that these articles discussed issues in the subprime market, while the Certificates were backed by Alt-A loans (*see* Opp'n at 28 n.19), is meaningless for statute-of-limitations purposes.  None of the FDIC's substantive allegations relates uniquely to Alt-A or "stated income" loans.  In any event, it was widely reported in early 2008 that securitized Alt-A loans were "starting to create a second tide of defaults for lenders swamped by the [sub-prime] meltdown . . . [because] stated-income loans made during the housing boom

---

[10] Given the volume of information that Defendants have identified specifically related to the entities connected with the Certificates and to the performance of the Certificates, the FDIC's reliance on cases where the defendants *failed* to provide the same type of information is unpersuasive.  *See Plumbers' & Pipefitters'*, 2012 WL 601448, at *11 (noting that defendants failed to submit information concerning securities law actions against defendants); *Morgan Stanley II*, 810 F. Supp. 2d at 664 ("cited articles and report[s] were not specifically about [Defendants] and were therefore too general"); *see also Bear Stearns*, 851 F. Supp. 2d at 764 (noting that the defendants' exhibits were "unconnected to any of the entities that were involved in the origination, packaging, and sale of the [ ] trust"); *MassMutual*, 843 F. Supp. 2d at 208 (articles "did not discuss Defendants' practices specifically"); *Fed. Home Loan Bank of Chi.*, slip op. at 14 ("Defendants have pointed to only generalized information about the mortgage market to support their argument").

have proved to be riddled with exaggeration." (Ex. 61). By February 2008, Bloomberg News reported that the market "for AAA rated securities backed by Alt-A loans" had "slumped" or dissipated entirely. (Ex. 62). The Offering Documents' disclosures that the Certificates were backed by stated income and similar loans (Ex. 63), further demonstrates that Colonial had the ability to link the problems in the MBS industry to the Certificates before August 14, 2008. (*See* Exs. 64-65 (describing problems with securities backed by Alt-A mortgage loans)). Finally, complaints filed by MBS investors against Defendants before August 14, 2008 alleged misstatements concerning the underwriting standards of Alt-A loans. (*See* Exs. 22-26).

The Certificates' downgrades and negative outlooks further contributed to Colonial's actual or constructive knowledge of the purported problems with the Certificates prior to August 14, 2008. (*See* Mot. at 30). The FDIC does not dispute that, as a sophisticated MBS investor and alleged participant in a purportedly fraudulent mortgage securitization scheme (*see id.* at 12; Ex. 15), Colonial understood the mechanics of the MBS structure, and that when tranches subordinate to Colonial's Certificates absorb losses to the point of being downgraded (*see* Mot. at App. C), it is because of high levels of mortgage defaults in the loan pools *backing Colonial's Certificates*. As Fitch warned MBS investors like Colonial in a press release in March 2008, "substantial pressure on subordinate classes [resulting from rapidly increasing defaults] will also put pressure on senior classes . . . ." (*See* Ex. 28).

In short, Defendants here have done far more than demonstrate problems in the MBS industry generally—they have directly connected the public information to the Certificates. *Cf. Bear Stearns*, 851 F. Supp. 2d at 764-65. When taken together, there was certainly enough information for Colonial to have filed a complaint by August 14, 2008. *See Colonial Bank*, 2013 WL 1598680, at *1; *Strategic Capital Bank*, 2012 WL 5900973, at *8.

### F.    The Ability of Other MBS Investors to File Complaints Prior to August 14, 2008 Confirms that Colonial Could Have Done so As Well.

Prior to August 14, 2008, at least six complaints were filed by MBS investors asserting § 11 claims against a majority of the Defendants here or their affiliates. (Mot. at 27-29, App. D).

13

These complaints make nearly identical allegations concerning Defendants' roles in the securitization process.  Moreover, most of these complaints allege misstatements regarding Alt-A mortgage underwriting standards by many of the same originators involved with the loans collateralizing the Certificates purchased by Colonial, including Chase Home Finance, American Home Mortgage, and Wells Fargo.  (*See* Mot. at App. D).  Not only does the filing of these other complaints demonstrate that Colonial also could have filed a complaint prior to August 14, 2008, but contrary to the FDIC's contention, many have survived motions to dismiss.[11]  And notably, none of these complaints relied on a retrospective AVM analysis.  Accordingly, the lawsuits filed before August 14, 2008 contributed to Colonial's knowledge of its purported claims and confirm that Colonial could have initiated a lawsuit prior to that date.  *See Colonial Bank*, 2013 WL 1598680, at *1; *accord Strategic Capital Bank*, 2012 WL 5900973, at *5, *8.

In short, the FDIC's Amended Complaint should be dismissed as untimely for at least the reasons identified in *Colonial Bank* and *Strategic Capital Bank*.  The FDIC cannot distinguish this authority by summarily stating that "[t]here was more information publicly available at an earlier date about Countrywide and its alleged origination practices than there was about the underwriting practices of any of the defendants here."  (Opp'n at 15).  As the FDIC well knows, the very same type of information was available to Colonial here, including "multiple lawsuits . . . filed against [Defendants] . . . alleging . . . [mis]stated underwriting guidelines and [] inflated appraisals."  *Colonial Bank*, 2013 WL 1598680, at *1.  Indeed, the court in the FDIC's other cases cited the class action complaint filed in *Luther v. Countrywide Home Loans Servicing LP*, in which MBS investors asserted nearly identical § 11 claims against multiple *Defendants in the*

---

[11] *See Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 777 (1st Cir. 2011); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, 703 F. Supp. 2d 253, 263 (E.D.N.Y. 2010); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust, Inc.*, 2010 WL 6617866, at *6-7 (E.D.N.Y. Dec. 23, 2010); *Plumbers & Pipefitters'*, 2012 WL 601448, at *13; *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) on reconsideration in part, 2013 WL 357615 (S.D.N.Y. Jan. 23, 2013).  A fifth case, *Luther v. Countrywide Home Loans Servicing LP* (Ex. 25), has never faced a Rule 12(b)(6) motion, but remains pending.

*instant case* for their role as underwriters of Alt-A MBS trusts.  (*See* Ex. 25).  The *Luther* complaint and others like it (*see* Mot. at 27-29; App. D), combined with "numerous media sources identifying serious problems with [the loan originators'] underwriting and appraisals" demonstrate that "a reasonably diligent investor in [Defendants'] RMBS, like Colonial Bank," could have filed a complaint for misstatements in the Offering Documents by August 14, 2008. *Colonial Bank*, 2013 WL 1598680, at *1; (*see also* Mot. at App. E).  Thus, whether the standard is inquiry notice or *Merck*, the FDIC's claims are time-barred.

### G.  None of the FDIC's Claims are Tolled by *American Pipe*.

Contrary to the FDIC's assertions, the *American Pipe* tolling doctrine does not save the FDIC's claims regarding RALI 2007-QS3, WFMBS 2007-4 and WFMBS 2007-7 because the class plaintiffs' claims relating to these securitizations were dismissed for lack of standing.[12] Although "[t]here is no conclusive authority in this Circuit regarding whether *American Pipe* applies to claims that are ultimately dismissed for lack of standing," *Lighthouse*, 2012 WL 4616958, at *14 n.14, "the better reasoned view" is that "*American Pipe* tolling is inapplicable because the original court's subject matter jurisdiction was never invoked as to [such] claims."  1 *McLaughlin on Class Actions* § 3:15 (9th ed. 2012); (*see also* authorities cited in Mot. at 35 n.25).

Where a plaintiff lacks standing to assert a claim, the court lacks Article III jurisdiction and all proceedings on that claim are a nullity—and proceedings that are a nullity cannot give rise to tolling.  Moreover, applying *American Pipe* where plaintiffs lacked standing would lead to an "untenable result" because it "would clearly 'encourage attempts to circumvent the statute of limitation by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule.'"  *N.J. Carpenters Health Fund v DLJ Mortgage Capital, Inc.*, 2010 WL 6508190, at *2 n.1 (S.D.N.Y. Dec. 15, 2010) (quoting *Kruse v.*

---

[12] The FDIC does not contend that *American Pipe* tolling applies to any of the other securitizations.

*Wells Fargo Home Mortg., Inc*, 2006 WL 1212512, at *6 (E.D.N.Y. May 3, 2006)).  For these reasons, the weight of authority holds that *American Pipe* does not apply to the extent the class plaintiffs' claims were dismissed for lack of standing.[13]

Further, *American Pipe* could not save the FDIC's claims relating to RALI 2007-QS3, WFMBS 2007-4 and WFMBS 2007-7 even if it otherwise could apply.  The class actions that unsuccessfully attempted to assert claims relating to these securitizations were filed on May 18, 2009 (in the case of RALI 2007-QS3) and March 27, 2009 (in the case of WFMBS 2007-4 and WFMBS 2007-7).  (*See* AC ¶¶ 113-14).  The facts discussed above establishing that Colonial's claims were time-barred by August 14, 2009 equally establish that they were time-barred by May 2009 and March 2009.  Accordingly, *American Pipe* tolling cannot save the FDIC's claims.

### H.    The Extender Statute Does Not Save the FDIC's Claims from Being Time Barred.

Because the FDIC's claims expired under the applicable statute of limitations before the FDIC took receivership, the Extender Statute cannot revive these claims.  Thus, the Second Circuit's decision interpreting a similar statute in *Federal Housing Finance Agency v. UBS Americas Inc.*, -- F. Supp. 2d --, 2013 WL 1352457 (2d Cir. Apr. 5, 2013), does not prevent the

---

[13] *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), does not change the analysis.  First, the courts that dismissed class claims relating to RALI 2007-QS3, WFMBS 2007-4 and WFMBS 2007-7 on standing grounds have not reconsidered their decisions following *NECA-IBEW*.  (*See* Opp'n at 34 n.27) (listing decisions reconsidered in light of *NECA-IBEW*).  Thus, the FDIC is simply speculating when it asserts that *NECA-IBEW* renders the dismissal of these securitizations "inappropriate."  (Opp'n at 34).  Second, the court that dismissed class claims relating to WFMBS 2007-4 and WFMBS 2007-7—the Northern District of California—unquestionably cannot be second-guessed by *NECA-IBEW* because "*NECA–IBEW* is inconsistent with Ninth Circuit precedent."  *FDIC as receiver for Sec. Savings Bank v. Countrywide Fin. Corp.*, -- F. Supp. 2d --, 2013 WL 1191785, at *7 (C.D. Cal. Mar. 21, 2013); *accord Strategic Capital Bank*, 2012 WL 5900973, at *10, 12.  Third, and most fundamentally, *NECA-IBEW* did not address standing in the context of *American Pipe* tolling and did not abrogate the significant authority within the Second Circuit rejecting the arguments made here by the FDIC.  *See, e.g.*, *Lighthouse*, 2012 WL 4616958, at *14 n.14 (finding after *NECA-IBEW* that "[t]here is no conclusive authority in this Circuit regarding whether American Pipe applies to claims that are ultimately dismissed for lack of standing"); *see also* Mot. at 35 n.25 (collecting cases).

FDIC's claims from being time-barred.  *See FDIC v. Shrader & York*, 991 F.2d 216, 220-27 (5th Cir. 1993); *Strategic Capital Bank*, 2012 WL 59000973, at *2, *8.

## II.    THE FDIC HAS FAILED TO STATE A CLAIM FOR RELIEF UNDER § 11.

### A.    The Allegations About Appraisals and LTV Ratios Fail.

#### 1.    Appraisals and LTV ratios are statements of opinion that are not actionable absent subjective falsity—which the FDIC does not allege.

The FDIC acknowledges (*see* Opp'n at 39) what numerous courts in this District have held:  appraisals and other property valuations are "subjective opinion[s] based on particular methods and assumptions the appraiser uses."  *Tsereteli*, 692 F. Supp. 2d at 393; (*see also* Mot. at 42 & n.36 (collecting cases)).  Thus, as the FDIC appears to concede, it must plead subjective falsity before it possibly can allege that LTV figures in the Offering Documents constituted actionable misrepresentations.  But the FDIC fails to allege any facts bearing on anyone's subjective state of mind—not the appraisers who provided the opinions and certainly not Defendants.  This is unsurprising, because the FDIC's allegations about appraisals and LTVs rest entirely on an AVM that, by its nature, cannot shed light on what someone subjectively was thinking.  The FDIC's various arguments to the contrary are unpersuasive.

*First*, the FDIC's allegation that some unspecified number of appraisals on unspecified properties securing unspecified mortgages underlying unspecified MBS certificates may have rested on "inaccurate" data or inappropriate comparable sales does not plead that appraisers subjectively disbelieved their own opinions (or the reporting of those opinions).  (Opp'n at 40 (citing AC ¶ 67)).  The FDIC's argument rests entirely on vague conclusions, not facts, and in any event conflates objective falsity with subjective falsity.  Its argument contravenes settled case law holding that objective and subjective falsity are separate and distinct elements requiring separate and distinct factual allegations.  For example, in *Fait*, the Second Circuit affirmed dismissal of § 11 claims alleging that a company had overstated the monetary value of corporate goodwill, notwithstanding that "market conditions . . . support[ed] the contention that defendants should have reached different conclusions."  655 F.3d at 112.  The Second Circuit held that

17

although the complaint alleged objective falsity, it "d[id] not . . . plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them," and that "such an omission is fatal to plaintiff's section 11 . . . claims." *Id.* This holding flatly contravenes the FDIC's argument that it adequately pleads subjective falsity by alleging that valuations were objectively incorrect or based on wrong data.

*Second*, there is no merit to the FDIC's related contention that "the [alleged] fact that the AVM results show such a widespread deviation from the LTVs reported in the prospectus supplements supports the plausible inference that the values were knowingly inflated." (Opp'n at 40). Again, the FDIC's argument conflates objective and subjective falsity, and contravenes settled case law holding that the alleged magnitude of the former does not create an inference of the latter. *See, e.g.*, *La. Sch. Emps.' Ret. Sys. v. Ernst & Young LLP*, 622 F.3d 471, 480, 484 (6th Cir. 2010) (rejecting the argument that "the magnitude of . . . accounting violations by [a company Ernst & Young audited] creates the inference that Ernst & Young acted knowingly . . . in ignoring the company's financial misstatements," because "[a]llowing such an inference would eviscerate the principle that accounting errors alone [*i.e.*, objective falsity] cannot support a finding of scienter [*i.e.*, subjective falsity]").[14]

The newly discovered CoreLogic affidavit confirms that one cannot infer from an AVM's output the particular reasons why it might differ from professional appraisal opinions, much less

---

[14] The two cases the FDIC cites for its argument underscore that it takes more than a computerized statistical analysis to allege subjective falsity. In *FHFA*,, 858 F. Supp. 2d at 328, the complaint supported its allegations of subjective falsity with "a series of news stories, lawsuits and government investigations that have revealed instances in which appraisers connected to some of the mortgage originators at issue . . . were found to have systematically and knowingly overstated the value of homes." Similarly, in *MassMutual*, 843 F. Supp. 2d at 204, the complaint contained factual allegations, beyond the output of an AVM, that the court held contributed to an inference of subjective falsity. The other cases the FDIC cites on the topic of subjective falsity are similar. *See Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, 2013 WL 535320, at *2-3 (D. Mass Feb. 13, 2013) (subjective falsity allegations based on more than an AVM's output); *Bear Stearns*, 851 F. Supp. 2d at 769-70 (allegations not based on AVM data, but on alleged conduct of defendants and third parties). Accordingly, no authority supports the FDIC's contention that the results of an AVM, standing alone, can support a plausible inference of subjective falsity.

infer fraud on the part of the appraisers: "[T]here is *no way* to discern from AVMs the *cause* of any difference between an AVM's point estimate and the opinion or value contained in an appraisal performed by a licensed or certified appraiser in compliance with the Uniform Standards of Professional Appraisal Practice" ("USPAP").  (Ex. 60 at ¶ 3 (emphasis added)).

*Third*, the FDIC incorrectly contends that a single clause of a single sentence of its Amended Complaint—"a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties"—adequately alleges that the appraisers were corrupt and deliberately falsified their opinions.  (Opp'n at 40 (quoting AC ¶ 67)).  To the contrary, the FDIC's allegation is precisely the sort of "mere conclusory statement[]" that must be disregarded.  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  The FDIC's allegation is substantively indistinguishable from the allegation in *Iqbal* that the defendants "knew of, condoned, and willfully and maliciously" engaged in wrongdoing—an allegation the Supreme Court rejected as "conclusory" and thus "not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009).

*Fourth*, the FDIC's Amended Complaint "expressly excludes . . .  any allegation that could be construed as alleging fraud or intentional or reckless conduct"—in other words, it excludes allegations of subjective falsity.  (AC ¶ 136).  The FDIC offers no response to the case law holding such disclaimers to be dispositive.  (*See* Mot. at 43).  The FDIC instead protests that it merely meant to exclude allegations of subjective falsity on the part of Defendants, not the appraisers (*see* Opp'n at 40), but its Amended Complaint contains no such limiting language, and "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."  *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

*Finally*, the FDIC's citation to its allegations about purported violations of USPAP (*see* Opp'n at 38-39), do not assist it.  The FDIC offers no response to the numerous decisions in this District holding that the "bare assertion that appraisals were not made in accordance with USPAP" —which is all the FDIC offers—is a "legal conclusion not entitled to the assumption of truth."  *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp.

2d 141, 153 (S.D.N.Y. 2011); (*see also* Mot. at 44 & n.39).  Although the FDIC argues that it *has* alleged more than a "bare assertion" (*see* Opp'n at 39), its cited allegations merely list USPAP provisions and offer the *ipse dixit* that the provisions were violated.  (AC ¶¶ 68-74).  The FDIC's allegations fall far short of what courts in this District have required when it comes to USPAP allegations.[15]

     In sum, the Amended Complaint alleges neither subjective falsity nor USPAP violations. Its allegations about appraisals and LTVs should be dismissed.

        2.     The FDIC provides no basis on which to infer that its AVM's output is <u>more reliable than an appraisal.</u>

     The FDIC offers no meaningful response to Defendants' showing that describing the output of an AVM is not the same as pleading a fact, and thus does not state a claim.  The FDIC does not meaningfully address the case law holding that because "financial valuation models depend so heavily on the discretionary choices of the modeler . . . and choice of 'comparables'[,] the resulting models and their predictions can only fairly be characterized as *subjective opinions* . . . . and *not objective facts*."  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005).  The FDIC's allegations thus present nothing but a difference of opinion—but "differences of opinion . . . are not evidence of misstatements."  *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *5 (N.D. Cal. June 8, 1994).

     The FDIC also offers no meaningful response to Defendants' argument that, because it alleges virtually nothing about how its AVM works, it is impossible to infer that the AVM is "better" at valuing a property (years after the fact) than the professional appraisers who conducted the appraisals at the time.  The FDIC's conclusory assurances that its model is "objective," "accurate," and "true," and that it is the best "of all such models" (Opp'n at 41 (citing AC ¶ 50)), are not factual allegations and do not support an inference that the AVM's

---

[15] The FDIC does not and cannot dispute that it makes those allegations as to only two of the nine offerings in this case, and that the allegations thus are irrelevant to nearly all the Defendants.  (*See* Mot. at 43 & n.38).

opinions are more reliable than those of professional appraisers who actually inspected the properties. Tellingly, the FDIC admits that AVMs are insufficient when it comes to transactions that affect the FDIC or another arm of the federal government, and insists instead that appraisals must be conducted: "[The FDIC's] guidelines state . . . that, for the limited purposes of appraising properties for federally related transactions, a full appraisal—rather than an AVM—must be conducted by a licensed appraiser." (Opp'n at 42-43). This debunks the FDIC's contention that AVMs should be deemed more reliable than appraisals.

Rather than addressing the merits of Defendants' arguments, the FDIC cites several cases it claims upheld "allegations . . . supported by substantially similar retrospective AVM data." (Opp'n at 42). But as the FDIC's own descriptions of those cases make clear (*see id.* at 42 n.31 (describing *FHFA*, 858 F. Supp. 2d 306; *Capital Ventures*, 2012 WL 4469101, at *9; and *MassMutual*, 843 F. Supp. 2d 191)), those complaints did not rely exclusively on AVM-based allegations, as the FDIC does, but pleaded *facts* about the originators and appraisers at issue.[16]

Similarly, the FDIC does not address the merits of Defendants' argument that, without pleading facts concerning the margins of error associated with the AVM, it is impossible to infer that the AVM's output is inconsistent with the Offering Documents. (*See* Mot. at 46-47). The FDIC's suggestion that alleging the so-called "mean error rate" cures this basic pleading deficiency is groundless. Although the FDIC never says what it means by "mean error rate," its AVM vendor's publications establish that "mean error rate" speaks to the extent of overvaluation or undervaluation of an entire loan pool—*i.e.*, it serves as a measure of "directional bias"—and says nothing about how accurate or inaccurate the AVM's valuation of any particular property may be. (*See* Mot. at 46 n.41). Notably, in moving to dismiss the FDIC's *original* Complaint, Defendants pointed out that the failure to allege the AVM's margins of error is fatal to its claim. (*See* Dkt. #70 at 44-45). The FDIC's persistent refusal to disclose the margin of error in its

---

[16] The FDIC also cites *FDIC as receiver for United Western Bank v. Countrywide Financial Corp.*, 2013 WL 49727 (C.D. Cal. Jan. 3, 2013), but there the court concluded that neither appraisals nor LTVs are opinions—a conclusion that is contrary to the overwhelming weight of authority in this District and elsewhere. (*See supra* Section II.A.1; Mot. at 42 & n.36.)

Amended Complaint all but confirms that it cannot do so while still maintaining its story that the AVM's output is inconsistent with the LTVs in the Offering Documents.

Defendants made the foregoing arguments in their opening papers *without* having access to the CoreLogic affidavit.  The affidavit, however, confirms every one of Defendants' points:

> Professionals in the real estate field should not . . . rely solely on CoreLogic (or other) AVMs to make reliable determinations of the reasonableness of value opinions offered by licensed or certified appraisers . . . *Our AVMs are not used to determine whether an appraiser actually inflated or deflated an opinion of value*. . . . [E]ven where a difference is identified between AVM value ranges and appraisals' opinions of value, *no professional would purport to draw conclusions on opinions of value* contained in professionally performed appraisals . . . *A professional should not use an AVM without knowing what inputs are going into the model and how the model calculates and produces its valuation*. . . . The slightest nuance can significantly alter an AVM's output . . . AVMs frequently produce entirely *inaccurate* values in rapidly fluctuating markets. . . . In addition, AVMs struggle to account for property-specific attributes . . . *that can only be assessed through an in-person professional inspection or appraisal*. . . . One cannot discern anything of significance from [a] pinpoint AVM estimate, and we certainly advise our clients to utilize our confidence intervals [similar to a margin of error] when using our AVMs.

(Ex. 60 at ¶¶ 3-6, 8, 10 (penultimate emphasis in original; other emphases added)).

Simply put, the FDIC's AVM-based allegations are not only implausible, but baseless. The Court should dismiss these allegations.

> 3.      The retrospective AVM cannot give rise to a "plausible" claim because it rests on hindsight and is predestined to deem "false" every prospectus <u>supplement ever issued in a declining real estate market.</u>

The FDIC offers no meaningful response to Defendants' showing that its AVM-based allegations are an improper attempt to plead "fraud by hindsight."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).  Nor does the FDIC dispute that its AVM is foreordained to deem false every MBS prospectus supplement issued in a declining real estate market.  That is necessarily so because the comparable sales that a retrospective AVM can consider will be closer to the time of the appraisals—and therefore will tend to be at lower prices—than the older comparable sales the appraisers were able to consider when performing the appraisals.  The FDIC has no answer to this.  Its AVM transparently is infected with hindsight; indeed, all it has really done is confirm that the housing market declined.

The FDIC's attempts to salvage its allegations in the face of such undisputed facts are unavailing because "[t]he accuracy of offering documents must be assessed in light of information available at the time."  *In re Barclays Bank PLC Sec. Litig.,* 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011).  Yet all the FDIC has shown is that an appraiser, on the date of appraisal, would not have had access to all the data considered in the AVM analysis—a fatal flaw when retrospectively challenging appraisals in a falling housing market.[17]

Further, the FDIC's discussion of a publication from its AVM vendor (*see* Opp'n at 43-44), highlights the flaws in the FDIC's use of the AVM.  The FDIC's contention that the publication "does not support Defendants' argument" plainly misreads the publication, which makes clear that the dataset included in a retrospective AVM analysis includes data that would not have been available contemporaneously.  (*See* Ex. 54 at 1; Mot. at 48 & n.43).  The FDIC further admits that the publication shows that the vendor has continually updated the data in its retrospective AVMs—such that an AVM analysis performed in 2010 about sales in 2006 will yield different results from the same AVM analysis run in 2006, 2007, 2008, or 2009.  (Opp'n at 44).  Thus, not only does the FDIC's AVM consider data that was unavailable to appraisers at the time of the appraisal, but it considers data that was unavailable even to AVMs at that time. (*See* Ex. 54 at 1 (noting that the 2010 AVM includes updated county record data, comparable sales data, indexes, and AVM models)).  This is nothing more than impermissible pleading by hindsight.  The issue is not whether the FDIC's AVM can come up with a better estimate of market value at some recent, unspecified date, but, rather, whether the FDIC is entitled to accuse the appraisers of fraud and Defendants of misrepresentations based on new information that was not available to appraisers, Defendants, or even contemporaneous AVMs.  The FDIC is not permitted to do so.  *See Slayton*, 604 F.3d at 776; *Barclays*, 2011 WL 31548, at *5.

---

[17] The Amended Complaint confirms that the AVM considers comparable sales data too recent to have been considered by the appraisers.  (*See* AC ¶ 50 (alleging that the FDIC's AVM uses "actual sale prices of comparable properties . . . *shortly* before the specified date")).

4.      The AVM-based allegations fail to state a claim because they challenge statements that were not even in the Offering Documents.

The Amended Complaint asserts that LTV ratios were understated because they were calculated based on allegedly inflated appraisal values. But as the Offering Documents make clear, the LTV ratios for purchase-money loans were calculated based on the *lower* of appraised value *or* purchase price. (*See* Mot. at 47-48 & n.42). The FDIC's error falsely imputes to Defendants LTV ratios that were not even in the Offering Documents—and that are guaranteed to be lower on average than the LTV ratios that actually *were* in the Offering Documents.[18] Further, its error not only renders meaningless its allegations about the LTVs for purchase-money loans, but *all* of its LTV-related allegations because the FDIC makes allegations based on a random sampling of the entire loan pool without regard to whether a loan was a purchase-money loan or a refinance. (*See* AC ¶ 3 & Item 57 of Schedules thereto).

Unable to dispute its error, the FDIC tries to rehabilitate its allegations by positing that "[when] the purchase price was used to calculate the LTV, it was only because the purchase price was lower than the appraised value," and that "*[h]ad the appraisal been accurate . . . , it would have been lower than the purchase price*, and thus would have been used instead of the purchase price to calculate [the] LTV." (Opp'n at 45) (emphasis added). The FDIC thus argues that "in all cases, the AVM supports the FDIC's allegations that the values that were actually used to calculate LTVs . . . were too high." *Id.* This is untenable because it requires replacing actual contemporaneous transaction prices (agreed to by actual buyers and sellers) with a computer's post hoc opinion of fair market value. But market value, by definition, is the "price at which a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction," Black's L. Dictionary (9th ed. 2009), not a computer model's estimate years after a massive housing collapse. Again, the CoreLogic affidavit confirms that market price is the best indicator of value:

---

[18] This is because a lower ratio results from using a higher denominator (as in the case of always using appraised value as the denominator, instead of the lower of purchase price or appraised value).

> Barring some indication that a transaction has not been negotiated at arms-length, the sale price agreed upon by a willing buyer and willing seller is the best indicator of market value.  Therefore, the value opinion [of an appraiser] should be at or about the sale price in virtually all such cases.

(Ex. 60 at ¶ 11).

The FDIC's reliance on *Federal Housing Finance Agency v. Morgan Stanley*, 2012 WL 5868300 (S.D.N.Y. Nov. 19, 2012), is misplaced.  There, the defendants asked the court to "*assume* that selling price was *always* used" to calculate the LTV ratios for purchase-money loans, and the court declined to make that assumption.  *Id.* at *3.  Here, no such assumption is required.  If the actual transaction price was used in calculating the LTV, then the appraisal was ignored and the LTV, by definition, was based on fair market value.  If, instead, the appraised value was used, it is because it was *lower* than the transaction price and therefore could not have been inflated.  Either way, the LTV ratio could not have been understated.  For this reason, too, the LTV-related allegations should be dismissed.

**B.    The Allegations About Additional Liens Fail.**

The FDIC does not dispute that the Offering Documents expressly stated that LTV ratios were calculated based on *only the subject mortgage*, and that the ratios ignored additional liens that were on the properties at the time of origination or added after origination and before securitization.  (*See* Mot. at 49-50 & n.44).[19]  Nor does the FDIC challenge the accuracy of the disclosed LTV ratios (putting aside the appraisal issues discussed above).  The FDIC nevertheless contends that Defendants are "liab[le] for *omissions*" because they did not volunteer that there were additional liens "already in existence before the prospectus supplements were disseminated."  (Opp'n at 45-46).  The FDIC's argument fails for two reasons.

*First*, § 11 liability cannot be premised solely on an omission because "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  Rather, § 11 requires a plaintiff to identify a *statement* that was false or rendered misleading by an omission (unless an

---

[19] The FDIC does not make additional lien allegations with respect to CHASE 2007-S4, WFMBS 2007-4, or WFMBS 2007-7.  (*See* Mot. at 50 n.44).

SEC regulation requires disclosure of certain information, which is not the case here).  *See* 15 U.S.C. § 77k(a) (authorizing a claim only if a "registration statement . . . contained an untrue *statement* of a material fact or omitted to state a material fact required to be stated therein or necessary to make the *statements therein* not misleading."); *see also Resnik*, 303 F.3d at 154 (no § 11 liability where "information [was] not required to make other information presented in the proxy statement not materially false or misleading").  There is nothing misleading about an LTV ratio that was calculated exactly as described in the Offering Documents, especially to sophisticated institutional investors like Colonial Bank.

*Second*, the Offering Documents explicitly disclosed the possibility of additional liens.[20] In light of these disclosures, the LTV ratios cannot constitute actionable misstatements, because any investor would understand that there was a possibility that there were additional liens on the properties.   The Offering Documents thus require dismissal of the FDIC's "additional lien" allegations, as was recently held in another of the FDIC's cases.  *See FDIC as receiver for United W. Bank*, 2013 WL 49727, at *2 n.4  ("The allegation of additional undisclosed liens fails to state a claim . . . since the prospectus supplements stated that the underwriting guidelines did not prohibit secondary financing.").

## C.     The Allegations About Owner-Occupancy Fail.

The FDIC's arguments in defense of its owner-occupancy allegations are equally unavailing.  (*See* Opp'n at 47-50).  As the FDIC was told by the court in another case, where, as here, "the Offering Documents revealed that owner-occupancy data was self-reported by borrowers," "owner-occupancy allegations do not plead a misstatement."  *FDIC as receiver for United W. Bank*, 2013 WL 49727, at *2; *accord Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA) LLC*, 2013 WL 1342529, at *9 (S.D.N.Y. Mar. 29, 2013) ("Because the Offering Materials explicitly stated that all occupancy rates were based only on borrowers' representations

---

[20] *See, e.g.*, Ex. 66 (excerpts from Offering Documents disclosing risk of secondary financing on properties).

and because Plaintiffs do not allege that Defendants falsely reported the borrowers'
representations, Plaintiffs have alleged no misstatements concerning owner-occupancy rates.").

The FDIC contends, however, that "none of the prospectus supplements [here] includes
the type of disclosure that some courts have found sufficient," and that offering documents must
"explicitly disclose[] the possibility of borrower misrepresentations or fraud." (Opp'n at 48-49).
But the Offering Documents here *did* disclose the possibility of "fraud or negligence in the
origination . . . of a mortgage loan, *including misrepresentation by the mortgagor*." (Excerpts of
Offering Documents in Ex. 57).[21] Accordingly, by the FDIC's own argument, its owner-
occupancy allegations fail.

The FDIC's corollary argument (that Defendants are liable for borrowers' misstatements
on the theory that Defendants "are not mere passive conduits of information" (Opp'n at 47-48)),
rests on the incorrect assumption that the Offerings Documents represented owner-occupancy
data without warning investors of its provenance. There can be no misstatement where the
Offering Documents disclosed that owner-occupancy rates were based on borrower
representations, and that Defendants were not vouching for the accuracy of those representations.
*See, e.g.*, *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *9 (S.D.N.Y.
Sept. 28, 2010) (rejecting allegations that "statements regarding owner-occupancy levels were
false because the number of owner-occupied properties was lower than defendants represented,"
because "[t]he [complaint] does not allege that the percentages reported . . . are inaccurate
representations of the data received from borrowers").[22]

---

[21] In a footnote, the FDIC contends that these disclosures are inadequate because they appeared
in discussions of loan pool insurance policies (*see* Opp'n at 49 n.33), but this argument
repeatedly has been rejected by the courts. *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Countrywide
Fin. Corp. (In re Countrywide Fin. Corp. MBS Litig.)*, 2012 WL 3578666, at *2 (C.D. Cal. Aug.
17, 2012) (relying on similar disclosures in pool insurance policy descriptions that "explicitly
stated that borrowers might have made misrepresentations at the time of origination").

[22] *FHFA*, 858 F. Supp. 2d at 330, cited by the FDIC for the proposition that Defendants can be
held liable for purported borrower misrepresentations, moreover, is inconsistent with the
majority of courts that have addressed this issue. The *FHFA* court cited no authority for this
proposition, *see id.* at 329-30, and incorrectly rested its analysis on the due diligence defenses
provided for by 15 U.S.C. § 77k(b)(3). *Capital Ventures*, 2012 WL 4469101, at *8, is off point,

Further, the FDIC's own allegations refute the inference that mortgage applicants misrepresented their owner-occupancy intentions.  The vast majority of borrowers the FDIC claims did not live in the premises acted *consistently* with living in the premises in two of the three ways the FDIC says are relevant to assessing occupancy.  (*See* Mot. at 53 & App. F).  But instead of addressing this argument on its merits, the FDIC simply cites *FHFA* for the proposition that the issue is not appropriately resolved on a motion to dismiss.  (Opp'n at 48-49).  In *FHFA*, however, the allegations were that borrowers acted *in*consistently with living in the premises in two of the ways the FDIC (and the FHFA) contends are relevant to assessing occupancy.  *See FHFA*, 858 F. Supp. 2d at 328-29.  Here, by contrast, the FDIC's allegations refute themselves, because when borrowers mainly act in ways that are *consistent* with living in the premises, the only plausible inference is that they live in the premises.  Thus, for these reasons, the FDIC's owner-occupancy allegations fail to state a claim and must be dismissed.

### D.   The Allegations About Underwriting Guidelines Fail.

The FDIC's arguments in support of its theory that underwriting guidelines were abandoned rest exclusively on *post hoc* mortgage default rates, and are therefore unavailing; courts repeatedly have held that default rates alone do not plausibly "establish that the[] offering documents contained material misstatements and omissions" because they "could [have been] caused by any number of broad economic factors besides . . . deviation from descriptions in the Offering Documents."  *Plumbers' & Pipefitters'*, 2012 WL 601448, at *11; *accord MassMutual*, 843 F. Supp. 2d at 208.[23]  The FDIC's contention that "[c]ourts have held that allegations similar

---

in that the plaintiff alleged that "Defendants . . . *knew* the borrowers were misrepresenting their intent to live in the property"—an allegation the FDIC does not make, cannot make, and expressly disclaims.  (*See* AC ¶ 36).  *In re Phar-Mor Litig.*, 848 F. Supp. 46 (W.D. Pa. 1993), and *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512 (M.D. Fla. 1989), also cited by the FDIC, did not concern owner-occupancy allegations or even MBS.

[23] As noted in Defendants' opening brief, the FDIC cannot have it both ways.  Either its allegations about default rates are sufficient to state a claim (in which case those allegations could have been brought long ago, and the claims are time-barred), or they are not (in which case its claims should be dismissed for failure to state a claim).  *See Allstate*, 824 F. Supp. 2d at 1180 ("[Plaintiff] is faced here with a Hobson's choice.  If it is correct in its [theory of liability], then

to those made here are sufficient," is inaccurate.  (Opp'n at 51).  Unlike the FDIC's Amended

Complaint, the complaints that have been upheld do not just cite to default rates, but rather

include *factual* allegations, such as "detailed statements by numerous confidential witnesses that

describe the systematic disregard of underwriting standards by the specific parties involved in

the origination of the loans populating the offerings."  *Bear Stearns*, 851 F. Supp. 2d at 767-68;[24]

*MassMutual*, 843 F. Supp. 2d at 202 (requiring the plaintiff to "allege specific practices of

abandoning guidelines and . . . link such practices with specific lending banks that supplied the

mortgages that underpinned the trusts").

      The Second Circuit's recent decision in *RBS* illustrates the point.  In *RBS*, the complaint

contained, among other things, (i) extensive allegations based on statements made by former

employees of the defendants that described practices that expressly contradicted the disclosures

in the offering documents and detailed specific practices that violated stated underwriting

standards; (ii) allegations about "unusually high" payment default rates that far exceed anything

alleged here; and (iii) allegations that ratings agencies based their ratings downgrades on the

"loosened underwriting" standards and "previously undisclosed 'aggressive underwriting'" by

relevant originators.  *RBS*, 709 F.3d at 117-19.  The Second Circuit, in holding that the complaint

stated a claim, noted that the plaintiff had "provided a 'fairly specific' account of how the

relevant underwriters had systematically disregarded guidelines," and that the complaint

incorporated detailed confidential witness testimony that constituted a "substantial source[]"

supporting allegations that underwriting guidelines were abandoned.  *Id.* at 122-23.

---

it was on notice of that claim before [the limitations date].  If it is wrong, as it is forced to argue
for purposes of this motion, then its claim is insufficient.").

[24] Accordingly, the FDIC is wrong in contending that *Bear Stearns* held that default rates alone
suffice to state a claim.  (*See* Opp'n at 53).  *Bear Stearns* observed that if misstatements
adequately are alleged, § 11 presumes that the misstatements caused the plaintiff's loss.  *See*
*Bear Stearns*, 851 F. Supp. 2d at 769 n.25.  It did not suggest that if losses on mortgages are
alleged, § 11 presumes there must have been a misstatement.

The FDIC's allegations here do not rise anywhere near the level of those upheld by the Second Circuit in *RBS*.  As a threshold matter, the FDIC brings suit against numerous Defendants based on 11 separate securities backed by over 26,000 loans (*see* AC ¶ 3), that were originated by numerous originators, whereas the operative complaint in *RBS* asserted allegations against only a single originator in connection with a single securitization.  Notwithstanding that the FDIC has numerous originators it could have tried to make allegations about, it does not allege *anything* about *any* of them.  It does not describe any originator's underwriting practices. It does not cite statements from any originator's former employees (or any other witness, for that matter).  Nor does it allege anything about how the rating agencies viewed originator's underwriting guidelines.  The FDIC merely cites default and delinquency rates—but even those rates are *miniscule* compared to the rates alleged in *RBS*.  (*See* AC ¶¶ 91-99).  The FDIC alleges six-month default rates ranging from just 0.2% to 1.9% (*see* Item 96 to Schedules to AC), in contrast to the *18%* six-month default rate alleged in *RBS*.  *See RBS*, 709 F.3d at 118.[25]  For example, the FDIC alleges with respect to WFMBS 2007-4 that there were 3278 loans in the pool, and that only *five* defaulted in the first six months.  (*See* Items 57 & 96(a) of Schedules to AC).  Five defaults out of 3278 loans utterly refutes any conceivable inference of "wholesale abandonment of the originators' underwriting standards."  (Opp'n at 51.)

The FDIC's argument that allegations about default rates (that cannot state a plausible claim in their own right) suddenly do state a plausible claim when coupled with allegations about ratings downgrades, is meritless.  (Opp'n at 52).  Because mortgage defaults and MBS ratings downgrades go hand in hand, "evidence of defaults and delinquencies *and the evidence of later credit rating downgrades* . . . is [not] adequate to state a plausible claim absent specific allegations against the loan originators for the MBS certificates,"  *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, 2012 WL 3028803, at *29 , which the FDIC does not allege here.  The FDIC's allegations about underwriting guideline abandonment should be dismissed.

---

[25] Similarly, the long-term default rate alleged in *RBS* of 68.6% by June 2011, *see RBS*, 709 F.3d at 118, is far higher than anything the FDIC alleges here.  (*See* Items 97-98 to Schedules to AC).

### E.      The Allegations About Credit Ratings Fail.

The FDIC does not dispute that its "allegations about credit ratings are 'entirely derivative of [its] other allegations'" (Opp'n at 54 (quoting Mot.)); therefore, those allegations should be dismissed for the reasons stated above.

Further, the FDIC does not and cannot allege that the "ratings were misreported" (*e.g.*, that they were reported to be AAA when the securities really had been rated AA)—which is required to state a claim based on credit ratings. *Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011); (*see also* Mot. at 56-57).

Nor does the FDIC offer a meaningful response to Defendants' argument that credit ratings reflect a "statement of *opinion* by each agency," and that a plaintiff therefore must "allege that the ratings agencies did not truly hold those opinions at the time they were made public." *Tsereteli*, 692 F. Supp. 2d at 394-95 (emphasis added); (*see also* Mot. at 57).  Because the FDIC does not allege that the rating agencies (or Defendants) disbelieved that the assigned ratings were appropriate, dismissal is required.

The FDIC cannot salvage its allegations by contending that "the rating agencies were provided inaccurate information about the loans in the collateral pool of each securitization, and the defendants never disclosed that."  (Opp'n at 54).  The FDIC does not plead this theory (*see* AC ¶¶ 100-105), and it cannot amend its pleading in its opposition brief.  *See O'Brien*, 719 F. Supp. at 229.  Moreover, "the exact contours of this [new] allegation are obscure," because the FDIC does not explain "what the faulty loan information [allegedly provided to the rating agencies] consisted of," "what information the Agencies relied upon," "at what stage the Agencies rated the Certificates," or "when . . . [Defendants allegedly] became aware that the Rating Agencies had relied on [allegedly] inaccurate information."  *Bear Stearns*, 851 F. Supp. 2d at 771-72; *accord Union Cent.*, 2013 WL 1342529, at *9 (dismissing such ratings allegations because "Plaintiffs do not explain what alleged information [the defendant] gave the agencies, when that information was given, and how that information affected the ratings").  Accordingly,

the FDIC's new theory (even if pleaded) would fail.  *See id.*  The credit rating allegations should be dismissed.

### III.  THE FDIC HAS FAILED TO STATE A CLAIM FOR RELIEF UNDER § 15.

Because the FDIC has not adequately pleaded an underlying violation of § 11, its claims for control person liability under § 15 necessarily fail.  *See Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).  The § 15 claims also fail because the FDIC makes only conclusory, non-factual allegations of control.  (*See* Mot. at 57-58).  The FDIC's attempt to supplement its pleading with reference to prospectus supplements (*see* Opp'n at 60), is inappropriate and must be disregarded because a "[c]omplaint cannot be amended by the briefs in opposition to a motion."  *O'Brien*, 719 F. Supp. at 229.  Moreover, the FDIC's argument that "each of the Section 15 defendants was, at the relevant time, the parent of a wholly-owned subsidiary that has violated section 11" (Opp'n at 60), is not enough.  These allegations are not in the Amended Complaint, and in any event, "[a]llegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control."  *Emps.' Ret. Sys. of Gov't of Virgin Is.*, 804 F. Supp. 2d at 157.  Thus the FDIC's contentions in its briefing, even if pleaded, still would be "too conclusory to warrant an inference in the plaintiff's favor."  *Id*.  The § 15 claims should be dismissed.

### IV.  THE FDIC LACKS STATUTORY STANDING TO ASSERT § 11 CLAIMS AGAINST CERTAIN DEFENDANTS.

In arguing that it has statutory standing to assert § 11 claims against all Underwriter Defendants because it is "sufficient" that "each of the Underwriter Defendants in fact participated directly in the distribution of securities from the relevant RMBS trust" (Opp'n at 56), the FDIC ignores the plain text of § 11 and instead relies on two district court cases that have been overruled in relevant part.  Under § 11, an investor in a security possesses standing to sue only "every underwriter with respect to such security."  15 U.S.C. § 77k(a)(5).  The FDIC therefore lacks standing to assert § 11 claims against any underwriter defendant that did not underwrite the securities Colonial purchased.  (*See* Mot. at 58).

As the FDIC acknowledges, the issue of statutory standing under § 11 has been litigated in several recent MBS class actions.  (*See* Opp'n at 56 n.41).  The statutory text interpreted in those cases is identical to the language at issue here:  just as § 11 limits underwriter defendants to "every underwriter with respect to *such security*," it likewise limits plaintiffs to "any person acquiring *such security*."  15 U.S.C. § 77k(a) (emphases added).  The FDIC extensively relies on two district court decisions permitting a plaintiff to assert *class* claims concerning tranches in which it did not invest, so long as it invested in other tranches in the same offering.[26]  Those two decisions, however, did not address whether a plaintiff could assert *individual* claims concerning tranches in which it never invested, as the FDIC seeks to do here.

This conclusion is confirmed by the Second Circuit's decision in *NECA-IBEW Health & Welfare Fund*, which stated that a plaintiff "*clearly lacks standing* to assert . . . claims on its behalf," concerning "*different tranches* of the same Offering," "because it did not purchase those Certificates."  *Id.* (emphases added).[27]  The same reasoning applies here.

The FDIC is also mistaken that there "is no reason to condition liability on whether the defendant underwrote the particular [security] that the plaintiff purchased."  (Opp'n at 57).  As the Second Circuit has recognized, § 11 can "impos[e] *in terrorem* liability" on defendants and is therefore narrowly restricted to "a limited list of persons."  *In re Lehman Bros. MBS Litig.*, 650 F.3d 167, 181 (2d Cir. 2011).  With respect to underwriters, § 11 "is limited . . . to . . . underwriters of the security at issue."  *Id.* at 175.  To further extend liability to underwriters of *other* securities, as the FDIC seeks to do here, "would contradict that section's specific

---

[26] *See* Opp'n at 57-58 (citing *Bear Stearns*, 851 F. Supp. 2d 746, and *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322 (S.D.N.Y. 2012)).

[27] Although the Second Circuit further concluded that the named plaintiff in *NECA-IBEW Health & Welfare Fund* could represent a *class* of investors in those other tranches, it did so only "[b]ecause the class standing analysis is different" from the statutory standing analysis under § 11.  *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 158.

enumeration of liable parties . . . render[ing] these narrowly drawn categories meaningless and contradict[ing] well-settled canons of statutory construction."  *Id.* at 184.[28]

Finally, the FDIC's contention that "[a] person may be liable as an underwriter of securities that it did not actually sell if it directly or indirectly 'participated' in the distribution of the security" (Opp'n at 58), does not salvage these claims.  Tellingly, the FDIC does not cite a single case in support of this theory.  To the contrary, the decisions cited by the FDIC declined to extend underwriter liability beyond the narrow categories in § 11, *see Lehman*, 650 F.3d at 184, or stated that a party that agreed to underwrite a security (but did not actually sell that security) could be sued by a purchaser of *that* security.  *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400-01 (7th Cir. 1995).[29]  But even if an underwriter of one security could be held liable for "participat[ing] in the distribution" of another security, the FDIC's claims would still fail because the Amended Complaint does not plead that the underwriters here did so.  Recognizing as much, the FDIC contends that "dismissal . . . on this basis would be premature" because it "has not had the opportunity to take discovery."  (Opp'n at 59).  But this argument is without merit—a complaint must contain "well-pleaded facts [that] permit the court to infer more than the mere possibility of misconduct" *before* a plaintiff can proceed to discovery.  *Iqbal*, 556 U.S. at 679 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  As the FDIC has conceded, the Amended Complaint contains

---

[28] *See also Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979) ("[G]eneralized references to the remedial purposes of [the securities laws] will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit.").

[29] The FDIC's reliance on an unreported decision from the District of New Jersey for the proposition that a defendant can be held liable as an underwriter for "taking part in the preparation of the registration statement or prospectus" (Opp'n at 58), is also misplaced because the Second Circuit has rejected such a broad view of underwriter liability under § 11.  *See Lehman*, 650 F.3d at 181 (recognizing that "direct or indirect participation in underwriting subjects a person" to liability under § 11, but holding that "the participation must be in the statutorily enumerated distributional activities, not in non-distributional activities that may facilitate the eventual distribution by others").

no such facts, and therefore its claims against the underwriter defendants that did not underwrite the securities Colonial purchased must be dismissed.

## CONCLUSION

For the reasons stated above and in Defendants' moving papers, the Amended Complaint should be dismissed with prejudice in its entirety.

Dated:   April 17, 2013                     Respectfully submitted,
         New York, New York

SIMPSON THACHER & BARTLETT LLP          MUNGER, TOLLES & OLSON LLP

By: __/s/ Andrew T. Frankel_____       By: __/s/ James C. Rutten_____
Thomas C. Rice (trice@stblaw.com)        Marc T.G. Dworsky
Andrew T. Frankel (afrankel@stblaw.com)  (marc.dworsky@mto.com)
Alexandra C. Pitney (lpitney@stblaw.com) James C. Rutten (james.rutten@mto.com)

425 Lexington Avenue                     355 South Grand Avenue, 35th Floor
New York, New York 10017                 Los Angeles, California 90071
Phone: (212) 455-2000                    Phone: (213) 683-9100
Fax: (212) 455-2502                      Fax: (213) 687-3702

*Attorneys for Defendant Deutsche Bank*   Achyut J. Phadke (achyut.phadke@mto.com)
*Securities Inc., RBS Securities Inc., and UBS*  560 Mission Street, 27th Floor
*Securities LLC*                          San Francisco, California  94105
                                          Phone: (415) 512-4000
                                          Fax: (415) 512-4077

                                          *Attorneys for Defendant Wells Fargo Asset*
                                          *Securities Corporation*

MAYER BROWN LLP

By: ___/s/ Michael O. Ware_____
Mark G. Hanchet
(mhanchet@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
Charles Korschun
(ckorschun@mayerbrown.com)

1675 Broadway
New York, New York 10019
Phone: (212) 506-2500
Fax: (212) 262-1910

*Attorneys for Defendants HSBC Securities
(USA) Inc. and Ally Securities, LLC*

SULLIVAN & CROMWELL LLP

By: ___/s/ Bruce E. Clark_____
Bruce E. Clark (clarkb@sullcrom.com)

125 Broad Street
New York, New York 10004-2498
United States
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Kathleen S. McArthur
(mcarthurk@sullcrom.com)

1701 Pennsylvania Avenue, NW
Washington, D.C. 20006-5805
Phone: (202) 956-7500
Fax: (202) 956-6993

*Attorneys for Defendants First Tennessee
Bank National Association (successor by
merger to First Horizon Home Loan
Corporation), FTN Financial Securities
Corp., and First Horizon Asset
Securities, Inc.*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: ___/s/ Roger A. Cooper_____
Roger A. Cooper (racooper@cgsh.com)
Jared Gerber (jgerber@cgsh.com)

1 Liberty Plaza
New York, New York 10006
Phone: (212) 225-2000
Fax: (212) 225-3999

*Attorneys for Defendant Merrill Lynch, Pierce,
Fenner & Smith Inc.*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: ___/s/ Bruce Birenboim_____
Brad S. Karp
(bkarp@paulweiss.com)
Bruce Birenboim
(bbirenboim@paulweiss.com)
Susanna M. Buergel
(sbuergel@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants Citicorp Mortgage
Securities Inc., CitiMortgage Inc., and
Citigroup Global Markets Inc.*

SULLIVAN & CROMWELL LLP

By:  \_\_/s/ Sharon L. Nelles_____
Sharon L. Nelles (nelless@sullcrom.com)
Darrell S. Cafasso (cafassod@sullcrom.com)

125 Broad Street
New York, New York 10004-2498
United States
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Defendants Chase Mortgage
Finance Corp., JP Morgan Chase & Co., and
J.P. Morgan Securities LLC*

CRAVATH, SWAINE & MOORE LLP

By:  \_\_/s/ Richard W. Clary_____
Richard W. Clary
(rclary@cravath.com)
Julie North
(jnorth@cravath.com)
Richard J. Stark
(rstark@cravath.com)
Michael T. Reynolds
(mreynolds@cravath.com)
Lauren A. Moskowitz
(lmoskowitz@cravath.com)

Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Defendant Credit Suisse
Securities (USA) LLC*