ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - -X
FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR COLONIAL BANK,

                    Plaintiff,                    12 Civ. 6166 (LLS)

          - against -                             OPINION AND ORDER

CHASE MORTGAGE FINANCE CORP., *et al*,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - -X

     This is an action brought by the Federal Deposit Insurance
Corporation (the "FDIC"), as receiver for Colonial Bank
("Colonial"), for violations of Sections 11 and 15 of the
Securities Act of 1933 (the "1933 Act") based on alleged
misstatements made in connection with Colonial's purchase of
securities issued or underwritten by defendants.

     Defendants move to dismiss the amended complaint.

     Bearing in mind that on such a motion the court "must
accept as true all of the factual allegations set out in
plaintiff's complaint, draw inferences from those allegations in
the light most favorable to plaintiff, and construe the
complaint liberally," Rescuecom Corp. v. Google Onc., 562 F.3d
123, 127 (2d Cir. 2009), and should dismiss the complaint if it
does not "contain sufficient factual matter, accepted as true,
to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), the motion is denied.

## Background

In the summer and fall of 2007, Colonial paid approximately $388 million to purchase eleven certificates backed by collateral pools of residential mortgage-backed securities. Those certificates were issued and underwritten by defendants, Chase Mortgage Finance Corp. ("Chase"), JPMorgan Chase & Co. ("JPMorgan Chase"), J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc., and the successor by merger to J.P. Morgan Securities Inc. ("JP Morgan")) ("Bear Stearns"), Citicorp Mortgage Securities, Inc. ("CMSI"), CitiMortgage, Inc. ("CitiMortgage"), Citigroup Global Markets Inc. ("Citigroup"), First Horizon Asset Securities Inc. ("FHASI"), First Horizon Home Loan Corporation ("FHHLC"), Ally Securities LLC (formerly known as Residential Funding Securities, LLC, and doing business as GMAC RFC Securities) ("GMAC"), Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC) ("Credit Suisse"), Deutsche Bank Securities Inc. ("DBS"), FTN Financial Securities Corp. ("FTN"), HSBC Securities (USA) Inc. ("HSBC"), Merrill Lynch, Pierce, Fenner & Smith Inc. (successor by merger to Banc of America Securities LLC) ("BAS"), RBS Securities Inc. (formerly known as Greenwich Capital Markets, Inc. and doing

business as RBS Greenwich Capital)("RBS"), UBS Securities LLC ("UBS"), and Wells Fargo Asset Securities Corporation ("WFASC").

On August 14, 2009, the FDIC was appointed receiver over Colonial as a failed bank. As receiver, the FDIC initiated the instant lawsuit on August 8, 2012.

The amended complaint's claims arise from four broad categories of alleged misstatements and omissions contained in the prospectus supplements for the eleven certificates, filed with the Securities and Exchange Commission: the appraisals of the properties serving as collateral to the mortgage loans in the pools, the occupancy status of the properties, the underwriting standards used by loan originators, and the credit ratings of the certificates.

On the basis of the foregoing allegedly misleading statements, the FDIC alleges violations of the 1993 Act. Count A alleges that CMSI, Chase, FHASIU, WFASC, Credit Suisse, RBS, HSBC, JP Morgan, Citigroup, DBS, FTN, UBS, BAS, GMAC, and Bear Stearns, who were issuers and underwriters of the certificates, violated Section 11 of the 1993 Act, which imposes civil liability on every person who signed the registration statement and every underwriter with respect to such security, in cases where, causing harm to purchasers, "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact

3

required to be stated therein or necessary to make the statements therein not misleading," 15 U.S.C. § 77k. Count B alleges that CitiMortgage, FHHLC, and JPMorgan Chase, who allegedly control CMSI, FHASI, and Chase, respectively, are jointly and severally liable for CMSI, FHASI, and Chase's primary violations of Section 11 pursuant to Section 15 of the 1933 Act, which extends liability for primary violations to any person who by stock ownership, agency or otherwise is in control of the primary violator. See 15 U.S.C. § 77o.

## Discussion

Defendants move to dismiss the amended complaint, arguing that it is untimely and fails to state a claim.

### Timeliness

### A.

The FDIC contends that by the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), it was given at least three years to bring any claims Colonial had on August 14, 2009, the date the FDIC was appointed receiver. FIRREA provides the following regarding the statute of limitations for actions brought by the FDIC as receiver:

> (A) In general
> Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as

4

```
                    conservator or receiver shall be—
                    (i)  in the case of any contract claim,
                         the longer of--
                         (I)  the 6-year period beginning on
                              the date the claim accrues; or
                         (II) the  period  applicable  under
                              State law; and
                    (ii) in  the  case  of  any  tort  claim
                         (other  than  a  claim  which  is
                         subject to section 1441a(b)(14) of
                         this title), the longer of--
                         (I)  the  3-year  period  beginning
                              on   the   date   the   claim
                              accrues; or
                         (II) the  period  applicable  under
                              State law.
               (B)  Determination  of  the  date  on  which  a
                    claim accrues
                    For purposes of subparagraph (A), the
                    date   on   which   the   statute   of
                    limitations begins to run on any claim
                    described in such subparagraph shall be
                    the later of—
                    (i)  the date of the appointment of the
                         Corporation   as   conservator   or
                         receiver; or
                    (ii) the  date  on  which  the  cause  of
                         action accrues.
```

12 U.S.C. § 1821(d)(14).

Defendants argue that FIREEA's statute of limitations does not apply because the claims pled in the amended complaint had already expired before the FDIC was appointed receiver on August 14, 2009.  The FDIC argues that its claims are subject to FIRREA's statute of limitations because they were viable at the time it was appointed receiver, and thus under FIRREA it had three years from that date to bring the claims.  Resolution of the argument turns on whether Colonial knew or should have known

(i.e. should have investigated, based on the information available to it) the claims on which the FDIC sues, before August 14, 2008.

The 1933 Act provides that Section 11 claims must be brought "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," 15 U.S.C. § 77m. However, "the discovery of facts that put a plaintiff on inquiry notice does not automatically begin the running of the limitations period." Merck & Co. v. Reynolds, 130 S.Ct. 1784, 1798 (2010).[1] The limitations period only begins to run "when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 174 (2d Cir. 2011)(discussing Merck). "In other words, the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." Id. at 175.

---

[1] Merck addressed the inquiry notice standard as it applies to the statute of limitations for securities fraud cases under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the parties dispute Merck's application to the 1933 Act. Although the language of the Exchange Act's statute of limitations differs slightly from that in the 1933 Act, it does not do so in a material way. See Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 317-20 (S.D.N.Y. 2012), aff'd, 712 F.3d 136 (2d Cir. 2013)(interpreting Merck to apply to 1933 Act claims).

Triggering information "must be such that it relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants." Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003). "As the statute of limitations is an affirmative defense, dismissing claims on statute of limitations grounds at the complaint stage is only appropriate if the 'complaint clearly shows the claim is out of time.'" Absolute Activist Master Value Fund, Ltd. v. Ficeto, No. 09 Civ. 8862 (GBD), 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013), quoting Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999).

Thus, only if Colonial clearly had sufficient information to file a well-pled complaint prior to August 14, 2008 for the specific misrepresentations and omissions the FDIC alleges here are the FDIC's claims not timely.

**B.**

Defendants contend that Colonial can be charged with knowledge of sufficient facts prior to August 14, 2008 to have pled the 1933 Act violations alleged here.  The FDIC disputes that assertion.  Resolution of that dispute is a fact-intensive inquiry, and not well-suited for resolution as a matter of law. Defendants' motion will only be granted if "uncontroverted evidence irrefutably demonstrates [that] plaintiff discovered or should have discovered," Newman, 335 F.3d at 193, sufficient

facts to adequately plead its claim.

1.

Defendants identify various sources of publicly accessible information from before August 14, 2008, including news articles, press releases, and public filings, that were pessimistic about the mortgage industry in general as well as critical of the entities involved in the origination, packaging, and sale of certificates similar to the ones at issue here. Defendants also note that other investors in similar securities filed civil complaints making similar allegations before August 14, 2008. Defendants argue that the aforementioned public information "contributed to the total mix of information that provided Colonial with knowledge of its alleged § 11 claims prior to August 14, 2008," Defs.' Repl. 12.

Even if Colonial was aware that the mortgage industry was troubled and there was negative publicity about securities similar to those that Colonial had purchased, none of that information is connected to the specific certificates or transactions at issue here, and thus it does not "relate[ ] directly to the misrepresentations and omissions" in the amended complaint. See In re Bear Stearns Mortgage Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 764 (S.D.N.Y. 2012)("Allegations of industry-wide or market-wide troubles

alone ordinarily are insufficient to state a securities claim."). The public information identified by defendants is too general and does not specifically demonstrate that Colonial should have discovered its claims before August 14, 2008.

## 2.

The FDIC bases its allegations about inflated property valuations on a forensic analysis it performed using an automated valuation model ("AVM") by which it determined the "true market value," Am. Compl. ¶ 50, of the properties serving as collateral to the mortgage loans underlying the certificates at issue. The amended complaint alleges that analysis of the property values depends on inputting the addresses of the properties in question, id. ¶ 51, and that it was not possible for an investor to learn the addresses of the mortgaged properties until after August 14, 2008 when the FDIC's AVM vendor "developed a method for cross-referencing information about the loans that backed a mortgage-backed security with information in its other proprietary databases of land and tax records," id.

The parties dispute whether Colonial could have learned the property addresses and done the same analysis before August 14, 2008.[2] Taking the allegations in the complaint as true, Colonial

---

[2] Defendants argue that "for certain offerings Colonial had access to the precise information the FDIC now pleads was unavailable: the street addresses and names of the mortgagors" because 2007 SEC filings "inform[ed] investors

cannot be charged with knowledge of the "true market value" of the properties in question before August 14, 2008.

Defendants' arguments that Colonial could have made the same allegations about additional liens on the properties and owner-occupancy rates without the AVM, by looking at land records, are similarly unsuccessful, because the amended complaint alleges that "Land records cannot be used to test the accuracy of statements in a prospectus supplement without knowing the property addresses," Am. Compl. ¶ 60 n.4.

3.

The prospectus supplements represented that "the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present," Am. Compl. ¶ 89. However:

> 90. Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those

---

that mortgage schedules, which include 'the Mortgagor's name and the street address of the Mortgaged Property' were 'Available Upon Request from the Trustee,'" Defs.' Repl. 10 n.8, citing Andrews Decl. Exs. 11-12. Defendants' argument opens a mixed question of fact and law: the degree to which such an investigation should have been initiated under the circumstances at the time.

> underwriting standards; (d) the originators
> were making mortgage loans that borrowers
> could not repay; and (e) the originators
> were failing frequently to follow quality-
> assurance practices necessary to detect and
> prevent fraud intended to circumvent their
> underwriting standards.

In support of those allegations, the FDIC alleges that the securitized mortgage loans backing the certificates experienced high rates of delinquency and default, which were caused by "deterioration in credit characteristics that were not disclosed to investors," id. ¶ 92.  Specifically, the amended complaint alleges a "rising incidence of early payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations . . . and that became 60 or more days delinquent within six months after they were made," id. ¶ 93, and that "Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus the underwriting standards were not followed)," id.

It is undisputed that Colonial had access to monthly loan data reports that were publicly available through the securitization trustees, and that those reports disclosed the percentage of loans in delinquency or default for each loan pool.  Defendants argue that "EPDs, by definition, occur early in the life of a securitization. . . .  Thus, to the extent that

11

such default information allows the FDIC to state a claim, it also bars the claim in this belatedly-filed action because the existence and rate of EPDs would have been readily apparent for all of the Certificates before August 2008, given that the certificates were issued between November 2006 and June 2007." Defs.' Br. 20.

The FDIC's alleged connection between default and delinquency rates and the abandonment of underwriting guidelines is plausible, but it is not possible to say as a matter of law that Colonial should have been aware of that connection before August 14, 2008.

> [I]t is one thing to know that the securities were not making their expected returns, or had even lost long term value in the eyes of investors, and quite another entirely to have cause to suspect that [defendant] had materially misrepresented the characteristics of the collateralized loans and its own due diligence. A period of poor performance by itself may reflect any number of unrelated economic or market factors, and is not necessarily sufficient to put investors on notice of *systematic* disregard of underwriting procedures, inflation of underwriting data or the seller's material misrepresentations.

CMFG Life Ins. Co. v. RBS Securities Inc., No. 12 Civ. 037 (WMC), 2013 WL 4483068, at *4 (W.D. Wis. Aug. 19, 2013), citing In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 810 F. Supp. 2d 650, 664-65 (S.D.N.Y. 2011). Although, in hindsight, the rising default and delinquency data available to

12

Colonial is consistent with a disregard for underwriting guidelines, that connection is bolstered by the certificates' subsequent downgrade to below investment grade, which occurred after August 14, 2008, Am. Compl. ¶ 110. See Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012), aff'd, 712 F.3d 136 (2d Cir. 2013)("Between 2007 and the filing of this complaint an important event occurred that caused the GSEs to discover that the loans included in the securitizations they bought from defendants were not as advertised: the securities were downgraded from investment grade to near-junk status."). Even if Colonial can be charged with knowledge of the EPD data, it is not clear that Colonial should have been aware, or would have been able to successfully plead, the claims about underwriting guidelines alleged in the amended complaint before August 14, 2008. See N.J. Carpenters Health Fund v. Residential Capital, LLC, No. 08 Civ. 8781 (HB), 2011 WL 2020260, at *5 (S.D.N.Y. May 19, 2011)(noting that plaintiffs' theory that high delinquency rates are evidence of misstatements concerning underwriting practices "is merely a theory").

**4.**

Defendants analogize to two recent complaints brought by the FDIC against a similarly situated defendant, both of which were held to be untimely, and argue that the same result is warranted here. Allstate Ins. Co. v. Countrywide Financial

Corp., 824 F. Supp. 2d 1164 (C.D. Cal. 2011), and F.D.I.C. for Strategic Capital Bank v. Countrywide Financial Corp., No. 12 Civ. 4354 (MRP), 2012 WL 5900973 (C.D. Cal. Nov. 21, 2012), were both brought against Countrywide Financial Corporation and its subsidiaries ("Countrywide"), alleging violations of the 1933 Act.   Both complaints were dismissed as untimely because of early and widespread public criticism stemming from Countrywide's securitization of residential mortgages, which "included first-hand witness accounts of deviations from underwriting standards and of a CFC cultural shift towards riskier mortgages and inflated appraisals," Strategic Capital Bank, 2012 WL 5900973, at *4.   Unlike the cases filed against Countrywide, there is no evidence that former employees of defendants in this case came forward before August 14, 2008 to testify to defendants' 1933 Act violations, nor were defendants subject to the same kind of early and widespread public criticism as Countrywide.   Allstate Insurance and Strategic Capital Bank's bearing on this case is inconclusive.

Defendants also identify four cases filed before August 14, 2008 by investors in similar securities, alleging similar 1933 Act claims, that survived motions to dismiss.   Defendants argue that the success of those actions establishes as a matter of law that Colonial could have filed a well-pled complaint at the same time as investors in those earlier actions, making the

14

allegations in the amended complaint. However, the cases defendants identify are inapposite and do not demonstrate that Colonial should have discovered facts sufficient to adequately plead its claims.

Like the Countrywide cases discussed above, the 1933 Act claims in Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I, No. 08 Civ. 1713 (WDW), 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012), were upheld on the basis of confidential statements made by former employees of the loan originators, see 2012 WL 601448, at *13, *16. No such witness statements are alleged in this matter.

In City of Ann Arbor Emps.' Ret. Sys. V. Citigroup Mortg. Loan Trust, Inc., 703 F. Supp. 2d 253 (E.D.N.Y. 2010), the court did not find that the complaint sufficiently stated its 1933 Act claims, but instead of dismissing the case, gave plaintiffs leave to replead their claims. See id. at 263. City of Ann Arbor does not demonstrate that Colonial should have been able to file a well-pled claim before August 14, 2008.

In Plumbers Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762 (1st Cir. 2011), plaintiffs brought 1933 Act claims against defendants after the credit ratings of their certificates were downgraded, alleging that the loan originator "routinely violated its lending guidelines and instead approved as many loans as possible," id. at 772. The

15

First Circuit described its decision as a judgment call, but allowed the claims about underwriting guidelines to go forward based on the complaint's allegations about the credit ratings downgrade and the specific allegations about the loan originator. Id. at 773-74 ("While this case presents a judgment call, the sharp drop in the credit ratings after the sales and the *specific* allegations as to FNBN offer enough basis to warrant some initial discovery aimed at these precise allegations."). Defendants argue that, as in Nomura, "Seven out of the 11 Certificates at issue in this action were put on negative outlook by one or more rating agencies prior to August 2008. Three of the certificates, CMALT 2007-A3, CMALT 2007-A2, and RALI 2007-QS3, were downgraded by one or more rating agencies in early August 2008." Defs.' Br. 30. Even if the certificates were put on "negative outlook," that is not a downgrade, the three downgrades were not to below investment grade then, and in any event it is doubtful that in the time available Colonial could have filed a complaint complying with City of Pontiac (see p. 6, supra) on that basis.

Finally, in NJ Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653, 2012 WL 1473288 (S.D.N.Y. Mar. 29, 2010), plaintiff brought 1933 Act claims alleging defendant's "systematic disregard of the mortgage underwriting Guidelines," id. at *3, among other claims. The court upheld

16

those claims because "The allegations here are extreme, yet plausible in light of the rapid and precipitous decline in market value, concurrent with skyrocketing mortgage loan delinquency rates and plummeting credit ratings. The Complaint alleges that the Rating Agencies attributed their downgrades—from investment grade securities to junk bonds—to aggressive underwriting practices by the Originators," id. at *7. Here, Colonial's certificates were not downgraded to below investment grade until after August 14, 2008.

At this stage of the case, I find that it is not clear as a matter of law that the FDIC's claims are untimely. Defendants' motion to dismiss for untimeliness is denied.

## Failure to State a Claim

### A.

Defendants argue that the amended complaint's allegations are insufficient on numerous grounds.

### 1.

Defendants argue that cautionary language in the offering documents adequately warned Colonial of the risks forming the basis of the claims in the amended complaint because the offering documents disclosed that "there could be no assurance of the accuracy of any appraisal opinions incorporated into the

Offering Documents," Defs.' Br. 40, and that "underlying loans may not conform to the descriptions contained in the Offering Documents," id. at 41.

The amended complaint alleges pervasive noncompliance with the offering documents.  Even if the disclosures in the offering documents "could be read as an acknowledgment of occasional underwriting violations, [they] cannot be read as an acknowledgment of the pandemic of violations that Plaintiffs allege," In re Bear Stearns Mortgage Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 775 (S.D.N.Y. 2012).

Defendants' motion to dismiss on that ground is denied.

**2.**

The amended complaint alleges that:

> 67.    The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs [loan-to-value ratios] of many of the mortgage loans in the collateral pools were biased upwards[,]

and that such appraisals were made in violation of the Uniform Standard of Professional Appraisal Practice ("USPAP"), even though the prospectus supplements represented that appraisals would be in conformance with USPAP.

Although "Property appraisals and corresponding LTV ratios

18

are subjective opinions that are actionable under the Securities Act only if the plaintiff alleges that the speaker did not truly have the opinion at the time it was made," In re Bear Stearns 851 F. Supp. 2d at 769, the amended complaint alleges that "the appraisals were not conducted in accordance with the industry standards . . . a statement of verifiable fact," id. Thus, the amended complaint adequately states a claim that the prospectus supplements contained misleading statements that appraisals would be made in conformance with USPAP.

To the extent that defendants move to dismiss the amended complaint's claims about inflated appraisals, their motion is denied.

### 3.

Defendants argue that the amended complaint's AVM-based allegations should be dismissed because "the FDIC has pled no basis on which to infer that its AVM is any more reliable than the appraisals it is second-guessing." Defs.' Br. 45.

The amended complaint alleges that the AVM is objective, consistent, "industry-standard" and "routinely used by mortgage lenders," and "the most accurate of all such models," as well as alleging the criteria the AVM uses and the scope of its analysis. Am. Compl. ¶ 50.

To the extent that defendants dispute those allegations, that disagreement is inappropriate for resolution at this

procedural stage.   Defendants' motion to dismiss on that ground is denied.

4.

The amended complaint alleges that:

> 60.    According to land records, many of the properties that secured mortgage loans in the collateral pools of the securitizations were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.  Many of these liens were originated concurrently with the first lien and by the same originator.  The defendants failed to disclose in the prospectus supplements any of these additional liens. These additional liens increased the risk that those owners would default in payment of the mortgage loans.

Defendants argue that claims based on allegations about additional liens are insufficient because the majority of the offering documents "make explicit that the 'LTV' or 'loan-to-value ratio' numbers they provide consist of the ratio only of the *subject mortgage* to the value of the property," Defs.' Br. 50, and do not represent that the numbers reflect additional liens.

Even so, the amended complaint adequately alleges that omitting the additional liens was material because the additional liens increased the risk of the certificates. Defendants' motion to dismiss on that ground is denied.

5.

The amended complaint alleges that the prospectus supplements materially overstated the extent to which the properties serving as collateral to the mortgages in the collateral pools were owner occupied. Those claims can be plausibly inferred from the amended complaint's allegations that many borrowers "instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself," Am. Compl. ¶ 83, "could have but did not designate the property as his or her homestead," id. ¶ 84, and "did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses," id. ¶ 85.

Defendants argue that the amended complaint's allegations about owner occupancy rates are insufficient because the offering documents "expressly warned that owner-occupancy rates were based on borrower representations and that there were no guarantees of the truth of those representations or guarantees against borrower fraud," Defs.' Br. 51.

> [Section 11 of the 1933 Act] was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a

21

> registered offering. If a plaintiff
> purchased a security issued pursuant to a
> registration statement, he need only show a
> material misstatement or omission to
> establish his *prima facie* case. Liability
> against the issuer of a security is
> virtually absolute, even for innocent
> misstatements.

Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).

Thus, defendants may be liable for misstatements regardless of whether they originate with third parties. To the extent that the underwriter defendants argue that they should not be liable for borrower misrepresentations, that argument turns on whether they are able to establish a due diligence defense. See id. (defendants who are not issuers "bear the burden of demonstrating due diligence"), citing 15 U.S.C. § 77k(b)("no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof . . . . [that] he had, after reasonable investigation, reasonable ground to believe and did believe . . . that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.").

The underwriter defendants do not argue their due diligence, nor is resolution of that issue appropriate on a motion to dismiss. Defendants' motion to dismiss the claims based on owner occupancy rates is denied.

6.

As discussed above, the FDIC alleges that statements in the prospectus supplements that loan originators made mortgage loans in compliance with their underwriting standards were misleading, because loan originators disregarded the underwriting standards and made "wholesale, rather than case-by-case, exceptions," Am. Compl. ¶ 90.  Those claims are adequately supported by the amended complaint's allegations about high rates of delinquency and default, and the certificates' subsequent downgrades to below investment grade.  See N.J. Carpenters Health Fund v. Residential Capital, LLC, No. 08 Civ. 8781 (HB), 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010), reconsidered on other grounds, 2013 WL 1809767 (S.D.N.Y. Apr. 30, 2013)("Plaintiffs [adequately] link their allegations about the failures of the underlying loan pools to allegations that the mortgage originator disregarded underwriting guidelines.").

To the extent that defendants move to dismiss the complaint on the grounds that the allegations about underwriting practices are insufficient, the motion is denied.

7.

The amended complaint alleges that "In the prospectus supplements, the defendants made statements about the ratings of

23

the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A.," Am. Compl. ¶ 100, and that "These statements by the defendants about the ratings of the certificates they issued and underwrote were misleading because the defendants omitted to state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools," id. ¶ 102.

Defendants contend that ratings are statements of opinion, and only actionable if the ratings agencies subjectively believed in their falsity.

The amended complaint adequately pleads that the ratings were materially misleading because they were based on defendants' misstatements and omissions.  To the extent that the underwriter defendants argue that they are not responsible for the ratings agencies' misleading ratings, that argument depends on the underwriter defendants' ability to establish their due diligence defense at trial.

Defendants' motion to dismiss claims based on misleading credit ratings is denied.

**B.**

Because the amended complaint adequately states a claim for primary liability against CMSI, FHASI, and Chase, and alleges that CitiMortgage, FHHLC, and JPMorgan "by or through stock

ownership, agency, or otherwise, controlled [CMSI, FHASI, and Chase, respectively] within the meaning of Section 15 of the 1933 Act," Am. Compl. ¶¶ 142, 145, 148, the amended complaint adequately states a claim under Section 15 of the 1933 Act against CitiMortgage, FHHLC, and JPMorgan, see 15 U.S.C. § 77o.

### C.

Citigroup, RBS, UBS, BAS, and FTN argue that, because they did not underwrite the particular class, or "tranche," of securities purchased by Colonial, the FDIC does not have standing to assert claims against them.

Section 11 of the 1933 Act imposes liability for materially misleading statements in securities prospectus supplements on "every underwriter with respect to such security." See 15 U.S.C. § 77k(a)(5). Citigroup, RBS, UBS, BAS, and FTN are named as underwriters in the relevant prospectus supplements that are alleged to contain materially misleading representations. See Matthews Decl. Ex. E, at S-1, S-61; Ex. F, at 1, 5; Ex. G, at 1, 5; Ex. H, at S-1; Ex. I, at S-1.

Defendants argue that underwriter liability attaches only at the tranche level, but do not cite any persuasive authority on that point, nor has the Court been able to find any.[3] The FDIC argues that Citigroup, RBS, UBS, BAS, and FTN are generally

---

[3] Both parties point to cases that address whether a named plaintiff in a class action has standing to assert claims on behalf of purchasers of certificates from tranches that the named plaintiff did not purchase. That question does not control the instant dispute.

liable as underwriters of the security, and are also liable as "participants" in the distribution of the certificates. <u>See</u> 15 U.S.C. § 77b(a)(11) (defining underwriter as "any person who . . . participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking").

At this stage of litigation, it is premature to decide this issue as matter of law. Citigroup, RBS, UBS, BAS, and FTN's motion to dismiss is denied, without prejudice.

## Conclusion

Defendants' motion to dismiss (Dkt. No. 75) is denied.

So ordered.

Dated:  New York, New York
        September 26, 2013

_Louis L. Stanton_
Louis L. Stanton
U.S.D.J.