UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
COLONIAL BANK,

Plaintiff,

v.

FIRST HORIZON ASSET SECURITIES
INC.; FIRST HORIZON HOME LOAN
CORPORATION; CREDIT SUISSE
SECURITIES (USA) LLC; DEUTSCHE
BANK SECURITIES INC.; FTN
FINANCIAL SECURITIES CORP.; HSBC
SECURITIES (USA) INC.; RBS
SECURITIES INC.; UBS SECURITIES
LLC; and WELLS FARGO ASSET
SECURITIES CORPORATION;

Defendants.

No. 12 Civ. 6166 (LLS) (MHD)

**SECOND AMENDED COMPLAINT**

---

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, Plaintiff Federal

Deposit Insurance Corporation as Receiver for Colonial Bank, for its Second Amended

Complaint (**Complaint**) against First Horizon Asset Securities Inc. (**FHASI**); First Horizon

Home Loan Corporation (**FHHLC**); Credit Suisse Securities (USA) LLC (formerly known as

Credit Suisse First Boston LLC and referred to in this Complaint as **Credit Suisse**); Deutsche

Bank Securities Inc. (**DBS**); FTN Financial Securities Corp. (**FTN**); HSBC Securities (USA) Inc.

(**HSBC**); RBS Securities Inc. (formerly known as Greenwich Capital Markets, Inc. and doing

business as RBS Greenwich Capital, and referred to in this Complaint as **RBS**); UBS Securities

LLC (**UBS**); and Wells Fargo Asset Securities Corporation (**WFASC**)[1], alleges as follows:

---

[1] Chase Mortgage Finance Corp. (**Chase**); JPMorgan Chase & Co. (**JPMorgan Chase**);
J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc. and referred to in this
Complaint as **Bear Stearns**), which is the successor by merger to J.P. Morgan Securities Inc. (in
that capacity referred to in this Complaint as **JP Morgan**) (collectively, the **Chase Defendants**);
Citicorp Mortgage Securities, Inc. (**CMSI**); CitiMortgage, Inc. (**CitiMortgage**); Citigroup

## I.  NATURE OF THIS ACTION

1.      This is an action for damages caused by violation of the Alabama Securities Act (**ASA**), the Nevada Uniform Securities Act (**NUSA**), and the Securities Act of 1933 (**1933 Act**) by the defendants. As alleged in detail below, defendants issued, underwrote, and/or sold eight securities known as "certificates" (the **Certificates**) which were backed by collateral pools of residential mortgage loans. Colonial Bank invested in residential mortgage-backed securities (**RMBS**) in part to diversify the bank's overall interest rate exposure. In particular, because Colonial Bank faced exposure to variable interest rates as part of its lending business, the bank invested primarily in fixed-rate RMBS.

2.      Defendants, in connection with initial, public offerings, solicited Colonial Bank in Montgomery, Alabama, to purchase the Certificates. For each certificate, the defendants published offering materials on EDGAR, the website of the Securities Exchange Commission. Based on the offering materials that the defendants sent or made available to the bank in Alabama, Colonial Bank made the decision to purchase each certificate, negotiated the purchase price with the relevant defendant, provided the funds for the full purchase price of the certificate, and directed a Nevada-based portfolio servicing company, M&I Portfolio Servicing (**M&I**), to execute the purchases on its behalf in the name of Colonial Bank's wholly owned Nevada investment subsidiary, CBG Investments, Inc. (**CBGI**).[2] Colonial Bank paid a total of approximately $317 million for the Certificates.

3.      Colonial Bank made all material decisions regarding its investment portfolio. CBGI had no business of its own; its only purpose was to hold Colonial Bank's investments. Two

---

Global Markets Inc. (**Citigroup**) (collectively, the **Citi Defendants**); Ally Securities LLC (formerly known as Residential Funding Securities, LLC and doing business as GMAC RFC Securities, and referred to in this Complaint as **GMAC**); Merrill Lynch, Pierce, Fenner & Smith Inc. (successor by merger to Banc of America Securities LLC, which is referred to in this Complaint as **BAS**), all of whom were named as defendants in the original and/or Amended Complaints, have settled Plaintiff's claims against them in this litigation. Orders dismissing the claims against GMAC, the Chase Defendants, the Citi Defendants, and BAS were granted on November 6, 2013, December 19, 2013, August 12, 2014, and November 21, 2014.

[2] "Colonial" as used in this Complaint, means CBGI and Colonial Bank collectively.

employees of M&I managed Colonial Bank's portfolio, including executing purchases and sales at the direction of Colonial Bank.

4.     In addition to paying for them, Colonial Bank bore all of the risks associated with the Certificates; received payments of principal and interest due on the Certificates; reported the Certificates, along with other RMBS it purchased through CBGI, on its consolidated financial statements; guaranteed settlement of the trades executed through CBGI; and suffered direct harm when the Certificates lost value.

5.     In March 2009, Colonial Bank, as the sole shareholder of CBGI, and the directors of CBGI (all of whom were Colonial Bank employees), declared a complete plan of liquidation for CBGI. CBGI distributed all of its assets, which included all of its legal claims, to Colonial Bank. Colonial Bank thereby became the owner of those legal claims. CBGI was dissolved, which, together with the distribution of all assets of CBGI to Colonial Bank, effected a merger of CBGI into Colonial Bank. Colonial Bank thereby succeeded to all of CBGI's assets, claims, rights, privileges, and liabilities. At the time it was dissolved, CBGI had no other shareholders or creditors, and had never raised capital from any source other than Colonial Bank. CBGI ceased business operations upon the distribution to Colonial Bank of all of its assets and later filed a certificate of dissolution with the Nevada Secretary of State on April 9, 2009.

6.     Colonial Bank then resecuritized most of its RMBS holdings, including seven of the Certificates.

7.     Colonial Bank's investment portfolio remained with M&I. Colonial Bank continued to manage its investment portfolio using the same M&I employees to assist with administrative tasks.

8.      When the defendants issued or underwrote the Certificates, they made numerous statements of material fact about the certificates and, in particular, about the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements or omitted

important information about such material facts as the loan-to-value ratios of the mortgage loans, the extent to which appraisals of the properties that secured the loans were performed in compliance with professional appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

9.     The allegations in this Complaint are based on an investigation by Plaintiff. That investigation included, for example, review and analysis of: (i) the offering materials for the certificates; (ii) thousands of pages of documents relating to, among other things, the purchase of the certificates by Colonial; (iii) media reports, congressional testimony, court filings, and other publicly available information about the practices of the defendants and of the originators of the mortgage loans that backed the certificates; and (iv) performance, rating, and pricing data regarding the securitizations involved in the Complaint.

10.     Plaintiff's investigation also included a forensic analysis of a random sample of loans in the securitizations to determine whether the statements in the prospectus supplements about the mortgage loans backing the certificates were accurate. As part of that forensic review, Plaintiff purchased from a leading vendor data relating to the loans underlying the securitizations. Plaintiff's analysis of that data showed that defendants made such untrue or misleading statements about at least the following numbers of loans.

| Securitization No.[3] | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[4] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 1,065 | 1,638 | 65.0% |
| 2 | 1,444 | 2,164 | 66.7% |
| 3 | 1,954 | 2,961 | 66.0% |
| 6 | 641 | 1,124 | 57.0% |
| 7 | 689 | 1,209 | 57.0% |
| 8 | 2,480 | 3,594 | 69.0% |
| 10 | 1,672 | 3,278 | 51.0% |
| 11 | 4,763 | 8,620 | 55.3% |

11.     The Certificates are "securities" within the meaning of the ASA, the NUSA, and the 1933 Act. The defendants are liable under the following provisions of the ASA, the NUSA, and the 1933 Act:

*As issuers:* The following defendants, which issued certain of the Certificates that Colonial purchased, are liable as "issuers" under Section 11 of the 1933 Act: FHASI, which issued two of the Certificates; and WFASC, which issued two of the Certificates.

*As underwriters:* The following defendants, which underwrote the Certificates that Colonial purchased, are liable as "underwriters" under Section 11 of the 1933 Act: Credit Suisse,

_____

[3] Additional certificates and securitizations that were included in prior versions of this Complaint (Securitization Nos. 4, 5, and 9) are not discussed herein because they were associated only with defendants who are no longer parties to this action.

[4] The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 5% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 5% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 1 about which defendants made untrue or misleading statements or omissions is within 5% of 1,065, that is, between 1,012 and 1,118. The same margin of error should be applied to all information in this Complaint and accompanying Schedules that is based on a random sample of loans in a collateral pool.

which underwrote two of the Certificates; FTN, which underwrote two of the Certificates; RBS, which underwrote four of the Certificates; and DBS, HSBC, and UBS, each of which underwrote one of the Certificates.

*As sellers*: The following defendants, which sold certain of the Certificates to Colonial, are liable as "sellers" under Section 8-6-19(a)(2) of the ASA, Sections 90.570(2) and 90.660(1)(d) of the NUSA, and Section 12(a)(2) of the 1933 Act: Credit Suisse, which sold two of the Certificates; RBS, which sold one of the Certificates; HSBC, which sold one of the Certificates; and Deutsche Bank, which sold one of the Certificates.

The following defendants are also liable as sellers under Section 8-6-19(a)(2) of the ASA, Sections 90.570(2) and 90.660(1)(d) of the NUSA, and Section 12(a)(2) of the 1933 Act because they issued certain of the Certificates that Colonial purchased when they were initially offered to the public: FHASI, which issued two of the Certificates; and WFASC, which issued two of the Certificates.

*As control persons:* FHHLC is liable as a "controlling person" of FHASI, under Section 8-6-19(c) of the ASA, Section 90.660(4) of the NUSA, and Section 15 of the 1933 Act, 15 U.S.C. § 77o.

## II.  PARTIES

12.     The Federal Deposit Insurance Corporation (**FDIC**) is a corporation organized and existing under the laws of the United States of America. Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions. On August 14, 2009, the FDIC was duly appointed the receiver for Colonial Bank. Under the Federal Deposit Insurance Act, the FDIC as receiver succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial Bank has authority to pursue claims held by Colonial Bank, including the claims made against the defendants in this action.

13.     Defendant FHASI is a corporation organized under the laws of Delaware.

14.     Defendant FHHLC is a corporation organized under the laws of Kansas. During the relevant time, FHHLC controlled FHASI. Under Section 15 of the 1933 Act, FHHLC therefore is liable jointly and severally with, and to the same extent as, FHASI.

15.     Defendant Credit Suisse is a limited liability company organized under the laws of Delaware.

16.     Defendant DBS is a corporation organized under the laws of Delaware.

17.     Defendant FTN is a corporation organized under the laws of Tennessee.

18.     Defendant HSBC is a corporation organized under the laws of Delaware.

19.     Defendant RBS is a corporation organized under the laws of Delaware.

20.     Defendant UBS is a limited liability company organized under the laws of Delaware.

21.     Defendant WFASC is a corporation organized under the laws of Delaware.

### III.  JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 22 of the 1933 Act, 15 U.S.C. § 77v, because the claims asserted in this Complaint arise under Sections 11, 12, and 15 of the 1933 Act, 15 U.S.C. §§ 77k and 77o.

23.     Venue is proper in this Court pursuant to Section 22 of the 1933 Act, 15 U.S.C. § 77v, because the defendants are found in this district, are inhabitants of this district, and transact business in this district.

### IV.  SECURITIZATION OF MORTGAGE LOANS

24.     The Certificates are so-called **residential mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against

sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards**.

25.    In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

26.    In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to investors such as Colonial Bank. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

27.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

28.    In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

29.    One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

30.     The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the historical average. All of the certificates referred to in this Complaint were rated triple-A when Colonial purchased them.

31.     Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

32.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

33.     **Securities underwriters**, like Credit Suisse, DBS, FTN, HSBC, RBS, and UBS, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they prepare, sign, and file with the Securities and Exchange Commission the legally required disclosure documents about the certificates, purchase the certificates from the trust, and then directly or indirectly participate in the distribution of the certificates to investors. In this

process, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

34.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

35.     Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission.

36.     As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## V.  DEFENDANTS' MATERIAL UNTRUE OR
## MISLEADING STATEMENTS ABOUT THE CERTIFICATES

37.     Colonial purchased certificates in 8 securitizations (referred to in this Complaint as Securitizations Nos. 1-3, 6-8, and 10-11). Details of each securitization and each certificate are stated in Item 37 of Schedules 1-3, 6-8, and 10-11 of this Complaint, which correspond to Securitizations Nos. 1-3, 6-8, and 10-11. Plaintiff incorporates into this paragraph 37, and alleges as though fully set forth in this paragraph, the contents of Item 37 of the Schedules.

38.     The prospectus supplement for each of the eight securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 37 of the Schedules. The prospectus supplements are incorporated into this Complaint by reference.

39.     Plaintiff drew and analyzed a random sample of 400 loans from the collateral pool of each securitization in which Colonial purchased a certificate.

40.     Many of the statements of material fact that the defendants made in the prospectus supplements were untrue or misleading. These untrue or misleading statements included the following.

**A.     Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**1.     LTVs**

**(a)     The materiality of LTVs**

41.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of

the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

42.     Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

43.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

44.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect denominator understates the risk of the loan.

45.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a

significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

><b>(b)</b>      <b>Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations</b>

46.      In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 46 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 46, and alleges as though fully set forth in this paragraph, the contents of Item 46 of the Schedules.

47.      The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. Colonial did understand the statements about the LTVs as statements of fact. Colonial had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

><b>(c)</b>      <b>An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.</b>

48.      The stated LTVs of many of the mortgage loans in the securitizations were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were, therefore, untrue and misleading.

49.      Using data that it purchased from a leading vendor, Plaintiff performed a forensic review of the mortgage loans underlying the certificates to determine whether statements in the prospectus supplements about the LTVs of those mortgage loans were accurate. The forensic

review used, among other things, a comprehensive, industry-standard automated valuation model (**AVM**), by which one can determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs are routinely used by mortgage lenders, including the defendants.

50.     To use an AVM, one must know the addresses of the properties on which the AVM is to be run. Until after August 14, 2008, however, it was not possible for an investor like Colonial Bank to know either the addresses of the mortgaged properties that backed that security or the names of the mortgagors. Those addresses and names were available only from loan files, servicing records, and similar documents, to which investors generally were not given access. (Although loan tapes sometimes are publicly filed at or near the time of the offering, they do not contain either the addresses of the mortgaged properties that backed the security or the names of the mortgagors.) Well after August 14, 2008, the same vendor that provided the AVM developed a method for cross-referencing information about the loans that backed a mortgage-backed security with information in its other proprietary databases of land and tax records. Only in this way was it possible for a reasonable investor, through the vendor, to learn the addresses of those properties and the names of those mortgagors and thereby to do a forensic review of the specific mortgage loans backing the certificates it purchased.

51.     For many of the properties that secured the mortgage loans, the model determined that the LTVs presented in the prospectus supplements were understated. In particular, for many of the properties, the model determined that the denominator[5] that was used in the disclosed LTV was 105% or more of the true market value as determined by the model as of the date on which

---

[5] The denominator in the LTVs stated in the prospectus supplements generally is the lower of the appraised value or the purchase price of the property if the transaction is for the purchase of the property. If the mortgage is being taken out to refinance an earlier mortgage, then there is, of course, no purchase price, and the denominator in the LTV is the appraised value. References in this Complaint to the denominator in the LTVs are to the value of the property that was used in the calculation of the LTV as stated in the prospectus supplement.

each individual mortgage loan closed. (The model considered no transactions that occurred after that date.) In contrast, the model determined that the denominator that was used in the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

52.     For example, in Securitization No. 1, there were 1,638 mortgage loans that backed the certificate that Colonial purchased. On 643 of the properties that secured those loans, the model determined that the denominator that was used in the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $53,528,877. The model determined that the denominator that was used in the disclosed LTV was 95% or less of true market value on only 152 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominators was $8,287,814. Thus, the number of properties on which the value was overstated exceeded by more than four times the number on which the value was understated, and the aggregate amount overstated was over six times the aggregate amount understated.

53.     On one of the loans in Securitization No. 1, the amount of the loan was $284,000 and the stated value of the property was $355,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $259,000, resulting in a true LTV of 110%. Thus, the stated value was higher than the true value by 37% and the stated LTV was lower than the true LTV by 30%. Both of these were huge discrepancies that were material to the credit quality of the loan.

54.     The overstated values of 643 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all mortgage loans had an LTV of 95% or less. In fact, 172 of the mortgage loans had LTVs of over 95%. Defendants also stated that the weighted-average LTV of

the loans in the collateral pool was 71.63%. In fact, the weighted-average LTV of the loans was

82.9%. These differences were material for the reasons stated above.

      55.    The results of the valuations by the automated model in this example are

summarized in the following table.

| | |
|---|---:|
| Number of loans that backed the certificate | 1,638 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 643 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $53,528,877 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 152 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $8,287,814 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 172 |
| Weighted-average LTV, as stated by defendants | 71.63% |
| Weighted-average LTV, as determined by the model | 82.9% |

      56.    The model produced similar results for the mortgage loans in the collateral pools

of each securitization. Details of the results of the model for each securitization are stated in Item

56 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 56, and alleges

as though fully set forth in this paragraph, the contents of Item 56 of the Schedules.

              **(d)**      **These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

      57.    As mentioned above, the LTV of a mortgage loan is a key determinant of the

likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

less likely that a decline in the value of the property will wipe out the owner's equity and thereby

give the owner an incentive to stop making mortgage payments and abandon the property.

Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to

predicting defaults and prepayments by borrowers. Also, as mentioned above, LTV affects the

severity of loss on those loans that do default. The power of LTV to predict defaults,

prepayments, and severities is a major reason why reasonable investors consider the LTVs of

mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

58.     The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

59.     According to land records,[6] many of the properties that secured mortgage loans in the collateral pools of the securitizations were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[7] Many of these liens were originated concurrently with the first lien and by the same originator. The defendants failed to disclose in the prospectus supplements any of these additional liens. These additional liens increased the risk that those owners would default in payment of the mortgage loans.

60.     To take an example, of the 1,638 properties that secured the mortgage loans that backed the certificate that Colonial purchased in Securitization No. 1, at least 508 were subject to

---

[6] Land records cannot be used to test the accuracy of statements in a prospectus supplement without knowing the property addresses, which, as described above, were not available until well after August 14, 2008.

[7] In order to ensure that this calculation did not include liens that were paid off but were not promptly removed from land records, the additional liens referred to in this Complaint and the Schedules do not include liens that were originated on or before the date on which each mortgage loan in the pools was closed.

liens in addition to the lien represented by the mortgage in the collateral pool. The defendants did not disclose in the prospectus supplement that those liens existed. Defendants stated that the weighted-average LTV of the properties was 71.63%, when, solely because of the additional liens on these 508 properties, the weighted-average combined LTV was 76.1%.[8] This is a significant difference.

61.    On one of the loans, the original balance of the mortgage loan was $681,850, the represented value of the property was $852,313, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $170,450. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

62.    Details of the undisclosed additional liens in the securitizations are stated in Item 62 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

63.    Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

### 2.    Appraisals

64.    As discussed above in paragraph 44, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

---

[8] The combined LTV is the ratio of all loans on a property to the value of the property.

65.     In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

> **(a)    The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

66.     The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 49 through 56, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 4.2 | 6.5 |
| 2 | 5.1 | 4.2 |

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 3 | 6.1 | 6.9 |
| 6 | 2.7 | 2.0 |
| 7 | 3.0 | 3.0 |
| 8 | 3.5 | 6.2 |
| 10 | 5.3 | 6.8 |
| 11 | 5.3 | 6.6 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

67.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

> **(b)     The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

68.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

69.     USPAP includes the following provisions:

(a)     USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)     USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)     USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

(i)     develop an opinion of site value by an appropriate appraisal method or technique;

(ii)    analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

(iii)   analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

70.     The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

71.     In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 71 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 71, and alleges as though fully set forth in this paragraph, the contents of Item 71 of the Schedules.

72.     Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

73.     Each of the statements referred to in paragraph 71 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

74.     By each of the untrue and misleading statements referred to in paragraphs 46 and 71 above, the defendants materially understated the risk of the certificates that they issued and underwrote.

**B.     Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.     The materiality of occupancy status**

75.     Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

76.     Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

**2.     Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

77.     In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that, of the 1,638 mortgage loans that backed the certificate that Colonial purchased, approximately 1,416 were

secured by primary residences and 222 were not. Details of each such statement in the securitizations are stated in Item 77 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 77, and alleges as though fully set forth in this paragraph, the contents of Item 77 of the Schedules.

78.     These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

> **3.     Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

79.     Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

80.     A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pools.

81.     The forensic review performed by Plaintiff also tested the accuracy of the representations in the prospectus supplements about owner occupancy. With the address of each property (which, as described above, was not available until well after August 14, 2008), it was possible to look up data about that property in proprietary databases owned by the same vendor. Those databases have information from local land and tax records and retrospective credit reports, among other sources.

82.     With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

83.     In some states and counties, the owner of a property is able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

84.     When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

85.     In Securitization No. 1, 115 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to

them at different addresses; 143 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 98 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 287 of the approximately 1,416 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not approximately 222, as defendants stated, but at least 509, a material difference. The numbers of such loans in the collateral pools of the securitizations are stated in Item 85 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 85, and alleges as though fully set forth in this paragraph, the contents of Item 85 of the Schedules.

86.     By each of the untrue and misleading statements referred to in paragraph 77, the defendants materially understated the risk of the certificates that they issued and underwrote.

### C.     Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools

#### 1.     The materiality of underwriting standards and the extent of an originator's disregard of them

87.     Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans, and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a

securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

> **2.     Untrue or misleading statements about the underwriting standards of originators of the mortgage loans**

88.     In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 88 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 88, and alleges as though fully set forth in this paragraph, the contents of Item 88 of the Schedules.

89.     Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards; and (f) the appraisals of a material number of the properties that secured the loans in the collateral pools did not comply with applicable appraisal standards.

> **3.     Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

> > **(a)     The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

90.     Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations the originators of the loans in the securitizations

disregarded their stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

91.     The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

92.     Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator FHHLC as an example, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by FHHLC and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by FHHLC that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.



93.     Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



94.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for some of them are presented in Figures 1 and 2 of Exhibits A and B of this Complaint:

| Exhibit | Originator |
|---------|------------|
| A | American Home Mortgage Corp. |
| B | Wells Fargo Bank, N.A. |

        (b)    **The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

95.    As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of

these securitizations experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 95 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 95, and alleges as though fully set forth in this paragraph, the contents of Item 95 of the Schedules.

96.     A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 96 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph, the contents of Item 96 of the Schedules.

97.     A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on January 31, 2012, are stated in Item 97 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 97, and alleges as though fully set forth in this paragraph, the contents of Item 97 of the Schedules.

98.     By each of the untrue and misleading statements referred to in paragraph 88 above, the defendants materially understated the risk of the certificates that they issued or underwrote. Moreover, Plaintiff is informed and believes, and based thereon alleges, that

discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

> **D.** **The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Colonial Bank's Certificates Untrue and Misleading.**

99. In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 99 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 99, and alleges as though fully set forth in this paragraph, the contents of Item 99 of the Schedules.

100. The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Colonial Bank, have investment policies that require a certain minimum rating for all investments. The policies of Colonial Bank limited investments to certificates that were rated at least double-A, and in practice, Colonial only purchased private label RMBS that were rated triple-A.

101. These statements by the defendants about the ratings of the certificates they issued and underwrote were misleading because the defendants omitted to state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a) loans whose LTVs were materially understated as shown by the AVM;

(b) loans whose LTVs were misleading as a result of undisclosed additional liens;

(c) loans for which the properties were stated to be owner-occupied, but were not; and

(d) loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans.

102. In Securitization No. 1, there were 643 loans whose LTVs were materially understated as shown by the AVM, 508 loans whose LTVs were misleading because of

undisclosed additional liens, 287 loans for which the properties were stated to be owner-occupied but were not, and 6 loans that suffered EPDs. Eliminating duplicates, there were 1,065 loans (or 65.0% of the loans that backed the certificate that Colonial purchased) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 102 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 102, and alleges as though fully set forth in this paragraph, the contents of Item 102 of the Schedules.

103.    Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

104.    By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued and underwrote.

## VI.  STATUTE OF LIMITATIONS

105.    All of the claims in this Complaint are timely. Plaintiff became receiver for Colonial Bank on August 14, 2009. Under 12 U.S.C. § 1821(d)(14), the statute of limitations on all of Colonial Bank's claims asserted in this Complaint that had not expired as of August 14, 2009, are extended to no less than three years from that date. Plaintiff filed its initial complaint less than three years from August 14, 2009.

106.    The statute of limitations applicable to the claims asserted in this Complaint had not expired as of August 14, 2009, because a reasonably diligent plaintiff would not have discovered until later than August 14, 2008, facts that show that the particular statements referred to in Items 37, 46, 71, 77, 88, and 99 of the Schedules to this Complaint were untrue or misleading. Those are statements about the 24,588 specific mortgage loans in the collateral pools of the securitizations involved in this action, not about residential mortgage loans or any type of residential mortgage loan (e.g., prime, Alt-A, subprime, etc.) in general. A reasonably diligent plaintiff did not have access until after August 14, 2008, to facts about those specific loans that show that the statements that defendants made about those specific loans were untrue or

misleading. A reasonably diligent plaintiff did not have access to the loan files compiled by the originators of those specific mortgage loans nor to records maintained by the servicers of those specific mortgage loans (from either or both of which a reasonably diligent plaintiff may have discovered facts that show that the statements that defendants made about those specific loans were untrue or misleading) because originators and servicers of loans and securitization trustees do not make those files available to certificateholders. Moreover, on and prior to August 14, 2008, there were not available to a reasonably diligent plaintiff, even at considerable expense, data about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. Such data became available for the first time in early 2010. A reasonably diligent plaintiff thus could not have brought a complaint before August 14, 2008, that would have withstood a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

107.    Plaintiff first discovered the untrue or misleading statements by defendants in 2012 in the course of its investigation.

108.    All of the claims asserted in this Complaint are timely for an additional reason. When Colonial purchased the certificates involved in this action, all of them were rated triple-A, the highest possible rating, by at least two of Fitch, Moody's, and Standard & Poor's, all Nationally Recognized Statistical Rating Organizations (**NRSROs**) accredited by the Securities and Exchange Commission. Sponsors of securitizations submitted to the NRSROs the same information about the loans in the collateral pools of proposed securitizations that they included in the prospectus supplements for those securitizations, including in particular statements of the type referred to in Items 37, 46, 71, 77, 88, and 99 of the Schedules to this Complaint. The NRSROs used and relied on that information in rating the certificates to be issued in each securitization.

109.    The NRSROs monitored the certificates that they rated after those certificates were issued. If an NRSRO discovers facts that show that there was an untrue or misleading statement about a material fact in the information submitted to it for its use in rating a certificate,

then the NRSRO will withdraw its rating of that certificate while it considers the impact of the untrue or misleading statement, or it will downgrade the rating of the certificate, usually to a rating below investment grade.

110.    As noted above, all of the certificates involved in this action were rated triple-A at issuance by at least two of Fitch, Moody's, and Standard & Poor's. Not one of those NRSROs withdrew any of those ratings, or downgraded any of them to below investment grade, before August 14, 2008. The date on which each certificate was first downgraded below investment grade is stated in Item 37 of the Schedules.

111.    If a reasonably diligent plaintiff would have discovered before August 14, 2008, facts that show that the particular statements referred to in Items 37, 46, 71, 77, 88, and 99 of the Schedules to this Complaint were untrue or misleading, then the NRSROs, which were monitoring the certificates and are much more sophisticated than a reasonably diligent plaintiff, would also have discovered such facts and withdrawn or downgraded their ratings on the certificates to below investment grade. The fact that none of the NRSROs did so demonstrates that, before August 14, 2008, a reasonably diligent plaintiff could not have discovered facts that show that those statements were untrue or misleading.

112.    Plaintiff's claims on Securitizations Nos. 8, 10, and 11 are timely for another reason. As a purchaser of certificates in these securitizations, and as the holder of the rights of CBGI, Colonial Bank was, and Plaintiff as Receiver for Colonial Bank is, a member of the proposed classes in *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, United States District Court for the Southern District of New York, No. 08-CV-8781, and *In re Wells Fargo Mortgage-Backed Certificates Litigation*, United States District Court for the Northern District of California, No. 09-cv-01376. The pendency of these actions has tolled the running of the statute of limitations on the claims in this Complaint.

113.    One of the securitizations from which Colonial purchased certificates, Securitization No. 8, was included in the Consolidated First Amended Securities Class Action

Complaint filed in *New Jersey Carpenters* on May 18, 2009. That securitization was dismissed from *New Jersey Carpenters* on March 31, 2010.

114.    Two of the securitizations from which Colonial purchased certificates, Securitizations Nos. 10 and 11, were included in the original Class Action Complaint filed in *General Retirement System of the City of Detroit v. The Wells Fargo Mortgage Backed Securities 2006-AR18 Trust*, filed on March 27, 2009. That action became *In re Wells Fargo*. Those securitizations were dismissed from *In re Wells Fargo* on April 22, 2010.

115.    One or more of the named plaintiffs in the Consolidated First Amended Securities Class Action Complaint filed in *New Jersey Carpenters* purchased a certificate that was issued pursuant to the same registration statement as the certificate that Colonial purchased in Securitization No. 8. The certificate that Colonial purchased and the certificate that the named plaintiff(s) purchased both were backed in part by loans originated by Homecomings Financial, LLC (formerly known as Homecomings Financial Network, Inc.).

116.    The named plaintiff in the original Class Action Complaint filed in *General Retirement System* purchased a certificate that was issued pursuant to the same registration statement as the certificates that Colonial purchased in Securitizations Nos. 10 and 11. The certificates that Colonial purchased and the certificate that the named plaintiff purchased both were backed by loans originated or acquired by Wells Fargo Bank, N.A.

## VII.  CLAIMS FOR RELIEF

### A.    Untrue or Misleading Statements in the Sale of Securities Under Section 8-6-19(a)(2) of the  Alabama Securities Act

117.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 116.

118.    Credit Suisse underwrote and sold to Colonial two certificates in Securitizations Nos. 1 and 2. Credit Suisse sent communications and solicitations regarding Securitizations Nos. 1 and 2 to Colonial Bank in Montgomery, Alabama, for the purpose of inducing a sale. These communications were received by Colonial Bank in Alabama. Based on the offering materials

associated with Securitizations Nos. 1 and 2, Colonial Bank decided to invest in the two associated certificates. Colonial Bank negotiated the price of the certificates, guaranteed settlement of the trades, and provided the funds for the purchase price of the certificates. Colonial Bank settled the trades with Credit Suisse in Nevada through CBGI.

119.    An offer to sell these certificates occurred in Alabama because employees or agents of Credit Suisse directed communications about the certificates and solicitations to purchase the certificates to Colonial Bank in Alabama.

120.    Colonial did not know when it purchased the certificates in Securitizations Nos. 1 and 2 that the statements in the prospectus supplements and other offering materials that Credit Suisse sent or made available to Colonial Bank were untrue or misleading.

121.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 1 and 2, Credit Suisse violated Section 8-6-19(a)(2)of the ASA by offering securities in Alabama by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.    RBS underwrote and sold to Colonial one certificate in Securitization No. 8. RBS sent communications and solicitations regarding Securitization No. 8 to Colonial Bank in Montgomery, Alabama, for the purpose of inducing a sale. These communications were received by Colonial Bank in Alabama. Based on the offering materials associated with Securitization No. 8, Colonial Bank decided to invest in the associated certificate. Colonial Bank negotiated the price of the certificate, guaranteed settlement of the trade, and provided the funds for the purchase price of the certificate. Colonial Bank settled the trade with RBS in Nevada through CBGI.

123.    An offer to sell the certificate in Securitization No. 8 occurred in Alabama because employees or agents of RBS directed communications about the certificate and solicitations to purchase the certificate to Colonial Bank in Alabama.

124.    Colonial did not know when it purchased the certificate in Securitization No. 8 that the statements in the prospectus supplement and other offering materials that RBS sent or made available to Colonial Bank were untrue or misleading.

125.    In doing the acts alleged in the offer and sale to Colonial of the certificate in Securitization No. 8, RBS violated Section 8-6-19(a)(2) of the ASA by offering securities in Alabama by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

126.    HSBC underwrote and sold to Colonial one certificate in Securitization No. 3. HSBC sent communications and solicitations regarding Securitization No. 3 to Colonial Bank in Montgomery, Alabama, for the purpose of inducing a sale. These communications were received by Colonial Bank in Alabama. Based on the offering materials associated with Securitization No. 3, Colonial Bank decided to invest in the certificate. Colonial Bank negotiated the price of the certificate, guaranteed settlement of the trade, and provided the funds for the purchase price of the certificate. Colonial Bank settled the trade with HSBC in Nevada through CBGI.

127.    An offer to sell the certificate occurred in Alabama because employees or agents of HSBC directed communications about the certificate and solicitations to purchase the certificate to Colonial Bank in Alabama.

128.    Colonial did not know when it purchased the certificate in Securitization No. 3 that the statements in the prospectus supplements and other offering materials that HSBC sent or made available to Colonial Bank were untrue or misleading.

129.    In doing the acts alleged in the offer and sale to Colonial of the certificate in Securitization No. 3, HSBC violated Section 8-6-19(a)(2) of the ASA by offering securities in Alabama by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    Deutsche Bank underwrote and sold to Colonial one certificate in Securitization No. 6. Deutsche Bank sent communications and solicitations regarding Securitization No. 6 to Colonial Bank in Montgomery, Alabama, for the purpose of inducing a sale. These communications were received by Colonial Bank in Alabama. Based on the offering materials associated with Securitization No. 6, Colonial Bank decided to invest in the certificate. Colonial Bank negotiated the price of the certificate, guaranteed settlement of the trade, and provided the funds for the purchase price of the certificate. Colonial Bank settled the trade with Deutsche Bank in Nevada through CBGI.

131.    An offer to sell the certificate occurred in Alabama because employees or agents of Deutsche Bank directed communications about the certificate and solicitations to purchase the certificate to Colonial Bank in Alabama.

132.    Colonial did not know when it purchased the certificate in Securitization No. 6 that the statements in the prospectus supplements and other offering materials that Deutsche Bank sent or made available to Colonial Bank were untrue or misleading.

133.    In doing the acts alleged in the offer and sale to Colonial of the certificate in Securitization No. 6, Deutsche Bank violated Section 8-6-19(a)(2) of the ASA by offering securities in Alabama by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    FHASI was the depositor of Securitizations Nos. 6 and 7 and therefore is the issuer of the certificates in Securitizations Nos. 6 and 7 that Colonial purchased. The offer to sell these certificates occurred in Alabama because, as part of an initial offering, employees or agents of Deutsche Bank and Citigroup directed communications about the certificates and solicitations to purchase the certificates to Colonial Bank there, and because Colonial Bank received those communications and solicitations there.

135.    FHASI prepared and signed the registration statements for the certificates in Securitizations Nos. 6 and 7 for the purpose of soliciting investors, including Colonial Bank, to

purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

136.   The certificates were offered and sold to Colonial in initial offerings and each certificate was sold by means of untrue or misleading statements in a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), FHASI is considered to have offered and sold the certificates to Colonial.

137.   Colonial did not know when it purchased the certificates in Securitization Nos. 6 and 7 that the statements in the prospectus supplements and other offering materials that were sent or made available to Colonial Bank were untrue or misleading.

138.   In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 6 and 7, FHASI violated 8-6-19(a)(2) of the ASA by offering securities to Colonial Bank in Alabama by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

139.   WFASC was the depositor of Securitizations Nos. 10 and 11 and therefore is the issuer of the certificates in Securitizations Nos. 10 and 11 that Colonial purchased. The offer to sell these certificates occurred in Alabama because, as part of an initial offering, employees or agents of Citigroup and Morgan Stanley directed communications about the certificates and solicitations to purchase the certificates to Colonial Bank there, and because Colonial Bank received those communications and solicitations there.

140.   WFASC prepared and signed the registration statements for the certificates in Securitizations Nos. 10 and 11 for the purpose of soliciting investors, including Colonial Bank, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

141.   The certificates were offered and sold to Colonial in initial offerings and each certificate was sold by means of untrue or misleading statements in a prospectus supplement.

Therefore, under 17 C.F.R. § 230.159A(a), WFASC is considered to have offered and sold the certificates to Colonial.

142.    Colonial did not know when it purchased the certificates in Securitization Nos. 10 and 11 that the statements in the prospectus supplements and other offering materials that were sent or made available to Colonial Bank were untrue or misleading.

143.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 10 and 11, WFASC violated 8-6-19(a)(2) of the ASA by offering securities to Colonial Bank in Alabama by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

144.    In March 2009, CBGI distributed all of its assets, which included all of its legal claims, to Colonial Bank. Colonial then dissolved CBGI, which, together with the distribution of all assets of CBGI to Colonial Bank, effected a merger of CBGI into Colonial Bank. At the time of CBGI's dissolution, Colonial had not discovered that the defendants had made untrue or misleading statements about the certificates.

145.    When it failed on August 14, 2009, Colonial Bank had not discovered that the defendants had made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

146.    Plaintiff has disposed of all of the certificates.

147.    Plaintiff is entitled to recover damages as described in Section 8-6-19 of the ASA.

**B.      Liability as a Controlling Person Under Section 8-6-19(c) of the Alabama Securities Act**

148.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 147.

149.    FHHLC, by or through stock ownership, agency, or otherwise, controlled FHASI within the meaning of Section 8-6-19(c) of the ASA.

150.    In doing the acts alleged, FHASI violated Section 8-6-19(a)(2) of the ASA by offering the certificates that Colonial purchased in Securitizations Nos. 6 and 7 to Colonial Bank in Alabama.

151.    FHHLC is therefore jointly and severally liable with and to the same extent as FHASI.

**C.    Untrue or Misleading Statements in the Sale of Securities Under Sections 90.570(2) and 90.660(1)(d) of the Nevada Uniform Securities Act**

152.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 151.

153.    Credit Suisse underwrote and sold to Colonial two certificates in Securitizations Nos. 1 and 2. Credit Suisse sent communications and solicitations regarding Securitizations Nos. 1 and 2 to Colonial Bank for the purpose of inducing a sale. Based on the offering materials associated with Securitizations Nos. 1 and 2, Colonial Bank decided to invest in the two associated certificates. Colonial Bank negotiated the price of the certificates, guaranteed settlement of the trades, and provided the funds for the purchase price of the certificates. Colonial Bank settled the trades with Credit Suisse in Nevada through CBGI.

154.    Sales of these certificates occurred in Nevada because Credit Suisse sold the certificates to Colonial there.

155.    Colonial did not know when it purchased the certificates in Securitizations Nos. and 1 and 2 that the statements in the prospectus supplements and other offering materials that Credit Suisse sent or made available to Colonial Bank were untrue or misleading.

156.    In doing the acts alleged in the offer and sale of the certificates in Securitizations Nos. 1 and 2, Credit Suisse violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling securities in Nevada by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.     RBS underwrote and sold to Colonial one certificate in Securitization No. 8. RBS sent communications and solicitations regarding Securitization No. 8 to Colonial Bank for the purpose of inducing a sale. Based on the offering materials associated with Securitization No. 8, Colonial Bank decided to invest in the associated certificate. Colonial Bank negotiated the price of the certificate, guaranteed settlement of the trade, and provided the funds for the purchase price of the certificate. Colonial Bank settled the trade with RBS in Nevada through CBGI.

158.     The sale of this certificate occurred in Nevada because RBS sold the certificate to Colonial there.

159.     Colonial did not know when it purchased the certificate in Securitization No. 8 that the statements in the prospectus supplement and other offering materials that RBS sent or made available to Colonial Bank were untrue or misleading.

160.     In doing the acts alleged in the offer and sale of the certificate in Securitization No. 8, RBS violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling securities in Nevada by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

161.     HSBC underwrote and sold to Colonial one certificate in Securitization No. 3. HSBC sent communications and solicitations regarding Securitization No. 3 to Colonial Bank for the purpose of inducing a sale. Based on the offering materials associated with Securitization No. 3, Colonial Bank decided to invest in the associated certificate. Colonial Bank negotiated the price of the certificate, guaranteed settlement of the trade, and provided the funds for the purchase price of the certificate. Colonial Bank settled the trade with HSBC in Nevada through CBGI.

162.     The sale of the certificate occurred in Nevada because Credit Suisse sold the certificates to Colonial there.

163.     Colonial did not know when it purchased the certificate in Securitization No. 3 that the statements in the prospectus supplement and other offering materials that HSBC sent or made available to Colonial Bank were untrue or misleading.

164.     In doing the acts alleged in the offer and sale of the certificate in Securitization No. 3, HSBC violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling securities in Nevada by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.     Deutsche Bank underwrote and sold to Colonial one certificate in Securitization No. 6. Deutsche Bank sent communications and solicitations regarding Securitization No. 6 to Colonial Bank for the purpose of inducing a sale. Based on the offering materials associated with Securitization No. 6, Colonial Bank decided to invest in the associated certificate. Colonial Bank negotiated the price of the certificate, guaranteed settlement of the trade, and provided the funds for the purchase price of the certificate. Colonial Bank settled the trade with Deutsche Bank in Nevada through CBGI.

166.     The sale of the certificate occurred in Nevada because Deutsche Bank sold the certificates to Colonial there.

167.     Colonial did not know when it purchased the certificate in Securitization No. 6 that the statements in the prospectus supplement and other offering materials that Deutsche Bank sent or made available to Colonial Bank were untrue or misleading.

168.     In doing the acts alleged in the offer and sale of the certificates in Securitization No. 6, Deutsche Bank violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling securities in Nevada by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.     FHASI was the depositor of Securitizations Nos. 6 and 7 and therefore is the issuer of the certificates in Securitizations Nos. 6 and 7 that Colonial purchased. The sale of these certificates occurred in Nevada because, as part of an initial offering, employees or agents of Deutsche Bank or Citigroup sold these certificates to Colonial there.

170.    FHASI prepared and signed the registration statements for the certificates in Securitizations Nos. 6 and 7 for the purpose of soliciting investors, including Colonial Bank, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

171.    The certificates in Securitizations Nos. 6 and 7 were offered and sold to Colonial in initial offerings, and each certificate was sold by means of untrue or misleading statements in a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), FHASI is considered to have offered and sold the certificates to Colonial.

172.    Colonial did not know when it purchased the certificates in Securitization Nos. 6 and 7 that the statements in the prospectus supplements and other offering materials that were sent or made available to Colonial Bank were untrue or misleading.

173.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 6 and 7, FHASI violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling securities to Colonial in Nevada by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

174.    WFASC was the depositor of Securitizations Nos. 10 and 11 and therefore is the issuer of the certificates in Securitizations Nos. 10 and 11 that Colonial purchased. The sale of these certificates occurred in Nevada because, as part of an initial offering, employees or agents of Citigroup and Morgan Stanley sold these certificates to Colonial there.

175.    WFASC prepared and signed the registration statements for the certificates in Securitizations Nos. 10 and 11 for the purpose of soliciting investors, including Colonial Bank, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

176.    The certificates in Securitizations Nos. 10 and 11 were offered and sold to Colonial in initial offerings, and each certificate was sold by means of untrue or misleading

statements in a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), WFASC is considered to have offered and sold the certificates to Colonial.

177.    Colonial did not know when it purchased the certificates in Securitization Nos. 10 and 11 that the statements in the prospectus supplements and other offering materials that were sent or made available to Colonial Bank were untrue or misleading.

178.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 10 and 11, WFASC violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling securities to Colonial in Nevada by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

179.    In March 2009, CBGI distributed all of its assets, which included all of its legal claims, to Colonial Bank. Colonial then dissolved CBGI, which, together with the distribution of all assets of CBGI to Colonial Bank, effected a merger of CBGI into Colonial Bank. At the time of CBGI's dissolution, Colonial had not discovered that the defendants had made untrue or misleading statements about the certificates.

180.    When it failed on August 14, 2009, Colonial Bank had not discovered that the defendants had made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

181.    Plaintiff has disposed of all of the certificates.

182.    Plaintiff is entitled to recover damages as described in Section 90.660(1) of the NUSA.

**D.    Liability as a Controlling Person Under Section 90.660(4) of the Nevada Uniform Securities Act**

183.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 182.

184.    FHHLC, by or through stock ownership, agency, or otherwise, controlled FHASI within the meaning of Section 90.660(4) of the NUSA.

185.    In doing the acts alleged, FHASI violated Sections 90.570(2) and 90.660(1)(d) of the NUSA by selling the certificates in Securitizations Nos. 6 and 7 to Colonial in Nevada.

186.    FHHLC is therefore jointly and severally liable with and to the same extent as FHASI.

      **E.**      **Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act**

187.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 186.

188.    Colonial purchased the certificates in Securitizations Nos. 1 and 2 that Credit Suisse sold to Colonial when they were initially offered to the public.

189.    Credit Suisse solicited Colonial Bank to purchase these certificates, and, based on those solicitations, sold the certificates to Colonial, by means of the prospectus supplements and other offering materials.

190.    The prospectus supplements and other offering materials that Credit Suisse sent or made available to Colonial Bank contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

191.    Colonial did not know when it purchased the certificates in Securitizations Nos. 1 and 2 that the statements in the prospectus supplements and other offering materials that Credit Suisse sent or made available to Colonial Bank were untrue or misleading.

192.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 1 and 2, Credit Suisse violated Section 12(a)(2) of the 1933 Act.

193.    Colonial purchased one certificate in Securitization Nos. 8 that RBS sold to Colonial when it was initially offered to the public.

194.    RBS solicited Colonial Bank to purchase this certificate, and, based on those solicitations, sold the certificate to Colonial, by means of the prospectus supplement and other offering materials.

195.    The prospectus supplement and other offering materials that RBS sent or made available to Colonial Bank contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

196.    Colonial did not know when it purchased the certificates in Securitization No. 8 that the statements in the prospectus supplements and other offering materials that RBS sent or made available to Colonial Bank were untrue or misleading.

197.    In doing the acts alleged in the offer and sale to Colonial of the certificate in Securitization No. 8, RBS violated Section 12(a)(2) of the 1933 Act.

198.    Colonial purchased one certificate in Securitization No. 3 that HSBC sold to Colonial when it was initially offered to the public.

199.    HSBC solicited Colonial Bank to purchase the certificate, and, based on those solicitations, sold the certificate to Colonial, by means of the prospectus supplement and other offering materials.

200.    The prospectus supplement and other offering materials that HSBC sent or made available to Colonial Bank contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

201.    Colonial did not know when it purchased the certificate in Securitization No. 3 that the statements in the prospectus supplement and other offering materials that HSBC sent or made available to Colonial Bank were untrue or misleading.

202.    In doing the acts alleged in the offer and sale to Colonial of the certificate in Securitization No. 3, HSBC violated Section 12(a)(2) of the 1933 Act.

203.    Colonial purchased one certificate in Securitization No. 6 that Deutsche Bank sold to Colonial when it was initially offered to the public.

204.    Deutsche Bank solicited Colonial Bank to purchase the certificate, and, based on those solicitations, sold the certificate to Colonial, by means of the prospectus supplement and other offering materials.

205.    The prospectus supplement and other offering materials that Deutsche Bank sent or made available to Colonial Bank contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

206.    Colonial did not know when it purchased the certificate in Securitization No. 6 that the statements in the prospectus supplement and other offering materials that Deutsche Bank sent or made available to Colonial Bank were untrue or misleading.

207.    In doing the acts alleged in the offer and sale to Colonial of the certificate in Securitization No. 6, Deutsche Bank violated Section 12(a)(2) of the 1933 Act.

208.    FHASI was the depositor of Securitizations Nos. 6 and 7, and therefore is the issuer of the certificates that Colonial purchased.

209.    FHASI prepared and signed the registration statements for the certificates in Securitizations Nos. 6 and 7 for the purpose of soliciting investors, including Colonial Bank, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

210.    The offers and sales of these certificates were made in connection with initial public offerings and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), FHASI is considered to have offered and sold the certificates to Colonial.

211.    Colonial did not know when it purchased the certificates in Securitizations Nos. 6 and 7 that the statements in the prospectus supplements and other offering materials that were sent or made available to Colonial Bank were untrue or misleading.

212.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 6 and 7, FHASI violated section 12(a)(2) of the 1933 Act.

213.    WFASC was the depositor of Securitizations Nos. 10 and 11, and therefore is the issuer of certificates that Colonial purchased.

214.    WFASC prepared and signed the registration statements for the certificates in Securitizations Nos. 10 and 11 for the purpose of soliciting investors, including Colonial Bank, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

215.    These offers and sales were in the initial offering of the certificates and each certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), WFASC is considered to have offered and sold the certificates to Colonial.

216.    Colonial did not know when it purchased the certificates in Securitization Nos. 10 and 11 that the statements in the prospectus supplements and other offering materials that were sent or made available to Colonial Bank were untrue or misleading.

217.    In doing the acts alleged in the offer and sale to Colonial of the certificates in Securitizations Nos. 11, WFASC violated section 12(a)(2) of the 1933 Act.

218.    Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

219.    In March 2009, CBGI distributed all of its assets, which included all of its legal claims, to Colonial Bank. Colonial then dissolved CBGI, which, together with the distribution of all assets of CBGI to Colonial Bank, effected a merger of CBGI into Colonial Bank. At the time of CBGI's dissolution, Colonial had not discovered that the defendants had made untrue or misleading statements about the certificates.

220.    When it failed on August 14, 2009, Colonial Bank had not discovered that the defendants had made untrue or misleading statements about the certificates. Plaintiff discovered

that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

221.    Plaintiff has suffered a loss on each of these certificates.

222.    Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77l.

**F.      Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

223.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 222.

224.    FHASI was the depositor of Securitizations Nos. 6 and 7 and therefore is the issuer of the certificates that Colonial purchased in Securitizations Nos. 6 and 7. In doing the acts alleged, FHASI violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 6 and 7.

225.    WFASC is the depositor of Securitizations Nos. 10 and 11 and therefore is the issuer of the certificates that Colonial purchased in Securitizations Nos. 10 and 11. In doing the acts alleged, WFASC violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 10 and 11.

226.    Credit Suisse underwrote Securitizations Nos. 1 and 2. In doing the acts alleged, Credit Suisse violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1 and 2.

227.    RBS underwrote Securitizations Nos. 1, 3, 8, and 10. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1, 3, 8, and 10.

228.    HSBC underwrote Securitization No. 3. In doing the acts alleged, HSBC violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 3.

229.    DBS underwrote Securitization No. 6. In doing the acts alleged, DBS violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 6.

230.    FTN underwrote Securitizations Nos. 6 and 7. In doing the acts alleged, FTN violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 6 and 7.

231.    UBS underwrote Securitization No. 6. In doing the acts alleged, UBS violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 6.

232.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 37 of the Schedules.

233.    The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 41 through 104.

234.    Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

235.    Plaintiff expressly excludes from this claim any allegation that could be construed as alleging fraud or intentional or reckless conduct. This claim is based solely on allegations of strict liability or negligence under the 1933 Act.

236.    In March 2009, CBGI distributed all of its assets, which included all of its legal claims, to Colonial Bank. Colonial then dissolved CBGI, which, together with the distribution of all assets of CBGI to Colonial Bank, effected a merger of CBGI into Colonial Bank. At the time of CBGI's dissolution, Colonial had not discovered that the defendants had made untrue or misleading statements about the certificates.

237.    Plaintiff has suffered a loss on each of these certificates.

238.    Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

**G.    Liability as a Controlling Person Under Section 15 of the 1933 Act**

239.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 238.

240.    FHHLC, by or through stock ownership, agency, or otherwise, controlled FHASI within the meaning of Section 15 of the 1933 Act.

241.    In doing the acts alleged, FHASI violated Sections 11 and 12 of the 1933 Act by issuing certain of the certificates.

242.    FHHLC is therefore jointly and severally liable with and to the same extent as FHASI.

## VIII. JURY DEMAND

243.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants for damages in an amount to be determined at trial, but not less than $213 million, plus attorneys' fees, costs of court, and pre- and post-judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff is entitled.

Dated: June 21, 2017
      New York, New York

Respectfully Submitted,

GRAIS & ELLSWORTH LLP

By _____

David J. Grais (DG7118)
Michael M. Pomerantz (MP0380)

Grais & Ellsworth LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: 212-755-0100

*Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank*

**EXHIBIT A TO THE COMPLAINT**





## EXHIBIT B TO THE COMPLAINT



Figure 1: Percent of Loans Originated by Wells Fargo Bank, N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Wells Fargo Bank, N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## SCHEDULE 1 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Second Amended Complaint, those allegations are made against defendants Credit Suisse and RBS.

**Item 37.        Details of trust and certificate(s).**

**(a)        Description of the trust:** CitiMortgage Alternative Loan Trust, REMIC Pass-Through Certificates, Series 2007-A3 was a securitization in March 2007 of 1,701 mortgage loans, in two pools. CMSI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage. Approximately 41.30% of the mortgage loans in Pool I were originated by organizations not affiliated with CitiMortgage. None of these organizations originated as much as 10% of the mortgage loans in any pool. CMALT 2007-A3 Pros. Sup. 11, 26.

**(b)        Description of the certificate(s) that Colonial purchased:** Credit Suisse and RBS were underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-4, for which Colonial Bank paid $46,617,188 plus accrued interest on August 21, 2007. Colonial Bank's certificate was paid primarily by the 1,638 mortgage loans in Pool I.

**(c)        Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

**(d)        Ratings of the certificate(s) when the original complaint was filed:** Fitch: D; Moody's: Caa3; Standard & Poor's: D.

**(e)        Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

**SCHEDULE 1 OF THE SECOND AMENDED COMPLAINT                    Page 1**

      **(f)**      **URL of prospectus supplement for this securitization:**

http://sec.gov/Archives/edgar/data/811785/000136153007000106/cmalt2007-a3form424b5.htm

      **(g)**      **Registration statement pursuant or traceable to which the certificate(s) were**

**issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued

pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on

December 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was

amended from time to time by prospectus supplements whenever a new series of certificates was

issued pursuant or traceable to that registration statement.

**Item 46.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

      In the prospectus supplement, Credit Suisse and RBS made the following statements

about the LTVs of the mortgage loans in the collateral pool of this securitization.

      **(a)**      The weighted-average loan-to-value ratio at origination of the loans in Pool I was

71.63%. CMALT 2007-A3 Pros. Sup. 10.

      **(b)**      Of the mortgage loans in Pool I, 2.03% had a loan-to-value ratio at origination of

more than 80.00%. CMALT 2007-A3 Pros. Sup. 10.

      **(c)**      In the Appendix of the prospectus supplement entitled "Detailed description of

the mortgage loans," Credit Suisse and RBS presented a table entitled "Distribution by loan-to-

value ratio at origination." This table divided the loans in Pool I into six categories of original

LTV (for example, 65.000% and below, 65.001% to 75.000%, 75.001% to 80.000%, etc.). The

table contained many untrue or misleading statements about the number of loans and the

aggregate principal balance in each of these categories. CMALT 2007-A3 Pros. Sup. 33.

      **(d)**      None of the mortgage loans in Pool I had a loan-to-value ratio at origination of

greater than 90.00%. CMALT 2007-A3 Pros. Sup. 33.

**SCHEDULE 1 OF THE SECOND AMENDED COMPLAINT**      **Page 2**

**Item 56.**     **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Pool I) | 1,638 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 643 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $53,528,877 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 152 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,287,814 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 172 |
| Weighted-average LTV, as stated by defendants | 71.63% |
| Weighted-average LTV, as determined by the model | 82.9% |

**Item 62.**     **Undisclosed additional liens in Pool I:**

   **(a)**     **Minimum number of properties with additional liens:** 508

   **(b)**     **Weighted average CLTV with additional liens:** 76.1%

**Item 77.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Credit Suisse and RBS made the following statement about

the occupancy status of the properties that secured the mortgage loans in the collateral pool of

this securitization.

   (a)     Of the mortgage loans in Pool I, 86.45% of the properties related to those loans

were determined by CMSI to be the primary residence of the homeowner. CMALT 2007-A3

Pros. Sup. 9.

**Item 85.**     **Details of properties in Pool I that were stated to be owner-occupied, but were not:**

   **(a)**     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 115

   **(b)**     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 143

**SCHEDULE 1 OF THE SECOND AMENDED COMPLAINT**                    **Page 3**

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 98

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 287

**Item 88.       Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 26, 36, 59, and 72 through 83 of the prospectus supplement, Credit Suisse and RBS made statements about the underwriting guidelines of CitiMortgage, its affiliated originators, and third-party originators. All of those statements are incorporated herein by reference.

One of these statements was that "Approximately [41.30%] of mortgage loans (by principal balance) in [Pool I] were originated by organizations not affiliated with CitiMortgage. These organizations originated the mortgage loans under guidelines that are substantially in accordance with CitiMortgage's guidelines for its own originations." CMALT 2007-A3 Pros. Sup. 26.

Another statement was that: "CitiMortgage will fully or partly credit score or re-underwrite the third-party loans to determine whether the original underwriting process adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on CitiMortgage's underwriting standards." CMALT 2007-A3 Pros. Sup. 83.

Another statement was that: "the affiliated originator decides . . . whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses . . . ." CMALT 2007-A3 Pros. Sup. 81.

Another statement was that: "the affiliated originator decides . . . if the loan is for the purchase of the mortgaged property, whether the prospective borrower has enough liquid assets

to acquire the mortgaged property and make the initial monthly mortgage payments . . . ."

CMALT 2007-A3 Pros. Sup. 81.

**Item 95.**    **Early payment defaults in Pool I:**

   **(a)**    **Number of the mortgage loans that suffered EPDs:** 6

   **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.4%

**Item 96.**    **90+ days delinquencies in Pool I:**

   **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 618

   **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.7%

**Item 97.**    **30+ days delinquencies in Pool I:**

   **(a)**    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 456

   **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 27.8%

**Item 99.**    **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages 3 and 4 of the prospectus supplement, Credit Suisse and RBS made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse and RBS stated that Colonial Bank's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's and Aaa by Moody's. CMALT 2007-A3 Pros. Sup. 3. These were the highest ratings available from these three rating agencies.

Credit Suisse and RBS also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMALT 2007-A3 Pros. Sup. 6.

**Item 102.**    **Summary of loans in Pool I about which defendants made untrue or misleading statements:**

   **(a)**    **Number of loans whose LTVs were materially understated as shown by the AVM:** 643

**SCHEDULE 1 OF THE SECOND AMENDED COMPLAINT**                    **Page 5**

(b)   **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 508

(c)   **Number of loans for which the properties were stated to be owner-occupied but were not:** 287

(d)   **Number of loans that suffered EPDs:** 6

(e)   **Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 1,065

(f)   **Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 65.0%

## SCHEDULE 2 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant Credit Suisse.

**Item 37.        Details of trust and certificate(s).**

(a)        **Description of the trust:** CitiMortgage Alternative Loan Trust, REMIC Pass-Through Certificates, Series 2007-A2 was a securitization in February 2007 of 2,230 mortgage loans, in two pools. CMSI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage. Approximately 47.32% of the mortgage loans in Pool I were originated by organizations not affiliated with CitiMortgage. None of these organizations originated as much as 10% of the mortgage loans in any pool, except that Provident Funding Associates, L.P. originated approximately 10.39% of the mortgage loans in Pool I. CMALT 2007-A2 Pros. Sup. 11, 27.

(b)        **Description of the certificate(s) that Colonial purchased:** Credit Suisse was an underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-15, for which Colonial Bank paid $45,253,320 plus accrued interest on June 5, 2007. Colonial Bank's certificate was paid primarily by the 2,164 mortgage loans in Pool I.

(c)        **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)        **Ratings of the certificate(s) when the original complaint was filed:** Fitch: D; Moody's: Caa3; Standard & Poor's: D.

(e)        **Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

**SCHEDULE 2 OF THE SECOND AMENDED COMPLAINT**                    **Page 1**

**(f)     URL of prospectus supplement for this securitization:**

http://sec.gov/Archives/edgar/data/811785/000136153007000069/cmalt2007-a2form424b5.htm

**(g)     Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on December 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 46.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The weighted-average loan-to-value ratio at origination of the loans in Pool I was 72.54%. CMALT 2007-A2 Pros. Sup. 10.

(b)     Of the mortgage loans in Pool I, 1.79% had a loan-to-value ratio at origination of more than 80%. CMALT 2007-A2 Pros. Sup. 10.

(c)     Of the mortgage loans in Pool I, 0.02% had a loan-to-value ratio at origination of more than 90.00%. CMALT 2007-A2 Pros. Sup. 10.

(d)     In the Appendix of the prospectus supplement entitled "Detailed description of the mortgage loans," Credit Suisse presented a table entitled "Distribution by loan-to-value ratio at origination." This table divided the loans in Pool I into six categories of original LTV (for example, 65.000% and below, 65.001% to 75.000%, 75.001% to 80.000%, etc.). The table contained many untrue or misleading statements about the number of loans and the aggregate principal balance in each of these categories. CMALT 2007-A2 Pros. Sup. 34.

**SCHEDULE 2 OF THE SECOND AMENDED COMPLAINT**                    **Page 2**

(e)      None of the mortgage loans in Pool I had a loan-to-value ratio at origination of greater than 95.00%. CMALT 2007-A2 Pros. Sup. 34.

**Item 56.**      **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Pool I) | 2,164 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 828 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $60,261,954 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 162 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,396,849 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 276 |
| Weighted-average LTV, as stated by defendants | 72.54% |
| Weighted-average LTV, as determined by the model | 85.2% |

**Item 62.**      **Undisclosed additional liens in Pool I:**

**(a)**      **Minimum number of properties with additional liens:** 676

**(b)**      **Weighted average CLTV with additional liens:** 76.8%

**Item 77.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statement about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      Of the mortgage loans in Pool I, 85.01% of the properties related to those loans were determined by CMSI to be the primary residence of the homeowner. CMALT 2007-A2 Pros. Sup. 9.

**Item 85.**    **Details of properties in Pool I that were stated to be owner-occupied, but were not:**

    **(a)**    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 233

    **(b)**    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 271

    **(c)**    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 162

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 530

**Item 88.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 28, 37, 60, and 73 through 84 of the prospectus supplement, Credit Suisse made statements about the underwriting guidelines of CitiMortgage, its affiliated originators, and third-party originators. All of those statements are incorporated herein by reference.

One of these statements was that: "Approximately [47.32%] of mortgage loans (by principal balance) in [Pool I] were originated by organizations not affiliated with CitiMortgage. These organizations originated the mortgage loans under guidelines that are substantially in accordance with CitiMortgage's guidelines for its own originations." CMALT 2007-A2 Pros. Sup. 28.

Another statement was that: "CitiMortgage will fully or partly credit score or re-underwrite the third-party loans to determine whether the original underwriting process adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on CitiMortgage's underwriting standards." CMALT 2007-A2 Pros. Sup. 84.

**SCHEDULE 2 OF THE SECOND AMENDED COMPLAINT**        **Page 4**

Another statement was that: "the affiliated originator decides . . . whether the prospective borrower has enough monthly income to meet monthly obligations on the proposed loan and related expenses . . . ." CMALT 2007-A2 Pros. Sup. 82.

Another statement was that: "the affiliated originator decides . . . if the loan is for the purchase of the mortgaged property, whether the prospective borrower has enough liquid assets to acquire the mortgaged property and make the initial monthly mortgage payments . . . ." CMALT 2007-A2 Pros. Sup. 82.

**Item 95.      Early payment defaults in Pool I:**

    **(a)      Number of the mortgage loans that suffered EPDs:** 13

    **(b)      Percent of the mortgage loans that suffered EPDs:** 0.6%

**Item 96.      90+ days delinquencies in Pool I:**

    **(a)      Number of the mortgage loans that suffered 90+ days delinquencies:** 805

    **(b)      Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.2%

**Item 97.      30+ days delinquencies in Pool I:**

    **(a)      Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 619

    **(b)      Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 28.6%

**Item 99.      Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages 3 and 4 of the prospectus supplement, Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse stated that Colonial Bank's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's and Aaa by Moody's. CMALT 2007-A2 Pros. Sup. 3. These were the highest ratings available from these three rating agencies.

**SCHEDULE 2 OF THE SECOND AMENDED COMPLAINT**                              **Page 5**

Credit Suisse also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMALT 2007-A2 Pros. Sup. 6.

**Item 102.    Summary of loans in Pool I about which defendants made untrue or misleading statements:**

    **(a)    Number of loans whose LTVs were materially understated as shown by the AVM:** 828

    **(b)    Number of loans whose LTVs were misleading because of undisclosed additional liens:** 676

    **(c)    Number of loans for which the properties were stated to be owner-occupied but were not:** 530

    **(d)    Number of loans that suffered EPDs:** 13

    **(e)    Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 1,444

    **(f)    Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 66.7%

## SCHEDULE 3 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants HSBC and RBS.

**Item 37.        Details of trust and certificate(s).**

(a)        **Description of the trust:** CitiMortgage Alternative Loan Trust, REMIC Pass-Through Certificates, Series 2007-A5 was a securitization in May 2007 of 3,060 mortgage loans, in two pools. CMSI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by CitiMortgage. Approximately 55.64% of the mortgage loans in Pool I were originated by organizations not affiliated with CitiMortgage. None of these organizations originated as much as 10% of the mortgage loans in any pool, except that . . . approximately 11.56% of the mortgage loans in Pool I were originated by American Home Mortgage Corp. CMALT 2007-A5 Pros. Sup. 10, 36.

(b)        **Description of the certificate(s) that Colonial purchased:** HSBC and RBS were underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-6, for which Colonial Bank paid $65,200,567 plus accrued interest on August 31, 2007. Colonial Bank's certificate was paid primarily by the 2,961 mortgage loans in Pool I.

(c)        **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)        **Ratings of the certificate(s) when the original complaint was filed:** Fitch: D; Moody's: Caa3; Standard & Poor's: D.

(e)        **Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

      **(f)     URL of prospectus supplement for this securitization:**

http://sec.gov/Archives/edgar/data/811785/000139781207000020/cmalt2007-a5424b5.htm

      **(g)     Registration statement pursuant or traceable to which the certificate(s) were**

**issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued

pursuant or traceable to a registration statement filed by CMSI with the SEC on form S-3 on

December 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was

amended from time to time by prospectus supplements whenever a new series of certificates was

issued pursuant or traceable to that registration statement.

**Item 46.     Untrue or misleading statements about the LTVs of the mortgage loans:**

      In the prospectus supplement, HSBC and RBS made the following statements about the

LTVs of the mortgage loans in the collateral pool of this securitization.

      (a)     The weighted-average loan-to-value ratio at origination of the loans in Pool I was

72.65%. CMALT 2007-A5 Pros. Sup. 9.

      (b)     Of the mortgage loans in Pool I, 3.15% had a loan-to-value ratio at origination of

more than 80%. CMALT 2007-A5 Pros. Sup. 9.

      (c)     Of the mortgage loans in Pool I, 0.14% had a loan-to-value ratio at origination of

more than 90%. CMALT 2007-A5 Pros. Sup. 9.

      (d)     In the Appendix of the prospectus supplement entitled "Detailed description of

the mortgage loans," HSBC and RBS presented a table entitled "Distribution by loan-to-value

ratio at origination." This table divided the loans in Pool I into six categories of original LTV

(for example, 65.000% and below, 65.001% to 75.000%, 75.001% to 80.000%, etc.). The table

contained many untrue or misleading statements about the number of loans and the aggregate

principal balance in each of these categories. CMALT 2007-A5 Pros. Sup. 43.

**SCHEDULE 3 OF THE SECOND AMENDED COMPLAINT**     **Page 2**

(e)     None of the mortgage loans in Pool I had a loan-to-value ratio at origination of greater than 95.00%. CMALT 2007-A5 Pros. Sup. 43.

**Item 56.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (Pool I) | 2,961 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,177 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $104,775,158 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 192 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,253,744 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 444 |
| Weighted-average LTV, as stated by defendants | 72.65% |
| Weighted-average LTV, as determined by the model | 85.8% |

**Item 62.     Undisclosed additional liens in Pool I:**

**(a)     Minimum number of properties with additional liens:** 992

**(b)     Weighted average CLTV with additional liens:** 77.6%

**Item 77.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, HSBC and RBS made the following statement about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     Of the mortgage loans in Pool I, 87.94% of the properties related to those loans were determined by CMSI to be the primary residence of the homeowner. CMALT 2007-A5 Pros. Sup. 9.

**SCHEDULE 3 OF THE SECOND AMENDED COMPLAINT**          **Page 3**

**Item 85.**    **Details of properties in Pool I that were stated to be owner-occupied, but were not:**

**(a)**    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 304

**(b)**    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 304

**(c)**    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 207

**(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 681

**Item 88.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 37, 46, 69, and 82 through 93 of the prospectus supplement, HSBC and RBS and made statements about the underwriting guidelines of CitiMortgage, its affiliated originators, and third-party originators. All of those statements are incorporated herein by reference.

One of these statements was that: "Approximately [55.64%] of mortgage loans (by principal balance) in [Pool I] were originated by organizations not affiliated with CitiMortgage. These organizations originated the mortgage loans under guidelines that are substantially in accordance with CitiMortgage's guidelines for its own originations." CMALT 2007-A5 Pros. Sup. 37.

Another statement was that: "CitiMortgage believes that Provident Funding's and American Home's underwriting procedures for the mortgage loans included in this series are not materially different from CitiMortgage's own underwriting procedures for similar loans." CMALT 2007-A5 Pros. Sup. 37.

Another statement was that: "CitiMortgage will fully or partly credit score or re-underwrite the third-party loans to determine whether the original underwriting process

**SCHEDULE 3 OF THE SECOND AMENDED COMPLAINT**                    **Page 4**

adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on CitiMortgage's underwriting standards." CMALT 2007-A5 Pros. Sup. 93.

**Item 95.** **Early payment defaults in Pool I:**

    **(a)** **Number of the mortgage loans that suffered EPDs:** 33

    **(b)** **Percent of the mortgage loans that suffered EPDs:** 1.1%

**Item 96.** **90+ days delinquencies in Pool I:**

    **(a)** **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,127

    **(b)** **Percent of the mortgage loans that suffered 90+ days delinquencies:** 38.1%

**Item 97.** **30+ days delinquencies in Pool I:**

    **(a)** **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 828

    **(b)** **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 28.0%

**Item 99.** **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages 3 and 4 of the prospectus supplement, HSBC and RBS made statements about the ratings assigned to the certificates issued in this securitization. HSBC and RBS stated that Colonial Bank's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's and Aaa by Moody's. CMALT 2007-A5 Pros. Sup. 3. These were the highest ratings available from these rating agencies.

HSBC and RBS also stated: "The offered certificates will not be sold unless the rating agencies have rated the offered certificates as shown above." CMALT 2007-A5 Pros. Sup. 6.

**Item 102.** **Summary of loans in Pool I about which defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,177

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 992

**SCHEDULE 3 OF THE SECOND AMENDED COMPLAINT**        **Page 5**

**(c)**     **Number of loans for which the properties were stated to be owner-occupied but were not:** 681

**(d)**     **Number of loans that suffered EPDs:** 33

**(e)**     **Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 1,954

**(f)**     **Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 66.0%

## SCHEDULE 6 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants FHASI, DBS, UBS, FTN, and FHHLC.

**Item 37.        Details of trust and certificate(s).**

**(a)        Description of the trust:** Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates, Series 2007-FA1 was a securitization in February 2007 of 1,124 mortgage loans, in one pool. FHASI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or purchased by FHHLC. FHAMS 2007-FA1 Pros. Sup. S-6 through S-7.

**(b)        Description of the certificate(s) that Colonial purchased:** DBS, UBS, and FTN were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-4, for which Colonial Bank paid $49,935,002 plus accrued interest on June 15, 2007.

**(c)        Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA.

**(d)        Ratings of the certificate(s) when the original complaint was filed:** Fitch: D; Standard & Poor's: D.

**(e)        Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

**(f)        URL of prospectus supplement for this securitization:**

http://sec.gov/Archives/edgar/data/1387481/000093041307001680/c46972_424b5.htm

**(g)      Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by FHASI with the SEC on form S-3 on August 31, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 46.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, FHASI, DBS, UBS, and FTN made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      The weighted-average original loan-to-value ratio of the loans was 71.71%. FHAMS 2007-FA1 Pros. Sup. S-7.

(b)       "Three mortgage loans in the mortgage pool have a loan-to-value ratio at origination of more than 95%." FHAMS 2007-FA1 Pros. Sup. S-27.

(c)      In Annex I of the prospectus supplement, FHASI, DBS, UBS, and FTN presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans." This table divided the loans in the collateral pool into 11 categories of original LTV (for example, loans with an original loan-to-value ratio range of 50.00% and below, 55.01% to 55.00%, 55.01% to 60.00%, etc.). This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool. FHAMS 2007-FA1 Pros. Sup. I-1.

(d)      "The weighted average original loan-to-value ratio of the mortgage loans is expected to be approximately 71.71%." FHAMS 2007-FA1 Pros. Sup. I-1.

**Item 56.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,124 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 275 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $16,403,095 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 101 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,311,940 |
| Number of loans with LTVs over 95%, as stated by defendants | 3 |
| Number of loans with LTVs over 95%, as determined by the model | 70 |
| Weighted-average LTV for loans, as stated by defendants | 71.71% |
| Weighted-average LTV for loans, as determined by the model | 81.6% |

**Item 62.     Undisclosed additional liens:**

    **(a)     Minimum number of properties with additional liens:** 343

    **(b)     Weighted average CLTV for properties with additional liens:** 76.1%

**Item 71.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, FHASI, DBS, UBS, and FTN made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by FHHLC: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac." FHAMS 2007-FA1 Pros. Sup. S-30.

**Item 77.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, FHASI, DBS, UBS, and FTN made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 6 OF THE SECOND AMENDED COMPLAINT**          **Page 3**

(a)        In Annex I of the prospectus supplement, described in Item 47, FHASI, DBS, UBS, and FTN presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investor Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories. FHAMS 2007-FA1 Pros. Sup. I-2.

(b)        In the "Occupancy Types for the Mortgage Loans" table in Annex I, FHASI, DBS, UBS, and FTN stated that of the 1,124 mortgage loans in the collateral pool, 707 were secured by primary residences and 417 were not. FHAMS 2007-FA1 Pros. Sup. I-2.

**Item 85.        Details of properties that were stated to be owner-occupied, but were not:**

**(a)        Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 81

**(b)        Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 76

**(c)        Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 53

**(d)        Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 177

**Item 88.        Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-28 through S-30 of the prospectus supplement, FHASI, DBS, UBS, and FTN made statements about the underwriting guidelines of FHHLC. All of those statements are incorporated herein by reference.

One of these statements was that: "The First Horizon Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the

value and adequacy of the mortgaged property as collateral." FHAMS 2007-FA1 Pros. Sup. S-28.

Another one of these statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHAMS 2007-FA1 Pros. Sup. S-28.

**Item 95.      Early payment defaults:**

    **(a)      Number of the mortgage loans that suffered EPDs:** 9

    **(b)      Percent of the mortgage loans that suffered EPDs:** 0.8%

**Item 96.      90+ days delinquencies:**

    **(a)      Number of the mortgage loans that suffered 90+ days delinquencies:** 366

    **(b)      Percent of the mortgage loans that suffered 90+ days delinquencies:** 32.6%

**Item 97.      30+ days delinquencies:**

    **(a)      Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 338

    **(b)      Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 30.1%

**Item 99.      Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5, S-11 and S-68 of the prospectus supplement, FHASI, DBS, UBS, and FTN made statements about the ratings assigned to the certificates issued in this securitization. FHASI, DBS, UBS, and FTN stated that Colonial Bank's certificate was rated AAA by Standard & Poor's and AAA by Fitch. FHAMS 2007-FA1 Pros. Sup. S-5. These were the highest ratings available from these two rating agencies.

FHASI, DBS, UBS, and FTN also stated: "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from Fitch and S&P indicated under the

heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement."

FHAMS 2007-FA1 Pros. Sup. S-11.

FHASI, DBS, UBS, and FTN also stated: "The issuance of the certificates is conditioned

on the certificates receiving the ratings from Fitch and S&P indicated under the heading

'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement." FHAMS

2007-FA1 Pros. Sup. S-68.

**Item 102.**  **Summary of loans about which defendants made untrue or misleading statements:**

(a)  **Number of loans whose LTVs were materially understated as shown by the AVM:** 275

(b)  **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 343

(c)  **Number of loans for which the properties were stated to be owner-occupied but were not:** 177

(d)  **Number of loans that suffered EPDs:** 9

(e)  **Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 641

(f)  **Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 57.0%

**SCHEDULE 6 OF THE SECOND AMENDED COMPLAINT**                    **Page 6**

SCHEDULE 7 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants FHASI, FTN, and FHHLC.

**Item 37.**　　　**Details of trust and certificate(s).**

　　(a)　　**Description of the trust:** Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates, Series 2007-FA2 was a securitization in March 2007 of 1,273 mortgage loans, in two pools. FHASI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or purchased by FHHLC. FHAMS 2007-FA2 Pros. Sup. S-6 through S-8.

　　(b)　　**Description of the certificate(s) that Colonial purchased:** Citigroup, BAS, and FTN were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-4, for which Colonial Bank paid $33,477,120 plus accrued interest on September 24, 2007. Colonial Bank's certificate was primarily paid by the 1,209 mortgage loans in Pool I.

　　(c)　　**Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

　　(d)　　**Ratings of the certificate(s) when the original complaint was filed:** Fitch: D; Moody's: Caa3; Standard & Poor's: D.

　　(e)　　**Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

　　(f)　　**URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1391188/000093041307002914/c47628_424b5.htm

　　(g)　　**Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were

issued pursuant or traceable to a registration statement filed by FHASI with the SEC on form S-3 on August 31, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 46.       Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, FHASI and FTN made the following statements about the LTVs of the mortgage loans in the collateral pool.

(a)       The weighted-average original loan-to-value ratio of the loans in Pool I was 71.55%. FHAMS 2007-FA2 Pros. Sup. S-8.

(b)        "No mortgage loan has a loan-to-value ratio at origination of more than 100%." FHAMS 2007-FA2 Pros. Sup. S-31.

(c)       In Annex I of the prospectus supplement, FHASI and FTN presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans in Pool I." This table divided the loans in Pool I into 11 categories of original LTV (for example, loans with an original loan-to-value ratio range of 50.00% and below, 55.01% to 55.00%, 55.01% to 60.00%, etc.). This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories for the loans in Pool I. FHAMS 2007-FA2 Pros. Sup. I-1.

(d)       "As of the cut-off date, the weighted average original loan-to-value ratio of the mortgage loans in Pool I is expected to be approximately 71.55%." FHAMS 2007-FA2 Pros. Sup. I-1.

**SCHEDULE 7 OF THE SECOND AMENDED COMPLAINT**                    **Page 2**

**Item 56.**     **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Pool I) | 1,209 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 329 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $28,746,264 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 109 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,701,374 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 70 |
| Weighted-average LTV for loans, as stated by defendants | 71.55% |
| Weighted-average LTV for loans, as determined by the model | 86.0% |

**Item 62.**     **Undisclosed additional liens in Pool I:**

    **(a)**     **Minimum number of properties with additional liens:** 375

    **(b)**     **Weighted average CLTV for properties with additional liens:** 76.8%

**Item 71.**     **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, FHASI and FTN made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by FHHLC: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and/or Freddie Mac." FHAMS 2007-FA2 Pros. Sup. S-33.

**Item 77.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, FHASI and FTN made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 7 OF THE SECOND AMENDED COMPLAINT**     **Page 3**

(a)      In Annex I of the prospectus supplement, described in Item 47, FHASI and FTN presented a table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table divided all of the mortgage loans in Pool I into the categories "Primary Residence," "Investor Property," and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percentage of the mortgage pool in each of these categories. FHAMS 2007-FA2 Pros. Sup. I-2.

(b)      In the "Occupancy Types for the Mortgage Loans in Pool I" table in Annex I, FHASI and FTN stated that of the 1,209 mortgage loans in Pool I, 763 were secured by primary residences and 446 were not. FHAMS 2007-FA2 Pros. Sup. I-2.

**Item 85.      Details of properties in Pool I that were stated to be owner-occupied, but were not:**

   **(a)      Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 91

   **(b)      Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 121

   **(c)      Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 39

   **(d)      Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 206

**Item 88.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-32 through S-33 of the prospectus supplement, FHASI and FTN made statements about the underwriting guidelines of FHHLC. All of those statements are incorporated herein by reference.

**SCHEDULE 7 OF THE SECOND AMENDED COMPLAINT**                    **Page 4**

One of these statements was that: "The First Horizon Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." FHAMS 2007-FA2 Pros. Sup. S-32.

Another one of these statements was that: "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHAMS 2007-FA2 Pros. Sup. S-32.

**Item 95.    Early payment defaults in Pool I:**

    **(a)    Number of the mortgage loans that suffered EPDs:** 10

    **(b)    Percent of the mortgage loans that suffered EPDs:** 0.8%

**Item 96.    90+ days delinquencies in Pool I:**

    **(a)    Number of the mortgage loans that suffered 90+ days delinquencies:** 401

    **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies:** 33.2%

**Item 97.    30+ days delinquencies in Pool I:**

    **(a)    Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 362

    **(b)    Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 29.9%

**Item 99.    Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5, S-13 and S-84 of the prospectus supplement, FHASI and FTN made statements about the ratings assigned to the certificates issued in this securitization. FHASI and FTN stated that Colonial Bank's certificate was rated Aaa by Moody's, AAA by Standard & Poor's, and AAA by Fitch. FHAMS 2007-FA2 Pros. Sup. S-5. These were the highest ratings available from these three rating agencies.

**SCHEDULE 7 OF THE SECOND AMENDED COMPLAINT**                    **Page 5**

FHASI and FTN also stated: "The issuance of the offered certificates is conditioned on the certificates receiving the ratings from Fitch, S&P and Moody's indicated under the heading 'Expected Ratings' in the chart shown on page S-5 of this prospectus supplement." FHAMS 2007-FA2 Pros. Sup. S-13, S-84.

**Item 102.**   **Summary of loans in Pool I about which defendants made untrue or misleading statements:**

     **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 329

     **(b)**   **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 375

     **(c)**   **Number of loans for which the properties were stated to be owner-occupied but were not:** 206

     **(d)**   **Number of loans that suffered EPDs:** 10

     **(e)**   **Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 689

     **(f)**   **Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 57.0%

SCHEDULE 8 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 37.        Details of trust and certificate(s).**

(a)        **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS3 was a securitization in February 2007 of 3,594 mortgage loans, in one pool. RALI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, and GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC. Homecomings Financial originated or acquired approximately 45.8% of the mortgage loans; and GMAC Mortgage originated or acquired approximately 7.4% of the mortgage loans. RALI 2007-QS3 Pros. Sup. S-5, S-35 through S-36. No other originator originated or acquired more than 10% of the mortgage loans. RALI 2007-QS3 Pros. Sup. S-36.

(b)        **Description of the certificate(s) that Colonial purchased:** RBS was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-5, for which Colonial Bank paid $46,997,950 plus accrued interest on June 15, 2007.

(c)        **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)        **Ratings of the certificate(s) when the original complaint was filed:** Fitch: D; Moody's: Ca; Standard & Poor's: D.

(e)        **Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

**SCHEDULE 8 OF THE SECOND AMENDED COMPLAINT                    Page 1**

(f)     **URL of prospectus supplement for this securitization:**

http://sec.gov/Archives/edgar/data/1386312/000089109207000665/e26372_424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by RALI with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 46.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     In Annex I of the prospectus supplement entitled, "Mortgage Loan Statistical Information," RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 50. Thus, in the "Mortgage Loan Statistical Information" section, RBS made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QS3 Pros. Sup. I-1 to I-7.

**SCHEDULE 8 OF THE SECOND AMENDED COMPLAINT**          **Page 2**

(b)      "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 73.77%." RALI 2007-QS3 Pros. Sup. I-7.

**Item 56.**      **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 3,594 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,069 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $104,035,971 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 305 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $16,739,011 |
| Number of loans with LTVs over 100%, as stated by defendant | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 270 |
| Weighted-average LTV, as stated by defendant | 73.77% |
| Weighted-average LTV, as determined by the model | 92.8% |

**Item 62.**      **Undisclosed additional liens:**

(a)      **Minimum number of properties with additional liens:** 1,581

(b)      **Weighted average CLTV with additional liens:** 80.7%

**Item 77.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Annex I of the prospectus supplement, described in Item 47, RBS presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation" and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance outstanding, and the percent of the

**SCHEDULE 8 OF THE SECOND AMENDED COMPLAINT**                    **Page 3**

principal balance of the mortgage loans in each of these categories. RALI 2007-QS3 Pros. Sup. S-11, I-1.

(b)    In the "Occupancy Types of the Mortgage Loans" table, RBS stated that of the 3,594 mortgage loans in the collateral pool, 2,717 were secured by primary residences and 877 were not. RALI 2007-QS3 Pros. Sup. S-11; I-1.

**Item 85.    Details of properties that were stated to be owner-occupied, but were not:**

    **(a)    Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 252

    **(b)    Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 485

    **(c)    Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 261

    **(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 773

**Item 88.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-40 through S-42 of the prospectus supplement, RBS made statements about the underwriting standards of Residential Funding Company. All of those statements are incorporated herein by reference.

One of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2007-QS3 Pros. Sup. S-40.

**SCHEDULE 8 OF THE SECOND AMENDED COMPLAINT**         **Page 4**

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QS3 Pros. Sup. S-41.

Another one of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QS3 Pros. Sup. S-41.

**Item 95.**   **Early payment defaults:**

    **(a)**   **Number of the mortgage loans that suffered EPDs:** 57

    **(b)**   **Percent of the mortgage loans that suffered EPDs:** 1.6%

**Item 96.**   **90+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,603

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 44.6%

**Item 97.**   **30+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,307

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 36.4%

**Item 99.**   **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-8 and S-90 through S-91 of the prospectus supplement, RBS made statements about the ratings assigned to the certificates issued in this securitization. RBS stated that Colonial Bank's certificate was rated AAA by Fitch Ratings, AAA by Standard &

Poor's, and Aaa by Moody's. RALI 2007-QS3 Pros. Sup. S-8. These were the highest ratings available from these rating agencies.

RBS also stated: "It is a condition of the issuance of the Senior Certificates that they be rated 'AAA' by Fitch Ratings . . . 'AAA' by Standard & Poor's Ratings Services . . . and 'Aaa' by Moody's Investors Service, Inc. . . ." RALI 2007-QS3 Pros. Sup. S-90.

**Item 102.     Summary of loans about which the defendant made untrue or misleading statements:**

    **(a)     Number of loans whose LTVs were materially understated as shown by the AVM:** 1,069

    **(b)     Number of loans whose LTVs were misleading because of undisclosed additional liens:** 1,581

    **(c)     Number of loans for which the properties were stated to be owner-occupied but were not:** 773

    **(d)     Number of loans that suffered EPDs:** 57

    **(e)     Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 2,480

    **(f)     Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 69.0%

## SCHEDULE 10 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants WFASC and RBS.

**Item 37.      Details of trust and certificate(s).**

(a)      **Description of the trust:** Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-Through Certificates, Series 2007-4 was a securitization in March 2007 of 3,278 mortgage loans, in one pool. WFASC was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Wells Fargo Bank and various undisclosed originators. WFMBS 2007-4 Pros. Sup. S-45. No originator or group of affiliated originators, apart from Wells Fargo Bank and its affiliates, originated 10% or more of the mortgage loans. WFMBS 2007-4 Pros. Sup. S-45.

(b)      **Description of the certificate(s) that Colonial purchased:** RBS and Citigroup were underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-15, for which Colonial Bank paid $9,721,875 plus accrued interest on September 4, 2007.

(c)      **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA; Moody's: Aaa.

(d)      **Ratings of the certificate(s) when the original complaint was filed:** Fitch: C; Standard & Poor's: CCC; Moody's: Caa1.

(e)      **Date on which the certificate(s) were downgraded below investment grade:** April 8, 2009.

(f)      **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1011663/000119312507065681/d424b5.htm

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by WFASC with the SEC on form S-3 on September 27, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 46.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, WFASC and RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      As of the cut-off date, the weighted-average original loan-to-value ratio of the mortgage loans was 72.38%. WFMBS 2007-4 Pros. Sup. A-1.

(b)      As of the cut-off date, the weighted-average original combined loan-to-value ratio of the mortgage loans was 78.61%. WFMBS 2007-4 Pros. Sup. A-1.

(c)      The original loan-to-value ratios of the mortgage loans in the collateral pool ranged from 17.14% to 95.00%. WFMBS 2007-4 Pros. Sup. A-1.

(d)      The original combined loan-to-value ratios of the mortgage loans in the collateral pool ranged from 17.62% to 100.00%. WFMBS 2007-4 Pros. Sup. A-1.

(e)      In Appendix A to the prospectus supplement entitled, "Mortgage Loan Data," WFASC and RBS presented another table entitled "Original Loan-to-Value Ratios." This table divided the loans in the collateral pool into 10 categories of original LTV ranges (for example, 50.00% or less, 50.01%, to 55.00%, 55.01%, to 60.00%, 60.01% to 65.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage of total unpaid principal balance in each of these categories. WFMBS 2007-4 Pros. Sup. A-4.

**SCHEDULE 10 OF THE SECOND AMENDED COMPLAINT**                    **Page 2**

(f)      No mortgage loan in the collateral pool had an original LTV of more than 95%.
WFMBS 2007-4 Pros. Sup. A-4.

(g)      In Appendix A, WFASC and RBS presented a table entitled "Original Combined
Loan-to-Value Ratios." This table divided the loans in the collateral pool into 11 categories of
original combined LTV ranges (for example, 50.00% or less, 50.01% to 55.00%, 55.01% to
60.00%, etc.). The table contained untrue or misleading statements about the number of
mortgage loans, the aggregate unpaid principal balance, and the percentage of total aggregate
unpaid principal balance in each of these categories. WFMBS 2007-4 Pros. Sup. A-4.

(h)      No mortgage loan in the collateral pool had an original combined LTV of more
than 100%. WFMBS 2007-4 Pros. Sup. A-4.

**Item 56.        Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 3,278 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,131 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $174,572,868 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 213 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $25,798,542 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 352 |
| Weighted-average LTV, as stated by defendants | 72.38% |
| Weighted-average LTV, as determined by the model | 86.5% |

**Item 77.        Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, WFASC and RBS made the following statements about the
occupancy status of the properties that secured the mortgage loans in the collateral pool of this
securitization.

**SCHEDULE 10 OF THE SECOND AMENDED COMPLAINT**                                        **Page 3**

(a)      In Appendix A of the prospectus supplement, described in Item 47, WFASC and RBS presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Second Home," and "Investment Property." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage of total aggregate unpaid principal balance in each of these categories. WFMBS 2007-4 Pros. Sup. A-5.

(b)      In the "Occupancy Types" table, WFASC and RBS stated that of 3,278 mortgage loans in the collateral pool, 3,107 were secured by primary residences and 171 were not. WFMBS 2007-4 Pros. Sup. A-5.

**Item 85.      Details of properties that were stated to be owner-occupied, but were not:**

**(a)      Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 213

**(b)      Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 516

**(c)      Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 205

**(d)      Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 779

**Item 88.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-47 through S-48 of the prospectus supplement, and pages 33 through 37 of the prospectus, WFASC and RBS made statements about the underwriting guidelines of Wells Fargo Bank. All of those statements are incorporated herein by reference.

One of these statements was that: The Mortgage Loans (by aggregate unpaid principal balance as of the Cut-off Date) were generally originated in conformity with the underwriting standards described in the prospectus under the heading "The Sponsor's Mortgage Loan

Programs — Mortgage Loan Underwriting" (the "Underwriting Standards"). WFMBS 2007-4 Pros. Supp. S-47

Another statement was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." WFMBS 2007-4 Pros. 33.

**Item 95.**     **Early payment defaults:**

    **(a)**     **Number of the mortgage loans that suffered EPDs:** 5

    **(b)**     **Percent of the mortgage loans that suffered EPDs:** 0.2%

**Item 96.**     **90+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 594

    **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 18.1%

**Item 97.**     **30+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 497

    **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 15.2%

**Item 99.**     **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7, S-9, and S-61 through S-62 of the prospectus supplement, WFASC and RBS made statements about the ratings assigned to the certificates issued in this securitization. WFASC and RBS stated that Colonial Bank's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. These were the highest ratings available from these three rating agencies. WFMBS 2007-4 Pros. Sup. S-6.

WFASC and RBS also stated: "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table beginning on page S-6." WFMBS 2007-4 Pros. Sup. S-9.

WFASC and RBS also stated: "It is a condition to the issuance of the Offered Certificates that each class will have received at least the rating set forth in the table beginning at page S-6 from Fitch Ratings . . . Moody's Investors Service Inc. . . . and Standard & Poor's . . . . WFMBS 2007-4 Pros. Sup. S-61.

**Item 102.** **Summary of loans about which defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,131

    **(b)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 779

    **(c)** **Number of loans that suffered EPDs:** 5

    **(d)** **Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 1,672

    **(e)** **Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 51.0%

## SCHEDULE 11 OF THE SECOND AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant WFASC.

**Item 37.       Details of trust and certificate(s).**

(a)     **Description of the trust:** Wells Fargo Mortgage Backed Securities Trust, Mortgage Pass-Through Certificates, Series 2007-7 was a securitization in May 2007 of 8,620 mortgage loans, in one pool. WFASC was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Wells Fargo Bank and various undisclosed originators. WFMBS 2007-7 Pros. Sup. S-46. No originator or group of affiliated originators, apart from Wells Fargo Bank and its affiliates, originated 10% or more of the mortgage loans. WFMBS 2007-7 Pros. Sup. S-46.

(b)     **Description of the certificate(s) that Colonial purchased:** Bear Stearns was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-36, for which Colonial Bank paid $19,488,354 plus accrued interest on June 26, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa.

(d)     **Ratings of the certificate(s) when the original complaint was filed:** Fitch: CC; Moody's: Caa1.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** April 23, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1011663/000119312507124435/d424b5.htm

**SCHEDULE 11 OF THE SECOND AMENDED COMPLAINT** **Page 1**

**(g)      Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by WFASC with the SEC on form S-3 on September 27, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 46.       Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, WFASC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      As of the cut-off date, the weighted-average original loan-to-value ratio of the mortgage loans in the collateral pool was 72.66%. WFMBS 2007-7 Pros. Sup. A-1.

(b)      As of the cut-off date, the weighted-average original combined loan-to-value ratio of the mortgage loans in the collateral pool was 78.60%. WFMBS 2007-7 Pros. Sup. A-1.

(c)      The original loan-to-value ratios of the mortgage loans in the collateral pool ranged from 5.92% to 100.00%. WFMBS 2007-7 Pros. Sup. A-1.

(d)      The original combined loan-to-value ratios of the mortgage loans in the collateral pool ranged from 9.99% to 100.00%. WFMBS 2007-7 Pros. Sup. A-1.

(e)      In Appendix A to the prospectus supplement, entitled "Mortgage Loan Data," WFASC presented a table entitled "Original Loan-to-Value Ratios." This table divided the loans in the collateral pool into 11 categories of original LTV ranges (for example, 50.00% or less, 50.01%, to 55.00%, 55.01%, to 60.00%, 60.01% to 65.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage of total aggregate unpaid principal balance in each of these categories. WFMBS 2007-7 Pros. Sup. A-4.

**SCHEDULE 11 OF THE SECOND AMENDED COMPLAINT**                    **Page 2**

(f)     No mortgage loan in the collateral pool had an original LTV of more than 100%. WFMBS 2007-7 Pros. Sup. A-4.

(g)     In Appendix A to the prospectus supplement, "Mortgage Loan Data," WFASC presented another table entitled "Original Combined Loan-to-Value Ratios." This table divided the loans in the collateral pool into 11 categories of original combined LTV ranges (for example, 50.00% or less, 50.01% to 55.00%, 55.01% to 60.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage of total aggregate unpaid principal balance in each of these categories. WFMBS 2007-7 Pros. Sup. A-4.

(h)     No mortgage loan in the collateral pool had an original combined LTV of more than 100%. WFMBS 2007-7 Pros. Sup. A-4.

**Item 56.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 8,620 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 3,405 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $520,099,222 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 647 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $78,451,008 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 797 |
| Weighted-average LTV, as stated by defendants | 72.66% |
| Weighted-average LTV, as determined by the model | 87.8% |

**Item 77.**       **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, WFASC made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)       In Appendix A of the prospectus supplement, described in Item 47, WFASC presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Second Home," and "Investment Property." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate unpaid principal balance, and the percentage of total aggregate unpaid principal balance in each of these categories. WFMBS 2007-7 Pros. Sup. A-6.

(b)       In the "Occupancy Types" table, WFASC stated that of 8,620 mortgage loans in the collateral pool, 8,119 were secured by primary residences and 501 were not. WFMBS 2007-7 Pros. Sup. A-6.

**Item 85.**       **Details of properties that were stated to be owner-occupied, but were not:**

   (a)       **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 560

   (b)       **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 1,487

   (c)       **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 539

   (d)       **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 2,069

**SCHEDULE 11 OF THE SECOND AMENDED COMPLAINT**                    **Page 4**

**Item 88.**          **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-48 through S-49 of the prospectus supplement, and pages 33 through 37 of the prospectus, WFASC made statements about the underwriting guidelines of Wells Fargo Bank. All of those statements are incorporated herein by reference.

One of these statements was that: Approximately 94.35% of the Mortgage Loans (by aggregate unpaid principal balance as of the Cut-off Date) were generally originated in conformity with the underwriting standards described in the prospectus under the heading "The Sponsor's Mortgage Loan Programs — Mortgage Loan Underwriting" (the "Underwriting Standards"). WFMBS 2007-7 Pros. Sup. S-48-49.

Another statement was that: "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." WFMBS 2007-7 Pros. 33.

**Item 95.**          **Early payment defaults:**

    **(a)**          **Number of the mortgage loans that suffered EPDs:** 10

    **(b)**          **Percent of the mortgage loans that suffered EPDs:** 0.1%

**Item 96.**          **90+ days delinquencies:**

    **(a)**          **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,441

    **(b)**          **Percent of the mortgage loans that suffered 90+ days delinquencies:** 16.7%

**Item 97.**          **30+ days delinquencies:**

    **(a)**          **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,118

    **(b)**          **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 13.0%

**Item 99.**      **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-8, S-10, and S-62 of the prospectus supplement, WFASC made statements about the ratings assigned to the certificates issued in this securitization. WFASC stated that Colonial Bank's certificate was rated AAA by Fitch Ratings and Aaa by Moody's. WFMBS 2007-7 Pros. Sup. S-6. These were the highest ratings available from these rating agencies.

WFASC also stated: "The trust will not issue the offered certificates unless they have received at least the ratings set forth in the table beginning on page S-6." WFMBS 2007-7 Pros. Sup. S-9.

WFASC also stated: "It is a condition to the issuance of the Offered Certificates that each such class will have received at least the rating set forth in the table beginning at page S-6 from Fitch Ratings . . . and Moody's Investors Service Inc. . . . . WFMBS 2007-7 Pros. Sup. S-62.

**Item 102.**      **Summary of loans about which the defendants made untrue or misleading statements:**

  **(a)**      **Number of loans whose LTVs were materially understated as shown by the AVM:** 3,405

  **(b)**      **Number of loans for which the properties were stated to be owner-occupied but were not:** 2,069

  **(c)**      **Number of loans that suffered EPDs:** 10

  **(d)**      **Eliminating duplicates, number of loans about which defendants made untrue or misleading statements:** 4,763

  **(e)**      **Eliminating duplicates, percent of loans about which defendants made untrue or misleading statements:** 55.3%

**SCHEDULE 11 OF THE SECOND AMENDED COMPLAINT**                    **Page 6**