UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR COLONIAL BANK,

          Plaintiff,

   v.

FIRST HORIZON ASSET SECURITIES INC., *et al.*,

          Defendants.

Case No. 12-cv-6166-LLS

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ON ITS STANDING TO SUE DEFENDANTS
FOR VIOLATIONS OF SECURITIES LAWS AND IN SUPPORT OF
<u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## Table of Contents

**Page**

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 4

    A.    CBGI Was An Independent Legal Entity Incorporated In Nevada To Shield Colonial Bank From Paying Alabama Corporate Taxes ............................ 4

    B.    CBGI Purchased And Continuously Held The At-Issue Securities ........................ 5

    C.    CBGI Dissolved In 2009 And Did Not Assign Its Securities Claims To Colonial Bank .......................................................................................................... 6

    D.    After Colonial Bank Failed, The FDIC Stepped Into Its Shoes And Asserted CBGI's Claims Purportedly On Behalf Of Colonial Bank ..................... 7

LEGAL STANDARD ................................................................................................................ 7

ARGUMENT ............................................................................................................................ 8

I.     CBGI Could Not, And Did Not, Assign Its Securities Claims To Colonial Bank ............ 8

    A.    CBGI's Securities Claims Were Not Legally Assignable ..................................... 8

    B.    Even If CBGI's Claims Were Assignable, CBGI Did Not Actually Assign Them To Colonial Bank ....................................................................................... 11

II.    Colonial Bank Cannot Invoke The *De Facto* Merger Doctrine To Create Standing To Sue On CBGI's Claims ..................................................................................... 16

    A.    The FDIC Misapplies The *De Facto* Merger Doctrine ...................................... 17

    B.    Even If The *De Facto* Merger Doctrine Could Be Invoked Here, The FDIC Has Not Established That One Occurred .................................................... 19

III.   Colonial Bank Was Not The Statutory Purchaser Of The Securities Purchased By CBGI ............................................................................................................................ 23

    A.    Only CBGI, Who Actually Purchased The Certificates, Has Standing To Sue For The Claims Brought By The FDIC ....................................................... 23

    B.    The FDIC Failed To Establish That Colonial Bank Should Be Treated As The Statutory Purchaser Even Though CBGI Purchased The Certificates .......... 29

CONCLUSION ....................................................................................................................... 31

Table of Authorities

Page(s)

### Cases

*Abbey v. 3F Therapeutics, Inc.*,
No. 06 CV 409(KMW), 2009 WL 4333819 (S.D.N.Y. Dec. 2,
2009)............................................................................................................................. 26

*All States Life Ins. Co. v. Jaudon*,
154 So. 798 (Ala. 1934) ...................................................................................................... 9

*Am. Bank & Tr. Co. v. Barad Shaff Sec. Corp.*,
335 F. Supp. 1276 (S.D.N.Y. 1972) ................................................................................. 27

*Ashland Inc. v. Morgan Stanley & Co., Inc.*,
700 F. Supp. 2d 453 (S.D.N.Y. 2010) ........................................................................ 26, 27

*Ashland Inc. v. Oppenheimer & Co., Inc.*,
689 F. Supp. 2d 874 (E.D. Ky. 2010)............................................................................... 26

*Banque Arabe et Internationale D'Investissement v. Maryland
Nat'l Bank*,
57 F.3d 146 (2d Cir. 1995)................................................................................................ 16

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
547 F. Supp. 3d 439 (S.D.N.Y. 2021) .............................................................................. 25

*Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*,
Nos. 10–2741–BLS1, 11–0555–BLS1, 2012 WL 3263786
(Mass. Super. Ct. Mar. 14, 2012) .................................................................................... 27

*Colonial BancGroup, Inc. v. PricewaterhouseCoopers LLP*,
No. 2:11-cv-746, 2017 WL 8890271 (M.D. Ala. Dec. 28, 2017) ...................................... 7

*Comm. of Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
25 N.Y.3d 543 (2015) ................................................................................................. 13, 14

*Comm'r of Internal Revenue v. Henry Hess Co.*, 210 F.2d 553 (9th
Cir. 1954) .......................................................................................................................... 12

*Dickerson v. Napolitano*,
604 F.3d 732 (2d Cir. 2010)............................................................................................... 7

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) .......................................................................................................... 25

*Grubb v. FDIC*,
   868 F.2d 1151(10th Cir. 1989)............................................................... 26

*Hardy Cos., Inc. v. SNMARK, LLC*,
   245 P.3d 1149 (Nev. 2010) ................................................................... 10

*HB Holdings Corp. v. Scovill, Inc.*,
   No. 88 CIV. 7983, 1990 WL 37869 (S.D.N.Y. Mar. 26, 1990)................. 27

*HD Supply Facilities Maintenance, Ltd. v. Bymoen*,
   210 P.3d 183 (Nev. 2009) ..................................................................... 18

*Heyman v. Heyman*,
   356 F. Supp. 958 (S.D.N.Y. 1973) .................................................. 26, 27

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................... 25

*In re Latimer*,
   489 B.R. 844 (Bankr. N.D. Ala. 2013).................................................... 9

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .................................................................. 25

*In re RCS Cap. Dev., LLC*,
   No. AZ–12–1381, 2013 WL 3618550 (9th Cir. Bankr. App.
   Panel July 16, 2013) ............................................................................. 18

*In re Tremont*,
   Nos. 08 Civ. 11117, 11 Civ. 1687, 2013 WL 2257053 (S.D.N.Y.
   May 23, 2013) ....................................................................................... 27

*Lamb v. Leroy Corp.*,
   454 P.2d 24 (Nev. 1969) ....................................................................... 17

*Levenfeld v. Boyd*,
   No. 02 C 4735, 2003 WL 22532801(N.D. Ill. Nov. 6, 2003) .................. 26

*Matrix-Churchill v. Springsteen*,
   461 So. 2d 782 (Ala. 1984) ................................................................... 18

*Maxwell v. Allstate Ins. Cos.*,
   728 P.2d 812 (Nev. 1986) ....................................................................... 8

*Miller v. Jackson Hosp. & Clinic*,
   776 So. 2d 122 (Ala. 2000) ..................................................................... 9

*MOH Mgmt., LLC v. Michelangelo Leasing, Inc.*,
   No. 73920, 2019 WL 1437136 (Nev. Mar. 29, 2019) .................................................... 21

*MPI Acquisition, LLC v. Northcutt*,
   14 So. 3d 126 (Ala. 2009) ............................................................................................ 18

*Norris v. Wirtz*,
   719 F.2d 256 (7th Cir. 1983) ........................................................................................ 26

*Novo Trading Corp. v. Comm'r of Internal Revenue*,
   113 F.2d 320 (2d Cir. 1940) .................................................................................... 12, 14

*Omnicare, Inc. v. Laborers Dist. Council Construction Indus.*
   *Pension Fund*,
   575 U.S. 175 (2015) ...................................................................................................... 10

*Peddie v. Spot Devices, Inc.*,
   No. 72721, 2018 WL 4781617 (Nev. Oct. 2, 2018) ...................................................... 19

*Phoenix Light SF Ltd. v. ACE Sec. Corp.*,
   No. 650422/2012, 2013 WL 1788007 (Sup. Ct. N.Y. County
   Apr. 24, 2013) ................................................................................................................ 16

*Pro Bono Invs., Inc. v. Gerry*,
   No. 03 Civ. 4347(JGK), 2008 WL 4755760 (S.D.N.Y. Oct. 29,
   2008) ............................................................................................................................... 12

*Prosky v. Clark*,
   109 P. 793 (Nev. 1910) .................................................................................................... 9

*Reynolds v. Tufenkjian*,
   461 P.3d 147 (Nev. 2020) ............................................................................................ 8, 9

*Rivers v. Stihl, Inc.*,
   434 So. 2d 766 (Ala. 1983) ........................................................................................... 18

*Shadow Wood HOA v. N.Y. Cmty. Bancorp*,
   366 P.3d 1105 (Nev. 2016) ........................................................................................... 10

*Soderberg v. Gens*,
   652 F. Supp. 560 (N.D. Ill. 1987) ................................................................................. 10

*Taggart v. Time Inc.*,
   924 F.2d 43 (2d Cir. 1991) ...................................................................................... 8, 29

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
   556 F. Supp. 3d 222 (S.D.N.Y. 2021) ............................................................................ 8

*Tycon Tower I Inv. Ltd. P'ship v. John Burgee Architect*,
234 A.D.2d 748 (3d Dep't 1996) ................................................. 13

*United Dep't Stores, Inc. v. Ernst & Whinney*,
713 F. Supp. 518 (D.R.I. 1989) ................................................. 26

*Vannest v. Sage, Rutty & Co, Inc.*, 960 F. Supp. 651 (W.D.N.Y.
1997)................................................................................. 28

*Vill. Builders 96, L.P. v. U.S. Labs., Inc.*,
112 P.3d 1082 (Nev. 2005) ........................................ 17, 18, 19, 21

*Walther v. Maricopa Int'l Inv., Corp.*,
No. 97 Civ. 4816(HB), 1999 WL 64280 (S.D.N.Y. Feb. 9, 1999) ........... 26

*Walther v. Maricopa Int'l Inv., Corp.*,
No. 97 CIV. 4816, 1998 WL 186736 (S.D.N.Y. Apr. 17, 1998) ............. 27

*Wilson v. Happy Creek, Inc.*,
448 P.3d 1106 (Nev. 2019) ....................................................... 10

*Zimmerman v. Kyte*,
765 P.2d 905 (Wash. Ct. App. 1988) ............................................. 12

## Statutes

15 U.S.C.A. § 77k(a) ................................................................ 23

Ala. Code § 8-6-19(a)(2)............................................................ 24

Nev. Rev. Stat. § 78.288 (2009)............................................... 10, 12

Nev. Rev. Stat. § 78.585 ...................................................... 15, 28

Nev. Rev. Stat. Chapter 92A.100................................................... 19

Defendants Credit Suisse Securities (USA) LLC ("Credit Suisse") and NatWest Markets Securities Inc., f/k/a RBS Securities Inc. ("RBS" and, collectively with Credit Suisse, "Defendants"), submit this memorandum of law in opposition to Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank's ("Plaintiff" or the "FDIC") motion for summary judgment that it has standing to sue Defendants for violations of securities laws and in support of Defendants' cross-motion for summary judgment that the FDIC lacks standing.

## PRELIMINARY STATEMENT

Standing in the shoes of Colonial Bank, the FDIC asks this Court to set aside the strategically-motivated and fastidiously-observed corporate separateness between Colonial Bank and its subsidiary, CBG Investments, Inc. ("CBGI"), to enable it to pursue securities claims relating to the residential mortgage-backed securities ("RMBS") that were indisputably purchased and held by CBGI, not Colonial Bank. The FDIC's arguments are contrary to the statutory purchaser requirements in the statutes under which its claims are brought, contrary to Nevada corporate law (which governs CBGI's actions), and seeks to undo the strategic trade-off that Colonial Bank made when it formed CBGI for tax avoidance purposes. This Court should deny Plaintiff's motion, grant Defendants' cross-motion, and enter judgment as a matter of law dismissing the FDIC's claims with prejudice for lack of standing.

Colonial Bank was an Alabama-based bank. Alabama has a corporate income tax; Nevada does not. Years before the securities at issue were sold, Colonial Bank created CBGI as a Nevada corporation to purchase, trade, manage, and hold securities in its own name. Because CBGI, not Colonial Bank, would purchase and hold the securities, Colonial Bank would not owe taxes to the state of Alabama on securities investments that CBGI purchased and held. Colonial Bank and CBGI maintained all the corporate formalities required to respect—and benefit from— their separate corporate existence. Indeed, when CBGI bought the RMBS at issue in this action,

it did so under its own name and held them through its dissolution.  The record evidence conclusively identifies CBGI, not Colonial Bank, as the purchaser of the at-issue securities.

After Colonial Bank failed due to its internal, historic fraud, the FDIC took over as its receiver in August 2009.  Years later, the FDIC filed this action asserting securities claims arising from CBGI's purchase of various RMBS certificates.  But Colonial Bank—the defunct bank in whose shoes the FDIC stands in this action—lacked standing to bring these claims because it did not purchase any of the certificates; CBGI did.  The relevant statutes—Section 11 of the Securities Act of 1933 and Section 8-6-19 of the Alabama Securities Act ("ASA")—make clear that only the person who purchased the securities has standing to bring claims for alleged misstatements or omissions in the offering documents for those securities.  The FDIC advances three arguments why it purportedly has standing to assert these claims on behalf of Colonial Bank.  All of the theories the FDIC asserts are disputed—and, in fact, definitively disproven—by the evidence in this case.

First, the FDIC alleges that CBGI "distributed" its securities claims to Colonial Bank when it dissolved in March 2009.  But CBGI's claims were non-assignable: Nevada law does not permit a party to assign misrepresentation-based claims like the ones asserted by the FDIC here.  Moreover, even if the claims were assignable, the FDIC has failed to establish that CBGI actually assigned them.  At most, CBGI's Board of Directors "authorized" CBGI officers to distribute CBGI's "assets" to Colonial Bank, but there is no evidence that CBGI actually took any steps to assign CBGI's legal claims to Colonial Bank.  The FDIC begs this Court to infer that such an assignment took place, but granting such inferences to the moving party turns the summary judgment standard on its head.

Second, and in the alternative, the FDIC argues that even if CBGI never actually assigned its claims to Colonial Bank, this Court should invoke the *de facto* merger doctrine to find that Colonial Bank obtained CBGI's securities claims after CBGI's dissolution.  But this is an entirely improper and unsupported invocation of the *de facto* merger doctrine.  Under Nevada law, the doctrine serves as an exception to the general rule that a purchaser does not assume the liabilities of the corporation it acquired.  That is, the doctrine exists to allow a plaintiff to recover *as against the acquiring* company for the liabilities of the predecessor company; it does not exist as a weapon to be wielded by the acquiring company, particularly in a situation where, as here, the acquiring company (Colonial Bank) made strategic use of its corporate separateness to avoid paying taxes on its investments.  In fact, the FDIC, as receiver of Colonial Bank, continued to deny Colonial Bank's tax liability to the state of Alabama arising from CBGI's activities until long after filing this suit, resolving the liability in a "no-admissions" settlement in 2013.  But even if the doctrine worked in the manner the FDIC suggests, the FDIC cannot obtain summary judgment on this fact-bound, equity-driven doctrine.

Finally, in a last-ditch effort, the FDIC argues that this Court should deem Colonial Bank the statutory purchaser of the certificates, even though it indisputably did not purchase the certificates.  The FDIC's argument relies almost exclusively on cases involving fraud claims under Section 10(b) of the Exchange Act of 1934, a substantially different statute with very different pleading requirements and liability standards.  The Section 10(b) private cause of action has *no* purchaser requirement, but is coupled with a stringent liability standard (including requiring the plaintiff to establish scienter and loss causation).  By contrast, the FDIC's claims here have a much more lenient liability standard that is coupled with a stringent standing requirement (including limiting the right to sue to the person who actually bought the securities).  The Supreme Court has

3

specifically admonished courts and litigants not to blend the securities statutes in the manner the FDIC seeks. Indeed, in dismissing the FDIC's claims against the depositor defendants in this action on the ground that liability under the ASA is limited to those who sold the securities to the purchaser (*see* ECF No. 204), this Court reinforced that the statutory limitations on standing have meaning and cannot, and should not, be brushed aside in service of the FDIC's "investor protection" arguments. Moreover, even if the FDIC could overcome its statutory hurdles to standing, the FDIC's arguments still rely on disputed facts, largely ignoring or otherwise minimizing the evidence that CBGI is the statutory purchaser of the securities.

For the reasons set forth below, Defendants respectfully request that the Court deny Plaintiff's motion. Moreover, because the Court can decide this issue as a matter of law in Defendants' favor, Defendants respectfully request that the Court grant Defendants' cross-motion.

## <u>STATEMENT OF FACTS</u>

### A.   CBGI Was An Independent Legal Entity Incorporated In Nevada To Shield Colonial Bank From Paying Alabama Corporate Taxes

Colonial Bank was an Alabama-based bank. (DSOF ¶ 1.)[1]  Alabama has a corporate income tax; Nevada does not. (DSOF ¶ 2.) In 1999, CBGI was incorporated in Nevada as a wholly-owned subsidiary of Colonial Bank. (PSOF ¶ 2.) CBGI was an investment holding company incorporated to purchase, trade, manage, and hold securities in its own name and, by virtue of being a Nevada corporation, avoid the need to pay Alabama state corporate tax. (DSOF ¶ 3.)

---

[1]   "DSOF" refers to Defendants' Statement of Undisputed Material Facts. "DRSOF" refers to Defendants' Responses to Plaintiff FDIC's Statement of Facts. "PSOF" refers to Plaintiff FDIC's Statement of Facts (ECF No. 375).

CBGI meticulously observed all corporate formalities necessary to maintain its corporate separateness from Colonial Bank. This permitted Colonial Bank to, among other things, shield millions of dollars in investment income from Alabama taxes. CBGI had its own corporate charter with Nevada's Secretary of State, its own articles of incorporation, and its own code of by-laws. (DSOF ¶ 4.) It had its own Board of Directors that held numerous meetings, of which minutes were kept. (DSOF ¶ 5.) It had employment agreements with its employees, including staff (Vice Presidents William Uelmen and Patrick Dorn) who were not affiliated with Colonial Bank. (DSOF ¶¶ 5-6.) When contracting with third parties, it "warrant[ed] and represent[ed]" that it was a "corporation in good standing in the state of Nevada." (DSOF ¶ 7.)

Notably, CBGI's contractual dealings with Colonial Bank likewise maintained the two entities' corporate separateness. A services contract between CBGI and Colonial Bank described Colonial Bank as "an independent contractor" that performed work for CBGI for which CBGI paid monthly fees. (DSOF ¶ 8.) When CBGI loaned money to Colonial Bank, Colonial Bank executed a promissory note that provided CBGI the "absolute unconditional right, in *its sole discretion*, to require [Colonial Bank] to pay the outstanding principal balance on demand." (DSOF ¶ 9 (emphasis added).)

**B.    CBGI Purchased And Continuously Held The At-Issue Securities**

CBGI purchased the at-issue certificates (the "Certificates") during the period January 2006 to September 2007. (DSOF ¶ 13.) CBGI purchased the Certificates in its own name, as demonstrated by the trade tickets documenting the purchases. (DSOF ¶ 19.) Thereafter, CBGI continuously held the Certificates in its own name until CBGI's dissolution on March 24, 2009. (DSOF ¶ 25.) Put another way, at no time between CBGI's purchase of the Certificates and its eventual dissolution did Colonial Bank ever hold the Certificates.

**C.      CBGI Dissolved In 2009 And Did Not Assign Its Securities Claims To
Colonial Bank**

On March 23, 2009, CBGI's Board of Directors executed a Unanimous Written

Consent (the "Written Consent"), which "authorized and directed" four specifically-enumerated

individuals—Mark Daigle, Brent Hicks, David Reimer, and Kamal Hosein—"to execute such

documents, instruments and contracts as said officer deems necessary to consummate the

liquidation and distribution of [CBGI's] assets to the sole shareholder: Colonial Bank."  (DSOF ¶

27.)  That is, the Written Consent did not itself purport to effectuate a distribution of assets but, by

its plain terms, "authorized" such a distribution and "directed" each officer to take further steps—

"execute" "documents, instruments and contracts"—to "consummate" the "distribution" of

CBGI's assets to Colonial Bank.  (DSOF ¶ 28.)

The next day, on March 24, 2009, one such officer, Kamal Hosein, executed a

Certificate of Dissolution for CBGI.   (DSOF ¶ 30.)  There is no evidence, however, that anyone

at CBGI took any steps to effectuate an assignment of CBGI's legal claims to Colonial Bank.

None of the four officers charged with effectuating the Written Consent, or the individuals who

were involved with purchasing the Certificates, recalls considering CBGI's legal claims as part of

the dissolution at all, let alone taking steps to assign CBGI's legal claims to Colonial Bank.  (DSOF

¶ 29.)

The FDIC contends that the Certificates were transferred to Colonial Bank as part

of CBGI's dissolution on March 24, 2009 (PSOF ¶ 57), although there is no specific,

contemporaneous document effectuating such a transfer (DSOF ¶ 31).  That same day, Colonial

Bank transferred the Certificates to an entity it created for the purpose of repackaging and reselling

the Certificates (and other RMBS) to investors, called the LVII Resecuritization Trust 2009-1 (the

"Resecuritization Trust").  (DSOF ¶ 32.)

On April 9, 2009, CBGI's Certificate of Dissolution was filed with the Nevada Secretary of State.  (DSOF ¶ 33.)

### D. After Colonial Bank Failed, The FDIC Stepped Into Its Shoes And Asserted CBGI's Claims Purportedly On Behalf Of Colonial Bank

On August 14, 2009, Colonial Bank failed after it was exposed that its senior executives had perpetrated "a multi-year, multi-faceted, multi-billion dollar fraud."  *Colonial BancGroup, Inc. v. PricewaterhouseCoopers LLP*, No. 2:11-cv-746, 2017 WL 8890271, at *2 (M.D. Ala. Dec. 28, 2017); DSOF ¶ 42.  That day, the Alabama State Banking Department closed Colonial Bank and named the FDIC as its Receiver.  (PSOF ¶ 1.)  Almost three years later, on August 10, 2012, the FDIC filed this action.  (DSOF ¶ 43.)[2]  After years of litigation, the operative Second Amended Complaint in this action asserts claims against Defendants under Section 11 of the Securities Act of 1933 ("Section 11") and Section 8-6-19(a) of the ASA.  (DSOF ¶ 44.)

### LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates there is "no genuine dispute as to any material fact" and that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. Pr. 56(a).  In evaluating the evidence, the Court construes the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences and resolving all ambiguities in its favor.  *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).  "Only when

---

[2]     The FDIC also filed two actions in Alabama state court, which were captioned *Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Credit Suisse First Boston Mortgage Securities Corp., et al.*, No. 03-CV-2012-901045.00 and *Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Morgan Stanley & Co., LLC, et al.*, No. 03-CV-2012-901036.00.  For ease of reference, Defendants refer to these actions collectively as *"Colonial Alabama."*  The court in *Colonial Alabama* issued two opinions on the FDIC's standing to assert the securities claims at issue in those actions.  *See* Declaration of Jisun Park, ECF No. 376 (hereinafter "PSOF Ex._") at Ex. 2 (Order on Motion to Dismiss); PSOF Ex. 85 (Order on Summary Judgment).  For the reasons set forth below, that court's opinions holding that the FDIC had standing in the Alabama actions were wrongly decided and should not be followed here.

no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Taggart v. Time Inc.*, 924 F.2d 43, 45-46 (2d Cir. 1991).  When multiple parties cross-move for summary judgment, the Court examines each motion on its own merits and in each case draws all reasonable inferences against the party whose motion is under consideration. *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 247 (S.D.N.Y. 2021).

## ARGUMENT

### I.      CBGI Could Not, And Did Not, Assign Its Securities Claims To Colonial Bank

The FDIC argues that CBGI "distributed" its securities claims to Colonial Bank upon dissolution, but CBGI's securities claims were personal to CBGI and could not, as a matter of law, be assigned to Colonial Bank.  Even if they could be assigned, the FDIC fails to establish that CBGI actually assigned the claims to Colonial Bank.

### A.      CBGI's Securities Claims Were Not Legally Assignable

Because CBGI was a Nevada corporation, Nevada law governs CBGI's ability to make assignments and distributions to Colonial Bank, as the FDIC concedes.  *See* Plaintiff's Memorandum of Law In Support of Its Motion for Summary Judgment On Its  Standing to sue Defendants For Violations of Securities Laws, ECF No. 374 ("Pl. Br.") at 6 n.6.  Thus, a threshold question—which the FDIC largely ignores—is whether Nevada law even permitted CBGI to assign (or "distribute," in the FDIC's terminology) its securities claims to Colonial Bank.  Nevada law indicates that CBGI's claims were not assignable as a matter of law.

Under Nevada law, personal claims such as tort and tort-like claims are generally not assignable.  As the Nevada Supreme Court has explained, "Nevada generally ***prohibits*** the assignment of tort claims on public policy grounds, as many tort claims are personal in nature and meant to recompense the injured party." *Reynolds v. Tufenkjian*, 461 P.3d 147, 152 (Nev. 2020) (emphasis added); *see also Maxwell v. Allstate Ins. Cos.*, 728 P.2d 812, 815 (Nev. 1986) (rejecting

the subrogation of tort claims via an insurance contract on public policy grounds); *Prosky v. Clark*, 109 P. 793, 794 (Nev. 1910) (recognizing that fraud claims are not assignable because they are "personal to the one defrauded").[3]  Defendants are not aware of any exception to this general rule that would apply to CBGI in this case, and the FDIC does not assert one.  *See* Pl. Br. at 5-9.  Instead, the FDIC argues that Nevada's distribution statute "does not exclude legal claims from the type of property that may be transferred."  Pl. Br. at 7 n.7.  As the Nevada Supreme Court recently explained, however, "Nevada is one of several jurisdictions that prohibits the assignability of certain causes of action, regardless of how the assignment is accomplished."  *Reynolds*, 461 P.3d at 150 & n.1 (rejecting argument that plaintiff could acquire an otherwise-non-assignable claim via a transaction styled as a "purchase" rather than an "assignment").[4]

       Here, the FDIC's Section 11 and ASA claims are personal to the purchaser of the securities because, like fraud and other misrepresentation-type tort claims, they are premised on alleged misrepresentations.  The FDIC alleges that Defendants made various "untrue or misleading statements" or allegedly "omitted to state many material facts that were necessary in order to make their statements not misleading."  *E.g.*, ECF No. 178 (Second Amended Complaint)  ¶¶ 8, 10; *see also* Pl. Br. at 1 (Plaintiff's motion seeks to establish standing to sue Defendants "for their untrue or misleading statements made in offering materials" for the securities they sold).  Indeed, the

---

[3]    The same is true under Alabama law.  *See In re Latimer*, 489 B.R. 844, 872 (Bankr. N.D. Ala. 2013) (quoting *All States Life Ins. Co. v. Jaudon*, 154 So. 798, 800 (Ala. 1934)) ("Under Alabama law . . . '[i]t seems to be well settled, as a general proposition under the common law, that a right of action arising from tort is nonassignable, and this rule has been applied to actions for fraud and deceit.'"); *Miller v. Jackson Hosp. & Clinic*, 776 So. 2d 122, 125 (Ala. 2000) (noting that the "general rule" is that there can be no "assignment of the right to recover for a purely personal tort").

[4]    For this reason, Plaintiff's invocation of cases applying the laws of other states has no bearing here.  Pl. Br. at 7. n.7 (citing cases applying the laws of the states of Washington and New York); *see also infra* at n.5 (distinguishing these cases).

Supreme Court has recognized that principles underlying Section 11 claims are similar to the common law tort of misrepresentation.  *Omnicare, Inc. v. Laborers Dist. Council Construction Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015) ("The reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading.  These principles are not unique to § 11: They inhere, too, in much common law respecting the tort of misrepresentation.").[5]

The FDIC largely glosses over this threshold question, citing only the general Nevada distribution statute and the *Colonial Alabama* decision.  However, the Nevada statute is silent as to whether, and to what extent, particular legal claims can be assigned, and nothing in its text indicates that its language permitting a corporation to "distribute" its property abrogated Nevada's long-standing prohibition against the assignment of claims that are personal in nature such as torts.  *See* Nev. Rev. Stat. § 78.288 (2009); *Hardy Cos., Inc. v. SNMARK, LLC*, 245 P.3d 1149, 1156 (Nev. 2010) ("In the enactment of a statute, the legislature will be presumed not to intend to overturn long-established principles of law, and the statute will be so construed unless an intention to do so plainly appears by express declaration or necessary implication."); *Shadow Wood HOA v. N.Y. Cmty. Bancorp*, 366 P.3d 1105, 1112 (Nev. 2016) (re-affirming *Hardy*); *Wilson v. Happy Creek, Inc.*, 448 P.3d 1106, 1111 (Nev. 2019) (same).

Moreover, the *Colonial Alabama* decision is not persuasive authority because that court did not address Defendants' arguments concerning the threshold question of whether CBGI was legally able to assign tort-like claims like the ones at issue here.  *See* PSOF Ex. 2 (Order on

---

[5]    Moreover, securities claims under Section 12 of the 1933 Act and Section 10(b) of the 1934 Act are not assignable.  *See, e.g.*, *Soderberg v. Gens*, 652 F. Supp. 560, 566 (N.D. Ill. 1987) (plaintiff who acquired securities that were purchased by insurance company after her husband died lacked standing to sue).

Motion to Dismiss) at 3 (observing only that Nevada law permits a corporation to "distribute assets" and that the Written Consent's language regarding "all assets" was "sufficiently broad to include any legal claims belonging to CBGI"); PSOF Ex. 85 (Order on Summary Judgment) at 6 (adhering to prior "conclusions of law").  Because CBGI's securities claims were not assignable as a matter of Nevada law, the FDIC does not have standing to pursue the securities claims as receiver for Colonial Bank.

### B.    Even If CBGI's Claims Were Assignable, CBGI Did Not Actually Assign Them To Colonial Bank

Although CBGI could not, as a matter of law, have assigned its securities claims to Colonial Bank, the FDIC fails to establish that CBGI assigned them as a matter of fact.  Instead, the FDIC points to a Written Consent which merely "authorized" (but did not execute) a distribution of assets and, in derogation of the well-worn summary judgment standard, pleads with this Court to grant all inferences *in its favor* to reach the counterfactual conclusion that CBGI assigned its securities claims to Colonial Bank.  The FDIC's argument has no merit.

The FDIC relies almost entirely on the language of the Written Consent to contend that, as a matter of fact, CBGI assigned its claims to Colonial Bank.  *See, e.g.*, Pl. Br. at 6 ("The Unanimous Written Consent is sufficient evidence that such a transfer of all assets, including CBGI's legal claims, took place.").  However, the Written Consent was *not* a self-executing document that actually assigned anything, let alone CBGI's securities claims.  Rather, by its plain terms, the Written Consent merely "authorized and directed" four CBGI officers to *take further steps*—such as "execut[ing] . . . documents, instruments, and contracts"—to "consummate the liquidation and distribution of [CBGI's] assets" to Colonial Bank.  (DSOF ¶ 27.)  There is no evidence that any such further step took place: no document, no instrument, no contract, no testimony.  (DSOF ¶ 29.)  Nor is there any evidence of a detailing of assets that could be distributed

that included CBGI's securities claims.  To the contrary, there is testimony from officers charged with effectuating the Written Consent, as well as the individuals involved with purchasing the Certificates, that they do not recall executing any instrument purporting to distribute CBGI's legal claims to Colonial Bank.  (*Id.*)

        The FDIC claims that "nothing more" was required.  Pl. Br. at 6-7.  But that assertion is not supported by the law or the facts.  As the FDIC notes, the Nevada statute states that "a ***board*** of directors ***may authorize*** and the ***corporation may make*** distributions to the holders of any class or series of the capital stock of the corporation[.]"  Nev. Rev. Stat. § 78.288 (emphasis added).  But that statute authorizes distinct actions: the Board may "authorize" distributions (which happened here) and the corporation may "make" distributions (which did not happen here).  That Nevada law permitted CBGI to make distributions is not dispositive of anything here, as there is no evidence that CBGI actually made a "distribution" of its legal claims to Colonial Bank.  If anything, this statute undermines the FDIC's argument that the Written Consent was "sufficient" to effectuate the distribution of CBGI's claims, as the statute expressly differentiates between what may be done by the Board ("authorize" distributions) and what may be done by the corporation itself ("make") distributions.[6]

---

[6]    Faced with an absence of Nevada authority supporting its position, the FDIC reaches to decisional law from other jurisdictions.  *See* Pl. Br. at 8.  These non-jurisdictional decisions are neither controlling nor relevant to the analysis.  *See Zimmerman v. Kyte*, 765 P.2d 905, 908-09 (Wash. Ct. App. 1988) (applying Washington law, and straining to affirm a trial court finding that a transfer occurred even though the appellant "did not ask the [trial] court to explain itself, so we do not know which theory of transfer the trial court adopted"); *Novo Trading Corp. v. Comm'r of Internal Revenue*, 113 F.2d 320, 321-22 (2d Cir. 1940) (applying New York law, and passing on an assignment that expressly allocated claims, such as "the claim for duty refunds [which] was allotted to [the stockholders] jointly"); *Comm'r of Internal Revenue v. Henry Hess Co.*, 210 F.2d 553, 555 (9th Cir. 1954) (federal tax case noting, without analysis, that a California corporation distributed a legal claim); *Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347(JGK), 2008 WL 4755760 (S.D.N.Y. Oct. 29, 2008) (applying New York law, and passing on an actual written assignment that provided that the assets of one entity "are hereby assigned, transferred and

In fact, the FDIC's argument that no further action was required is belied by Colonial Bank's actions when it established CBGI in 1999.  As reflected in the meeting minutes, on February 22, 1999, Colonial Bank's Board of Directors unanimously adopted "Resolutions of the Board of Directors of Colonial Bank Concerning Transfer Of Assets To CBGI Investment, Inc." (DSOF ¶ 10.)  Among other things, the Board "authorized and directed" Colonial Bank officers and Nevada Region president Richard L. Martucci, Sr. "to execute any documents and take any and all actions necessary to effect . . . the transfer of Securities from [Colonial] Bank to CBGI on such terms as they may deem advisable." (DSOF ¶ 11.)  On March 31, 1999, Mr. Martucci (signing on behalf of CBGI) and P.L. McLloed, Jr. (signing on behalf of Colonial Bank) executed an "Instrument Of Assignment And Transfer," in which Colonial Bank "hereby grant[ed], convey[ed], assign[ed], transfer[red], set over and deliver[ed] unto CBG Investment, Inc. . . . all of the assets, properties, rights and interests specifically described on Schedule I," which in turn listed out more than $450 million in securities. (DSOF ¶ 12.)  Thus, far from treating a board authorization as self-effectuating, Colonial Bank and CBGI executed a formal written assignment and transfer.

Furthermore, even if the Written Consent were self-effectuating (it was not), there is no evidence that CBGI intended to assign legal claims.  The Written Consent refers to the distribution of "all assets" of CBGI, but the term "assets" is not defined.  And there is no clear

---

conveyed" to a second entity, and distinguishing a New York appellate case, *Tycon Tower I Inv. Ltd. P'ship v. John Burgee Architect*, 234 A.D.2d 748 (3d Dep't 1996), where "no written or explicit assignment existed at all").  Moreover, although the FDIC repeatedly invokes cases applying New York law, it overlooks that New York's highest court has stated that for an assignment of claims to occur, there must be language that both "evinces that intent ***and effectuates*** the transfer of such rights." *Comm. of Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 25 N.Y.3d 543, 550 (2015) (emphasis added).  Here, there is no evidence that there was language "effectuat[ing]" the transfer of anything, let alone securities claims.

evidence that CBGI intended to assign its legal claims.  *See supra* at 13 (no relevant personnel recall considering CBGI's legal claims as part of the dissolution).  Even in jurisdictions that allow the assignment of personal claims (which Nevada does not), courts often require more direct and express language evincing an intent to assign legal claims than the generic "all assets" language in the Written Consent.  *See Comm. of Pa. Pub. Sch. Emps.' Ret. Sys.*, 25 N.Y.3d at 550 (for an assignment of claims to occur, there must be language that both "evinces that intent and effectuates the transfer of such rights"); *Novo Trading*, 113 F.2d at 321-22 (cited by FDIC) (assignment expressly referred to and allocated legal claims).

The FDIC next points to several actions that it contends took place subsequent to the March 23, 2009 Written Consent.  *See* Pl. Br. at 7 (CBGI ceased business operations; on March 24, 2009, CBGI no longer had any securities in its account; CBGI filed a certificate of dissolution with Nevada; Colonial Bank purportedly assumed CBGI's tax obligations).  But even if these post-Written Consent actions took place (and, as discussed below, Colonial Bank and the FDIC contested CBGI's tax obligations for years after the dissolution), they only underscore the absence of evidence of CBGI's assignment of its securities claims to Colonial Bank.  For example, the Written Consent "authorized and directed" four CBGI officers to execute documents to "consummate the liquidation."  (DSOF ¶ 27.)  Far from viewing this as a self-executing dissolution, CBGI took the affirmative step of executing a Certificate of Dissolution for CBGI and filing it with the Nevada Secretary of State.  (DSOF ¶ 33.)  Furthermore, although the FDIC points to evidence it claims evinces a transfer of CBGI's investments to Colonial Bank, there is no comparable documentation regarding legal claims.  (DSOF ¶ 29.)

The FDIC relies on the *Colonial Alabama* case, which found that the Written Consent was sufficient to establish an assignment of the securities claims.  Pl. Br. at 5-6; *see also*

PSOF Ex. 2 (Order on Motion to Dismiss) at 3; PSOF Ex. 85 (Order on Summary Judgment) at 6. But the Alabama court did not address the material facts noted above.  Additionally, the Alabama court ignored that the FDIC had previously represented to that court that this very issue was a question of fact for the jury:

- "We can debate [whether CBGI actually did make an assignment] for as long as the Court will suffer us to do so, but the outcome of it is going to be that there are unresolved questions of fact about it." (DRSOF ¶ 57.)

- "[T]he documents and testimony that the FDIC-R has presented create an issue of fact as to whether the CBGI's claims were validly transferred to its parent and sole shareholder, Colonial Bank." (*Id*.)

- "[T]here is a genuine dispute of material fact over whether sufficient action was in fact taken to distribute CBGI's assets to Colonial Bank." (*Id*.)

Nothing has changed.  The FDIC should not be permitted to abandon those representations here.

Finally, the FDIC suggests that this Court must find that CBGI assigned its securities claims to Colonial Bank, even in the face of an "ambiguous" factual record, because it would "make no sense for Colonial to leave any assets with an entity that it intended to dissolve." Pl. Br. at 8.  But that invitation for speculation is belied by Nevada statutory law on this very point, which provides for this precise outcome by permitting a dissolved corporation to pursue its legal claims.  Specifically, in a provision whose title includes the phrase "Continuation of corporation after dissolution for winding up and liquidating its business and affairs," the Nevada statute expressly provides that "[t]he dissolution of a corporation ***does not impair any remedy or cause of action available to or against it*** or its directors, officers or stockholders" that is commenced within either two years or three years depending on the type of claim at issue.  Nev. Rev. Stat. § 78.585(1) (emphasis added).  The statute further provides that the dissolved corporation "continues as a body corporate" for the purpose of prosecuting such claims:

> The corporation ***continues as a body corporate for the purpose of prosecuting and defending suits***, actions, proceedings and claims of any kind or character by or against it and of enabling it gradually to settle and close its business, ***to collect its assets***, to collect and discharge its obligations, to dispose of and convey its property, to distribute its money and other property among the stockholders, after paying or adequately providing for the payment of its liabilities and obligations, ***and to do every other act to wind up and liquidate its business and affairs, but not for the purpose of continuing the business for which it was established***.

*Id.* (emphasis added).  Thus, the FDIC entirely ignores that even after CBGI dissolved, it continued to exist for the purpose of prosecuting its securities claims, the proceeds of which (if meritorious) it could have distributed to its stockholder.  But CBGI did not do so here.[7]  Because there is no evidence that the securities claims were identified as assets to be distributed to Colonial Bank or that any actions were taken to effectuate an assignment of the securities claims, this Court should grant summary judgment to Defendants that CBGI did not assign its securities claims to Colonial Bank.  At a minimum, this Court should deny the FDIC's motion and let the jury decide whether Colonial Bank in fact assigned the securities claims to Colonial Bank.

## II.  Colonial Bank Cannot Invoke The *De Facto* Merger Doctrine To Create Standing To Sue On CBGI's Claims

As an alternative to its argument that CBGI "distributed" its claims to Colonial Bank (it could not and did not), the FDIC argues that Colonial Bank (and therefore the FDIC) has standing to sue over CBGI's securities purchases because CBGI purportedly "*de facto* merged"

---

[7]     Viewed in this light, the FDIC's citations to *Banque Arabe* and *Phoenix Light* (Pl. Br. at 8-9) are unavailing.  *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 151-52 (2d Cir. 1995) (applying New York contract law and interpreting a contract of assignment, not a board resolution authorizing further steps such as executing as-yet-nonexistent "contracts," and doing so in light of New York law—which differs from Nevada law—"adopting principles of free assignability of claims, including those of fraud"); *Phoenix Light SF Ltd. v. ACE Sec. Corp.*, No. 650422/2012, 2013 WL 1788007, at *3 (Sup. Ct. N.Y. County Apr. 24, 2013) (New York law) (where there was an express written assignment of all "causes of action," denying motion to dismiss on standing grounds because New York law would presume that "fraud" claims were included in such assignment, but granting "leave to renew" if discovery "demonstrate[s] that the right to assert such claims was never conferred").

into Colonial Bank.  Pl. Br. at 9-13.  That is, the FDIC seeks to invoke the *de facto* merger doctrine

to permit an acquirer (Colonial Bank) to step into the shoes of a defunct corporation (CBGI) to

assert the defunct corporation's rights (securities claims concerning certificates that CBGI

purchased).  But that is precisely the opposite of how the *de facto* merger doctrine works.  This

Court should reject the FDIC's attempt to improperly invoke this doctrine to manufacture standing.

In addition, even if the *de facto* merger doctrine were applicable here, the FDIC has not established

entitlement to summary judgment on this issue.

> **A.    The FDIC Misapplies The *De Facto* Merger Doctrine**

Under Nevada law, the *de facto* merger doctrine serves as an "exception" to the

"general rule" that "when one corporation sells all of its assets to another corporation the

***purchaser*** is not liable for the ***debts of the seller***."  *Vill. Builders 96, L.P. v. U.S. Labs., Inc.*, 112

P.3d 1082, 1087 (Nev. 2005) (quoting *Lamb v. Leroy Corp.*, 454 P.2d 24, 26-27 (Nev. 1969))

(emphasis added).  As the Nevada Supreme Court explained:

> The de facto merger exception permits courts to ***hold the purchaser*** of a business's
> assets ***liable*** for the ***seller corporation's conduct*** when the parties have essentially
> achieved the result of a merger although they do not meet the statutory requirements
> for a de jure merger.

*Id.*  Put another way, the *de facto* merger doctrine would allow a plaintiff to circumvent the

corporate liability shield that an entity such as Colonial Bank might otherwise be able to invoke

and allow that plaintiff to recover ***against Colonial Bank*** for the wrongful conduct of ***CBGI***.  The

doctrine does not exist to allow an acquiring entity such as Colonial Bank to invoke it offensively

to assert the rights of CBGI.

Tellingly, the FDIC cites no Nevada case that applies the *de facto* merger doctrine in the manner the FDIC proposes here.[8]  Likewise, although Nevada law governs the issue, the FDIC's Alabama cases also do not support the application of the *de facto* merger doctrine in the manner the FDIC seeks here.[9]  There is a good reason why this is the case: the *de facto* merger doctrine is a "judge-made rule that rests on general equitable principles" and seeks to balance (1) "the **successor corporation's rights to be free from liabilities** incurred by its predecessor" with (2) "the important interest involved in ensuring that **ongoing businesses are not able to avoid liability** by transferring their assets to another corporation that continues to operate profitably as virtually the same entity."  *Vill. Builders*, 112 P.3d at 1088 (emphasis added).  There is no valid equitable interest served in allowing a corporation to invoke corporate separateness as a shield where beneficial (here, Colonial Bank used its corporate separateness from CBGI to, among other things, avoid tax liabilities) only to subsequently ditch that separateness when convenient to seek

---

[8]    *See HD Supply Facilities Maintenance, Ltd. v. Bymoen*, 210 P.3d 183, 187 (Nev. 2009) (no discussion or application of *de facto* merger doctrine); *Vill. Builders*, 112 P.3d at 1090 (finding no *de facto* merger occurred); *In re RCS Cap. Dev., LLC*, No. AZ–12–1381, 2013 WL 3618550, at *10-11 & n.10 (9th Cir. Bankr. App. Panel July 16, 2013) (finding no error in bankruptcy court permitting a party to invoke the *de facto* merger doctrine to "establish that it properly assumed [predecessor's] liabilities through a merger"—while noting that there was no Nevada authority that had extended the use of the *de facto* this far and that "the facts of this case do not fit neatly" into the doctrine).

[9]    At most, the three cases cited by the FDIC stand for the non-controversial proposition that Alabama recognizes the *de facto* merger doctrine as a narrow exception to the general rule that a corporation does not assume the liabilities of another corporation when it has purchased assets from that corporation.  None of the cited cases even found that a *de facto* merger had occurred, let alone under the square-peg-round-hole facts on which the FDIC seeks to invoke the doctrine.  *See MPI Acquisition, LLC v. Northcutt*, 14 So. 3d 126, 128 (Ala. 2009) (reciting that one of the exceptions to the "general rule" that "where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor" is when "the transaction amounts to a de facto merger or consolidation of the two companies"); *Rivers v. Stihl, Inc.*, 434 So. 2d 766, 771 (Ala. 1983) (same); *Matrix-Churchill v. Springsteen*, 461 So. 2d 782, 785-88 (Ala. 1984) (affirming trial court finding of no *de facto* merger).

the benefit of the separate corporation's assets (here, CBGI's securities claims).  Accordingly, this

Court should deny the FDIC's motion and grant summary judgment to Defendants that the *de facto*

merger doctrine is not applicable to this action.

### B.    Even If The *De Facto* Merger Doctrine Could Be Invoked Here, The FDIC Has Not Established That One Occurred

Although the *de facto* merger doctrine cannot be invoked in the manner the FDIC

seeks here, the FDIC also fails to establish that CBGI *de facto* merged into Colonial Bank.  As a

threshold matter, the Nevada Supreme Court has instructed that the question of whether the *de*

*facto* merger exception can be invoked is generally left to the jury:

> If the plaintiff fails to make a prima facie showing of successor liability, summary
> judgment is appropriate.  However, if the plaintiff sets forth facts sufficient to
> establish a prima facie case of successor liability **under one of the exceptions**, the
> issue becomes one of fact, **which must be determined by the jury**.

*Vill. Builders*, 112 P.3d at 267-68 (emphasis added); *see also Peddie v. Spot Devices, Inc.*, No.

72721, 2018 WL 4781617, at *7 (Nev. Oct. 2, 2018) (same).  That is, even if this Court concluded

that the FDIC made a *prima facie* showing that the *de facto* merger doctrine applied, this would at

most create a factual issue for the jury.  It would not warrant summary judgment in the FDIC's

favor.

Beyond that, the FDIC has failed to demonstrate that a *de facto* merger occurred.

To start with, the *de facto* merger doctrine exists for situations where the parties "have essentially

achieved the result of a merger although they do not meet the statutory requirements for a de jure

merger."  *Vill. Builders*, 112 P.3d at 268-69.  As a factual matter, that is not what happened here.

It is not as if CBGI and Colonial Bank attempted a merger but failed to satisfy some of the statutory

requisites.  *See, e.g.*, Nev. Rev. Stat. Chapter 92A.100 et seq. (setting forth the statutory

requirements for merging pursuant to a "plan of merger").  Rather, there is conclusive evidence

that CBGI intended to dissolve, not merge with Colonial Bank.  Most notably, CBGI filed a

19

dissolution with the Nevada Secretary of State.  (DSOF ¶ 33.)  Beyond that, Colonial Bank treated the transaction as a dissolution for accounting purposes, as reflected in correspondence with its outside accounting firm (PwC) and internal emails discussing the accounting and tax treatment for the transaction.  (DSOF ¶ 34.)  Colonial Bank also told its outside counsel (Sonnenschein Nath & Rosenthal) to treat the transaction as a dissolution (rather than a sale), which caused its counsel to re-evaluate its prior legal opinions that were predicated on the transaction being a sale of assets.  (DSOF ¶ 35.)  Colonial Bank employees were aware that the transaction was being structured as a dissolution.  (DSOF ¶ 36.)

On June 3, 2009, several months after CBGI dissolved, Colonial Bank responded to a tax assessment by the Alabama Department of Revenue by representing that CBGI had dissolved, *but did not* assert that CBGI had merged into Colonial Bank.  (DSOF ¶ 38; PSOF Ex. 79 (Colonial letter) at FDIC_COL_AL_00516019) ("CBG Investments was dissolved on April 9, 2009.  Upon its dissolution, CBG Investments distributed its assets to Colonial Bank, N.A. ('Colonial Bank' and, together with CBG, CBG Investments, and CBG Nevada, the 'CBG Entities').").  Far from stating that CBGI had merged into the Alabama-based Colonial Bank, Colonial Bank asserted that "[t]he CBG Entities maintain that they have no nexus with the State of Alabama and that the Department does not have jurisdiction over the CBG Entities." (DSOF ¶ 39.)[10]

---

[10]    It was not until five years into this litigation that the FDIC's pleadings asserted that CBGI had "merged" into Colonial Bank.  In its initial complaint (filed on August 10, 2012) and first amended complaint (filed on September 13, 2013), the FDIC failed to mention CBGI at all, let alone that CBGI had purchased the Certificates, that it purportedly "distributed" its legal claims to Colonial Bank, and that it had "merged" into Colonial Bank.  *See, e.g.*, ECF No. 1 (Complaint) at ¶ 2 (referring to "the certificates that Colonial purchased"); ECF No. 72 (First Amended Complaint) at ¶ 2 (referring to "the purchase of the certificates by Colonial").  It was not until the Second Amended Complaint, filed on June 21, 2017, that the FDIC's pleadings even

In addition, the FDIC has failed to satisfy at least two of the factors necessary to establish a *de facto* merger—continuation of the enterprise; and the purchaser's assumption of the seller's obligations—which the Nevada Supreme Court has held is sufficient to defeat its application. *See Vill. Builders*, 112 P.3d at 273 ("Therefore, we conclude that a de facto merger does not exist when only two of the four factors exist.")[11]

Continuation of the Enterprise. The FDIC has failed to establish continuity of management, personnel, physical location, assets and general business operations between the purchaser and the seller. *See Vill. Builders*, 112 P.3d at 270; Pl. Br. at 10-11. As an initial matter, there was plainly no continuity of "physical location," as CBGI was located in Nevada whereas Colonial Bank at all times operated in Alabama. (DSOF ¶ 26.) Furthermore, the FDIC also argues that there was continuity of "assets." However, on the same day that the FDIC contends that CBGI's securities were "distributed" to Colonial Bank (March 24, 2009), Colonial Bank relinquished ownership of some of these securities to an entirely different entity (the resecuritization trust). (DSOF ¶ 32.) Thus, any chain of "continuity" of assets was almost immediately broken by the resecuritization transaction. Also, Nevada courts "pay special attention to whether the successor corporation operated under the same name and logo as its predecessor and whether the successor corporation hired the same upper level managers as its predecessor." *MOH Mgmt., LLC v. Michelangelo Leasing, Inc.*, No. 73920, 2019 WL 1437136, at *4 (Nev. Mar. 29, 2019) (finding factor was not satisfied where successor "did not operate under [predecessor's] logos or name" and only hired some of the predecessor's managers, but not any "upper level

---

acknowledged CBGI and advanced the contention that CBGI "distributed" "its legal claims" "to Colonial Bank." ECF No. 178 (Second Amended Complaint) at ¶ 5.

[11]    The other two factors are whether there is continuity of shareholders and whether the seller corporation ceased its ordinary business operations. *Vill. Builders*, 112 P.3d at 273.

managers"). Here, Colonial Bank did not continue to operate under the CBGI logo or name (PSOF ¶ 64), and there is no evidence that Colonial Bank hired either of the two CBGI officers who were not already Colonial Bank employees (DSOF ¶ 37).

Whether the Purchasing Corporation Assumed the Seller's Obligations. Although the FDIC claims that this factor is satisfied because Colonial Bank allegedly "assumed" CBGI's tax obligations (Pl. Br. at 12-13), that is incorrect. CBGI dissolved in April 2009. According to a June 2009 letter from Colonial Bank's attorneys, the Alabama Department of Revenue entered a preliminary assessment in May 2009 that CBGI owed corporate income tax for 2006 and 2007. (DSOF ¶ 40.) In response, Colonial Bank sent the state of Alabama a letter in which it *denied* CBGI's responsibility for any such tax obligation, asserting that CBGI had "no nexus with the State of Alabama and that the Department d[id] not have jurisdiction" over it. (DSOF ¶ 39.)

After Colonial Bank failed in August 2009 and the FDIC stepped in as its receiver, the FDIC continued to deny CBGI's tax liability for multiple years, as set forth in the 2013 settlement agreement relied on by the FDIC for this very point. (DSOF ¶ 41; *see also* PSOF ¶ 68 (citing PSOF Ex. 78 (Settlement Agreement).) For example, Alabama filed a proof of claim with the FDIC regarding its tax assessments in November 2009, and the FDIC *disallowed* the claim in February 2011. This forced Alabama to sue the FDIC and BB&T (which had assumed certain of Colonial Bank's assets and liabilities pursuant to a purchase and sale agreement, under which the FDIC agreed to indemnify BB&T for the tax claims). After the court dismissed the claim without prejudice in 2012, the FDIC, BB&T and Alabama reached a settlement agreement in 2013 "to avoid the risk and expenses attendant to litigation, and without any Party admitting liability[.]" (DSOF ¶ 41.) That record hardly establishes beyond dispute that Colonial Bank willingly "assumed" CBGI's liabilities. Indeed, the FDIC did not even "assume" CBGI's tax liabilities (if

making a payment to resolve a disputed litigation without admitting liability can even qualify as "assuming" responsibility) until more than a year after it filed this lawsuit purporting to assert CBGI's claims.

Accordingly, if this Court does not grant Defendants' cross-motion, it should deny the FDIC's motion because the FDIC failed to establish that there is no material dispute of fact concerning whether CBGI *de facto* merged with Colonial Bank.

## III.   Colonial Bank Was Not The Statutory Purchaser Of The Securities Purchased By CBGI

As a further alternative to its arguments that Colonial Bank obtained CBGI's statutory claims either by assignment or by *de facto* merger (which it could not and did not), the FDIC contends that Colonial Bank should be treated as the "statutory purchaser" of the Certificates despite undisputed record evidence that CBGI purchased and continuously held the Certificates. The FDIC seeks this incongruous ruling based on its contention that state and federal securities laws "protect investors" like Colonial Bank because Colonial Bank allegedly "made [the] purchase decisions and suffered harm as a result." Pl. Br. at 13. But Section 11 and the ASA only grant claims to the person who acquired the Certificates. That entity is CBGI, not Colonial Bank. This Court should reject the FDIC's attempt to stretch the applicable securities laws beyond the narrow standing rights granted by Congress and the Alabama Legislature.

### A.   Only CBGI, Who Actually Purchased The Certificates, Has Standing To Sue For The Claims Brought By The FDIC

Section 11 limits standing to "any person acquiring such security." *See* 15 U.S.C.A. § 77k(a). Similarly, Section 8-6-19 of the ASA provides a cause of action against an underwriter

"to the person buying the security from him." *See* Ala. Code § 8-6-19(a)(2).[12]   Despite plain statutory language that the cause of action belongs to the person who actually purchased or acquired the securities at issue, the FDIC asks this Court to find that Colonial Bank (who did not purchase the Certificates) should have standing due to the "remedial purpose of securities laws." Pl. Br. at 14.  But this Court's prior ruling dismissing the FDIC's claims against the depositor defendants reinforces that the statutory purchaser/seller requirements must be given effect and should not be overridden by broader appeals to "investor protection" that are implicated by standing rules for claims under a different statute—Section 10(b) of the 1934 Act—that has no purchaser requirement. *See* ECF No. 204 (Joint MTD Order) at 24 ("Because Section 8-6-19(a)(2) of the Alabama Securities Act and Section 12(a)(2) of the 1933 Act impose liability on the seller of a security to the party buying the security from him, the depositor defendants are liable only if they are 'sellers' under those statutes."); *id.* at 29 ("Because Colonial is not 'the person buying the security from' the depositor defendants, [the depositor defendants] are not liable to it for any violations of Section 8-6-19(a)(2). [(citing cases)].)"

Instead, the FDIC places considerable reliance on cases involving claims under Section 10(b) of the 1934 Act ("Section 10(b)").  But that statute differs fundamentally from the statutes at issue here in ways that render the FDIC's reliance profoundly misplaced.  In sharp contrast to Section 11 and the ASA, Section 10(b) contains no "person buying" or "person acquiring" requirement.  Indeed, Section 10(b) says nothing about who, if anyone, has a cause of action.  Section 10(b)—and Rule 10b-5 promulgated thereunder—provides only that "[i]t shall be unlawful for any person" to commit fraud "in connection with the purchase or sale of any security."

---

[12]    The FDIC appears to contend there is no meaningful difference between the verbs "purchase," "acquire," or "buy" for purposes of this motion. *See, e.g.*, Pl. Br. at 14 & nn.13-14.

Courts have, therefore, balanced the broad reach of Section 10(b) with more stringent pleading and proof requirements, such as requiring fraudulent intent and proof of loss causation. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976) ("There is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith. The catchall provision of [Section] 10(b) should be interpreted no more broadly."); *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021) ("Unlike claims under Section 10(b) of the Exchange Act, Section 11 claims do not require plaintiffs to plead loss causation.")

As numerous courts have recognized, this stands in sharp contrast to Section 11 (and Section 12 of the 1933 Act), which balance a lower pleading standard (proof of fraudulent intent and loss causation are not required) with a specifically-delineated standing requirement. "In contrast to their catchall cousin in the Exchange Act—section 10(b)—sections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more readily." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359-60 (2d Cir. 2010) (citations and internal quotation marks omitted); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009) ("Although sections 11 and 12(a)(2) of the Securities Act are narrower in scope than section 10(b) of the Exchange Act, a plaintiff bringing claims pursuant to sections 11 and 12(a)(2) need not plead several elements that are requisite to pleading adequately a claim pursuant to section 10(b)."). In fact, the Supreme Court expressly cautions against blending the expansive Section 10(b) with the more narrowly circumscribed provisions of Sections 11 and 12. *See Ernst*, 425 U.S. at 208-10. The Court "consider[s] it significant that each of the express civil remedies in the 1933 Act allowing recovery for negligent conduct"—Sections 11, 12, and 15—"is subject to significant procedural restrictions not applicable under s[ection] 10(b)." *Id.* at 208-09. In concluding that Section 10(b) claims (which have no "comparable" procedural restrictions) must be premised on

something more than "negligent wrongdoing," the Court reasoned that to hold otherwise would "nullify the effectiveness of [Congress's] carefully drawn procedural restrictions on these express actions [Section 11, 12 and 15 claims]." *Id.* at 210.

   Accordingly, the FDIC's reliance on Section 10(b) cases is misplaced. These cases merely show that courts have been willing to broaden the concept of standing in Section 10(b) claims to entities other than the direct, legal purchasers of securities.[13] But, and as discussed above, there is no sound basis to import this expansive view of standing in the context of the Section 10(b) claim that lacks any statutory purchaser requirement. Indeed, this Court correctly emphasized that the statutory purchaser/seller requirements in the ASA and the 1933 Act have meaning and must be given effect. *See generally* ECF No. 204 (Joint MTD Order).

   Even where courts have afforded standing to non-purchasers to pursue Section 10(b) claims, they have done so only in unusual circumstances not present here. For example, the FDIC cites a case where the defendant made the alleged misrepresentations to the non-purchaser plaintiff (an individual) "before [the purchasing entity] even existed, thus inducing him to involve himself in the transaction by borrowing $625,000 to establish the [purchasing entity] and personally guarantying repayment of one-half of its loan to purchase the [securities]."[14] That is

---

[13]  *See Norris v. Wirtz*, 719 F.2d 256, 259 (7th Cir. 1983) (claims under Section 10(b) and Rule 10b-5); *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 700 F. Supp. 2d 453, 462 (S.D.N.Y. 2010) (same); *Abbey v. 3F Therapeutics, Inc.*, No. 06 CV 409(KMW), 2009 WL 4333819, at *8 (S.D.N.Y. Dec. 2, 2009) (same); *Levenfeld v. Boyd*, No. 02 C 4735, 2003 WL 22532801, at *2 (N.D. Ill. Nov. 6, 2003) (same); *Walther v. Maricopa Int'l Inv., Corp.*, No. 97 Civ. 4816(HB), 1999 WL 64280, at *2 (S.D.N.Y. Feb. 9, 1999) (same); *United Dep't Stores, Inc. v. Ernst & Whinney*, 713 F. Supp. 518, 524 (D.R.I. 1989) (same); *Heyman v. Heyman*, 356 F. Supp. 958, 964 (S.D.N.Y. 1973) (same); *see also Ashland Inc. v. Oppenheimer & Co., Inc.*, 689 F. Supp. 2d 874, 889 (E.D. Ky. 2010) (viewing the Kentucky blue sky law at issue as "virtually identical to its federal counterpart, Section 10(b) and Rule 10b-5 promulgated thereunder" and interpreting it accordingly).

[14]  *See, e.g.*, *Grubb v. FDIC*, 868 F.2d 1151, 1161-62 (10th Cir. 1989) (granting non-purchaser plaintiff standing to bring a 10b-5 claim where the plaintiff formed the holding company that made

not what happened here, as CBGI was created seven years before Defendants sold the Certificates and for the broad purpose to make and hold investments in Nevada to shield Colonial Bank from Alabama's corporate income tax.  The FDIC also cites cases in which the defendant played a role in creating the plaintiff's corporate structure, which did not happen here.[15]  Additionally, the FDIC cites cases where a fiduciary purchased (or sold) securities on behalf of a beneficiary, and the beneficiary was permitted to sue the fiduciary—another circumstance not found here.[16]

While the FDIC cites a handful of cases outside the Section 10(b) context that interpret a person purchasing/acquiring/buying requirement, these cases are distinguishable on their facts.[17]  And, to the extent they purported to import a broader Section 10(b)-style standing

---

the purchases "*after* [the defendant] made the alleged representations, for the *sole purpose* of buying the [relevant] stock") (emphasis added).

[15]   *See, e.g., Walther v. Maricopa Int'l Inv., Corp.,* No. 97 CIV. 4816, 1998 WL 186736, at *1 (S.D.N.Y. Apr. 17, 1998) (defendants were plaintiff's "investment advisors" and "allegedly persuaded him to create the Bahamian offshore entities" that made the purchases); *Levenfeld*, 2003 WL 22532801, at *5 (defendant "created" the shell company to make the acquisition two days before the transaction was executed).

[16]   *See, e.g.*, *Ashland*, 700 F. Supp. 2d at 458 (plaintiff had standing to sue investment advisor for Section 10(b) and Rule 10b-5 claims); *Heyman*, 356 F. Supp. at 966 (beneficiary of residuary trust had standing to sue executor and trustees for Section 10(b) and Rule 10b-5 claims relating to the sale of the trust's assets).

[17]   *See Am. Bank & Tr. Co. v. Barad Shaff Sec. Corp.*, 335 F. Supp. 1276, 1279, 1281 (S.D.N.Y. 1972) (plaintiff had Section 12(a)(2) standing because—unlike Colonial Bank—"it actually received and paid for the stock"); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Nos. 10–2741–BLS1, 11–0555–BLS1, 2012 WL 3263786, at *1, 4 (Mass. Super. Ct. Mar. 14, 2012) (plaintiff had standing under Massachusetts blue sky law because the actual purchasers assigned their legal claims via thoroughly documented assignment contracts and power-of-attorney agreements, or, alternatively, by applying Section 10(b) case law); *In re Tremont*, Nos. 08 Civ. 11117, 11 Civ. 1687, 2013 WL 2257053, at *6-7 (S.D.N.Y. May 23, 2013) (plaintiff who directed investments through an esoteric life insurance policy had standing under the Texas Securities Act because, otherwise, "the injured party [plaintiff] would not be able to sue and the party that could sue [the insurance company] would not be injured"); *HB Holdings Corp. v. Scovill, Inc.*, No. 88 CIV. 7983, 1990 WL 37869, at *1-4 (S.D.N.Y. Mar. 26, 1990) (plaintiffs had standing to assert Section 10(b) and Section 12(a)(2) claims arising out of a merger where one of them succeeded to the claims by virtue of the merger and the other, the parent corporation conducting

doctrine onto Section 11 claims, those courts ran afoul of the Supreme Court's admonition against precisely that type of statute-blending.  For the same reason, the *Colonial Alabama* decision should not be viewed as persuasive authority here, as that court relied entirely on Section 10(b) cases to find that the FDIC had standing to assert the claims in that case and failed to heed the Supreme Court's admonition not to blend these distinct securities statutes.  *See* PSOF Ex. 2 *(Colonial-Alabama* MTD Opinion) at 3 (faulting Defendants for not citing a case "in which a court has determined that the definition of the words 'purchaser' and 'buyer' would differ among the Securities Exchange Act of 1934, the Alabama Securities Act, and the Nevada Securities Act"— even though there is no "purchaser" or "buyer" language in Section 10(b), as that statute focuses on "deceptive practices" of the seller and does not, by its plain terms, supply a private cause of action); *id*. at 4 (citing a subset of the 10(b) cases the FDIC cites here).

Finally, the FDIC mischaracterizes Defendants' position as advocating that "no party may pursue these claims" because CBGI dissolved.  Pl. Br. at 16.  That is false.  Defendants acknowledge that CBGI could have sued for these claims even after it dissolved.  As noted above, under Nevada law, "[t]he dissolution of a corporation *does not impair any remedy or cause of action* available to or against it," and the dissolved corporation "continues as a body corporate for the purpose of prosecuting and defending suits[.]"  Nev. Rev. Stat. § 78.585(1).  Here, CBGI made its own choice not to pursue the claims that the FDIC filed three-and-a-half years after CBGI's dissolution.  Because the FDIC's statutory purchaser arguments fails as a matter of law, this Court should deny the FDIC's motion and grant summary judgment to Defendants.

---

the merger, had created the merger subsidiary as part of and solely for the purpose of that single transaction and had been "first solicited" by defendants for the merger "before [the merger subsidiary] even existed"); *Vannest v. Sage, Rutty & Co, Inc.*, 960 F. Supp. 651, 658 (W.D.N.Y. 1997) (plaintiff, whose "shares were purchased by his IRA Rollover," was the "beneficiary of his self-directed IRA account").

**B.    The FDIC Failed To Establish That Colonial Bank Should Be Treated As The Statutory Purchaser Even Though CBGI Purchased The Certificates**

Although the FDIC's statutory purchaser argument fails as a matter of law, the FDIC also failed to establish as a matter of fact that it should be treated as the statutory purchaser of the Certificates.  To start, there is clear evidence demonstrating that Colonial Bank did not purchase the Certificates.  For example, the trade tickets and trade confirmations clearly identify CBGI as the purchaser of the Certificates.  (DSOF ¶ 19.)  Witnesses testified that CBGI purchased the Certificates.  (DSOF ¶ 25.)  Indeed, CBGI's purpose was to purchase, trade, manage, and hold securities in its own name to avoid the need to pay Alabama state corporate tax.  (DSOF ¶ 3.)[18]

The FDIC's attempts to overcome this undisputed evidence fails to eliminate factual disputes and establish that Colonial Bank was actually the statutory purchaser of the Certificates.  For example, the FDIC makes various claims about its interactions with Defendants that the FDIC asserts indicate that Colonial Bank was the purchaser.  But there is plenty of evidence on which a jury could reach the opposite conclusion.  *See Taggart*, 924 F.2d 43 at 45-46 ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").  For example, the FDIC claims that Colonial Bank, not CBGI, was solicited for the investment in the Certificates.  Pl. Br. at 17.  But there is also evidence that Colonial Bank employees would merely recommend or suggest securities purchases to CBGI, which had the discretion not to follow them.  (DSOF ¶¶ 16-17.)  Indeed, CBGI employees William Uelman and Patrick Dorn had the authority to make purchase decisions on CBGI's behalf and were involved in the decision-making process to purchase securities for CBGI.  (DSOF ¶¶ 14-16.)  Mr. Uelmen signed the trade tickets for the Certificates.  (DSOF ¶ 15.)  Moreover, documents from

---

[18]    The FDIC's claim that CBGI was created for the "sole purpose" of purchasing the Certificates (Pl. Br. at 17) is wrong but, at a minimum, disputed.

both Defendants and Colonial Bank indicate that CBGI was the purchaser of the Certificates, and Defendants sent trade confirmations regarding those purchases to CBGI.  (DSOF ¶ ¶ 22-25.)

The FDIC raises arguments claiming that Colonial Bank was, effectively, the real party in interest in these purchases.  But these arguments likewise at most raise jury issues.  For example, the FDIC argues that Colonial Bank "reviewed the offering materials" and "made the purchase decisions."  Pl. Br. at 17.  But the FDIC cites no evidence in support that anyone at Colonial ever received, let alone reviewed any prospectus supplement for the Certificates. (Instead, the FDIC cites to testimony about its personnel's general habits and practices.)  The prospectus supplements that the FDIC produced were found in the files of CBGI's servicer, M&I Portfolio Servicing ("M&I"), and put there as part of M&I's regular practice following the purchase of securities made on CBGI's behalf.  (DSOF ¶ 23.)  Further, according to witness testimony, Colonial's role was limited to making "recommendations" to CBGI about which securities to purchase (consistent with its contractual advisory role), and that CBGI employees, including Bill Uelmen, were involved in the "decision-making process" for purchasing securities on CBGI's account and had the ultimate authority to approve any securities purchase on CBGI's behalf.  Additionally, CBGI's Board of Directors reviewed and approved CBGI's investment policies and each purchase of securities made by CBGI.  (DSOF ¶¶ 8, 14-18.)

While the FDIC claims that Colonial Bank paid for the Certificates (Pl. Br. at 17), the evidence and testimony shows that all funds to pay for the Certificates came from CBGI accounts (DSOF ¶ 20), and that any money flowing from Colonial Bank to CBGI to help facilitate those purchases were treated as intercompany loans because Colonial owed that money to CBGI as a result of a $2.5 billion promissory note CBGI provided to Colonial (DSOF ¶ 21, PSOF ¶ 11).

And CBGI, as holder and owner of the Certificates, was entitled to receive, and did receive, the pass-through principal and interest payments on the Certificates.  (DSOF ¶ 24.)

The FDIC also claims that Colonial Bank, not CBGI, was "economically at risk" in the transaction.  Pl. Br. at 17.  But the evidence it relies on is far from undisputed.  For example, the FDIC claims that Colonial Bank executed a document whereby it pledged the Certificates as collateral.  Pl. Br. at 17.  But CBGI maintained ownership of the Certificates, and to the extent they were pledged as collateral by Colonial Bank, they were only lent to Colonial Bank pursuant to a Securities Lending Agreement.  (DRSOF ¶ 46.)  The same holds true for the FDIC's claims that it suffered "direct and calculable harm," Pl. Br. at 17, which is not borne out by the evidence on which the FDIC relies (DRSOF ¶¶ 48-54).  Rather, Colonial Bank's losses were the result of its own mismanagement and business decisions—not CBGI's purchase of the Certificates.  (DSOF ¶ 42; DRSOF ¶ 54.)  At the very least, these conflicting assertions and evidence demonstrate material disputes of fact that preclude summary judgment for the FDIC.

## CONCLUSION

For the reasons set forth above, the FDIC's motion should be denied and Defendants' cross-motion should be granted.

Dated:  New York, New York
        May 20, 2022

                              Respectfully submitted,



**SIMPSON THACHER & BARTLETT LLP   ORRICK, HERRINGTON & SUTCLIFFE LLP**


By:  */s/ Linton Mann III*          By:  */s/ Richard Jacobsen*
Andrew T. Frankel                   Richard Jacobsen
(afrankel@stblaw.com)               (rjacobsen@orrick.com)
Linton Mann III (lmann@stblaw.com)  Paul Rugani
425 Lexington Avenue                (prugani@orrick.com)
New York, New York 10017            Gregory D. Beaman
Telephone:  (212) 455-2000          (gbeaman@orrick.com)
Facsimile:  (212) 455-2502          51 West 52nd Street
                                    New York, New York 10019
*Attorneys for Defendant NatWest Markets*   Telephone:  (212) 506-5000
*Securities Inc. (f/k/a RBS Securities Inc.)*
                                    *Attorneys for Defendant Credit Suisse Securities*
                                    *(USA) LLC*