UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR COLONIAL BANK,

        *Plaintiff*,

    v.

FIRST HORIZON ASSET SECURITIES INC., *et al.*,

        *Defendants*.

Case No. 12-cv-6166-LLS

---

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ....................................................................................................... 5

    I.      THE FDIC SOLD THE REMIC SECURITIES TO BB&T AT THEIR
              BOOK VALUE PURSUANT TO THE PAA ...................................................... 5

            A.     The REMIC Securities Were Sold Pursuant To The PAA ...................... 5

            B.     The FDIC Cannot Avoid The Fact That It Sold The REMIC
                    Securities At Book Value By Claiming Mistake ...................................... 7

    II.     THE VALUE OF THE REMIC SECURITIES WAS NOT LEFT TO A
              LATER DETERMINATION ................................................................... 14

            A.     The FDIC Refused To Engage BB&T In A Bidding Process ................ 14

            B.     There Is No Evidence That The PAA's Adjustment Process Was
                    Thought To Be Applicable Or Even Considered ................................... 15

    III.   THE POST-SALE LETTER AGREEMENT CONFIRMS THAT THE
              REMIC SECURITIES SOLD AT THEIR BOOK VALUE .............................. 16

            A.     The Post-Sale Letter Agreement Did Not Modify The PAA But
                    Rather Confirmed The Sale Of The REMIC Securities At Book
                    Value ................................................................................................. 16

            B.     The Voluntary Refund The FDIC Provided To BB&T In The Post-
                    Sale Letter Agreement Is Legally And Factually Irrelevant ................... 18

CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Beasley v. Mellon Fin. Servs. Corp.*
   569 So.2d 389 (Ala. 1990) ........................................................................... 9

*Beecher v. Able*
   435 F. Supp. 397 (S.D.N.Y. 1975) .......................................................... 21

*Brown v. Butts*
   214 So.3d 1181 (Ala. Ct. Civ. App. 2016) ....................................... 10, 11

*Ex parte Perusini Constr. Co.*
   7 So.2d 576 (Ala. 1942) ....................................................................... 10, 11

*Genesee Cty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*
   825 F. Supp. 2d 1082 (D.N.M. 2011) ....................................................... 21

*Gray v. Bain*
   164 So.3d 553 (Ala. 2014) ......................................................................... 10

*Hargrove v. Tree of Life Christian Day Care Center*
   699 So.2d 1242 (Ala. 1997) ....................................................................... 10

*In re McKesson HBOC, Inc. Sec. Litig.*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................... 21

*Marvin's, Inc. v. Robertson*
   608 So.2d 391 (Ala. 1992) ......................................................................... 10

*McMahan & Co. v. Wherehouse Entm't, Inc.*
   65 F.3d 1044 (2d Cir. 1995) ...................................................................... 21

*Morgan Keegan & Co. v. Cunningham*
   918 So.2d 897 (Ala. 2005) ......................................................................... 21

*Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc.*
   2016 WL 3685210 (D. Kan. July 12, 2016) ....................................... 22, 23

*PPM Am., Inc. v. Marriott Corp.*
   853 F. Supp. 860 (D. Md. 1994) ............................................................... 21

**Statutes**

15 U.S.C. § 77k(e) ............................................................................................................ 21

15 U.S.C. § 77k(e)(2) ....................................................................................................... 21

Ala. Code § 8-6-19(a) ...................................................................................................... 21

**Other Authorities**

27 Richard A. Lord, *Williston on Contracts*
    § 70:112 (4th ed. 2022) ............................................................................................. 10

John D. Calamari & Joseph M. Perillo, *The Law of Contracts*
    § 9.26 (4th ed. 1998) .................................................................................................. 9

Defendants[1] respectfully submit this reply memorandum of law in further support of their motion for partial summary judgment concerning the price at which the FDIC disposed of the REMIC Securities.

## PRELIMINARY STATEMENT

The FDIC does not contest the dispositive facts that make summary judgment appropriate in Defendants' favor that the FDIC sold to BB&T the REMIC Securities at Book Value, or approximately $1.004 billion. These facts include the following: [2]

1. On August 14, 2009, the FDIC and BB&T entered into the PAA (*see* Plaintiff's Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts, ECF No. 382, ("PRSOF") ¶ 12);

2. Pursuant to the PAA, BB&T agreed, with limited exception not relevant here, to purchase all assets of Colonial Bank, including the Shared-Loss Securities (PRSOF ¶ 13);

3. The FDIC understood that the REMIC Securities were Shared-Loss Securities (PRSOF ¶ 35(c));

4. Pursuant to the PAA, BB&T agreed to purchase the Shared-Loss Securities at "Book Value" subject to a shared-loss agreement (*see* PRSOF ¶ 15);

5. The Book Value of the REMIC Securities was $1,004,268,498.26 (PRSOF ¶ 18);

6. Pursuant to the PAA, the terms of the PAA and the exhibits and schedules attached thereto, "embodies the entire agreement of the parties" and "supersedes all prior understandings or agreements, oral or written, between the parties" (PRSOF ¶ 22);

7. Pursuant to the PAA, the FDIC paid BB&T for purchasing Colonial Bank's assets and assuming its liabilities, and determined that amount using the REMIC Securities' Book Value (PRSOF ¶¶ 23, 24);

---

[1]     All capitalized terms have the same meaning as in Defendants' opening brief. ECF No. 358.

[2]     In identifying undisputed facts for purposes of this motion, Defendants do not concede or admit that Colonial Bank originally purchased the RMBS certificates that comprised the REMIC Securities, or that the FDIC, as receiver for Colonial Bank, has standing to pursue the claims asserted in this action. Rather, for the reasons set forth in Defendants' cross-motion for summary judgment, ECF No. 391, Colonial Bank did not purchase the RMBS certificates and the FDIC therefore lacks standing.

8.  Upon executing the PAA, ownership of the REMIC Securities transferred to BB&T (PRSOF ¶ 20); and

9.  In the post-sale letter agreement, the FDIC and BB&T "acknowledge[d]" that the REMIC Securities transferred to BB&T at their Book Value pursuant to the PAA (PRSOF ¶ 41).

These facts are undisputed, and they are dispositive. In its opposition, the FDIC has no credible response to them. Instead, it offers a number of arguments, often inconsistent with one another, that rely upon contortions of the evidence, testimony and law. As discussed below, the FDIC's arguments are meritless, and do not serve as a basis to deny summary judgment in Defendants' favor.

*First*, the FDIC argues that no agreement was reached with BB&T to purchase the REMIC Securities *at all* prior to the post-sale letter agreement because the schedule identifying the "Shared-Loss Securities" in the PAA was left blank. But the idea that BB&T did not purchase the REMIC Securities pursuant to the PAA is demonstrably incorrect. Pursuant to Section 3.1 of the PAA, BB&T agreed to purchase, with limited exceptions not relevant here, "all rights, title, and interest of [Colonial Bank] in and to all of [its] assets." *See* Beaman Decl. Ex. 9 (PAA) § 3.1.[3] There is no ambiguity that BB&T intended to, and did, purchase the REMIC Securities. It said as much in its public statements. It took possession of the REMIC Securities upon execution of the PAA. And it received payment from the FDIC that valued the REMIC Securities at their Book Value. In short, the FDIC's assertion that no agreement was reached is pure fiction.

---

[3]     All exhibit references are to the exhibits attached to the Declaration of Gregory D. Beaman, ECF No. 363, submitted in support of Defendants' opening motion ("Beaman Declaration"), or to the Declaration of Jisun Park, ECF No. 372, submitted in support of the FDIC's motion for summary judgment on the sale price issue ("Park Decl").

The FDIC's point seems to be that there is no evidence that the parties intended to treat the REMIC Securities as Shared-Loss Securities that would be sold at Book Value.  But the FDIC ignores testimony from its own corporate representatives who confirmed these facts.  The FDIC also ignores that it valued the REMIC Securities using their Book Value when determining the amount to transfer to BB&T.  Even the post-sale letter agreement—the FDIC's preferred evidence—acknowledges that the REMIC Securities are Shared-Loss Securities that transferred to BB&T at their Book Value.  At best, the evidence the FDIC has mustered shows that perhaps **BB&T** thought that the REMIC Securities would be sold at their market value.  And yet, even if true, it demonstrates a unilateral mistake on BB&T's part that does not provide a basis for this Court to conclude that the REMIC Securities did not pass to BB&T at their Book Value.

*Second*, the FDIC argues that it sold the REMIC Securities to BB&T at the time of the PAA, but at a price to be determined (and which was supposedly later determined in the post-sale letter agreement).  In support, the FDIC points to two provisions in the PAA, one providing that non-Shared-Loss Securities would be acquired at their "market value" and that if such a value was not available, a bidding process would occur to determine the price at which the securities would transfer; the other allowing the parties to make adjustments to the value of the assets and liabilities acquired by BB&T to account for bookkeeping errors of Colonial Bank.  In addition to directly contradicting the FDIC's theory above that there was no agreement to purchase the REMIC Securities pursuant to the PAA, this secondary theory finds no support in the factual record.  As discussed above, the FDIC understood the REMIC Securities were Shared-Loss Securities that passed to BB&T at their Book Value, which both the FDIC and BB&T later "acknowledge[d]" in the post-sale letter agreement.  Further, the FDIC's theory ignores that the FDIC refused to engage BB&T in any bidding process after executing the PAA for the REMIC

Securities.  Instead, it took the position that the REMIC Securities were Shared-Loss Securities, as confirmed by contemporaneous communications at the FDIC and between the FDIC and BB&T.  And there is no contemporaneous evidence in the record that either the FDIC or BB&T ever invoked or thought applicable the PAA's "adjustments" process.  In short, the FDIC's made-for-litigation assertion that it and BB&T put off determining the price of the REMIC Securities is baseless and provides no basis to deny summary judgment in Defendants' favor.

*Lastly*, the FDIC argues that the post-sale letter agreement amounted to a modification of the PAA which should be taken into account in assessing damages.  Not so.  The FDIC's assertion that the post-sale letter agreement modified the PAA is simply false.  Rather, that agreement "***confirms the mutual agreement***" of the FDIC and BB&T that as of the PAA closing date, the REMIC Securities "***were acquired by BB&T … [and] passed to BB&T for an aggregate amount equal to $1,004,268,498.45, which represents their aggregate Book Value.***"  Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_034500067 ¶ 5 (emphasis added).  Even if the assertion were true (it is not), by statute, the FDIC's Section 11 and Alabama Securities Act damages are capped at the price at which it disposed of the REMIC Securities, which was $1.004 billion.  Further, the law is clear that post-disposition events—whether they benefit the FDIC or not—are legally irrelevant and cannot be taken into account.  While the FDIC makes much out of the voluntary refund payment it made under the post-sale letter agreement in an amount equal to the difference in the Book Value and market value of the REMIC Securities, that payment was not made in recognition of any mistake by the parties that they had always meant to transfer REMIC Securities at their market value under the PAA.  Rather, as its own contemporaneous documents reflect, the FDIC made that payment, ███████████████████████████████████ ████████████████████████████████████████████.  While the wisdom of the

FDIC's policy decision is not before the Court, it is plainly improper for the FDIC to force Defendants to subsidize that decision by attempting to enhance the FDIC's damages here.

## ARGUMENT

### I.   THE FDIC SOLD THE REMIC SECURITIES TO BB&T AT THEIR BOOK VALUE PURSUANT TO THE PAA

#### A.   The REMIC Securities Were Sold Pursuant To The PAA

In attempting to create a factual issue where none exists, the FDIC argues that there was "no meeting of the minds" between the FDIC and BB&T to purchase the REMIC Securities "at all" prior to the post-sale letter agreement and that the PAA was an "unenforceable" contract as it concerns those securities. Plf.'s Opp. to Defs.' Motion for Partial Summary Judgment, ECF No. 380 ("Opp.") at 11, 13. The FDIC bases this argument on the fact that the PAA and its schedules do not identify the REMIC Securities to be purchased. *Id*. at 14, 25.

The FDIC's argument, however, finds no support in the record. As an initial matter, the fact that the REMIC Securities are not specifically identified in the PAA or its schedules proves nothing. Several of the PAA's schedules were left substantively blank, *see* Beaman Decl. Ex. 9 (PAA) at Schedules 2.1, 2.1(a), 3.1, 3.1(a), 3.5(l), 4.15A, 4.15B, 4.15C, 7, and 8, which, according to the FDIC's witnesses, was common given the quick turnaround time between the FDIC's take-over of a failed institution and the sale of its assets. Park Decl. Ex. 11 (Shibut FDIC 30(b)(6) Dep.) at 116:1-11 (testifying that ███████████████████████████ and that ███████████ ███████████████████████████████) (emphasis added). That does not mean that nothing was intended to be transferred. Indeed, if the FDIC were right, it would mean that BB&T assumed no liabilities and purchased no assets at all as a result of the PAA because both those schedules (2.1 and 3.1, respectively) were also either left blank or failed to specify the assets being sold. Even the FDIC does not argue that this is true.

Second, the FDIC's argument is plainly contradicted by (and ignorant of) PAA Section 3.1(a), which unambiguously provides that BB&T agreed to purchase "all assets" of Colonial Bank with limited exceptions not relevant here.  Beaman Decl. Ex. 9 (PAA) § 3.1(a).  It is also contradicted by the evidence and testimony from its own corporate representatives conclusively establishing that, upon execution of the PAA, the FDIC (i) transferred ownership of the REMIC Securities to BB&T;[4] and (ii) wired BB&T a payment for purchasing Colonial Bank's assets and assuming its liabilities that took into account the Book Value of the REMIC Securities;[5] neither of which would make sense if the parties did not understand and agree that BB&T was purchasing the REMIC Securities pursuant to the PAA.  The FDIC's argument is also at odds with BB&T's own contemporaneous presentation, made just days after the PAA's execution, in which it planned to tell investors that it had bought the REMIC Securities and intended to re-sell them,[6] which, again, would make no sense if it had not already purchased those securities.  Even the post-sale letter agreement "acknowledge[d]" that BB&T acquired the REMIC Securities pursuant to

---

[4]      *See* Beaman Decl. Ex. 1 (Held Dep. Tr.) at 21:14-17 ("Q. After August 14, 2009, is it fair to say that FDIC-R had transferred ownership of the re-REMIC certificates to BB&T? A. Yes."); *see also id.* at 21:24-22:4 ("Q. And other than loss sharing and gain sharing after August 14, 2009, is it correct that FDIC-R no longer had any claim of ownership with respect to the re-REMIC certificates? A. Yes."); *see also* Beaman Decl. Ex. 4 (Shibut Dep. Tr.) at 97:11-19 (explaining that ████████████████████████████████████████████████████████████████████████████████████████████████████████); PRSOF ¶ 20 (admitting that "[a]s part of the resolution of the parties' disagreement over the sale price, BB&T agreed that it had acquired the Re-REMICs as of August 14, 2009.").

[5]      Beaman Decl. Ex. 1 (Held Dep. Tr.) at 128:25-129:19 ("Q. [T]he re-REMIC certificates transferred to BB&T at $1,004,268,498.  Do you recall that? A. Yes. Q. And is that how much money the FDIC-R received for the re-REMIC certificates as of August 17, 2009? A. That was the value included in the computation of the initial wire . . . It's the consideration that was included in the calculation. Q. The consideration for the re-REMIC certificates? A. Right.").

[6]      *See* Park Decl. Ex. 18 (BB&T presentation) at CSFDICCOLAL003173711.

the PAA.  Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5 (the "parties acknowledge that (i) in accordance with Schedule 3.2 to the [PAA], the [REMIC Securities] were acquired by BB&T").  In short, the undisputed evidence conclusively establishes that the FDIC sold the REMIC Securities to BB&T pursuant to the PAA.

### B.    The FDIC Cannot Avoid The Fact That It Sold The REMIC Securities At Book Value By Claiming Mistake

Recognizing the absence of evidence supporting its argument that there was no agreement "at all" to sell the REMIC Securities, the FDIC argues that it and BB&T never agreed that the REMIC Securities would be sold at their Book Value because there was some confusion about whether the REMIC Securities would be treated as Shared-Loss Securities (which, pursuant to the PAA, would be sold at their Book Value).  Opp. at 1, 14.  But this argument is plainly contradicted by the post-sale letter agreement, pursuant to which the FDIC and BB&T both "acknowledge[d]" that "in accordance with Schedule 3.2 to the [PAA]" the "REMIC Securities passed to BB&T for an aggregate amount equal to $1,004,268,498.45, which represent their aggregate Book Value," Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5.  The parties' use of the past tense is significant, as it confirmed the reality that the FDIC had sold the REMIC Securities at their Book Value at the time of the PAA.[7]  This alone defeats the FDIC's argument that there was no meeting of the minds on price at the time of the PAA.

Moreover, the post-sale letter agreement affirmed the FDIC's position all along that the REMIC Securities were Shared-Loss Securities to be sold at their Book Value.  Indeed, the FDIC's own corporate representative confirmed that this is what the FDIC had in mind when

---

[7]    There is no evidence that the language of the post-sale letter agreement did not capture the parties' intent or accurately describe the reality of what happened.  Rather, the FDIC's corporate representative testified that the post-sale letter agreement was meant to "better reflect BB&T's understanding of what they were buying."  Beaman Decl. Ex. 2 (Stoner Dep. Tr.) at 88:12-19.

entering into the PAA.[8] ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.[9]  When

the FDIC wired payment to BB&T in consideration for BB&T assuming Colonial Bank's liabilities

and purchasing its assets, the FDIC determined that amount, in part, using the Book Value for the

REMIC Securities.[10]   And when BB&T subsequently raised the possibility of acquiring the

REMIC Securities at their market value, the FDIC initially refused to do so on the basis that the

REMIC Securities had sold at their Book Value.[11]   The evidence is so overwhelming that even the

---

[8]     *See* Beaman Decl. Ex. 1 (Held Dep. Tr.) at 23:8-10 ("Q. And were the re-REMIC certificates . . . shared-loss securities? A. We considered them that, yes."); *id*. at 24:15-18 ("Q. Does that mean that BB&T purchased the re-REMIC securities at book value? A. Subject to loss. They were purchased at book value subject to loss share."); *id*. at 129:17-19 ("Q. The consideration for the re-REMIC certificates? A. Right. It was a billion and four million[.]").

[9]     *See* Beaman Decl. 4 (Shibut Dep. Tr.) at 58:22-59:2 (confirming that ███████████████ ████████████████████████████████); Ex. 7 (Memo) at FDIC-C_COL-SDNY_00007276 & n.1 (explaining that ██████████████████████ █████████); *see also id*. at FDIC-C_COL-SDNY_00007277 (explaining that ██████████████████████ ████████████████████████████████████████████████████████████████████); Beaman Decl. Ex. 4 (Shibut Dep. Tr.) at 117:8-11 (confirming that ██████████████████ ██████████████████████████████████████████████████████).

[10]    *See* Beaman Decl. Ex. 1 (Held Dep. Tr.) at 128:25-129:19 ("Q. [T]he re-REMIC certificates transferred to BB&T at $1,004,268,498. Do you recall that? A. Yes. Q. And is that how much money the FDIC-R had received for the re-REMIC certificates as of August 17, 2009? A. That was the value included in the computation of the initial wire . . . It's the consideration that was included in the calculation. Q. The consideration for the re-REMIC certificates? A. Right. It was a billion and four million[.]");  Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007276 (explaining that ████████████████████████████ ██████████████████████████████).

[11]    *See* Park Decl. Ex. 20 (August 16, 2009 email chain) at FDIC_COL_03451302 (in response to request for "advice" on how to respond to BB&T's email that it was "going to get live bids from Credit Suisse and Deutsche Bank" on the REMIC Securities, FDIC noting that "Shared-Loss

FDIC admits in its Opposition that "[i]t is undisputed that the FDIC intended to treat the [REMIC Securities] as shared-loss securities that would sell for book value."  Opp. at 14.

This concession cannot be understated because it defeats any argument that the FDIC and BB&T were operating under the same misunderstanding that might justify disaffirming the PAA on the basis of some sort of "mutual mistake" or lack of meeting of the minds.  *Beasley v. Mellon Fin. Servs. Corp.*, 569 So.2d 389, 394 (Ala. 1990) (explaining that mutual mistake occurs where all parties to the contract "have agreed to the same terms and have mistakenly assumed that those terms were properly expressed in the instrument."); *accord* John D. Calamari & Joseph M. Perillo, *The Law of Contracts*, § 9.26 (4th ed. 1998) ("Mutual mistake can render a transaction voidable [] [w]here ***both parties share a common assumption about a vital existing fact*** on which they based their bargain and that assumption is false") (emphasis added).

Rather, after years of discovery, the only evidence that the FDIC could marshal demonstrates, at best, an apparent misunderstanding on BB&T's part about the REMIC Securities' price.  But even if that were true, the FDIC fails to acknowledge that BB&T's purported misunderstanding was, at most, temporary as BB&T later "acknowledge[d]" in the post-sale letter agreement the undisputed fact that it had bought the REMIC Securities at their Book Value pursuant to the PAA.  Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5.

---

Securities ('SLS') include private-label securities on Schedule 4.15C (which Herb [Held] said in his e-mail yesterday include any private-label securities on the books of the bank). Schedule 3.2 of the P&A says the Purchase Price of SLS is Book Value."); Park Decl. Ex. 21 (August 28, 2009 email) at FDIC_COL_03451309 (at BB&T's request, preparing list of all Shared-Loss Securities "held by Colonial and subs at failure" and identifying the REMIC Securities as Shared-Loss Securities); Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007278 (explaining that ███████████████████████████████████████████████████████████ ).

Further, BB&T's fleeting misapprehension is not the significant, contract-defeating event that the FDIC makes it out to be.  That is because under Alabama law,[12] a unilateral mistake as to consideration is ***not*** a basis to conclude that there was no meeting of the minds and, therefore, no contract.  *See, e.g.*, *Ex parte Perusini Constr. Co.*, 7 So.2d 576, 578 (Ala. 1942) ("A unilateral error, it has been said does not avoid a contract."); *Gray v. Bain*, 164 So.3d 553, 564 (Ala. 2014) (same); *accord* 27 Richard A. Lord, *Williston on Contracts* § 70:112 (4th ed. 2022) ("As a general rule, rescission is unavailable where a unilateral mistake is unknown to the other party (even though that mistake relates to a basic assumption of a contract and has a material effect on the agreed exchange of performances).").  The only exceptions recognized under Alabama law are when there has been fraud or misrepresentation by the non-mistaken party, or where the mistake about consideration is so "'out of all proportion to the value of the subject of negotiation and the other party realizing that a mistake must have been committed, takes advantage of it and refuses to let the mistake be corrected'" and which, in either instance, must be shown with "clear and convincing evidence."  *Brown v. Butts*, 214 So.3d 1181, 1190–91 (Ala. Ct. Civ. App. 2016) (quoting *Ex parte Perusini*, 7 So.2d at 578); *see also Gray*, 164 So.3d at 564–66 (describing

---

[12]     The PAA provides that "This Agreement … and the rights and obligations hereunder shall be governed by and construed in accordance with the federal law of the United States of America, and in the absence of controlling federal law, in accordance with the laws of the state in which the main office of the failed bank is located."  Beaman Decl. Ex. 9 (PAA) § 13.4.  Defendants are not aware of any "controlling federal law" on the question of contract formation and in its absence the law of Alabama should apply, which is where the main office of Colonial Bank was located.  The FDIC appears to agree, as it also cites to Alabama law as it concerns general contract formation principles.  *See* Opp. at 13 (citing *Marvin's, Inc. v. Robertson*, 608 So.2d 391, 393–94 (Ala. 1992) and *Hargrove v. Tree of Life Christian Day Care Center*, 699 So.2d 1242, 1246–47 (Ala. 1997)).  To be sure, the relevance of both *Marvin's* and *Hargrove* are limited, as neither address the question here of whether, and under what circumstances, a unilateral mistake as to consideration can prevent a contract from forming.  *See Marvin's, Inc.*, 608 So.2d at 393–94 (addressing whether a contract novation had occurred and, alternatively, whether the parties had entered into a new, oral contract); *Hargrove*, 699 So.2d at 1246–47 (addressing whether the plaintiffs had entered into an express contract with a daycare center).

circumstances that might justify avoiding a contract because of a unilateral mistake).  By contrast, where the evidence shows that the mistake is due to "'want of care or diligence,'" a party cannot avoid a contract notwithstanding its mistake, no matter how significant.  *Brown*, 214 So.3d at 1191 (quoting *Ex parte Perusini*, 7 So.2d at 578).

Not surprisingly, the FDIC does not attempt to argue that BB&T's mistake was the product of the FDIC's fraud or inequitable conduct.  More revealingly, though, the FDIC also does not argue or provide evidence that it was ***aware*** of BB&T's mistaken assumption that the REMIC Securities would sell at their market value during the bidding process for Colonial Bank's assets and negotiations over the PAA, or that it believed that the price it was offering was out of the ordinary and sought to take advantage of BB&T's apparent misunderstanding.  Rather, the FDIC admits that the first time it learned of BB&T's "mistake" was ***after*** the parties had executed the PAA.[13]  Moreover, the evidence shows that pricing the REMIC Securities at Book Value—██ ████████████████████████—████████████████████████.[14]  And the evidence shows that the FDIC did not try to "take advantage" of BB&T's "mistake" by holding it to the terms of the PAA; instead, ████████████████████████████████████████████████████

---

[13]    *See* Opp. at 14 (identifying August 16, 2009—two days after the PAA's execution—as when BB&T first "advised the FDIC of its intention to obtain bids from the Re-REMICs … according to the bidding provision in Section 3.2(b)(2) of the PAA"); Beaman Decl. Ex. 7 (Memo) at  FDIC-C_COL_SDNY_00007276  (████████████████████████████████████ ████████████████████████████████████████████); Park Decl. Ex. 13 (Sept. 2, 2009 email attaching August 28, 2009 BB&T memo) at FDIC-C_COL_AL_0080690 (explaining to the FDIC for the first time BB&T's understanding that the REMIC Securities would be sold at their market value).

[14]    Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007276-77 (explaining that ██ ████████).

- 11 -

██████████████████████████████████████████████████████.[15]  Thus, there is no

evidence (much less clear and convincing evidence) that BB&T's purported mistake was of the

kind that would allow for a finding that no contract was formed.

    If anything, the record shows that BB&T's claimed mistake was the product of its

own "want of care or diligence."  Indeed, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████.[16]  Further, the apparent source of BB&T's

confusion  was ████████████████████████████████████████████████████████████

██████████████████████████████████████████████  Park Decl. Ex. 9 at

FDIC-C_COL_AL_0083624 (emphasis added); Beaman Decl. Ex. 7 (Memo) at FDIC-

C_COL_SDNY_00007277 (explaining ████████████████████████████).  No evidence

is offered that BB&T ever followed up with the FDIC to clarify whether all or just some private

label securities held by Colonial Bank and its subsidiaries—including the REMIC Securities—

would  be sold subject to  loss  share  (and  therefore  valued  at  Book  Value  per  the  PAA),

---

[15]    Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007280-81 (recommending that
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████); Beaman Decl. Ex. 2 (Stoner Dep. Tr.) at 89:2
(explaining that the FDIC "basically gave [BB&T] a refund.").

[16]    Beaman Decl. Ex. 7 (Memo) at FDIC-C- COL_SDNY_00007276 (█████████████
████████████████████████████████████████████████████████████) (emphasis added); Park Decl. Ex. 11
(Shibut FDIC 30(b)(6) Dep.) at 116:1-11 (███████████████████████████████████████
███████████████████████████████████████████████████████████████████████); id.
at 131:22-132:20 (██████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████); Opp. at 23
(attempting to justify BB&T's mistake on the basis that "the sale not only involved a large bank
but was done on a particularly abbreviated timeframe due to the circumstances of the bank's failure
– just two weeks from the start of marketing to closing.").

██████████████████████████████████████████████████

████████████████████████. *See* Beaman Decl. Ex. 7 (Memo) at FDIC-

C_COL_SDNY_00007277.  Moreover, the FDIC identifies no evidence ████████████

██████████████████████████████████████████████████

████████████████████████████████████ the PAA states that

its terms and related schedules "embodie[d] the entire agreement of the parties" and "***supersedes***

***all prior understandings or agreements***, oral or written, between the parties."  Beaman Decl. Ex.

9 (PAA) § 13.1 (emphasis added).

Finally, while the FDIC makes much of the fact that the Memo says █████████

████████████████████████ it ignores that the Memo also noted that ███████████

██████████████ and concluded that ████████████████████████

██████████████████████████████████████████████████

████████▁██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████, Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007276-

80 (emphasis added), thus undermining how truly █████████████ BB&T's "mistake" actually

was.  While BB&T's purported mistake would have been unfortunate to BB&T (absent the FDIC's

voluntary business decision to honor it), it does not provide a basis for the FDIC to ignore the PAA

or impose the consequences of it on Defendants.[17]

_____

[17]     Contrary to the FDIC's suggestion, Defendants do not contend that BB&T "made up a story about being confused to renegotiate a lower price."  Opp. at 15–16.  Rather, Defendants contend that BB&T's purported, unilateral confusion provides no basis for this Court to set aside the $1.004 billion purchase price reflected in the PAA.

## II.   THE VALUE OF THE REMIC SECURITIES WAS NOT LEFT TO A LATER DETERMINATION

### A.   The FDIC Refused To Engage BB&T In A Bidding Process

Faced with overwhelming and irrefutable evidence that it always intended to sell, and did sell, the REMIC Securities at Book Value, the FDIC attempts to muddy the waters by arguing that the PAA "contemplated that some securities would pass from the FDIC to BB&T at closing 'with no price yet agreed upon,'" which later "would be determined by a post-closing bid submitted by BB&T", and that this was "precisely the process that BB&T believed applied to the" REMIC Securities.  Opp. at 23–24.  The FDIC bases this argument on the fact that, under the PAA, non-Shared-Loss Securities would be sold at their "market value" and that if no such value was available the parties would engage in a bidding process to determine value.  *Id*. (citing Park Decl. Ex. 14 (PAA) § 3.2(b)(2)).  Tellingly, however, the FDIC neither argues nor points to evidence that the REMIC Securities were actually sold at their market value.  That is because, as discussed at Part I.B *supra*, the evidence and testimony conclusively establishes that the REMIC Securities were sold at their Book Value, as the post-sale letter agreement later confirmed.  *See* Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5.

In arguing that BB&T "believed" that the bidding process applied to the REMIC Securities, the FDIC elides the fact that the FDIC itself was never under the misimpression that the REMIC Securities would be sold at their market value and refused to engage BB&T in any bidding process.  Indeed, as discussed in Part I.B *supra*, when BB&T first raised the possibility of bidding on the REMIC Securities at market value, the FDIC balked at the suggestion and resisted BB&T's efforts to pay a reduced value for those securities, believing that they had been validly sold at their Book Value, as FDIC witnesses confirmed.  *See supra* at nn. 5, 8, 10.  Even the Memo,

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████.   Beaman   Decl.   Ex.   7   (Memo)   at   FDIC-

C_COL_SDNY_00007280 (explaining ███████████████████). Thus, the fact that the PAA

contemplated a "bidding process" for other securities that BB&T "believed" applied is ultimately

irrelevant and does not change what actually happened.

### B.     There Is No Evidence That The PAA's Adjustment Process Was Thought To Be Applicable Or Even Considered

The FDIC further argues, somewhat inconsistently, that the PAA "contemplated a

months-long settlement process and post-closing adjustments," and that the wire payment the

FDIC made to BB&T that used the Book Value of the REMIC Securities was just "a 'first cut' or

'estimate' that was expressly subject to later adjustment under the [PAA]."  Opp. at 14, 23.  In

making this argument, the FDIC relies on PAA Section VIII which provides that "[i]n the event

any bookkeeping omissions or errors are discovered in preparing any Pro Forma statement or in

completing the transfers and assumptions contemplated hereby," and witness testimony explaining

generally the closing and adjustment process.  The relevance of this evidence is unclear, but to the

extent the FDIC is suggesting that the FDIC and BB&T believed that the PAA's "adjustments"

provision was applicable or had any bearing on the price at which the REMIC Securities would be

sold, that suggestion finds no support in the record.

The PAA allows for "adjustments" to the Pro Forma statement (a document the

FDIC prepared that "reflects a reasonably accurate financial statement of the Failed bank through

the date of closing" of the PAA) in the event either the FDIC or BB&T identified an omission or

error *in Colonial Bank's* own "bookkeeping" records.  *See* Beaman Decl. Ex. 9 (PAA) § 8.2

(describing circumstances when adjustment are appropriate).  For example, if the FDIC determined

that Colonial Bank's own financial records miscategorized or omitted particular assets or liabilities in its accounting records, or used incorrect accounting methods to categorize or value those assets or liabilities, those omissions or errors may have been incorporated into the FDIC's Pro Forma statement.  The PAA's adjustments provision allowed the FDIC and BB&T to correct the Pro Forma statement to fix Colonial Bank's errors and omissions.  Tellingly, there is no evidence in the record (and the FDIC cites to none) that BB&T's purportedly mistaken assumption that the REMIC Securities would be sold at their market value derived from an error or omission in Colonial Bank's own "bookkeeping" records that was then incorporated into the Pro Forma statement.[18]  In fact, the FDIC cites to no evidence at all that during the supposed "months-long settlement process" the FDIC or BB&T mentioned, let alone invoked, the PAA's "adjustments" provision as a basis for adjusting the value of the REMIC Securities (whether or not in the Pro Forma statement).  The PAA's adjustment process is not even mentioned in the Memo or the post-sale letter agreement as a basis or justification for the reimbursement payment to BB&T, which would be a curious, if not, glaring omission had the FDIC believed that the PAA's "adjustments" provision were applicable.  *See generally* Beaman Decl. Exs. 6 (post-sale letter agreement) & 7 (Memo).  Ultimately, there is no evidence that the adjustments provision was a factor in determining the price for the REMIC Securities and its existence is irrelevant to this motion.

## III.   THE POST-SALE LETTER AGREEMENT CONFIRMS THAT THE REMIC SECURITIES SOLD AT THEIR BOOK VALUE

### A.   The Post-Sale Letter Agreement Did Not Modify The PAA But Rather Confirmed The Sale Of The REMIC Securities At Book Value

Unable to refute the fact that it sold and transferred ownership of the REMIC Securities at their Book Value to BB&T pursuant to the PAA, the FDIC argues that the post-sale

---

[18]    BB&T's purported error seems to have come from ███████████████████████ ██████████████████████████████████.  *See* Part I.B & n.16, *supra*.

letter agreement was a "valid and enforceable modification" of the PAA that the Court must take into account when assessing damages.  The post-sale letter agreement, however, did not modify the PAA as it concerns the REMIC Securities.  Rather, according to the agreement's plain terms, the FDIC and BB&T:

> acknowledge[d] that (i) in accordance with Schedule 3.2 to the [PAA], the [REMIC Securities] were acquired by BB&T through its acquisition of the REMIC and such REMIC Securities passed to BB&T for an aggregate amount equal to $1,004,268,498.45, which represents their aggregate Book Value [ ] and (ii) the REMIC Securities Book Value was reflected in the calculation of the [wire payment made by the FDIC to BB&T] pursuant to Article VII of the [PAA].

Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5.  Even the part of the post-sale letter agreement providing that the FDIC would make a "reimbursement" payment to BB&T in an amount equal to the difference between the REMIC Securities' Book Value and their market value was expressly made "***effective as of the date of this letter agreement***" (*i.e.*, September 25, 2009), *id*. (emphasis added), making clear that the FDIC and BB&T were not revising or modifying the PAA to reflect that the REMIC Securities somehow were not actually sold to BB&T at their Book Value upon the PAA's execution.  The Memo ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████.  Beaman

Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007278-81.[19]

---

[19]     Thus, the FDIC's carefully-worded litigation contention that the post-sale letter agreement "was the first, and only, written agreement memorializing a purchase price that was agreed on by ***both BB&T*** and the FDIC" (Opp. at 16 (emphasis added)) is undermined by ████████████████

Importantly, other aspects of the post-sale letter agreement *did* amend the PAA. Specifically, the PAA contains a "Tax Indemnification" section pursuant to which "[t]he parties agree *to enter into an amendment to the [PAA] (an 'Amendment') which will specifically provide in Section 12.1(a) that the Indemnitees will be indemnified and held harmless against*," among other things, any fines, judgments or settlements associated with any "tax claims" asserted by the Alabama Department of Revenue against Colonial Bank or its subsidiaries.  Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450068 ¶ 11.  Thus, the FDIC and BB&T clearly knew when and how to modify the PAA when circumstances called for it.  That the FDIC and BB&T did not similarly amend the PAA to provide that the REMIC Securities were non-Shared Loss Securities or should have been sold at their market value only further confirms that the post-sale letter agreement was not intended to, and did not, amend or modify the PAA, but reflected a new agreement between the FDIC and BB&T to protect the FDIC's reputational interests.

**B.     The Voluntary Refund The FDIC Provided To BB&T In The Post-Sale Letter Agreement Is Legally And Factually Irrelevant**

The FDIC also argues that the voluntary refund payment that the FDIC provided to BB&T pursuant to the post-sale letter agreement must be taken into account because it is the amount "that the FDIC actually 'received'" for the REMIC Securities (after netting it from the REMIC Securities' Book Value) and therefore reflects the "economic reality of the transaction".  Opp. at 16, 20, 22, 26.  The FDIC, however, is mistaken that the voluntary refund payment was meant to reflect, or does reflect, the economic reality of the FDIC and BB&T's agreement, much less that it must be taken into account when assessing statutory damages in this action.

---

████████████████████████████████████████████████████████

██████████████████████████████████████ Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007278.

As discussed, the post-sale letter agreement confirmed that the REMIC Securities were sold at their Book Value pursuant to the PAA.  Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5.  That indisputably was the "economic reality" of the parties' transaction, as FDIC witness testimony confirmed.[20]  While the FDIC harps on the fact that the voluntary refund payment had the economic *effect* of reducing the amount the FDIC received for the REMIC Securities, the FDIC fails to even mention (let alone address) in its Opposition the fact that, according to its own documents, the voluntary refund payment was not intended to fix some error or mistake in the PAA so that it reflected the economic reality of the parties' agreement. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ Beaman Decl. Ex. 7 (Memo) at FDIC-C_COL_SDNY_00007280.  Importantly, ███████████████

██████████████████████████████████████████████████. *Id.* at FDIC-C_COL_SDNY_00007278 (███████████████████████████████████). ████

---

[20]   Beaman Decl. Ex. 1 (Held Dep. Tr.) at 128:25-129:19 ("Q. [T]he re-REMIC certificates transferred to BB&T at $1,004,268,498.  Do you recall that? A. Yes. Q. And is that how much money the FDIC-R received for the re-REMIC certificates as of August 17, 2009? A. That was the value included in the computation of the initial wire . . . It's the consideration that was included in the calculation. Q. The consideration for the re-REMIC certificates? A. Right."); *see also id.* at 21:14-17 ("Q. After August 14, 2009, is it fair to say that FDIC-R had transferred ownership of the re-REMIC certificates to BB&T? A. Yes."); *id.* at 21:24-22:4 ("Q. And other than loss sharing and gain sharing after August 14, 2009, is it correct that FDIC-R no longer had any claim of ownership with respect to the re-REMIC certificates? A. Yes."); Beaman Decl. 4 (Shibut Dep. Tr.) at 97:11-19 (explaining that ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████);
PRSOF ¶ 20 (admitting that "[a]s part of the resolution of the parties' disagreement over the sale price, BB&T agreed that it had acquired the Re-REMICs as of August 14, 2009.").



*Id*. at FDIC-C_COL_SDNY_00007280.

*Id*. at FDIC-C_COL_SDNY_00007281.

*Id*.[21]

     While the FDIC may have believed at the time that providing the voluntary refund was a sound business decision, it is completely irrelevant for purposes of assessing damages in this action.  That is because, under Section 11 and the ASA, damages are based on the "price" (under Section 11) or "value" the FDIC received (under the ASA) of the securities at the time they

---

[21]    This point is reinforced by the FDIC's own corporate representative, Lynn Shibut, who testified that ▮ and that ▮ including that ▮. Beaman Decl. Ex. 4 (Shibut Dep. Tr.) at 148:4-7, 148:15-149:8.  Moreover, the FDIC's contention that "the entire sale transaction was voluntary" misses the mark.  Opp. at 18–19.  While it is a truism that entering a contract (such as the PAA) is "voluntary," what matters here is that the FDIC voluntarily chose to relinquish its right to enforce the PAA as-written ▮. It is improper for the FDIC to pass the cost of that more than $300 million decision to Defendants.

were "disposed of" (*i.e.*, sold), 15 U.S.C. § 77k(e)(2); Ala. Code § 8-6-19(a); *Morgan Keegan & Co. v. Cunningham*, 918 So.2d 897, 906 (Ala. 2005) (ASA damages are the difference between the purchase price of the security "and the price at which it was sold"), and which, for the REMIC Securities, indisputably was the Book Value at the time of the PAA.

Moreover, courts are in agreement that the statutory language here provides the specific manner in which damages must be calculated and allows no exceptions. *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995) (the plain language of Section 11(e) prescribes the method of calculating damages, . . . and the court must apply that method in every case."); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1261 (N.D. Cal. 2000) (Section 11(e) "provides an exact measure of damages: 'the difference between the amount paid for the security . . . and . . . the price at which such security shall have been disposed of in the market before suit.") (quoting 15 U.S.C. § 77k(e)); *PPM Am., Inc. v. Marriott Corp.*, 853 F. Supp. 860, 876 (D. Md. 1994) (Section 11(e) "is unambiguous" and "admits of no exceptions").  Because of this, courts have long rejected arguments that different damages measures should apply, including those that take into account events that occur *after* the statutory cut-off dates that may increase or decrease damages.  *See, e.g.*, *Genesee Cty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1149–50 (D.N.M. 2011) (rejecting argument that because RMBS market was illiquid at time of lawsuit that plaintiffs could not recover Section 11 damages based on decline in market value of RMBS); *Beecher v. Able*, 435 F. Supp. 397, 410 (S.D.N.Y. 1975) (refusing to consider subsequent increase in security's market value after complaint was filed for purposes of assessing Section 11 damages, and holding that "[t]he time of suit value is the statutory cut-off.  In general, damages are frozen as of that date.  The defendant cannot be charged with declines unrelated to the falsity of the prospectus.  Neither can the defendant benefit

from a rising market, except to the limited extent provided for in § 11(e)(3).").  Thus, the FDIC completely misses the mark in attacking Defendants for supposedly wrongly focusing on the date when the FDIC actually transferred the REMIC Securities because it is just a "date on a calendar." Opp. at 22; *see also id.* at 12–13.  That date is critical because Section 11 and the ASA plainly say that the disposition date is dispositive for assessing damages.

The FDIC also completely misses the mark in accusing Defendants of "ignor[ing] and distort[ing] the FDIC's transaction with BB&T" and supposedly taking the position that the Court must ignore all evidence that occurred after the date of the PAA, including the post-sale letter agreement.  Opp. at 22.  To the contrary, Defendants readily acknowledge the existence of that evidence and, in particular, the post-sale letter agreement and the voluntary refund payment the FDIC made thereunder, and agrees that this evidence has bearing on when, and at what price, the FDIC disposed of the REMIC Securities, as discussed throughout.  What the FDIC fails to understand, and cannot dispute, is that the post-sale letter agreement and voluntary refund payment were not "part and parcel" or even "an integral piece of" the PAA, as the FDIC contends.  Opp. at 17, 22.  Indeed, it is not as if the FDIC and BB&T agreed when entering into the PAA that they would later address or revisit the purchase price of REMIC Securities.  There is no evidence of that, and the FDIC cites to none, as discussed in Part II *supra*.[22]  Rather, the FDIC's decision to

---

[22]    For this reason, the FDIC's attempt to distinguish *Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc.*, ("*NCUA*"), 2016 WL 3685210, at *4 (D. Kan. July 12, 2016), on the basis that the court held that the parties should look at the economic reality of the transaction rather than "each step in the process" goes nowhere.  Opp. at 22.  The part of the *NCUA* decision the FDIC cites addressed whether there had been a disposition at all in light of evidence that the NCUA had retained some control and interest in the securities in question.  *See NCUA*, 2016 WL 3685210, at *5.  That is not the situation here.  As explained above, the REMIC Securities were plainly "disposed of" for Section 11(e) and ASA purposes when the PAA was executed and the FDIC transferred ownership of the REMIC Securities to BB&T, following arm's-length negotiations, in exchange for their Book Value (which was incorporated into the FDIC's wire payment to BB&T).  *See supra* nn. 4,

voluntarily refund BB&T was made *after* the PAA was entered into and *after* the REMIC Securities had sold at their Book Value, ███████████████████████████████
███████████████████████████████████████. *See* Part I.B *supra.*
That is why the post-sale letter agreement, rather than modifying or amending the PAA, "acknowledge[d]" that the REMIC Securities had sold at their Book Value pursuant to the PAA and that the voluntary refund was only "effective" as of the later date of the post-sale letter agreement (*i.e.*, September 25, 2009).   Beaman Decl. Ex. 6 (post-sale letter agreement) at FDIC_COL_03450067 ¶ 5.   Had the PAA contemplated the voluntary refund payment and post-sale letter agreement, neither the language quoted above that was used in the post-sale letter agreement, █████████████ would have been necessary.   In sum, the economic reality is that the FDIC disposed of the REMIC Securities at their Book Value.   The FDIC's later voluntary refund payment, ███████████████████████, is legally and factually irrelevant. Section 11 and the ASA do not allow the FDIC to sell the REMIC Securities for one price, cut a post-sale voluntary refund check to the buyer over a month later ████████████████
███████████████, and force Defendants to pick up the bill for the difference as "damages."

---

5, 8 & 10, and the evidence cited therein. ████████████████████████████████
████████████, as its corporate representative confirmed.  Beaman Decl. Ex. 4 (Shibut Dep. Tr.) at 97:11-19.   As *NCUA* instructs, these undisputed facts are significant on the disposition issue.  *NCUA*, 2016 WL 3685210, at *4 (explaining that for there to be a disposition under Section 11(e), "the owner of the security must actually have given up control, in a substantive way, by transferring the security to an independent party.").

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' opening brief (ECF No. 358), this Court should grant Defendants' motion and enter partial summary judgment that the FDIC disposed of the REMIC Securities for $1,004,268,498.

Dated: June 10, 2022                              Respectfully submitted,

**ORRICK, HERRINGTON**                    **SIMPSON THACHER**
**& SUTCLIFFE LLP**                          **& BARTLETT LLP**

By: */s/ Richard Jacobsen*_____     By: */s/ Linton Mann III*_____
Richard Jacobsen                              Andrew T. Frankel, Esq.
(rjacobsen@orrick.com)                      (afrankel@stblaw.com)
Paul Rugani                                      Linton Mann III, Esq.
(prugani@orrick.com)                        (lmann@stblaw.com)
Gregory D. Beaman                          425 Lexington Avenue
(gbeaman@orrick.com)                      New York, New York 10017
51 West 52nd Street                          Phone: (212) 455-2000
New York, New York 10019
Telephone:  (212) 506-5000

*Counsel for Defendant Credit Suisse Securities*   *Counsel for NatWest Markets Securities Inc.*
*(USA) LLC*                                                   *(f/k/a RBS Securities Inc.).*