```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR COLONIAL
BANK,

                Plaintiff,

   - against -

FIRST HORIZON ASSET SECURITIES INC.
FIRST HORIZON HOME LOAN CORPORATION,
CREDIT SUISSE SECURITIES (USA) LLC,
DEUTSCHE BANK SECURITIES INC., FTN
FINANCIAL SECURITIES CORP., HSBC
SECURITIES (USA) INC., RBS
SECURITIES INC., UBS SECURITIES LLC,
and WELLS FARGO ASSET SECURITIES
CORPORATION,

                Defendants.

12 Civ. 6166 (LLS)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/3/23

    Plaintiff Federal Deposit Insurance Corporation (the "FDIC"), as Receiver for Colonial Bank, brought this action over Colonial Bank's purchase of securities that were issued or underwritten by defendants.

    As Receiver for Colonial Bank, the FDIC re-sold part of that purchase and accordingly reduces its claimed damages.

    Defendants NatWest Markets Securities Inc. ("defendant"), then known as RBS Securities Inc., and Credit Suisse Securities, LLC[1] challenge plaintiff's calculation of the amount of the reduction of damages.

---

[1] On July 14, 2022, after this motion and cross-motion were brought, plaintiff dismissed all claims against Credit Suisse with prejudice. (Dkt. No. 406).

1

## Background

The parties are well familiar with the facts and procedural history of this case. I will only recount the facts necessary to this particular decision.

Three non-agency residential mortgage-backed ("RMBS") certificates remain at issue in this case. They were purchased by a Colonial Bank wholly-owned subsidiary in 2007. Plaintiff's Counter 56.1 Statement ("Pl. Counter") (Dkt. No. 382) at ¶ 3. In March 2009, Colonial Bank "re-securitized" its RMBS certificates by placing them into a Real Estate Mortgage Investment Conduit; as a result, those RMBS certificates are referred to as "REMIC securities." Id. at ¶ 5.

On August 14, 2009, Colonial Bank failed, and the FDIC was appointed its Receiver.

In the weeks leading up to Colonial Bank's failure, the FDIC solicited bids from third parties to acquire Colonial Bank's assets, including the REMIC securities. TD Bank and Branch Banking & Trust Company ("BB&T") made bids.

On August 14, 2009, the FDIC entered into a Purchase and Assumption Agreement (the "P&AA") with BB&T, whereby BB&T acquired certain assets and liabilities of Colonial Bank. Id. at ¶ 13. The FDIC sold BB&T Colonial Bank's "Shared-Loss" Securities (those are carried at book value on Colonial Bank's books) and some non-loss share assets for their fair market

value. Id. at ¶ 15. Under the terms of the P&AA, the REMIC securities were Shared-Loss Securities sold for their book value of $1,004,268,498.00. Id. at ¶ 17. However, when the P&AA was executed, Schedule 3.2, which listed those of Colonial Bank's securities that were Shared-Loss Securities, was left blank. Defendant's Counter to Plaintiff's 56.1 Statement (Dkt. No. 386) ("Defs. Counter") at ¶ 17, 28.

On August 17, 2009, the FDIC made a wire payment to BB&T[2] pursuant to the P&AA, which accounted for the price of the REMIC securities at their book value. Pl. Counter at ¶ 23.

On August 28, 2009, the FDIC sent BB&T a list of the purchased assets, divided into Shared-Loss Securities and non-loss share assets. Defs. Counter at ¶ 31. That list showed that the REMIC were sold as a Shared-Loss Security for book value. Id. When BB&T received that list, it informed the FDIC of its belief that the REMIC securities were non-loss share securities that should have been purchased at their fair market value, not their book value. Beaman Declaration (Dkt. No. 363) ("Beaman Decl.") at Ex. 12.

BB&T's apparent misunderstanding of the nature of the securities, and the resulting purchase price, stemmed from a

---

[2] The FDIC made a payment to BB&T, as opposed to receiving a payment from BB&T, to offset part of a larger transaction, in which BB&T had assumed liabilities exceeding the value of the assets it bought. Pl. Response at ¶ 24.

perceived inconsistency between the summary information the FDIC provided bidders in early August 2009 and the actual terms of the P&AA. Id. BB&T stated that "given the information provided at the time of bidding, BB&T feels that it should not be asked to accept the securities at Colonial's carrying value and would seek to enter into negotiations with the FDIC to determine an appropriate market value for these securities." Id.

In response, FDIC Senior Economist Lynn Shibut prepared a memo explaining BB&T's confusion regarding the price of the REMIC securities and considering potential responses, including any potential harm to the FDIC's business reputation. Pl. Counter at ¶ 32, 34; Beaman Decl. at Ex. 7.

On September 25, 2009, the FDIC and BB&T entered an agreement (the "September 25th Agreement") that stated, in relevant part,

> The parties acknowledge that (i) in accordance with Schedule 3.2 to the Agreement, the securities in the portfolio of Colonial REMIC, LLC (the "REMIC") as of the Bank Closing (the "REMIC Securities") were acquired by BB&T through its acquisition of the REMIC and such REMIC Securities passed to BB&T for an aggregate amount equal to $1,004,268,498.45, which represents their aggregate Book Value ("the REMIC Securities Book Value") and (ii) the REMIC Securities Book Value was reflected in the calculation of the First Loss Tranche payment pursuant to Article VII of the Agreement. The parties hereby agree that effective as of the date of this letter agreement, BB&T shall be deemed to have acquired the REMIC Securities at an aggregate purchase price equal to $624,243,994.21, which represents 50% of the aggregate par value of the REMIC Securities, as allocated on Annex B ("the REMIC Securities Purchase Price"). BB&T and the

4

Receiver agree that the REMIC Securities Purchase Price reflects the fair market value of such securities.

Pl. Response at ¶ 41. The FDIC reimbursed BB&T the difference in price between the book value of $1,004,268,498.45 and the fair market value of $624,243,994.21, id. at ¶ 42, which is $380,024,504.24. As the result of this deduction, the FDIC netted the agreed fair market value of the REMIC Securities.

Under the 1933 Securities Act Section 11 ("Section 11") and the Alabama Securities Act (the "ASA"), the decisive figure determining the reduction of the FDIC's damages is the amount the FDIC received when it disposed of the securities. The FDIC says it received $624, 243, 994.21 (the $1,0004,268,498.45 BB&T paid, minus the $380,024,504.24 the FDIC returned to BB&T). The defendant says the FDIC received the book value of $1,004,268,498.45.

## Discussion

The damages formulas provided in Section 11 and Section 8-6-19(a) of the ASA govern the calculation of damages in this case. Under both statutes, a plaintiff's damages must be reduced by the amount for which plaintiff disposed of the securities. 15 U.S.C. § 77k(e)(2) (a suit for violation of Section 11 "may be to recover such damages as shall represent the difference between the amount paid for the security" and "the price at which such security shall have been disposed of in the market

5

before suit"); Ala. Code § 8-6-19(a) ("damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition").

Defendant says that shortly after the FDIC was appointed Receiver for the failing Colonial Bank, it disposed of those securities to BB&T for $1,0004,268,498.45 when it executed the P&AA. That, defendant says, is the significant transaction because it transferred ownership of the REMIC securities to BB&T. The defendant says that the issue ends at that point and that the later dispute with BB&T over the book value versus the fair market value categorization, which involved the extraneous consideration of the FDIC's business image, is unrelated and immaterial.

However, the execution the P&AA did not finally dispose of the REMIC securities for the purpose of calculating the FDIC's damages. It was one step in a series of negotiations and transactions between the FDIC and BB&T, beginning with the solicitation of bids in early August 2009 and ending with the September 25th Agreement, that defined the ultimate amount received for the securities.

To determine "whether an owner has truly ceded control of a security, it makes sense in this context to view the transaction together with related transactions, to determine the economic

6

reality of a series of related events—just as courts have done in other contexts." Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc., No. 11-2340-JWL, 2016 WL 3685210, at *4 (D. Kan. July 12, 2016) (citing In re Joseph Kanner Hat Co., 482 F.2d 937, 940 (2d Cir. 1973)). When determining transfer of ownership, courts resist looking "solely at each step in the process" to see whether a transfer occurred. Id at *5.

There is no genuine dispute that the execution of the P&AA was not the only transaction governing BB&T's purchase of the REMIC securities. The sale began with the solicitation of bids in early August 2009, and the summary information provided during that solicitation led to confusion regarding the terms of the P&AA. That confusion led to BB&T's objection to the sale of the REMIC securities at their book value and subsequent negotiations. Only the September 25th Agreement, which set the sale price of the REMIC securities at $624,243,994.21, remains.

Defendant contends that the FDIC's determination to protect its reputation following the execution of the P&AA shows that the FDIC believed the REMIC securities should have been priced at their book value. But that motivation is immaterial to the calculation of damages. The "clear goal of this provision of Section 11 is to measure a plaintiff's actual damages, and if the plaintiff received value while disposing of the security, the calculation of its actual loss must account for that value."

7

Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc., 2016 WL 3685210, at *4 (D. Kan. July 12, 2016).

There is no genuine dispute of material fact that the FDIC ultimately received $624,243,994.21 for the securities. That is the price that will be used to calculate damages at trial.

## Conclusion

The defendant's motion for partial summary judgment is denied and plaintiff's motion for partial summary judgment is granted.

So ordered.

Dated:   New York, New York
         March 3, 2023

*Louis L. Stanton*

LOUIS L. STANTON

U.S.D.J.